# EXHIBIT C

VIRGINIA:

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

FILED

2021 JUL 21 AM 9: 30

CIRCUIT COURT
LOUDOUN COUNTY, VA

TESTE: _____ D.C.

HARRY KAMIN,
**Individually and Derivatively on behalf of**
**BNG GROUP LLC**
      **Plaintiff,**

v.

      Case No:CL-21-1557

VALERIA GUNKOVA
      **Defendant.**

## AMENDED COMPLAINT

Harry Kamin, both individually and derivatively on behalf of BNG Group, LLC, by counsel, and pursuant to this Court's July 6, 2021 Order, hereby files the following Amended Complaint against Defendant Valeria Gunkova, and for his causes of action, states as follows:

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to Virginia Code § 17.1-513.

2.      This Court has general personal jurisdiction over Defendant Valeria Gunkova pursuant to Va. Code § 8.01-328.1(A).

3.      Venue of this Court is proper pursuant to Va. Code § 8.01-262 as the matters set forth herein relate to Defendant's business activity in Loudoun County.

## THE PARTIES

4.      Plaintiff Harry Kamin ("**Mr. Kamin**") is a resident of the state of Florida.  Mr. Kamin is a 50% Class A Member and co-Manager of BNG Group LLC ("**BNG**" and/or the "**Company**"). Mr. Kamin fairly and adequately represents the interests of the Company in

enforcing the rights of the Companies and in seeking to remedy Valeria Gunkova's conduct as set forth below.

5.     Upon information and belief, Defendant Valeria Gunkova ("**Ms. Gunkova**") is a resident of the Commonwealth of Virginia. Ms. Gunkova is the other 50% Class A Member of BNG and co-Manager of BNG. Ms. Gunkova cannot fairly and adequately represent the interests of the Company because it is Ms. Gunkova who has engaged in improper and fraudulent conduct in violation of the Company's Operating Agreement and Virginia law.

## STATEMENT OF FACTS

6.     On or about September 15, 2019, BNG was formed as a limited liability company in the Commonwealth of Virginia, with Ms. Gunkova being the sole member of BNG.

7.     At the time of BNG's formation, BNG rented office space located at 2 Pidgeon Hill Drive, Suite 120, Sterling, Virginia 20165.

8.     In or about February 2020, Ms. Gunkova's alleged husband, Jacob Bogatin ("**Mr. Bogatin**"), appeared at Mr. Kamin's home in Florida on behalf of Ms. Gunkova. Mr. Bogatin indicated that Ms. Gunkova was interested in buying the building located at 2 Pidgeon Hill Drive, Sterling, Virginia 20165 (the "**Property**") and needed Mr. Kamin's financial assistance in doing so. Mr. Bogatin, on behalf of Ms. Gunkova, represented that Mr. Kamin would be made a 50% Class A Member and Manager of BNG if he provided a payment for the purchase of his membership interest. Mr. Bogatin, on behalf of Ms. Gunkova, also represented that as Manager, Mr. Kamin would have full access to all Company bank accounts and that no decisions with regards to the Company would be made without Mr. Kamin's approval. Mr. Kamin indicated that he would consider Ms. Gunkova's proposal.

9.      Mr. Bogatin returned to Mr. Kamin's home on a second day.  During the visit, Mr. Bogatin, on behalf of Ms. Gunkova, spent several hours trying to convince Mr. Kamin to go into business with Ms. Gunkova. Mr. Bogatin, on behalf of Ms. Gunkova, repeated Ms. Gunkova's prior representations that Mr. Kamin would be made a 50% Class A Member and Manager of BNG, have full access to the Company's bank accounts, and decision-making power for the Company.  Mr. Kamin agreed that he would visit the Property to tour the Property and meet Ms. Gunkova in further consideration of Ms. Gunkova's proposal.

10.      In or around March 2020, Mr. Kamin travelled to Virginia for approximately one week per the parties' prior discussions. Mr. Bogatin picked up Mr. Kamin from the airport and introduced him to Ms. Gunkova. During his visit, Mr. Kamin explored the Property and attempted to speak with Ms. Gunkova about the business.  Mr. Kamin was informed that he was to direct all communications to Mr. Bogatin on behalf of Ms. Gunkova.

11.      During Mr. Kamin's visit, Ms. Gunkova and Mr. Kamin agreed to add Mr. Kamin as a 50% Class A Member and Manager of BNG.  Ms. Gunkova further agreed that Mr. Kamin would have full access to the Company's bank accounts and that no decisions or actions could be taken for the Company without Mr. Kamin's approval.  As a result of Ms. Gunkova's promises, Mr. Kamin agreed and issued and endorsed two checks, each in the amount of $25,000.00 on March 9, 2020 for the purchase of his membership interest in BNG.

12.      On or about May 14, 2020, Mr. Kamin again travelled to Virginia. During Mr. Kamin's second visit, Mr. Bogatin, on behalf of Ms. Gunkova, provided Mr. Kamin with a document believed by Mr. Kamin to be titled "Limited Liability Company Operating Agreement of BNG Group, LLC" (the "**Operating Agreement**"), a copy of which is attached hereto as

**Exhibit A.**[1] The Operating Agreement was presented to and signed by Mr. Kamin which memorialized the terms agreed to by Mr. Kamin and Mr. Gunkova, including (i) Mr. Kamin and Ms. Gunkova each are a 50% Class A Member and Manager of the Company; (ii) Ms. Gunkova is prohibited from taking unilateral action for the Company without the approval of Mr. Kamin; and (iii) Mr. Kamin has full access and control of the Company's finances and bank accounts. Mr. Kamin signed the Operating Agreement while at the Property, but was not given the original signed Operating Agreement or a copy thereof at that time.

13. At or around the time of the signing of the Operating Agreement, Mr. Kamin provided an additional two checks, each in the amount of $135,000.00, as a loan to the Company for operating expenses relating to the Company's plan to purchase the Property. Copies of Mr. Kamin's checks (with confidential account information redacted) are attached hereto as **Exhibit B.**

14. BNG submitted an offer to purchase the Property. A copy of the document believed by Mr. Kamin to be the Contract of Sale dated March 6, 2020 (produced by Ms. Gunkova as GUNKOVA_000098 through 000115) is attached hereto as **Exhibit C.**

15. BNG obtained financing for the Property loan through Atlantic Union Bank. Ms. Gunkova and Mr. Bogatin compiled all necessary documentation, including documentation from Mr. Kamin, and coordinated with Atlantic Union Bank to obtain the loan.

16. On October 30, 2020, BNG, through Mr. Kamin and Ms. Gunkova, closed on the purchase of the Property. BNG purchased the Property for $9,500,000. Mr. Kamin provided the down payment as a loan to the Company. Notably, the loan documents submitted and signed by

---

[1] As set forth below, Mr. Kamin is now unsure as to whether the Operating Agreement provided to him by Mr. Bogatin and Ms. Gunkova is a true and accurate copy of the Operating Agreement signed by Mr. Kamin on May 14, 2020. In the event the Operating Agreement was forged by Ms. Gunkova and/or Mr. Bogatin, Mr. Kamin's claims will proceed on the basis of the parties' oral agreement.

Mr. Kamin and Ms. Gunkova list Mr. Kamin as both a 50% Member and Manager of BNG. Copies of the relevant closing documents, which corroborate Mr. Kamin's 50% membership interest in BNG and his status as BNG Manager, are attached collectively as **Exhibit D.**

17.     Since becoming a Member in March 2020, Mr. Kamin requested information about the Company on a weekly basis. Ms. Gunkova failed to fulfill Mr. Kamin's requests and refused to provide Mr. Kamin with information about the Company's business and records.

18.     Eventually, on or around January 2, 2021, Mr. Bogatin and Ms. Gunkova shipped a box to Mr. Kamin containing three binders of documents. The box contained the Operating Agreement attached hereto as Exhibit A represented by Mr. Bogatin, on behalf of Ms. Gunkova, to Mr. Kamin to be the Operating Agreement signed by Mr. Kamin on May 14, 2020. Mr. Kamin confirmed that the terms included in the Operating Agreement believed by Mr. Kamin to be a true and accurate copy signed by him and delivered to him by Mr. Bogatin and Ms. Gunkova were consistent with the terms agreed upon by Mr. Kamin and Ms. Gunkova, including:

> a)  the "Company shall be managed by a Board of Managers". Section 5.1.3. The Board of Managers consisting of two (2) Class A Members (for which Mr. Kamin and Ms. Gunkova are the only Class A Members) shall be elected and be responsible for performing the major functions of the company. *Id.; see also* Section 5.1.3.3. Any action taken on behalf of the Company must be approved by both Class A Members, specifically,
>
>> The Board of Managers shall have full, exclusive and complete discretion, power, and authority…to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:…sell, convey, assign, mortgage or lease any real estate and any

personal property…Sell, dispose, trade or exchange Company assets…Enter into agreements and contracts…Execute or modify leases with respect to any part or all of the assets of the Company" *see* p. 15, Section 5.1.4 and 5.1.4.2;

b) "the Board of Managers shall not undertake any of the following without the approval of at least fifty-one percent (51%) of the Interests of the Members", including but not limited to any sale, lease or other disposition of the Company assets. Section 5.1.5;

c) "Except as otherwise provided in this Agreement, wherever the Law or this Agreement requires unanimous consent by the Board of Managers to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of all Managers." Section 5.2.6;

d) the "Board of Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business." Section 8.2.1; and

e) each Member has a right to inspect the books and records of the Company at any time. Section 8.2.2.

19.     Unbeknownst to Mr. Kamin at the time of his agreement to join the Company, Ms. Gunkova never intended to fulfill the promises she made (or directed Mr. Bogatin to make) to Mr. Kamin regarding his membership interest, his authority on behalf of the Company, and his access to financial accounts and company information. Ms. Gunkova simply made the representations to Mr. Kamin to induce Mr. Kamin into providing the finances Ms. Gunkova needed to purchase the Property.

20.     Beginning in December 2020, Mr. Kamin discovered that Ms. Gunkova was further violating the terms of the parties' agreement, including but not limited to:

    a) Ms. Gunkova unilaterally hired employees for BNG without the knowledge or consent of Mr. Kamin;

    b) Ms. Gunkova unilaterally entered into lease contracts with third-party tenants of the Property without the knowledge or consent of Mr. Kamin;

    c) Unbeknownst to Mr. Kamin, Ms. Gunkova signed an agreement with a real estate broker to begin listing the Property for marketing and sale in or around January 2021. Ms. Gunkova did not confer with Mr. Kamin prior to taking actions to list the Property for sale, nor did she obtain his consent to take such action;

    d) During his membership, Mr. Kamin has provided the Company with loans over the course of time that were requested by Mr. Bogatin on behalf of Ms. Gunkova. To date, Mr. Kamin has provided the Company with funds totaling no less than $2,529,342.78. Ms. Gunkova has directed those funds to activities outside of the Company, including for personal use by Ms. Gunkova and for use in Ms. Gunkova's other businesses;

    e) unilaterally making purported amendments to the Company's governance documents with Mr. Kamin's knowledge and/or approval.

21.     In or around January 2021, Mr. Kamin also learned that Mr. Bogatin had been indicted by a grand jury on no less than forty-five (45) felony charges including (i) RICO conspiracy, (ii) wire fraud, (iii) mail fraud, (iv) securities fraud, (v) filing false reports with the SEC, (vi) falsification of books and records, (vii) money laundering conspiracy, (viii) and money

laundering. A copy of the Grand Jury Superseding Indictment is attached hereto as **Exhibit E.**
The case remains pending against Mr. Bogatin.

22.     After repeatedly being shut out of Company business and after learning of Mr.
Bogatin's pending felony fraud charges, Mr. Kamin became increasingly concerned with his
investment. Mr. Kamin requested Ms. Gunkova provide him information related to BNG's bank
accounts in February 2021. Ms. Gunkova refused. Mr. Kamin attempted to receive the
information directly from the financial institutions, but was told repeatedly by such institutions
that the accounts only authorized Ms. Gunkova to request and receive such information.

23.     Mr. Kamin requested he be added as an authorized signatory to BNG's operating
account at TD Bank. Ms. Gunkova again refused. Ms. Gunkova instead offered to open a *new*
account and add Mr. Kamin as an authorized holder on the account.

24.     On February 9, 2021, Mr. Kamin, by counsel, sent Ms. Gunkova a letter objecting
to the sale of the Property and demanding certain information about the business of BNG. A
copy of the letter is attached hereto as **Exhibit F** and incorporated by reference as if fully set
forth herein.

25.     To date, all of Mr. Kamin's requests have been rejected by Ms. Gunkova.
Notwithstanding this Court's June 7, 2021, Order compelling Ms. Gunkova to provide Mr.
Kamin full and complete financial records of the Company, Ms. Gunkova has failed to do so and
continues to refuse Mr. Kamin's access to the bank accounts.

26.     Since receiving the February 9, 2021 letter, Ms. Gunkova has insisted that Mr.
Kamin is not a 50% Class A Member and/or Manager of BNG. Contrary to the Company's
Operating Agreement provided to Mr. Kamin by Ms. Gunkova and Mr. Bogatin, and documents
submitted by Ms. Gunkova and Mr. Kamin to the banks on October 30, 2020, Ms. Gunkova now

asserts that Mr. Kamin is only a 20% Class A Member and is not entitled to any Company information or management.

27.     Ms. Gunkova also directed the Company's taxes for the year 2020 to be filed indicating that Mr. Kamin holds only a 20% membership interest in the Company.  During the course of discovery, Mr. Kamin learned that an amended return was filed on June 2, 2021, indicating that Mr. Kamin does indeed hold 50% membership interest in the Company. Notwithstanding, Ms. Gunkova continues to assert that Mr. Kamin is not a 50% Class A Member and/or Manager.

28.     Additionally, Mr. Kamin has discovered, and continues to discover, that Ms. Gunkova committed forgery by creating fabricated documents and signing the documents on behalf of Mr. Kamin, including but not limited to:

     a) Unbeknownst to Mr. Kamin, Ms. Gunkova has held Mr. Kamin out to be a "Director" of her *other* business, Skin Logic LLC d/b/a Aria MediSpa, for which if Mr. Kamin has any involvement, Mr. Kamin is unaware.  A copy of the Property's directory created by and maintained by Ms. Gunkova is attached hereto as **Exhibit G**;

     b) Unbeknownst to Mr. Kamin, Ms. Gunkova created an email address for Mr. Kamin as "Harry@ariamedispa.com" and exchanged over a thousand pages worth of emails to the banks with a signature block affixed to the emails to give the appearance that Mr. Kamin was the sender. In fact, Mr. Kamin did not learn of Ms. Gunkova's fraudulent communications with Atlantic Union Bank using this email address until the emails were compelled by this Court to be produced by Ms. Gunkova in discovery in this case;

c)  Unbeknownst to Mr. Kamin, Ms. Gunkova and Mr. Bogatin created and
registered a business known as "Sterling Investment LLC" on behalf of Mr.
Kamin.  Ms. Gunkova and Mr. Bogatin fabricated a "Certificate of Organization"
purportedly issued on behalf of the Virginia State Corporation Commission
reflecting Mr. Kamin as "Director" of that entity, a copy of which is attached
hereto as **Exhibit H;**

d)  Mr. Kamin learned that at some point after the purchase of the Property, Ms.
Gunkova sent a letter to tenants of the Property and signed the letter as: "Harry D
Kamin Director and CEO BNG Group LLC harry@bnggroupllc.com". Mr. Kamin had
no involvement or knowledge of the letter and did not authorize anyone send out
the letter on his behalf.  A copy of the letter is attached hereto as **Exhibit I;**

e)  Ms. Gunkova fabricated an Operating Agreement purportedly signed by Mr.
Kamin on February 20, 2020.  Mr. Kamin has no knowledge of signing the
putative Operating Agreement and a review of the document indicates it has been
altered to be give the appearance that it was signed by Mr. Kamin.  A copy of the
February 20, 2020 forged Operating Agreement is attached hereto as **Exhibit J;**

f)  Ms. Gunkova fabricated a document titled "First Amendment to the Operating
Agreement of BNG Group LLC" dated March 14, 2020, and forged or caused to
be forged Mr. Kamin's signature to the document, a copy of which is attached
hereto as **Exhibit K;**

g)  Ms. Gunkova fabricated a document titled "Power of Representation" dated
March 14, 2020 and forged Mr. Kamin's signature to the document, a copy of
which is attached hereto as **Exhibit L**.  Additionally, Ms. Gunkova forged the

notary block and signature of notary public Fatima El-Hage by lifting the block

and signature from the Contract of Sale document (*see* Exhibit C) and pasting it to

the Power of Representation document to appear as if Ms. El-Hage had notarized

the Power of Representation document when in fact she confirmed she has never

met Mr. Kamin nor seen this document;

h) Ms. Gunkova fabricated a document titled "Membership Interest Transfer

Agreement" dated May 16, 2020, and forged Mr. Kamin's signature to the

document, a copy of which is attached hereto as **Exhibit M**;

i) Ms. Gunkova fabricated a document titled "Amendment No. 1 to Contract of

Sale" dated August 17, 2020, and forged Mr. Kamin's signature to the document,

a copy of which is attached hereto as **Exhibit N**;

j) Ms. Gunkova fabricated a document titled "Amendment No. 2 to Contract of

Sale" dated September 27, 2020, and forged Mr. Kamin's signature to the

document, a copy of which is attached hereto as **Exhibit O**;

k) Ms. Gunkova fabricated a document titled "Amendment No. 3 to Contract of

Sale" dated September 29, 2020, and forged Mr. Kamin's signature to the

document, a copy of which is attached hereto as **Exhibit P**;

l) Ms. Gunkova fabricated a document titled "October 29, 2020 Members Meeting"

dated October 29, 2020, and forged Mr. Kamin's signature to the document, a

copy of which is attached hereto as **Exhibit Q**;

m) Ms. Gunkova fabricated a document titled "Amended and Restated Operating

Agreement of BNG Group LLC" dated October 29, 2020, and forged Mr.

Kamin's signature to the document, a copy of which is attached hereto as **Exhibit R;**

n) Ms. Gunkova fabricated a document titled "Second Amendment to Operating Agreement of BNG Group LLC" dated October 29, 2020, and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit S**; and

o) Ms. Gunkova established and used (potentially still uses) an email account known as "harry@bnggroupllc.com" to send and receive emails purportedly on behalf of Mr. Kamin. Mr. Kamin was not aware of any email or user account set up for Mr. Kamin for his BNG business, including but not limited to "harry@bnggroupllc.com". Mr. Kamin has not been provided with the account login and/or password information, although he has requested such information. Accordingly, Mr. Kamin does not have access to the account(s) and is unable to determine what, if any, emails are being sent by the account purportedly on his behalf, or received by the account purportedly on his behalf.

## COUNT I: SPECIFIC PERFORMANCE

29. The allegations contained in Paragraphs 1 through 28 above are incorporated by reference as if fully set forth herein.

30. Pursuant to Section 9.3 of the Operating Agreement, Mr. Kamin and Ms. Gunkova agreed:

> that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions in this Agreement, any party who may be injured (in addition to any

other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

31.     Ms. Gunkova has certain obligations pursuant to the Operating Agreement, including to provide information to Mr. Kamin at his request.

32.     Ms. Gunkova has breached her obligations pursuant to the Operating Agreement.

33.     Mr. Kamin is entitled to an order of specific performance, compelling Ms. Gunkova to turn over all books and records of the Company and declaring that Mr. Kamin is a 50% Class A Member and Manager of BNG.

WHEREFORE, Harry Kamin respectfully requests this Court enter an order for specific performance in favor of Harry Kamin and against Valeria Gunkova, requiring Ms. Gunkova to turn over all books and records of the Company, including the information requested in the letter attached hereto as Exhibit A, and declaring Mr. Kamin as a 50% Class A Member and Manager of BNG, enjoining Ms. Gunkova from making any distribution of the Company's assets or sale of Company property (including the Property as defined above) until this action is resolved and Mr. Kamin's membership interest is confirmed, awarding attorneys' fees in favor of Mr. Kamin pursuant to Va. Code § 13.1-1045, and for other relief this Court deems just and proper.

## COUNT II: DECLARATORY JUDGMENT

34.     The allegations contained in Paragraphs 1 through 33 above are incorporated by reference as if fully set forth herein. Upon the agreement of Mr. Kamin and Ms. Gunkova, Mr. Kamin became a 50% Class A Member and Manager of BNG Group, LLC.

35.     Mr. Kamin is unaware of any amendment to the Operating Agreement or any transfer of membership interest made after he became a Member of BNG Group, LLC in March 2020.

36.     Ms. Gunkova has denied Mr. Kamin's his rights under the Operating Agreement and has insisted that Mr. Kamin is only a 20% Class A Member of the Company. As a result, Ms. Gunkova refuses to give Mr. Kamin access to manage and participate in the Company's business.

37.     This case presents an actual case or controversy and is otherwise appropriate for declaratory judgment pursuant to Va. Code § 8.01-184.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova, declaring Mr. Kamin as a 50% Class A Member and Manager of BNG, and for other relief this Court deems just and proper.

### COUNT III: BREACH OF CONTRACT
**(written contract pursuant to the Operating Agreement,
or in the alternative, if the Operating Agreement is found to have been forged by Ms.
Gunkova and/or Mr. Bogatin, oral contract pursuant to the parties' verbal agreement)**

38.     The allegations contained in Paragraphs 1 through 37 above are incorporated by reference as if fully set forth herein.

39.     Beginning in or around March 2020, Mr. Kamin and Ms. Gunkova entered into a valid and enforceable agreement to conduct business through BNG, with each party obtaining and holding 50% Class A membership interests.

40.     Pursuant to their agreement, Mr. Kamin and Ms. Gunkova each served as a Manager of the Company.

41.     Pursuant to their agreement, Ms. Gunkova has certain obligations, including to provide information to Mr. Kamin at his request.  Ms. Gunkova is prohibited from acting without the consent of Mr. Kamin in conducting the business of BNG.

42.     Ms. Gunkova has breached the agreement, including but not limited to unilaterally:

    a) Hiring employees of the Company;

    b) Hiring her husband, Mr. Bogatin, as a consultant of the Company;

    c) Entering into lease contracts on behalf of the Company with third-parties;

    d) Hiring a real estate broker to list and sell the Property;

    e) Forging documents purportedly signed by Mr. Kamin;

    f) Converting Company funds for personal use;

    g) Refusing the provide Mr. Kamin the books and records of the Company upon his request;

    h) Concealing the Company's financial accounts by failing to authorize Mr. Kamin access to the bank accounts;

    i) Directing the Company's tax returns to be filed with erroneous information; and

    j) Disregarding Mr. Kami's rights as a Member of BNG Group LLC.

43.     As a result of Ms. Gunkova's breaches, Mr. Kamin has been damaged in an amount no less than $2,529,342.78.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova in an amount no less than $2,529,342.78, plus interest at the statutory rate, attorneys' fees pursuant to Va. Code § 13.1-1045, and for any other relief this Court deems just and proper.

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (Derivatively on behalf of BNG)

44.     The allegations contained in Paragraphs 1 through 43 above are incorporated by reference as if fully set forth herein.

45.     As a Manager of BNG, Ms. Gunkova is vested with special confidence and has fiduciary duties to act in the best interests of the Company.  Ms. Gunkova, in her capacity as Manager of the Company, is required to perform her duties in compliance with the terms of the Operating Agreement and with the laws of the Commonwealth of Virginia.

46.     Ms. Gunkova breached her fiduciary duties, including but not limited to forging Company documents, breaching the Company's Operating Agreement, and converting Company funds for her personal or other use.

47.     The actions of Ms. Gunkova were contrary to the terms of the Company's Operating Agreement and were willful, deliberate, and at times, a knowing violation of criminal law (with regards to the forgeries).

48.     As a result of Ms. Gunkova's misconduct, BNG has been harmed in an amount no less than $2,529,342.78.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin, derivatively on behalf of BNG Group LLC, and against Valeria Gunkova in an amount no less than $2,529,342.78, plus interest at the statutory rate, attorney's fees pursuant to Va. Code § 13.1-1045, and for any other relief this Court deems just and proper.

## COUNT V:   FRAUDULENT INDUCEMENT

49.     The allegations contained in Paragraphs 1 through 48 above are incorporated by reference as if fully set forth herein.

50.     Ms. Gunkova, through her agent Jacob Bogatin, made false and material misrepresentations to Mr. Kamin, including that Mr. Kamin would be transferred 50% Class A membership interest in BNG and would be a Manager of BNG, that Ms. Gunkova would be prohibited from acting without the consent of Mr. Kamin with regards to Company business; and that monies obtained from Mr. Kamin to the Company would be used for Company business and expenses.

51.     Ms. Gunkova made the aforementioned misrepresentations to induce Mr. Kamin into entering into a business agreement with Ms. Gunkova and into providing large sums of money to Ms. Gunkova (believed by Mr. Kamin to be for the Company).

52.     Ms. Gunkova never intended to fulfill her promises, and instead made the representations to obtain Mr. Kamin's money.

53.     Mr. Kamin relied upon Ms. Gunkova's statements, not knowing them to be false, and entered into the parties' agreement based on Ms. Gunkova's representations.

54.     As a result, Mr. Kamin was defrauded by Ms. Gunkova and has been damaged.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova in an amount no less than $2,529,342.78, plus interest at the statutory rate, punitive damages in the amount of $350,000, attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999), and for any other relief this Court deems just and proper.

### COUNT VI:  CONVERSION

55.     The allegations contained in Paragraphs 1 through 54 above are incorporated by reference as if fully set forth herein.

56.     Ms. Gunkova, through her agent Jacob Bogatin, made false and material misrepresentations to Mr. Kamin, including that Mr. Kamin would be transferred 50% Class A membership interest in BNG and would be a Manager of BNG, that Ms. Gunkova would be prohibited from acting without the consent of Mr. Kamin with regards to Company business; and that monies obtained from Mr. Kamin to the Company would be used for Company business and expenses.

57.     Mr. Kamin was the rightful holder of no less than $2,529,342.78 prior to Ms. Gunkova's fraudulent inducement of Mr. Kamin to loan those amounts to the Company.

58.     Ms. Gunkova wrongfully exercised dominion and control over no less than $2,529,342.78 by using the funds for her personal and other use without the consent of Mr. Kamin.

59.     As a result of Ms. Gunkova's conversion of Mr. Kamin's funds, Mr. Kamin has been damaged in an amount no less than $2,529,342.78.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova in an amount no less than $2,529,342.78, plus interest at the statutory rate, punitive damages in the amount of $350,000, attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999), and for any other relief this Court deems just and proper.

## COUNT VII: JUDICIAL EXPULSION PURSUANT TO VA. CODE § 13.1-1040.1(5)(a)

60.     The allegations contained in Paragraphs 1 through 64 above are incorporated by reference as if fully set forth herein.

61.     Mr. Kamin is a 50% Class A Member of BNG Group, LLC with standing in BNG Group, LLC to request the judicial expulsion of Ms. Gunkova.

62.     Ms. Gunkova has engaged in wrongful conduct, including but not limited to converting Company funds for her personal or other use, disregarding Mr. Kamin's rights as a Member, and forging Company documents purportedly signed by Mr. Kamin.

63.     Ms. Gunkova's wrongful conduct has adversely and materially affected the business of BNG Group, LLC.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova, judicially expelling and dissociating Ms. Gunkova as a Member of BNG Group, LLC pursuant to Va. Code § 13.1-1040.1(5)(a), terminating Ms. Gunkova's rights to participate in the management and affairs of the Company, any other relief this Court deems just and proper.

**COUNT VIII: JUDICIAL EXPULSION PURSUANT TO VA. CODE § 13.1-1040.1(5)(b)**

64.     The allegations contained in Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

65.     Mr. Kamin is a 50% Class A Member of BNG Group, LLC with standing in BNG Group, LLC to request the judicial expulsion of Ms. Gunkova.

66.     Ms. Gunkova has committed willful and/or persistent material breaches of the Company's Operating Agreement, , including but not limited to converting Company funds for her personal or other use, disregarding Mr. Kamin's rights as a Member, and forging Company documents purportedly signed by Mr. Kamin.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova, judicially expelling and dissociating Ms. Gunkova as a Member of BNG Group, LLC pursuant to Va. Code § 13.1-1040.1(5)(b), terminating Ms. Gunkova's rights to participate in the management and affairs of the Company, any other relief this Court deems just and proper.

### COUNT IX: JUDICIAL EXPULSION PURSUANT TO VA. CODE § 13.1-1040.1(c)

67.     The allegations contained in Paragraphs 1 through 66 above are incorporated by reference as if fully set forth herein.

68.     Mr. Kamin is a 50% Class A Member of BNG Group, LLC with standing in BNG Group, LLC to request the judicial expulsion of Ms. Gunkova.

69.     Ms. Gunkova has engaged in conduct that makes it not reasonably practicable to carry on the business of the Company with Ms. Gunkova as a member, including but not limited to converting Company funds for her personal or other use, disregarding Mr. Kamin's rights as a Member, and forging Company documents purportedly signed by Mr. Kamin.

WHEREFORE, Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova, judicially expelling and dissociating Ms. Gunkova as a Member of BNG Group, LLC pursuant to Va. Code § 13.1-1040.1(5)(c), terminating Ms. Gunkova's rights to participate in the management and affairs of the Company, any other relief this Court deems just and proper.

### COUNT X: (In the Alternative) DISSOLUTION

70.     The allegations contained in Paragraphs 1 through 69 above are incorporated by reference as if fully set forth herein.

71.     Mr. Kamin is a 50% Class A Member of BNG Group, LLC with standing in BNG Group, LLC to request the judicial expulsion of Ms. Gunkova.

72.     The Operating Agreement of BNG Group, LLC (or alternatively, the parties' oral agreement) requires the approval of both Mr. Kamin and Ms. Gunkova for all purposes of managing and operating the Company's business.

73.     Ms. Gunkova has ignored and refused to recognize all of Mr. Kamin's rights as a Class A 50% Member and Manager of the Company.

74.     Ms. Gunkova and Mr. Kamin have disagreed, and will continue to disagree, on each and every major decision of the Company, including but not limited to distributions, expenses, spending, and obligations, which all require both parties to consent.

75.     As a result, the two 50% Class A Members of the Company are deadlocked.

76.     If Ms. Gunkova is not removed as a member pursuant to Va. Code § 13.1-1040.1(5)(a) and/or (b) and/or (c), it will not be reasonably practicable to carry on the business of the Company in conformity with the parties' agreement.

WHEREFORE, only if Ms. Gunkova is not removed as a member pursuant to Va. Code § 13.1-1040.1(5)(a) and/or (b) and/or (c), Harry Kamin respectfully requests this Court enter judgment in favor of Harry Kamin and against Valeria Gunkova, judicially dissolving the Company pursuant to Va. Code § 13.1-1047, any other relief this Court deems just and proper.

**A TRIAL BY JURY IS DEMANDED.**

**Respectfully submitted,**

**HARRY KAMIN,**
**By Counsel**

_____

Bethany R. Benes, VSB No. 85408
BETHUNE BENES, PLLC
4290 Chain Bridge Road, Suite 302
Fairfax, VA 22030
Tel: (703) 260-9322
bbenes@bethunebenes.com
*Counsel for Harry Kamin*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Amended Complaint was emailed (by agreement of counsel pursuant to Rule 1:12) on this 27th day of July 2021 to:

Faisal Moghul, Esq.
moghul@moghullaw.com
*Counsel for Defendant Valeria Gunkova*

_____
Bethany Benes

EXHIBIT

A

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## BNG GROUP, LLC

### A Virginia Limited Liability Company

**THE MEMBERSHIP INTERESTS IN BNG GROUP, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS. THE MEMBERSHIP INTERESTS ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER UNDER THIS AGREEMENT.**

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### OF
## BNG GROUP, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is made as of this 20 day of March 2020 by, between and among individuals undersigned individuals whose names are set forth on the signature pages hereto and whose names and addresses appear on Exhibit "A" attached hereto. For purposes of this Agreement, the foregoing parties are further referred to each as a "Member" and collectively as the "Members."

### BACKGROUND

### The Members formed BNG GROUP, LLC

(the "Company") as a Virginia limited liability company under the Virginia Limited Liability Company Act by filing a Certificate of Organization with the Department of State of the Commonwealth of Virginia on 17 day of September 2019. The Members intend this Agreement to set forth the rights and obligations of each of the Members regarding the Company and each other and to provide for the management and operation of the Company.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the legal sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

### Section 1.
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)     The deficit shall be decreased by the amounts which the Member is obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)    The deficit shall be increased by the items described in Regulation Section 1.704-(b)(2)(ii)-(d)(4), (5), and (6).

Adjusted Capital Balance means, as of any day, a Member's total Capital Contributions less all amounts actually distributed to the Member pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

Affiliate means, with respect to any Member, any Person: (i) in which the Member owns or controls more than thirty-three and one-third percent (33 1/3%) of the voting interests; or (ii) in which more than thirty-three and one-third percent (33 1/3%) of the voting interests are owned or controlled by a Person who has a relationship with the Member described in clause (i) above.

Agreement means this Agreement, as amended from time to time.

Capital Account means the account to be maintained by the Company for each Member in accordance with the following provisions:

(i)     A Member's Capital Account shall be credited with the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to the Member), the Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii)     A Member's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or which are secured by property contributed by the Member to the Company), the Member's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Member pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

Capital Contribution means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed by the Company or to which the assets are subject.

Capital Proceeds means the gross receipts received by the Company from a Capital Transaction.

Capital Transaction means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, finances, refinances, condemnations, recoveries of damage awards and insurance proceeds.

Cash Flow means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements and replacements as determined by the Board of Managers. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

Class means a group of Members that comprises the Class A

The Members, subject to the terms of Section 5.1.6 below, may provide for the creation of additional Classes of Members having such relative rights, powers and duties as the Members, in their discretion, may determine, including but not limited to, rights, powers and duties senior to any existing Class of Members.

Code means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

Company means the limited liability company formed in accordance with this Agreement.

Interest means a Person's interest as a Member in the Company including, without limitation, the Member's share of the Profits and Losses of, and the right to receive distributions from, the Company, and to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Law.

Involuntary Withdrawal means, with respect to any Member, the occurrence of any of the following events:

      (i)     The Member makes an assignment for the benefit of creditors;

      (ii)    The Member files a voluntary petition of bankruptcy;

      (iii)   The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

      (iv)   The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

3

       (v)     The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

       (vi)    The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

       (vii)   Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

       (viii)  The Member's death, Permanent Disability (as hereinafter defined) or adjudication by a court of competent jurisdiction that the Member is incompetent to manage the Member's person or property;

       (ix)    A Member's ceasing to be eligible to own an interest in a Virginia limited liability company;

       (x)     A Member's ceasing to meet the ownership standards set forth at Section 3.3;

       (xi)    A Member's loss of his or her Virginia medical license;

       (xii)   A material breach by a Member of a Member's obligation hereunder which is not cured within thirty (30) days of Member's receipt of notice thereof; or

Law means the Virginia Limited Liability Company Law of 1994, 15 Virginia Consolidated Statutes, Chapter 89, and its provisions pertaining to limited liability companies, as amended from time to time.

Manager or Board of Managers means the Person or Persons designated as such in Section V as the same may be changed from time to time.

Member means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

Minimum Gain has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under Code Section 704(b).

4

Negative Capital Account means a Capital Account with a balance of less than zero.

Nonrecourse Deductions has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

Nonrecourse Liability means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

Percentage means, as to a Member, the percentage Interest set forth after the Member's name on Exhibit "A" or Exhibit "B", as applicable, as amended from time to time.

Permanent Disability means a Member's inability to engage in the practice of medicine for twelve (12) consecutive months on account of disability or other illness.

Person means and includes any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

Positive Capital Account means a Capital Account with a balance greater than zero.

Profit and Loss mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

      (i)     All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

      (ii)     Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

      (iii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

      (iv)     Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

      (v)     In lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

5

    (vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

    Regulation(s) mean the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

    Transfer means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer of the Interest held by any Member as permitted under this Agreement; and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer a Member's Interest as permitted under this Agreement.

    Unit(s) means units of ownership Interests of Members in the Company as reflected on Exhibits "A" and "B" attached hereto.

    Voluntary Withdrawal means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

### Section II.
### Formation and Name: Office; Purpose; Term

    2.1    Organization. The Company has been organized as a Virginia limited liability company pursuant to the Law and the provisions of this Agreement and has caused the Certificate of Organization in the form attached as Exhibit "C" to be executed and filed with the Virginia Department of State on 20 day of February 2020.

    **2.2**    **Name of the Company. The name of the Company is "[BNG GROUP, LLC]"**
The Company may do business under any other name or names which the Board of Managers selects from time to time.

    2.3    Purposes. The Company is organized to (i) management services and other related products and services; (ii) to make, enter into, and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes; and (iii) to engage in such other lawful businesses and activities as the Managers may determine are reasonably related to the foregoing purposes.

    2.4    Term. The existence of the Company commenced on the date the Certificate was filed with the Department of State of the Commonwealth of Virginia pursuant to Section 8914 of the Law. The Company shall dissolve on the first to occur of the following events: (a) the decision by the Members to dissolve the Company; or (b) the date the Company may be otherwise dissolved by operation of law or judicial decree.

    2.5    Registered Office; Principal Office. The initial registered office of the Company in the Commonwealth of Virginia shall be located at 2 Pidgeon Hill Dr Suite 120, Sterling, VA