unenforceability of any one or more phrases, sentences, clauses or sections contained in this Guaranty Agreement shall not affect the validity, legality or enforceability of the remaining portions of this Guaranty Agreement.

**Section 6.10.** **Successors and Assigns.** This Guaranty Agreement and the obligations and benefits hereof will accrue to the parties hereto as well as their respective heirs, personal representatives, successors, and/or assigns.

**Section 6.11.** **Confession of Judgment.** Upon the occurrence of an Event of Default hereunder, the Guarantor appoints and designates any of Douglas D. Callaway and/or Michael E. Walsh and/or Lynn Harrison and/or Frank Merritt and/or Inga Green , the Guarantor's duly constituted attorney-in-fact to confess judgment pursuant to the provisions of Section 8.01-432 of the Code of Virginia of 1950, as amended, against Guarantor for the amount of the unpaid principal balance hereunder, all interest accrued and unpaid thereon, and all other amounts payable by Guarantor to the Lender under the terms of this Guaranty Agreement, together with court costs and attorneys' fees of fifteen percent (15%) of the unpaid principal balance and interest then due hereunder, which judgment shall be confessed in the Clerk's Office of the Circuit Court of the City of Richmond, Virginia. The Guarantor shall, upon request of the Lender, name such additional or alternative persons designated by the Lender as the Guarantor's duly constituted attorney or attorneys-in-fact to confess judgment against the Guarantor, pursuant to the foregoing provision. The Guarantor represents and warrants that the obligations evidenced by this Guaranty Agreement were not incurred for personal, family or household purposes. The Guarantor hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which the Guarantor may otherwise be entitled under the laws of the United States of America or of any state or possession of the United States of America now in force and which may hereafter be enacted. The authority and power to appear for and enter judgment against the Guarantor shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised on one or more occasions or from time to time as often as the Lender shall deem necessary or desirable, for all of which this Guaranty Agreement shall be a sufficient warrant.

In the event that (a) the Lender obtains a judgment by confession under this Guaranty Agreement and (b) all of the obligations of the Guarantor under the Guaranty Agreement are satisfied and paid in full, other than the obligation to pay attorneys' fees, the Lender will require that the Guarantor make payment only of attorney's fees actually incurred (such fees to be reasonable), and any funds received in excess of the actual amount of attorney's fees shall be refunded to the Guarantor.

**Section 6.12.** **Waiver of Jury Trial.** The Guarantor and the Lender each agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by the Guarantor or the Lender or any successor or assign of the Guarantor or the Lender with respect to this Guaranty Agreement or any other Loan Document or which in any way relates, directly or indirectly, to the Guaranteed Obligations, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. THE GUARANTOR AND THE LENDER EACH HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. The Guarantor acknowledges and agrees that this provision is a specific and material

aspect of the agreement between the parties and the Lender would not provide the Loan to the Borrower if this provision were not part of this Guaranty.

**Section 6.13.** **Joint and Several Liability.** In the event this Guaranty Agreement is executed by more than one party as Guarantor, the liability of such parties is joint and several. In addition, Guarantor's obligations hereunder are joint and several with any other party now or hereafter obligated under the Loan Documents.

**IN WITNESS WHEREOF,** the Guarantor has hereto executed this Guaranty Agreement under seal on the date first above written.

**GUARANTOR:**

Harry D. Kamin (SEAL)
HARRY KAMIN

**COMMONWEALTH OF VIRGINIA** :
: **to wit:**
**CITY/COUNTY OF** Fairfax :

I HEREBY CERTIFY that on this 30th day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared HARRY KAMIN, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes and in the capacity therein contained.

WITNESS MY Hand and Notarial Seal.

______________________(SEAL)
Notary Public

My Commission expires: 6/30/24

Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

_______________________(SEAL)
VALERIA GUNKOVA

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF** Fairfax **:**

I HEREBY CERTIFY that on this 30th day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared VALERIA GUNKOVA, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes and in the capacity therein contained.

WITNESS MY Hand and Notarial Seal.

_______________________(SEAL)
Notary Public

My Commission expires: 6/30/24

Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

# ENVIRONMENTAL INDEMNITY AGREEMENT

THIS ENVIRONMENTAL INDEMNITY AGREEMENT (the "Agreement") is entered into this 30th day of October, 2020, by and between **BNG GROUP LLC**, a Virginia limited liability company ("Borrower"); **HARRY KAMIN** and **VALERIA GUNKOVA** (individually and collectively, the "Guarantor") (Borrower and Guarantor being individually and collectively referred to herein as "Indemnitor"); and **ATLANTIC UNION BANK** ("Lender").

WITNESSETH:

WHEREAS, Lender has agreed to make a purchase money loan (the "Loan") to Borrower, which Loan is (i) evidenced by, inter alia, that certain Promissory Note of even date herewith, made by Borrower and payable to the order of Lender, in the original principal amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** (the "Note"), and (ii) secured by, inter alia, that certain first lien Deed of Trust, Assignment of Rents and Security Agreement to be recorded among the land records of Loudoun County, Virginia dated of even date herewith (the "Deed of Trust") from Borrower conveying to **UNION SERVICE CORPORATION**, a Virginia corporation, Trustee, for the benefit of Lender certain property located in Loudoun County, Virginia known as 2 Pidgeon Hill Drive, Sterling, VA 20165 and more particularly described on Exhibit "A" attached hereto (the "Property"); and

WHEREAS, Guarantor will receive financial or other benefits from Lender making the Loan to Borrower and, as such, has agreed to indemnify Lender with regard to certain environmental matters relating to the Property, subject to and in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises, Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Indemnitor, intending to be legally bound, hereby jointly and severally (if more than one) agrees as follows:

1. Recitals. The foregoing recitals are incorporated into this Agreement by this reference.

2. Covenants. (a) Indemnitor covenants and agrees with Lender that, except for such items in not more than *de minimis* amounts necessary in connection with the operation of the Property, Indemnitor shall not cause, permit to occur or permit to exist any deposit, storage, disposal, burial, discharge, spillage, uncontrolled loss, seepage or filtration of (i) any substances (collectively, "Hazardous Substances") now or hereafter defined as "hazardous substances," "pollutants," "contaminants," "hazardous materials," "hazardous wastes," or "hazardous or toxic substances" or related materials in any applicable federal, state, or local law, regulation, ordinance, or directive, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1976 (42 U.S.C. §§6901 et seq.), Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended by SARA, 42 U.S.C. §§ 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1810, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq.; the Resource Conservation and

Recovery Act, as amended (42 U.S.C. §§ 9601, et seq.); the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7412 et seq.; as any such acts may be amended, modified or supplemented (collectively, the "Hazardous Waste Laws"); (ii) those substances listed or otherwise identified in the regulations adopted and publications issued, as may be amended, modified or supplemented, pursuant to any Hazardous Waste Laws; (iii) any friable or airborne asbestos; (iv) any substance the presence of which on the Property is prohibited by any legal requirement of any governmental authority or which may give rise to an assessment of a governmental authority; and (v) any other substance which by legal requirement of any governmental authority requires special handling in its collection, storage, treatment, or disposal at, upon, under or within any portion of the Property.

(b) Indemnitor further covenants and agrees with Lender that (i) Indemnitor will not be involved in operations at the Property, which operations could lead to (A) the imposition of liability under the Hazardous Waste Laws on Indemnitor, or on any subsequent or former owner of the Property or (B) the creation of a lien on the Property under the Hazardous Waste Laws or under any similar laws or regulations, and (ii) Indemnitor will not permit any tenant or occupant of the Property to engage in any activity that could impose liability under the Hazardous Waste Laws on such tenant or occupant, on Indemnitor or on any other owner of any of the Property.

(c) Indemnitor shall comply strictly and in all respects with the requirements of the Hazardous Waste Laws and related regulations and with all similar laws and regulations and shall notify Lender immediately upon Indemnitor becoming aware of any discharge or discovery of any Hazardous Substance at, upon, under or within any portion of the Property. Indemnitor shall promptly forward, or cause to be forwarded, to Lender copies of all orders, notices, permits, applications or other communications and reports received by Indemnitor in connection with any discharge or the presence of any Hazardous Substance or any other matters relating to the Hazardous Waste Laws or any similar laws or regulations, as they may affect the Property.

3. Representations and Warranties. Indemnitor represents and warrants that, to the best of Indemnitor's knowledge and belief: (a) the Property is in compliance with all Hazardous Waste Laws; (b) that no event or circumstance exists or has occurred which could impose liability under the Hazardous Waste Laws or cause a violation thereof, or result in a breach of any covenant of Indemnitor hereunder, and; (c) that no claim, action or proceeding is pending or threatened against Indemnitor or any portion of the Property under the Hazardous Waste Laws.

4. Indemnity. Indemnitor shall at all times defend, indemnify and hold harmless Lender and its officers, directors, agents and employees (collectively, "Indemnitee") against and from any and all liabilities, suits, actions, claims, demands, losses, costs or expenses, of any nature whatsoever suffered or incurred by Indemnitee, whether as beneficiary of the Deed of Trust, as mortgagee in possession, or as successor-in-interest to Indemnitor by foreclosure deed or deed in lieu of foreclosure, with respect to all or any portion of the Property which involve or relate to any of the following events or circumstances:

(i) any discharge of Hazardous Substances, the threat of discharge of any Hazardous Substances, or the presence of any Hazardous Substances affecting the

Property;

(ii) any costs of removal or remedial action incurred by the United States Government or any state or local governmental authority, any response costs incurred by any other person or damages from injury to, destruction of, or loss of natural resources, including reasonable costs of assessing such injury, destruction or loss, incurred pursuant to any Hazardous Waste Laws;

(iii) liability for personal injury or property damage arising under any statutory or common law tort theory, including, without limitation, damages assessed for the maintenance of a public or private nuisance or for the carrying on of an abnormally dangerous activity at the Property; and/or

(iv) any other environmental matter affecting the Property within the jurisdiction of the Environmental Protection Agency, any other federal agency, the Commonwealth of Virginia, or any state or local environmental agency.

(b) Indemnitor's obligations under this Agreement shall arise upon the discovery of the presence of any Hazardous Substance, whether or not the Environmental Protection Agency, any other federal agency, the Commonwealth of Virginia or any state or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances.

(c) In the event of any discharge of Hazardous Substances, the threat of a discharge of any Hazardous Substances, or the presence of any Hazardous Substance affecting the Property in breach of Indemnitor's covenants in Section 2 hereof, and/or if Indemnitor shall fail to comply with any of the requirements of the Hazardous Waste Laws or related regulations or any other environmental law or regulation, Lender may at its election, but without the obligation so to do, give notice to Indemnitor of such event or threat. After the expiration of ten (10) days' notice to Indemnitor thereof (unless Indemnitor cures such condition within ten (10) days after such notice is sent to it or within such additional time (not exceeding sixty (60) days) reasonably necessary if it acts diligently), then Lender may cause such work to be performed at the Property and/or take any and all other actions as Lender shall deem necessary or advisable in order to abate the discharge of any Hazardous Substance, remove the Hazardous Substance or cure Indemnitor's noncompliance.

(d) Indemnitor acknowledges that Lender has agreed to make the Loan in reliance upon Indemnitor's covenants and warranties in this Agreement. For this reason, it is the intention of Indemnitor and Lender that the provisions of this Agreement shall supersede any provisions in the Note, the Deed of Trust or any of the other loan documents executed in connection with the Loan (collectively the "Loan Documents") which in any way limit the personal liability of Indemnitor and that each Indemnitor shall be personally and jointly and severally liable for any obligations arising under this Agreement. All of the covenants and indemnities of this Agreement shall survive the transfer of any or all right, title and interest in and to the Property by any Indemnitor to any party, whether or not affiliated with Indemnitor, and shall survive foreclosure except that such covenants and indemnities shall not apply to events or circumstances which are

to be indemnified against hereunder and which first arise after the transfer of the affected portion of the Property by Indemnitor to a party unaffiliated with Indemnitor, if such transfer is permitted by the Deed of Trust or was a transfer by foreclosure or deed in lieu thereof.

5. Environmental Assessments. Lender shall have the right to obtain environmental assessments of all or any portion of the Property from time to time to the extent that Lender, in its reasonable discretion exercised in good faith and based upon reasonable need, determines that such assessments are necessary, or determines that such assessments are required by any law or governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any interpretation thereof. The cost of such assessments shall be borne by Indemnitor. Lender shall have the right to select the environmental firm to conduct all such assessments and the form of such assessments shall be satisfactory to Lender in its reasonable discretion.

6. Attorneys' Fees. If Lender, or someone on Lender's behalf, retains the services of an attorney in connection with the subject of indemnity herein, Indemnitor shall pay Lender's costs and reasonable attorneys' fees thereby incurred. Lender may employ attorneys of its own choice.

7. Interest. In the event that Indemnitee incurs any obligations, costs or expenses under this Agreement, Indemnitor shall pay the same to Lender immediately on demand, and if such payment is not received within ten (10) days after written demand from Indemnitee to Indemnitor, interest on such amount shall, after the expiration of the ten (10) day period, accrue at the default rate of interest as provided in the Note until such amount, plus interest, is paid in full.

8. Joint and Several Liability. In the event that this Agreement is executed by more than one party as Indemnitor, the liability of such parties is joint and several. In addition, Indemnitor's obligations hereunder are joint and several with any other person now or hereafter obligated under the Loan Documents.

9. Consent to Jurisdiction. EACH INDEMNITOR CONSENTS TO THE EXERCISE OF PERSONAL JURISDICTION OVER EACH INDEMNITOR BY STATE COURT IN THE COMMONWEALTH OF VIRGINIA OR BY FEDERAL COURT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA DIVISION).

10. Notices. All notices, demands, requests and other communications required hereunder shall be in writing and shall be given in person, by reliable overnight courier or by certified mail, return receipt requested, to the parties at the following addresses:

| | |
|---|---|
| If to the INDEMNITOR: | BNG GROUP LLC<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |
| and to: | HARRY KAMIN<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |

| | |
|---|---|
| and to: | VALERIA GUNKOVA<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |
| If to the LENDER: | ATLANTIC UNION BANK<br>5803 Rolling Road<br>Springfield, VA 22152<br>Attn: Anthony Wininger |
| With a copy to: | Vincent J. Keegan, Esquire<br>Keegan & DeVol, PLC<br>8280 Greensboro Drive, Suite 710<br>McLean, VA 22102 |

11. Waivers. EACH INDEMNITOR WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER, OR BY VIRTUE OF THIS AGREEMENT AND WAIVES ANY RIGHT TO REQUIRE LENDER AT ANY TIME TO PURSUE ANY REMEDY IN LENDER'S POWER WHATSOEVER. The failure of Lender to insist upon strict compliance with any of the terms hereof shall not be considered to be a waiver of any such terms, nor shall it prevent Lender from insisting upon strict compliance with this Agreement or any other Loan Documents at any time thereafter.

12. Severability. If any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or part, then such clause or provision shall be held for naught as though not contained herein and shall not affect any other provisions or the remaining part of any effective provisions of this Agreement, and the remainder of this Agreement shall remain operative and in full force and effect.

13. Inconsistencies Among the Loan Documents. Nothing contained herein is intended to modify in any way the obligations of Indemnitor under the Loan Documents. In the event of any inconsistencies between the Loan Documents and this Agreement, the terms and conditions of this Agreement shall control.

14. Successors and Assigns. This Agreement shall be binding upon Indemnitor's successors, assigns, heirs, personal representatives and estate and shall inure to the benefit of Indemnitee and its respective successors and assigns.

15. Controlling Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

16. Voluntary Act. EACH INDEMNITOR REPRESENTS AND WARRANTS TO LENDER THAT IT (I) HAS READ EACH AND EVERY PROVISION OF THIS INSTRUMENT, (II) HAS CONSULTED, OR HAS BEEN GIVEN THE OPPORTUNITY TO HAVE THIS INSTRUMENT REVIEWED BY, COMPETENT LEGAL COUNSEL OF ITS

CHOOSING AND (III) UNDERSTANDS, AGREES TO AND ACCEPTS THE PROVISIONS HEREOF.

IN WITNESS WHEREOF, Indemnitor has executed this Agreement under seal as of the date first above written.

**INDEMNITOR:**
BNG GROUP LLC

By: Harry D. Kamin (SEAL)
HARRY KAMIN, Manager

By: Valeria Gunkova (SEAL)
VALERIA GUNKOVA, Manager

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF Fairfax :**

I HEREBY CERTIFY that on this 30 day of October, 2020, before me, the undersigned Notary Public of the jurisdiction aforesaid personally appeared HARRY KAMIN and VALERIA GUNKOVA, and acknowledged themselves to be Managers of BNG GROUP LLC, and that they, being authorized so to do, executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

______________ (SEAL)
Notary Public

My Commission expires: 6/30/24

Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

(SEAL)
HARRY KAMIN

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF Fairfax :**

I HEREBY CERTIFY that on this 30 day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared HARRY KAMIN, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

(SEAL)
Notary Public

My Commission expires: 6/30/24 Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

[signature] (SEAL)
VALERIA GUNKOVA

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF** Fairfax **:**

I HEREBY CERTIFY that on this 30th day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared VALERIA GUNKOVA, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

[signature] (SEAL)
Notary Public

My Commission expires: 6/30/24

Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

**EXHIBIT "A"**

All that certain lot or parcel of land situate, lying and being in Loudoun County, Virginia, to-wit:

Parcel J-3, containing 3.4435 acres of land, more or less, Professional Office/Commercial Park, Countryside, as more particularly shown on Plat entitled "Boundary Line Adjustment Parcels C-3, F-2, J-2, K-2 and O-1, Professional Office/Commercial Park, Countryside" and attached to Deed of Boundary Line Adjustment and Deeds of Trust Modification recorded in Instrument No. 20041020-0112921 and Plat recorded as Instrument No. 20041020-0112922, among the land records of Loudoun County, Virginia.

(NOTE: PURSUANT TO OWNER'S TERMINATION AGREEMENT OF COUNTRYSIDE CENTRE OFFICE CONDOMINIUM DATED JANUARY 31, 2018 AND RECORDED FEBRUARY 16, 2018 AS INSTRUMENT #20180216-0009064.)

**RESOLUTIONS OF MEMBERS OF**
**BNG GROUP LLC**

THESE RESOLUTIONS are made as of this 30 day of October, 2020 by **HARRY KAMIN** and **VALERIA GUNKOVA**, being all the members of **BNG GROUP LLC**, a Virginia limited liability company (the "Company ").

**WITNESSETH**

WHEREAS, it is desired by the undersigned, being all members of the Company that they, pursuant to a written operating agreement dated February 20, 2020, be empowered and authorized to execute and deliver contracts of sale, notes, deeds of trust, settlement statements and similar transaction documents related to the purchase and encumbrance by the Company of the property known as 2 Pidgeon Hill Drive, Sterling, VA 20165 (the "Property").

NOW, THEREFORE, BE IT RESOLVED, that the undersigned are hereby empowered and authorized to execute and deliver on behalf of the Company contracts of purchase and sale, notes, deeds of trust, settlement statements, and similar transaction documents related to the purchase and encumbrance of the Property by the Company and to take all other actions, in their reasonable discretion, as may be necessary to effectuate and consummate such transactions for the benefit of the Company;

AND BE IT FURTHER RESOLVED, that the undersigned are hereby authorized on behalf of the Company, to enter into a Loan and Security Agreement (the "Loan Agreement") providing for the borrowing by the Company of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** from **ATLANTIC UNION BANK** (the "Bank") and to execute the Company's note to the order of the Bank in the amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** (the "Note");

AND BE IT FURTHER RESOLVED, that to secure the Note, the undersigned are hereby authorized, empowered, and directed to execute and deliver a Deed of Trust, Assignment of Rents and Security Agreement (the "Deed of Trust") on the Property, and to execute and deliver such other and further documents as they shall determine to be necessary and proper to evidence and secure such loan as shall be requested by the Bank, and all of the foregoing, including the Note, Deed of Trust and Loan Agreement, in the name of the Company;

AND BE IT FURTHER RESOLVED, that any such documents or instruments executed and delivered by the undersigned, or any such actions taken by the undersigned on behalf of the Company, are hereby ratified and confirmed, and all such acts are adopted as the Company's own;

AND BE IT RESOLVED FURTHER, that any such instrument, executed by the undersigned on behalf of the Company and recorded among the land records of the County of Loudoun, Virginia, shall be conclusive evidence of the consent and authorization of all the members of the Company to the conveyance, encumbrance, or action set forth in said instrument

until and unless a new resolution executed by the members shall be so recorded.

IN WITNESS WHEREOF, the undersigned, being all the members of the Company, have executed this resolution effective as of the date first above written.

Harry D Kamin (SEAL)
HARRY KAMIN

Valeria V Gunkova (SEAL)
VALERIA GUNKOVA

# DEBTOR'S CONSENT TO FILE FINANCING STATEMENT

ATLANTIC UNION BANK
5803 Rolling Road
Springfield, VA 22152

Gentlemen:

I authorize you to file the attached financing statement or amendment in the appropriate public records.

Sincerely,
BNG GROUP LLC

By: Harry D Kamin (SEAL)
HARRY KAMIN, Manager

By: Valeria V Gunkova (SEAL)
VALERIA GUNKOVA, Manager

# DEBTOR'S CONSENT TO FILE FINANCING STATEMENT

ATLANTIC UNION BANK
5803 Rolling Road
Springfield, VA 22152

Gentlemen:

I authorize you to file the attached financing statement or amendment in the appropriate public records.

Sincerely,
BNG GROUP LLC

By: Harry D Kamin (SEAL)
HARRY KAMIN, Manager

By: Valeria Gunkova (SEAL)
VALERIA GUNKOVA, Manager

# ERRORS AND OMISSIONS/COMPLIANCE AGREEMENT

| | |
|---|---|
| LENDER: | ATLANTIC UNION BANK |
| BORROWER: | BNG GROUP LLC |
| GUARANTORS: | HARRY KAMIN<br>VALERIA GUNKOVA |
| PROPERTY ADDRESS: | 2 Pidgeon Hill Drive<br>Sterling, VA 20165 |

In consideration of the Lender's funding and closing of this loan, the Borrower and Guarantors agree, if requested by Lender, to fully cooperate and adjust for clerical errors in all loan and/or closing documentation if deemed necessary or desirable in the sole reasonable discretion of Lender. The Borrower and/or Guarantors agree to comply with all above noted requests by the Lender within thirty (30) days from the date of Lender's mailing of such requests. Borrower and Guarantors, jointly and severally, agree to assume all costs including, by way of illustration and not limitation, actual expenses and legal fees incurred by Lender for failing to comply with correction requests in the above noted time period.

The Borrower and Guarantors do hereby so agree in order to assure that loan documentation will conform and be acceptable in the marketplace in the instance of transfer, sale or conveyance by Lender of its interest in and to the loan documentation, as well as to assure the enforceability of the loan documents.

DATED effective this 30 day of October, 2020.

**WITNESS:**

______________________

______________________

**BORROWER:**
BNG GROUP LLC

By: Harry A Kamin (SEAL)
HARRY KAMIN, Manager

By: Valeria Gunkova (SEAL)
VALERIA GUNKOVA, Manager

**GUARANTORS:**

_____________________ (SEAL)
HARRY KAMIN

_____________________ (SEAL)
VALERIA GUNKOVA

# POST-CLOSING AGREEMENT

THIS POST-CLOSING AGREEMENT (this "**Agreement**") is made this 30th day of October, 2020 by and among **BNG GROUP LLC**, a Virginia limited liability company ("Borrower"); **HARRY KAMIN** and **VALERIA GUNKOVA** (individually and collectively, the "Guarantor"); and **ATLANTIC UNION BANK** ("Lender").

## WITNESSETH:

A. As of this date, Lender has made a purchase money loan to the Borrower in the principal amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** (the "**Loan**") pursuant to the terms and conditions of a Promissory Note of the same date (the "**Promissory Note**"), a Loan and Security Agreement of the same date (the "**Loan Agreement**"), and other documents and writings executed by the Borrower and the Guarantor and delivered to the Lender in connection with the Loan (collectively, with the Promissory Note and the Loan Agreement the "**Loan Documents**").

B. In connection with the Loan, the Lender is requiring that the Borrower provide it with good and sufficient subordination, non-disturbance and attornment agreements from all tenants with the property known as 2 Pidgeon Hill Drive, Sterling, VA 20165 (the "**Property**") that contain such commercially reasonable terms as may be acceptable to Lender (individually and collectively, the "**SNDAS**").

C. At the time of closing, the Borrower has been unable to provide the SNDAS to Lender.

D. The parties wish to execute this Agreement to enable closing to occur and the Loan to be funded, and to establish a timeframe for the delivery of the SNDAS to the Lender.

NOW, THEREFORE, in consideration of these promises, the terms and conditions set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Loan Agreement is hereby amended to incorporate the provisions of this Agreement.

2. The Borrower agrees to deliver the SNDAS to Lender within forty-five (45) days from the date hereof. In the event Borrower fails to provide the SNDAS within such forty-five (45) day period, and such failure is not specifically excused in writing by the Lender, the Borrower shall have committed an Event of Default under the Loan Agreement and the other Loan Documents.

3. This Agreement may not be modified or amended except by a writing signed by all of the parties. Except to the extent specifically provided herein, the terms of the Loan Documents shall remain in full force and effect. Time is strictly of the essence hereof.

IN WITNESS WHEREOF, Indemnitor has executed this Agreement under seal as of the date first above written.

**BORROWER:**
BNG GROUP LLC

By: *Harry Kamin* (SEAL)
HARRY KAMIN, Manager

By: *Valeria Gunkova* (SEAL)
VALERIA GUNKOVA, Manager

**COMMONWEALTH OF VIRGINIA** :
: **to wit:**
**CITY/COUNTY OF** Fairfax :

I HEREBY CERTIFY that on this 30th day of October, 2020, before me, the undersigned Notary Public of the jurisdiction aforesaid personally appeared HARRY KAMIN and VALERIA GUNKOVA, and acknowledged themselves to be Managers of BNG GROUP LLC, and that they, being authorized so to do, executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

_______________ (SEAL)
Notary Public

My Commission expires: 6/30/24 Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

**GUARANTOR:**

Harry D. Kamin (SEAL)
HARRY KAMIN

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF** Fairfax **:**

I HEREBY CERTIFY that on this 30 day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared HARRY KAMIN, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

____________________ (SEAL)
Notary Public

My Commission expires: 6/30/24 Registration # : 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

_________________________ (SEAL)
VALERIA GUNKOVA

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF** Fairfax **:**

I HEREBY CERTIFY that on this 30th day of October, 2020, before me, the undersigned Notary Public in the aforesaid jurisdiction, personally appeared VALERIA GUNKOVA, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

_________________________ (SEAL)
Notary Public

My Commission expires: 6/30/24 Registration #: 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

**A. Settlement Statement**

**U.S. Department of Housing and Urban Development**

OMB Approval No. 2502-0265

**B. Type of Loan**

| | | | |
|---|---|---|---|
| 1.☐ FHA 2.☐ FmHA 3.☒ Conv. Unins. 4.☐ VA 5.☐ Conv. Ins. ☐ Other | 6. File Number: 2000097 | 7. Loan Number: | 8. Mortgage Insurance Case Number: |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | |
|---|---|
| **D. Name & Address of Borrower:** | BNG GROUP LLC, a Virginia limited liability company, 2 Pidgeon Hill Drive, Suite 120, Sterling, VA 20165 |
| **E. Name & Address of Seller:** | JUDICIAL DRIVE PROPERTY HOLDING, LLC, a Virginia limited liability company, 5521 LEESBURG PIKE, FALLS CHURCH, VA 22041 |
| **F. Name & Address of Lender:** | Atlantic Union Bank, 2325 Dulles Corner Boulevard, Suite 500, Herndon, VA 20171 |
| **G. Property Location:** | 2 Pidgeon Hill Drive Sterling, Virginia 20165<br>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-000, 029 39 4077 000 |
| **H. Settlement Agent:** | Stewart Title and Escrow, Inc., 10505 Judicial Drive, Suite 300, Fairfax, VA 22030, (703) 352-2900 |
| **Place of Settlement:** | 10505 Judicial Drive, Suite 300, Fairfax, VA 22030 |

**I. Settlement Date:** 10/30/2020 **Proration Date:** 10/30/2020 **Disbursement Date:** 10/30/2020

| **J. Summary of Borrower's Transaction** | | **K. Summary of Seller's Transaction** | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | $9,500,000.00 | 401. Contract sales price | $9,500,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $315,135.18 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes 10/30/2020 to 1/1/2021 | $11,198.27 | 407. County taxes 10/30/2020 to 1/1/2021 | $11,198.27 |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due from Borrower** | **$9,826,333.45** | **420. Gross Amount Due to Seller** | **$9,511,198.27** |
| **200. Amounts Paid by or in Behalf of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | $250,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $7,360,000.00 | 502. Settlement charges to seller (line 1400) | $38,473.33 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. ADDITIONAL DEPOSIT from Stewart Title And | $250,000.00 | 504. Payoff of first mortgage loan | |
| 205. DUE DILIGENCE DEPOSIT from Atlantic Unio | $11,600.00 | 505. Payoff of second mortgage loan | |
| 206. HVAC ROOFTOP ADJ. PER CONTRACT | $600,000.00 | 506. HVAC ROOFTOP ADJ. PER CONTRACT | $600,000.00 |
| 207. | | 507. 2ND HALF TAX to LOUDOUN COUNTY, ACC | $32,528.32 |
| 208. AGREEMENT FOR MAINTENANCE ITEMS | $5,000.00 | 508. AGREEMENT FOR MAINTENANCE ITEMS | $5,000.00 |
| 209. TENANT SECURITY DEPOSITS | $51,601.05 | 509. TENANT SECURITY DEPOSITS | $51,601.05 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. PRE PAID RENT 10/30/2020 to 11/1/2020 | $5,887.26 | 513. PRE PAID RENT 10/30/2020 to 11/1/2020 | $5,887.26 |
| 214. NOVEMBER PREPAID RENT(CANTY,NV DE | $17,367.91 | 514. NOVEMBER PREPAID RENT(CANTY,NV DE | $17,367.91 |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid by/for Borrower** | **$8,551,456.22** | **520. Total Reduction Amount Due Seller** | **$750,857.87** |
| **300. Cash at Settlement from/to Borrower** | | **600. Cash at Settlement to/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $9,826,333.45 | 601. Gross amount due to seller (line 420) | $9,511,198.27 |
| 302. Less amounts paid by/for borrower (line 220) | ($8,551,456.22) | 602. Less reductions in amount due seller (line 520 | ($750,857.87) |
| **303. Cash ☒ From ☐ To Borrower** | **$1,274,877.23** | **603. Cash ☒ To ☐ From Seller** | **$8,760,340.40** |

**SUBSTITUTE FORM 1099 SELLER STATEMENT** - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**SELLER INSTRUCTION** - If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required to provide the Settlement Agent with your correct taxpayer identification number.
If you do not provide the Settlement Agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

YOUNG NAM CHUN
MANAGER

| L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission | | | |
| Division of commission (line 700) as follows: | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan origination fee to Atlantic Union Bank (0.500000%) | | $36,800.00 | |
| 802. Loan discount | | | |
| 803. Appraisal fee to Atlantic Union Bank | | $7,000.00 | |
| 804. Credit report | | | |
| 805. Lender's inspection fee | | | |
| 806. Mortgage insurance application fee | | | |
| 807. Assumption fee | | | |
| 808. APPRAISAL REVIEW FEE to Atlantic Union Bank | | $850.00 | |
| 809. FLOOD CERT. FEE to Atlantic Union Bank | | $25.00 | |
| 810. DOCUMENTATION FEE to Atlantic Union Bank | | $300.00 | |
| 811. REQUIRED RESERVE ACCOUNT to Atlantic Union Bank | | $200,000.00 | |
| 812. | | | |
| 813. LENDER COUNSEL FEE to KeEGAN & DEVOL, PLC | | $4,250.00 | |
| **900. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Interest from | | | |
| 902. Mortgage insurance premium for | | | |
| 903. Hazard insurance premium for to StATE FARM | POCB $2,406.50 | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to Stewart Title And Escrow, Inc - VA | | $900.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination to Stewart Title And Escrow, Inc - VA | | $250.00 | |
| 1104. Title insurance binder to Stewart Title And Escrow, Inc - VA | | $250.00 | |
| 1105. Document preparation DEED FEE to J. Charles Curran, Attorney at Law | | | $125.00 |
| 1106. Notary fees | | | |
| 1107. Attorney's fees to | | | |
| Includes above item numbers: | | | |
| 1108. Title Insurance to Stewart Title And Escrow, Inc - VA | | $9,700.00 | |
| Includes above item numbers: | | | |
| 1109. Lender's coverage $7,360,000.00 | $7,360.00 SIMULTANEOUS ISSUE | | |
| 1110. Owner's coverage $9,500,000.00 | $2,340.00 SPECIAL RATE | | |
| 1111. RECORDING FEE REIMBURSEMENT to Stewart Title And Escrow, Inc - VA | | | $47.50 |
| 1112. RECORD OPTION RELEASE to Stewart Title E-Record | | | $47.50 |
| 1113. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees: Deed $49.50; Mortgage $62.50 | | $112.00 | |
| 1202. City/county tax/stamps: Deed $7,916.67 Mortgage $6,133.34 | | $10,091.68 | $3,958.33 |
| 1203. State tax/stamps: Deed $23,750.00 Mortgage $18,400.00 | | $30,275.00 | $11,875.00 |
| 1204. GRANTOR TAX to Stewart Title E-Record | | $4,750.00 | $4,750.00 |
| 1205. WMATA FEE to Stewart Title E-Record | | $7,125.00 | $7,125.00 |
| 1206. CONGESTION RELIEF FEE to Stewart Title E-Record | | $2,375.00 | $2,375.00 |
| 1207. ASSIGN/RENTS/LEASES to Stewart Title E-Record | | $41.50 | |
| 1208. FINANCING STATEMENT-LOCAL to Stewart Title E-Record | | $20.00 | |
| 1209. FINANCING STATEMENT-VA SCC to Stewart Title OPERATING ACCOUNT | | $20.00 | |
| 1210. | | | |
| **1300. Additional Settlement Charges** | | | |

**CERTIFICATION:**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement. The Settlement Agent does not warrant or represent the accuracy of information provided by any party, including information concerning POC items and information supplied by the lender, if any, in this transaction appearing on this HUD-1 Settlement Statement and the parties hold harmless the Settlement Agent as to any inaccuracies in such matters. The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

BNG GROUP LLC, A VIRGINIA LIMITED LIABILITY COMPANY

Harry Z. Kamin

HARRY KAMIN
MANAGER

Valeria Gunkova

VALERIA GUNKOVA
MANAGER

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

YOUNG NAM CHUN
MANAGER

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Title and Escrow, Inc.

6/2/20
Date

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

**CERTIFICATION:**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement. The Settlement Agent does not warrant or represent the accuracy of information provided by any party, including information concerning POC items and information supplied by the lender, if any, in this transaction appearing on this HUD-1 Settlement Statement and the parties hold harmless the Settlement Agent as to any inaccuracies in such matters. The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

BNG GROUP LLC, A VIRGINIA LIMITED LIABILITY COMPANY

HARRY KAMIN
MANAGER

VALERIA GUNKOVA
MANAGER

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

YOUNG NAM CHUN
MANAGER

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Title and Escrow, Inc.

10/3/20
Date

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

EXHIBIT
E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 02-157 |
| | : DATE FILED: ________________ |
| v. | : VIOLATIONS: |
| SEMION MOGILEVICH,<br>a/k/a "Simeon Mogilevitch"<br>a/k/a "Semjon Mogilevcs"<br>a/k/a "Shimon Makhelwitsch"<br>a/k/a "Seva"<br>IGOR FISHERMAN<br>JACOB BOGATIN<br>a/k/a "Yakov"<br>ANATOLY TSOURA | RICO Conspiracy (1 Count)<br>18 U.S.C. § 1962(d)<br>Wire Fraud (22 Counts)<br>18 U.S.C. § 1343<br>Mail Fraud (6 Counts)<br>18 U.S.C. § 1341<br>Securities Fraud (1 Count)<br>15 U.S.C. §§ 78j(b), 78ff(a)<br>17 C.F.R. § 240.10b-5<br>Filing False Registration Statement with the SEC (1 Count )<br>15 U.S.C. §§ 78l(g), 78ff(a)<br>17 C.F.R. § 240.12b-20<br>False Filings with the SEC (2 Counts)<br>15 U.S. C. §§ 78m(a), 78 ff(a)<br>17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-3, 240.13a-16<br>Falsification of Books and Records (1 Count)<br>15 U.S.C. §§ 78m(b)(5), 78ff(a) and 17 C.F.R. § 240.13b2-1<br>Money Laundering Conspiracy (1 Count)<br>18 U.S.C. § 1956(h)<br>Money Laundering (4 Counts)<br>18 U.S.C. § 1956(a)(2)(A)<br>Money Laundering (6 Counts)<br>18 U.S.C. § 1956(a)(2)(B)(i)<br>Aiding and Abetting<br>18 U.S.C. § 2<br>Forfeiture (Racketeering)<br>18 U.S.C. § 1963<br>Forfeiture (Money Laundering)<br>18 U.S.C. §982 |

SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

## INTRODUCTION

### The Scheme to Defraud

1. From in or about 1993, and continuing up to and including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

together with others known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud thousands of investors in the United States, Canada, and elsewhere, and to obtain money and property by means of false and fraudulent pretenses, representations and promises ("the scheme to defraud").

### Plan and Purpose of the Scheme To Defraud

2. It was part of the plan and purpose of the scheme to defraud that the defendants:

(a) created and controlled a publicly-owned company in North America which became known as YBM MAGNEX INTERNATIONAL, INC. (“YBM”);

(b) used a network of companies in the Eastern District of Pennsylvania, Canada, Eastern Europe and elsewhere, which included fraudulently

operated businesses, described herein as "the Network of YBM companies," see paragraphs 10 to 19 of the Introduction below;

(c) acquired millions of shares of YBM stock at minimal cost to the defendants;

(d) deceived securities regulators through efforts to secure approval for listing and sale of YBM stock on securities exchanges and markets in Canada and the United States; and

(e) fraudulently inflated the price of YBM stock by falsely reporting and representing to investors and securities regulators that YBM was a highly profitable and investment-worthy enterprise which generated high revenues from the worldwide sale and distribution of magnets and other products.

3. It was a further part of the plan and purpose of the scheme to defraud that the defendants were to carry out the conduct referenced above in paragraph 2, through the manner and means of the scheme to defraud as set forth in paragraphs 29 to 46 of the Introduction, in order to:

(a) defraud the investing public into purchasing millions of shares of YBM stock on the Canadian exchanges and through brokers in the United States;

(b) enable the defendants to profit unjustly, and enrich themselves, by selling millions of dollars of YBM stock at fraudulently inflated prices;

(c) enable certain of the defendants to enrich themselves by paying themselves large salaries and bonuses and granting themselves stock options and

personal loans; and

(d) enable the defendants to use the proceeds from the public offering of YBM stock to further the fraudulent operations of the Network of YBM companies, and thereby conceal and continue the fraudulent scheme to defraud.

4. As a result of the scheme to defraud, the defendants caused the defrauded shareholders of YBM to lose in excess of $150 million (all references are to U.S. dollars unless otherwise designated as Canadian dollars (CDN)) in funds invested in the purchase of YBM stock.

5. As a result of their participation in the scheme to defraud, each defendant, either directly or through nominees, enriched himself with proceeds of the scheme to defraud, totaling at least the following approximate amounts, from the sale of YBM stock, and other compensation including salary, bonuses, stock options, commissions and personal loans:

| | **Defendant** | **Amount** |
|---|---|---|
| (a) | MOGILEVICH | $ 18.4 million |
| (b) | FISHERMAN | $ 3 million |
| (c) | BOGATIN | $ 10 million |
| (d) | TSOURA | $ 1.3 million |

**The Defendants**

6. SEMION MOGILEVICH, a/k/a "Simeon Mogilevitch," a/k/a "Semjon Mogilevcs," a/k/a "Shimon Makhelwitsch," a/k/a “Seva,” was born in Kiev, Ukraine and holds Ukrainian, Russian and Israeli citizenship. At various times relevant to this Superseding

Indictment, MOGILEVICH resided in Budapest, Hungary. MOGILEVICH provided the funds and authorized the formation of the Network of YBM companies described herein. He exercised control over the companies through: (a) his ownership and control of YBM stock; (b) his relationship with defendants IGOR FISHERMAN and JACOB BOGATIN, who held key executive positions within YBM and the Network of YBM companies; and (c) his influence over persons, activities, and the bank accounts of the various companies comprising the Network of YBM companies. MOGILEVICH funded, authorized and directed the scheme to defraud, and conducted the affairs of the Mogilevich Enterprise as set forth in paragraphs 2 and 3 of Count One, from his office headquarters located at 44 Benczur Street, Budapest, Hungary, among other locations.

7. IGOR FISHERMAN was born in L'Vov, Ukraine, entered the United States in or about 1990, and became a naturalized United States citizen in or about October 1995. FISHERMAN also holds Israeli citizenship. While in the United States, FISHERMAN lived at various addresses in Buffalo, New York, Mt. Laurel and Cherry Hill, New Jersey, and Huntingdon Valley, Pennsylvania. FISHERMAN served as a member of YBM's Board of Directors. FISHERMAN held various executive positions within the Network of YBM companies, including: Chief Operating Officer of YBM; President of UNITED TRADE LTD, and its predecessor ARIGON COMPANY LTD., YBM's main subsidiary companies described below at paragraphs 13 and 14. In these positions FISHERMAN exercised daily control over YBM's operations in Eastern Europe. He was a close associate and top financial advisor to defendant MOGILEVICH. As part of the scheme to defraud, FISHERMAN was instrumental in directing the movement of money through bank accounts and brokerage accounts held in the names of

nominees, closely-related parties, and shell companies. FISHERMAN coordinated, supervised and implemented the scheme to defraud from MOGILEVICH's headquarters at 44 Benczur Street in Budapest, Hungary, among other locations.

8. JACOB BOGATIN, a/k/a "Yakov," was born in Saratov, Russia. BOGATIN entered the United States in or about 1987 and became a naturalized United States citizen in or about January 1993. BOGATIN held various executive positions within the Network of YBM companies, including: President and Chief Executive Officer of YBM MAGNEX, INC., described below at paragraph 15, from March 1994 until at least September 1998, and President, Chief Executive Officer and a member of the Board of Directors of YBM from late 1995 until at least September 1998. Through these positions, BOGATIN was involved in the daily control and supervision of YBM's operations in the United States and abroad, including those in Budapest, Hungary. BOGATIN coordinated, supervised and implemented the scheme to defraud from YBM headquarters in the Eastern District of Pennsylvania, among other locations.

9. ANATOLY TSOURA was born in Russia and served as the Vice President of Finance for YBM's subsidiaries ARIGON CO., LIMITED and UNITED TRADE, LIMITED, see paragraphs 13 and 14 below, from approximately 1995, until at least September 1998. TSOURA was not a citizen of the United States. Under the direction of defendant FISHERMAN, TSOURA was responsible for, among other things, the compilation of UNITED TRADE's financial records and the preparation of false purchase orders, invoices and other documentation to support bogus commercial transactions. TSOURA implemented and participated in the scheme to defraud from the Budapest, Hungary location of UNITED TRADE, among other places.

**The Network of YBM Companies**

**YBM Magnex International, Inc. - The Parent Company**

10. YBM MAGNEX INTERNATIONAL, INC., a public corporation, was registered in Calgary, Alberta, Canada, as "PRATECS TECHNOLOGIES, INC." ("PRATECS") on or about March 16, 1994. In or about November 1995, the name "PRATECS" was changed to YBM MAGNEX INTERNATIONAL, INC. (variously referred to herein as "PRATECS," "PRATECS/YBM" and "YBM").

11. From approximately March 16, 1994 to late 1995, YBM's offices were located at 2935 Byberry Road, Hatboro, Bucks County in the Eastern District of Pennsylvania. From in or about late 1995 to at least September 1998, YBM's international corporate headquarters were located at 110 Terry Dr., Newtown, Bucks County in the Eastern District of Pennsylvania.

12. YBM, and its subsidiaries, represented to the investing public, to securities regulators, and to auditors and accountants, that YBM's primary business was the manufacture and worldwide distribution of custom-made, precision-designed, neodymium magnets which were manufactured at its plant in Budapest, Hungary, and sold throughout the United States, Canada, Europe and the Middle East, among other locations. YBM also represented that its business operations included the manufacture and distribution of magnetic products, a computer software security system called "CatchDisk," and the refinement and sale of crude oil.

**YBM's Subsidiaries**

13. ARIGON COMPANY LIMITED ("ARIGON") was an off-shore company, incorporated in the Channel Islands, United Kingdom on or about May 24, 1990.

Defendant MOGILEVICH was a 40% shareholder of ARIGON, and directed and controlled its operations. ARIGON operated as a trader of commodities and consumer goods which were purchased in Western Europe and North America, and resold in Eastern Europe, including Russia and Ukraine. In or about December 1994, as part of the scheme to defraud, ARIGON was acquired by YBM MAGNEX, INC. ("YBM MAGNEX"), a Pennsylvania corporation set up by defendant BOGATIN. ARIGON became a subsidiary of YBM, the public corporation, in or about November 1995. ARIGON remained a subsidiary of YBM until April 1, 1996 when its assets were transferred to UNITED TRADE LIMITED ("UNITED TRADE"). ARIGON was dissolved in 1997. ARIGON's two subsidiaries were:

(a) MAGNEX VALLALKOZOI RT (“MAGNEX RT”), a Hungarian corporation, located in Budapest. MAGNEX RT became a subsidiary of ARIGON in or about October 1992. MAGNEX RT owned the manufacturing plant in Budapest, Hungary, which purportedly produced YBM's neodymium magnets. ARIGON was to market, sell and distribute the magnets produced by MAGNEX RT, and was to purchase raw materials on behalf of MAGNEX RT. MAGNEX RT became a subsidiary of UNITED TRADE on or about April 1, 1996, when ARIGON transferred its assets to UNITED TRADE.

(b) ARBAT INTERNATIONAL, INC. ("ARBAT"), a Russian company located in Moscow, was formed by ARIGON in or about July 1991 to conduct trading activity in Russia. ARIGON divested itself of ARBAT on or about April 1, 1996. Thereafter, ARBAT was no longer within the

YBM Network of companies and did not become a subsidiary of UNITED TRADE.

14. UNITED TRADE LIMITED ("UNITED TRADE") was an offshore company incorporated in the Cayman Islands, British West Indies, on or about February 6, 1996. UNITED TRADE was the successor company to ARIGON and became a wholly owned subsidiary of YBM on or about April 1, 1996. At that time, the assets of ARIGON, including MAGNEX RT and the Budapest manufacturing plant, were transferred to UNITED TRADE. Thereafter UNITED TRADE was the marketing, sales and distribution arm of YBM, and was the core subsidiary which controlled transactions involving hundreds of millions of dollars primarily from purported magnet sales and other business activity, including oil. UNITED TRADE maintained a registration address in the Cayman Islands, but its operations were centered in Budapest, Hungary and were directed principally by defendant FISHERMAN with the assistance of defendant TSOURA.

15. YBM MAGNEX, INC. ("YBM MAGNEX"), a Pennsylvania corporation, was incorporated on or about February 10, 1994, by defendant BOGATIN who served as President at all times relevant to the Superseding Indictment. YBM MAGNEX was initially located at 2935 Byberry Road in Hatboro, Pennsylvania and was a shell company set up in the United States to acquire ARIGON. YBM MAGNEX acquired ARIGON in or about December 1994. Subsequently, in or about November 1995, YBM MAGNEX became a wholly owned subsidiary of YBM and thereafter was operated from headquarters in Newtown, Pennsylvania.

**Related Companies**

16. YBM TECHNOLOGIES, INC. (“YBM TECHNOLOGIES”), a Pennsylvania corporation, was incorporated on May 13, 1991 and owned by defendant BOGATIN, who served as President at all times relevant to this Superseding Indictment until its assets were sold to YBM. YBM TECHNOLOGIES was located at 2935 Byberry Road in Hatboro, Pennsylvania. From approximately 1993 to August 1996, YBM TECHNOLOGIES served primarily as a purported vendor to YBM, providing consulting services, research and development, equipment and other magnetic products. YBM TECHNOLOGIES was not a YBM subsidiary company, but its assets were acquired by YBM from BOGATIN in or about August 1996.

17. TECHNOLOGY DISTRIBUTION LIMITED (“TDL”) was an offshore company incorporated in the Isle of Man, United Kingdom, in or about 1994. Defendant MOGILEVICH directed the creation of TDL, and at all times relevant to this Superseding Indictment was the beneficial owner and controlled its operations. From approximately 1995 to approximately February 1997, funds in TDL's bank accounts in Budapest were reported as cash assets on the books and records of ARIGON, and later UNITED TRADE. TDL served as an agent of UNITED TRADE from approximately April 1996 until early 1997. Thereafter, TDL acted as a purported vendor of UNITED TRADE.

18. ORIGON COMPANY LIMITED (“ORIGON”) was an offshore company incorporated on the island of Nevis in the Caribbean in or about June of 1995. FISHERMAN directed the creation of ORIGON. Defendants FISHERMAN and MOGILEVICH at all times relevant to this Superseding Indictment were the beneficial owners of ORIGON and controlled its operations. From approximately June of 1995 to approximately February 1997, funds in

ORIGON's bank account in Israel were reported as cash assets on the books and records of ARIGON, and later UNITED TRADE. ORIGON served as an agent of UNITED TRADE from approximately April 1996 until early 1997. Thereafter, ORIGON acted as a purported customer of UNITED TRADE.

19. BRITISH EUROPEAN MARKETING LTD. (“BEM”) was a private limited company incorporated in Cardiff, Wales, United Kingdom on or about January 19, 1996. BEM was formed by a former officer of ARIGON and a close associate of defendant MOGILEVICH to act as an agent of UNITED TRADE in the oil and petroleum industry. Its operations were conducted primarily in London, England. From approximately March of 1996 through May of 1997, funds in BEM’s bank account in London were reported as cash assets on the books and records of UNITED TRADE. BEM served as an agent of UNITED TRADE from approximately April 1996 until May 1997.

**The Securities Regulators**

20. The United States Securities and Exchange Commission (“SEC”) was an independent agency of the United States government that regulated the securities industry within the United States. This included the regulation of the over-the-counter (“OTC”) securities market, that is, securities traded directly between securities brokerage firms and between brokerage firms and individuals.

21. The National Association of Securities Dealers, Inc. (“NASD”) was a self-regulatory organization of the United States securities industry responsible for the regulation of the OTC securities market, including the NASDAQ ("National Association of Securities Dealers Automated Quotation System") Stock Market. The NASD enforced its rules and regulations for

the protection of investors in securities and promoted observance of United States federal and state securities laws by its members. The NASDAQ Stock Market was an electronic, computer screen–based market that enabled securities firms to execute transactions for investors in the companies that are listed on NASDAQ. Companies that were listed on the NASDAQ were required to comply with the NASD's rules and regulations, as well as those of the SEC, in order to maintain their listing on the NASDAQ.

22. The Alberta Securities Commission ("ASC") was a governmental regulatory body in Canada which administered and enforced Canadian securities legislation and regulations in the province of Alberta, including supervisory oversight of the regulations of the Alberta Stock Exchange.

23. The Alberta Stock Exchange ("ASE") was a self-regulatory organization located in Calgary, Canada that provided a securities market for the trading of securities and monitored and enforced compliance with the Canadian securities regulations of its exchange. The ASE had a program for start-up companies with no significant assets or business, known as Junior Capital Pool ("JCP"), which provided such companies easier access to listing on the ASE in order to raise capital to conduct business in Canada. Companies had to satisfy and comply with specific requirements and regulations of the ASE in order to avail themselves of this type of listing.

24. The Ontario Securities Commission ("OSC") was a governmental regulatory body in Canada which administered and enforced securities legislation and regulations in the province of Ontario, including supervisory oversight of the regulations of the Toronto Stock Exchange.

25. The Toronto Stock Exchange ("TSE") was a self-regulatory organization located in Toronto, Canada that provided a securities market for the trading of securities, and monitored and enforced compliance with the Canadian securities regulations of its exchange.

**The Auditors**

26. Coopers and Lybrand ("Coopers") was an international public accounting firm with an office in Budapest, Hungary, among other locations. Coopers was contacted between September 1993 and March 1994 to serve as an independent accounting firm to audit and certify MAGNEX RT's financial statements for the years 1992, 1993 and 1994. Certification of the financial statements was a prerequisite to approval by the securities regulators for any public offering of PRATECS/YBM stock. Coopers declined to serve as MAGNEX RT's auditors. Coopers did conduct a valuation of machinery and equipment and other assets of MAGNEX RT in or about June 1994.

27. Parente, Randolph, Orlando, Carey and Associates ("Parente") was a public accounting firm with offices in Plymouth Meeting and Media, Pennsylvania, among other locations. Parente was retained by YBM from approximately February 1995 to approximately March 1998 as the independent public accounting firm to audit and certify the accuracy of YBM's financial statements for years 1992, 1993, 1994, 1995 and 1996. Certification of the financial statements by Parente was a prerequisite to approval by the securities regulators to list and trade YBM stock, and to sell additional stock through public offerings.

28. Deloitte & Touche LLP ("Deloitte") was an international public accounting firm with an office in Philadelphia, Pennsylvania, among other locations. Deloitte was retained by YBM from approximately June 1997 to approximately June 1998 as the independent accounting

firm to audit and certify YBM's annual financial statements for the years 1996 and 1997. Certification of the financial statements by Deloitte was a prerequisite to securing approval from the securities regulators to list and trade YBM stock and to sell additional stock through public offerings. Deloitte resigned as YBM's auditor in or about June 1998, and refused to certify YBM's financial statements for calendar year 1997.

**Manner and Means To Accomplish the Scheme To Defraud**

Among the manner and means by which the defendants carried out and implemented the scheme to defraud were the following:

**A. OVERVIEW**

29. In order to sell securities to the public and maintain public trading of its securities in the United States and Canada, YBM was required to comply with provisions of Canadian and United States federal securities laws, including the Securities Exchange Act of 1934 and regulations promulgated thereunder. These laws and regulations were designed to ensure, among other things, (a) that the identities of those individuals in control of the company, and their financial interests in the company, were fully disclosed to the public, and (b) that the company's financial information and operations were accurately and honestly recorded and reported to the public.

30. It was part of the scheme to defraud that the defendants made false, deceptive and misleading statements of material matters to, and concealed material matters from, the investing public, including YBM shareholders, the securities regulators in Canada and the United States, and the company's auditors and forensic examiners, in that the defendants:

(a) concealed defendant MOGILEVICH's ownership of and control over the

Network of YBM companies, including his beneficial ownership of YBM stock;

(b) engaged in various deceptive business practices, including the creation of fraudulent books and records, that were designed to conceal YBM's fraudulent operations from securities regulators, auditors and the investing public. This included: (a) creating false bank statements, invoices, customer lists, shipping documentation and audit confirmations to support false claims of sales activities and revenues; and (b) funneling proceeds from the sale of YBM stock to closely-related parties and entities to create the false appearance of commercial transactions on YBM's books and records;

(c) used various techniques to fraudulently inflate the value of YBM stock and to create market demand for the artificially inflated stock, in order to profit from sales of YBM stock owned and controlled by the defendants, in that the defendants falsely touted the business activity and financial performance of the Network of YBM Companies through, among other things, the issuance of press releases, shareholder presentations, and annual and periodic reports filed with securities regulators; and

(d) implemented the scheme to defraud using companies and bank accounts in over twenty different countries, including offshore locations such as the Republic of Nauru in the South Pacific, the Cayman Islands and Nevis in the Caribbean, as well as Canada, England, Hungary, Israel, Lithuania,

Ukraine and Russia, in order to make it more difficult for law enforcement authorities, securities regulators, as well as YBM's auditors and forensic examiners, to uncover the true nature of their criminal operations.

**B. THE GENESIS OF THE NETWORK OF YBM COMPANIES**

31. Commencing in or about January 1993, the defendants, MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, formulated plans to establish and control a new, publicly-owned company in North America (which became known first as PRATECS, and later as YBM). It was part of the scheme to defraud that this publicly-owned company would be given the appearance of an international magnet manufacturer and distributor, and would be structured in such a way that it could sell its stock on the securities exchanges, first in Canada and, eventually, in the United States. It was the defendants' intention to build the scheme around a Canadian publicly-owned company because the defendants believed securities regulations in Canada were more lenient than in the United States, and provided the easiest access to the North American capital markets.

32. To carry out this scheme to defraud, in a series of corporate mergers and acquisitions involving companies owned and controlled by defendant MOGILEVICH, namely, YBM MAGNEX, ARIGON, MAGNEX RT and ARBAT, as set forth in paragraphs 32a-32e below, the defendants took the following steps, among others, to create the publicly-owned company, PRATECS/YBM, and to ensure that MOGILEVICH would have effective control of the resulting publicly-owned company.

(a) Defendant MOGILEVICH authorized and financed the plans to fund this venture by providing seed money totaling approximately $2.4 million through his offshore

company ARIGON between approximately February 1993 and November 1995. This money was funneled through bank accounts of ARIGON to bank accounts controlled by defendant BOGATIN in the Eastern District of Pennsylvania, in order to pay expenses related to the creation, promotion, and operation of the public company, as well as to acquire stock of the public company.

(b) In or about February 1994, the defendants, MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused the creation of YBM MAGNEX in Pennsylvania. Subsequently, in or around December 1994, as part of the scheme to defraud, YBM MAGNEX acquired ARIGON as a wholly-owned subsidiary, along with ARIGON's subsidiaries, MAGNEX RT and ARBAT.

(c) In or about March 1994, the defendants, MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused the creation of PRATECS, the Canadian shell corporation, that was to become the public company. Defendant BOGATIN served as a Director of PRATECS/YBM from the time of its creation until at least September 1998. PRATECS became a publicly-owned company in July 1994 through a public offering of its stock in Canada.

(d) On or about October 31, 1995, PRATECS acquired YBM MAGNEX and its wholly-owned subsidiaries, ARIGON, MAGNEX RT, and ARBAT. Thereafter, in or about November 1995, PRATECS changed its name to YBM MAGNEX INTERNATIONAL, INC.

(e) In or about April 1996, UNITED TRADE became a wholly-owned subsidiary of YBM. UNITED TRADE acquired the assets of ARIGON, including the

Budapest manufacturing plant and was the primary company through which magnet sales and other commercial transactions were conducted. Defendant FISHERMAN served as President of UNITED TRADE from its inception until at least August 1998, when he was forced to resign.

**C. CONTROL OVER YBM**

**<u>Control of Management</u>**

33. At all times relevant to the period of the Superseding Indictment, defendants FISHERMAN, BOGATIN and TSOURA used their various executive positions within the Network of YBM companies to control the operations of the Network of YBM companies and, thereby, carry out the scheme to defraud. As a result, defendants FISHERMAN, BOGATIN and TSOURA were able to act for, and on behalf of, defendant MOGILEVICH, and to follow his directives and implement his objectives in executing the scheme.

**<u>Control Through Ownership of Stock</u>**

34. Between approximately February 1994 and November 1995, defendants MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, orchestrated a series of corporate and financial transactions (see paragraphs 32(b)-32(d) above) that, among other things, were designed to enable MOGILEVICH, FISHERMAN and BOGATIN to acquire a controlling stock interest in PRATECS/YBM that continued until at least May 1998.

(a) As a result of the said corporate transactions that occurred in 1994 and 1995, MOGILEVICH and five close Russian business associates, the ARIGON shareholders, received approximately 18.7 million shares of PRATECS stock in exchange

for stock in YBM MAGNEX. As a result, by the end of November 1995, defendants MOGILEVICH, FISHERMAN and BOGATIN, directly and indirectly, owned and controlled over 80% of the issued and outstanding stock of PRATECS/YBM.

(b) From in or about January 1996 through in or about May 1998, approximately 16 million additional shares of YBM were sold to the investing public in additional offerings through fraudulent means described below. The defendants took profits from the fraudulent scheme by selling millions of shares of YBM stock as described below (see paragraphs 43 through 45 of the Introduction).

**D. FRAUDULENT, FALSE AND DECEPTIVE PRACTICES**

35. Between approximately 1994 and September 1998, defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA employed the following fraudulent, false and deceptive practices regarding YBM's business operations, financial condition, management and control in order to make YBM look profitable and investment worthy. In addition, these practices were designed to conceal the fraudulent activities described herein and MOGILEVICH's ownership and control of the Network of YBM companies from securities regulators, auditors, forensic examiners (hired by YBM's Board of Directors to examine the operations, books and records of the company), market analysts and the investing public.

**<u>Bribes Offered to Auditors</u>**

(a) Defendant FISHERMAN offered cash bribes in the amount of $500,000 to accountants, in or about March 1994, to prepare and issue a false audit report favorable to the company MAGNEX RT, which offer was refused.

**<u>Deceiving the Auditors/Examiners</u>**

(b) Defendants FISHERMAN, BOGATIN and TSOURA, in order to conceal the falsification of the books and records of the Network of YBM companies described below at paragraph 35(c), at various times between 1994 and 1998, routinely deceived, obstructed, and lied to the auditors, and to the forensic examiners who examined the books and records of YBM and its subsidiaries by, among other things:

(1) falsely representing that the books and records of YBM and the Network of YBM Companies were accurate when they were not;

(2) providing false financial records, bank statements, invoices, contracts, customer lists, shipping documentation and audit confirmations, which were created to support false claims of sales activity and revenues;

(3) systematically withholding access to records and documentation essential to substantiate the accuracy of YBM's statements of its financial condition, by using "put-offs," stalling tactics, and false promises of production; and

(4) failing to disclose to the auditors the material matters as set forth in paragraph 37 below.

**<u>Falsification of Books and Records</u>**

(c) Defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, in order to make YBM's financial statements look profitable and attractive to

investors, recorded, and caused to be recorded, in YBM's books and records at various times between 1994 and 1998:

(1) tens of millions of dollars of fictitious magnet-related transactions that were either: (i) non-existent; (ii) generated from the sales in Europe of consumer goods, food commodities and alcohol-related products and disguised as magnet sales; or (iii) proceeds from stock transactions funneled through shell companies set up by closely-related third parties at the direction of defendant FISHERMAN and his associates to give the appearance of legitimate sales;

(2) payments of money by YBM or its subsidiaries that were falsely described as payments to vendors for raw materials, equipment, technology and services related to magnet production. In reality, the payments were either: (i) non-existent; (ii) directed to the benefit of defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, or to closely-related parties and associates of the defendants; (iii) made to bona fide vendors in Europe for non-magnet purchases such as food commodities, cigarettes, alcohol, or other materials for alcohol production; or (iv) were proceeds from stock transactions funneled through shell companies set up by closely related third parties and disguised as payments to vendors; and

(3) payments by YBM and its subsidiaries of "magnet sales commissions" which, in reality, either: (i) were never made; or (ii) were disguised payments to close associates of defendants MOGILEVICH, BOGATIN, FISHERMAN, and TSOURA.

(d) Defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, in order to make YBM look profitable and attractive to investors, at various times between 1994 and 1998, further falsified or caused YBM's books and records to be falsified by, among other things:

(1) creating false financial records, bank statements, invoices, contracts, customer lists, shipping documentation and audit confirmations, to support false claims of sales activity and revenues;

(2) disguising the fact that approximately $32 million had been falsely reported on the books and records of UNITED TRADE and deposited in a UNITED TRADE bank account for the year ended December 31, 1997, and covering up the falsification by orchestrating a sell-off of YBM stock by the defendants and their nominees in early 1998, and then moving the proceeds into bank accounts to create the appearance that the $32 million existed on the books when it did not;

(3) moving funds in a circular flow to and from bank accounts of UNITED TRADE, using bank accounts under the control of related parties in Russia and Eastern Europe to create the illusion that

UNITED TRADE had a diverse customer and vendor base and conducted significant activity, including brokering of magnets, which was untrue;

(4) destroying wire transfers and other documents that would otherwise track the flow of money through YBM bank accounts;

(5) funneling proceeds generated from the sale of YBM stock to closely related parties and entities to create the false appearance of commercial transactions on YBM's books and records;

(6) routinely using cash withdrawals from bank accounts set up in foreign banks to make millions of dollars in disbursements to the defendants and other closely-related parties for purported business expenses that could not be traced or verified through the books and records; and

(7) routinely and systematically failing to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and disposition of the assets of YBM, as required under the Securities Exchange Act of 1934, §13(b)(2)(A), under securities regulations in Canada, and in accordance with generally accepted accounting principles.

**E. MISREPRESENTATIONS OF YBM's OPERATIONS AND FINANCIAL CONDITION TO SECURITIES REGULATORS AND INVESTMENT COMMUNITY**

36. Defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, in order to make YBM look profitable and attractive to investors, made the following material misrepresentations to the securities regulators and to the investment community regarding YBM's operation and financial condition in public filings with securities regulators, and through the methods set forth below in paragraph 38. It was materially misrepresented at various times between 1994 and September of 1998 that:

**Core Business**

(a) YBM Magnex had an established track record of profitably selling high energy permanent industrial magnets, which it manufactured and distributed throughout Europe, the United States and Canada from 1992 through 1994.

- In reality, the defendants knew YBM had no such history of significant magnet sales in the global market, including Europe, the United States and Canada; and further, knew that YBM MAGNEX's predecessor and subsidiary, ARIGON, was a European commodities trader, with a financial history involving commodities, alcohol and food products, not industrial magnets;

**Operations**

(b) The magnet manufacturing plant in Budapest, Hungary had been operational since 1992.

- In reality, the defendants knew the MAGNEX RT manufacturing plant was not operational until at least August 1994 when some magnet manufacturing commenced and, furthermore, knew it was only marginally

productive between September and December of 1994;

(c) YBM maintained a sales office and staff in Canada which promoted and sold millions of dollars of its magnet products.

- In reality, the defendant BOGATIN and an unindicted conspirator set up a sham sales office in Canada in or about January 1995 to foster the illusion that YBM maintained a viable customer base in Canada, when it did not.

**Sales**

(d) YBM MAGNEX's net magnet sales totalled approximately $110 million for the years 1992, 1993, 1994, and through September 1995.

- In reality, the defendants knew that the books and records were "cooked," that is, the financial statements for those years contained bogus sales and inventory figures in order to create the false appearance that YBM had a viable customer base with significant sales of its magnet products;

(e) Sales of YBM magnets in Canada between 1992 and May 1994 amounted to $4.2 million (U.S.).

- In reality, the defendants knew sales of YBM magnets in Canada during that period were virtually nonexistent and the valuation of the distribution rights to sell YBM products in Canada based upon these bogus sales figures was artificially inflated;

(f) YBM had penetrated the North American magnet market, primarily in the United States, and sales revenues from North American customers were approximately $13.6 million in 1996.

- In reality, the defendants knew YBM's North American magnet sales were less than $1.8 million in 1996; magnet imports into Canada, the United States and Mexico from the Budapest manufacturing plant were negligible; and the companies identified to regulators as North American customers were: (i) companies that purportedly did business in Russia and Eastern Europe that merely maintained registered addresses in the United States; (ii) legitimate United States companies that never purchased magnets from YBM; or (iii) sham customers;

(g) Revenues totaled approximately $100 million between 1996 and June 1998, primarily from YBM's magnet and oil sales through its subsidiary UNITED TRADE LIMITED.

- In reality, the defendants knew such revenues did not exist and were falsely recorded on YBM's books to make the company look profitable.

**Assets**

(h) The value of the start-up machinery and equipment as reported in YBM's financial statements included Russian machinery and equipment contributed to ARIGON for the Budapest manufacturing plant in or about 1992, valued at approximately $14.5 million (USD).

- In reality, the defendants knew this value was based upon false and fraudulent documentation.

(i) The depreciated value of machinery and equipment at the Budapest, Hungary plant as of December 31, 1997 was reported on the books and records of

UNITED TRADE and MAGNEX RT to be approximately $40 million.

- In reality, the defendants knew this was a false and inflated value, and indeed the value of the machinery and equipment at the Budapest plant as of May 1999 was not more than approximately $3,080,000;

(j) YBM sold ARBAT, a Russian joint venture company and a subsidiary of ARIGON, for the sum of $250,000, and realized a profit of $70,000.

- In reality, the defendants knew YBM did not realize a profit, rather the purchase was paid for with monies funneled to closely-related straw parties from Mogilevich's ARIGON bank account and from monies from the sale of MOGILEVICH's YBM stock.

**Management and Control**

(k) YBM's core operations, including production, sales, marketing and corporate finance, were primarily directed and controlled by a North American-based Board of Directors and corporate management team.

- In reality, the defendants knew the core operations were directed and controlled by the defendants MOGILEVICH, FISHERMAN and TSOURA from Budapest, Hungary, and other locations in combination with BOGATIN; and

(l) Certain individuals held various titles and positions of authority for companies within the Network of YBM companies, including Treasurer, Sales and Marketing Director, and Director of Industrial Relations.

- In reality, the defendants knew these individuals performed minimal

functions for the various corporations, were placed in the Network of YBM Companies by MOGILEVICH as "window dressing" for the public, and took directions from MOGILEVICH to move money to and from the corporate accounts of ARIGON, UNITED TRADE and TDL .

**F. FAILURE TO DISCLOSE TO SECURITIES REGULATORS**

37. The defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA failed to disclose the following material matters, among others, in public filings with securities regulators :

(a) Defendant MOGILEVICH controlled YBM through his control over YBM management;

(b) MOGILEVICH owned in excess of 10% of the shares of PRATECS and YBM stock from between approximately April 1994 and approximately January 1998. This was concealed by creating false documentation to show that others owned a percentage of MOGILEVICH's stock when in fact the other persons were merely nominees for MOGILEVICH;

(c) Fairfax Group Ltd ("Fairfax"), an international, forensic investigative security firm conducted an investigation of YBM and presented investigative findings to the YBM directors and management, including defendants FISHERMAN and BOGATIN, in or about March 1997 that:

(1) the ARIGON shareholders, including defendant MOGILEVICH, were members of a Russian organized crime syndicate, and owned or controlled YBM subsidiaries,

ARBAT, ARIGON, and MAGNEX RT;

(2) equipment sold by the original ARIGON shareholders, including defendant MOGILEVICH, to MAGNEX RT was overvalued and the records documenting the transactions false; and

(3) YBM was doing business with companies that did not exist, were shell companies, and were controlled by closely related parties to the defendants.

**G. DISSEMINATING FALSE AND MISLEADING INFORMATION TO THE INVESTMENT COMMUNITY**

38. The defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA created market demand for YBM stock and artificially inflated the price of such stock through the dissemination of false and misleading information to the investment community. The false and misleading information was disseminated by the defendants in various ways, including:

(a) the creation and issuance of annual and other periodic reports filed with the securities regulators and available to the public to falsely tout the business successes of YBM, including false representations about YBM's sales and profitability contained in these reports;

(b) the issuance of press releases that contained false and misleading information about the business activity and financial performance of the YBM Network of companies; and

(c) making shareholder presentations, lobbying stockbrokers and

communicating with market analysts to tout record profits in revenues from magnet sales, and global operations, which were false and fraudulent.

**H. SALES OF SECURITIES BY PRATECS/YBM**

39. As a result of the material omissions set forth in paragraph 37(a) and (b) above, the defendants caused Canadian regulators (ASE and ASC) on or about July 27, 1994, to approve the sale of 4,000,000 shares of PRATECS at $0.10 (CDN) per share in an Initial Public Offering. This sale of stock generated approximately $400,000 (CDN), which was used to fund and promote the fraudulent operations of the company, including payments for consultant fees to certain unindicted coconspirators.

40. As a result of the false, fraudulent, and deceptive practices set forth in paragraph 35 and the misrepresentations and omissions set forth in paragraphs 36 and 37, the defendants caused Canadian regulators to approve the sale of securities by the public company, YBM, as follows:

(a) In or about October 1995, 7,075,000 Special Warrants, that is, securities permitting the owners of the Warrants to convert them to shares of YBM common stock, were sold to the public generating approximately $14.15 million (CDN) in proceeds, which monies were used by the defendants to: (a) continue to fund the fraudulent operations of the Network of YBM companies, including payments to defendant BOGATIN, and others known and unknown to the grand jury; and (b) make payments to FISHERMAN through a third party nominee account in Russia as well as payments to individuals and companies associated with defendants MOGILEVICH, FISHERMAN and BOGATIN.

(b) On or about November 20, 1997, approval was obtained from the OSC to register for sale approximately 7.2 million common shares to the investing public which raised approximately $100 million (CDN) in proceeds ("1997 Offering"). The $100 million raised was used to fund and promote the fraudulent operations of the company and to carry out the scheme to defraud. This stock was sold in two stages, as follows:

(1) 3.2 million shares of YBM stock were sold to the public for $16.50 (CDN) share in a public offering approved by the OSC and completed on November 26, 1997, which generated approximately $52 million (CDN); and

(2) 4 million shares of YBM stock, at $12 (CDN) per share, were issued in connection with a private placement of convertible notes on or about August 20, 1997, which were purchased primarily by institutional investors. This raised approximately $48 million (CDN). The notes were convertible into the 4 million shares of YBM common stock on November 20, 1997.

41. From approximately July 1994, when PRATECS stock was sold in the IPO at $.10 (CDN) per share, until approximately March 1998, when PRATECS/YBM's stock reached a peak of $20.15 (CDN) per share, the price of stock rose approximately 2,000 percent in less than four years. On May 13, 1998, when the trading in YBM stock was suspended by the OSC, the stock was trading at approximately $14.35 (CDN) per share.

**I. EFFORT TO EXPLOIT THE UNITED STATES SECURITIES MARKETS**

42. In furtherance of the scheme to defraud, defendants MOGILEVICH,

FISHERMAN, BOGATIN and TSOURA and others known and unknown to the grand jury, took steps to have YBM's securities registered for trading with securities regulators in the United States and listed on securities exchanges inside the United States in order to further exploit the financial markets in the United States which offered greater access to investors. In this regard they caused the following to be filed:

(a) On or about August 14, 1996, Registration Statement (Form 40-F) was filed with the SEC to register YBM securities for sale in the United States pursuant to Section 12(g) of the Securities Exchange Act of 1934, and an Application for Public Securities ("NASDAQ Application") was filed with the NASDAQ to obtain approval for a listing of YBM's stock on the NASDAQ. The Form 40-F was available to the public. As part of the filings of the Form 40-F and the NASDAQ Application, the defendants incorporated and included, and caused to be incorporated and included, the false and fraudulent representations submitted to the OSC and TSE regarding the financial condition of the Network of YBM companies, its business operations and ownership and control of YBM stock as set forth in paragraphs 36 and 37 above.

(b) On or about November 27, 1996 and December 19, 1997, Forms 6-K (Reports of Foreign Issuer) were filed with the SEC, which Reports were available to the investing public. The Reports contained false and fraudulent representations of financial condition and business operations including filings that falsely inflated sales revenues and customer base, as set forth in paragraphs 36 and 37 above.

**J. PROFITS TO DEFENDANTS FROM SCHEME TO DEFRAUD**

**Sale of YBM stock**

43. At various times during the scheme to defraud the defendants sold large amounts of YBM stock in order to profit from the scheme to defraud described herein. The defendants and their nominees received in excess of $25 million in stock proceeds over the life of the conspiracy.

44. Beginning in or about May 1994, defendants MOGILEVICH, FISHERMAN, and BOGATIN established and used accounts at different brokerage firms in their names and in the names of nominees, including "investment club" accounts described below. These accounts were depositories for millions of shares of YBM stock. These accounts enabled defendants MOGILEVICH, FISHERMAN and BOGATIN to coordinate and control the distribution, transfer and sales of large blocks of YBM stock and to profit unjustly from the sale of fraudulently inflated stock. The proceeds from these sales were disbursed to the defendants, to their associates, and to shell companies set up and controlled, directly and indirectly, by defendants MOGILEVICH and FISHERMAN.

**Investment Clubs**

45. The following investment clubs served as depositories for some of the stock sold for the benefit of defendants MOGILEVICH, FISHERMAN and BOGATIN, generating proceeds in excess of $15 million:

(a) The Anix Investment Club ("Anix") was established at First Canada Securities in or about May 1994. In 1996, the Anix account was transferred to a series of brokerage firms in the United States. Proceeds derived from the sales of YBM stock through Anix totaled in excess of $1.5 million and were concealed by depositing monies in a foreign bank account in the names of nominees closely associated with defendants MOGILEVICH and

FISHERMAN.

(b) The Arion Investment Club ("Arion") was established at First Marathon Securities in or about May 1996. Proceeds derived from the sales of YBM stock through Arion totaled approximately $12 million, which monies were concealed in foreign bank accounts held in the name of an unindicted co-conspirator, a close associate of defendant MOGILEVICH.

(c) In or about March 1996, defendant BOGATIN, at the direction and with the assistance of defendants MOGILEVICH and FISHERMAN, opened approximately 48 brokerage accounts at Dean Witter Reynolds located in the Eastern District of Pennsylvania (“Dean Witter Accounts") over which BOGATIN held power of attorney. One of these accounts was called the Poseidon Investment Club (“PIC”), a stock investment club which traded exclusively YBM stock. There were approximately 30 members of PIC, the membership of which was limited to defendants MOGILEVICH and FISHERMAN, the ARIGON shareholders, and nominees controlled by the defendants. Through his power of attorney, defendant BOGATIN managed and coordinated the trading in the Dean Witter accounts on behalf of himself, the other defendants MOGILEVICH, FISHERMAN, and TSOURA, and their nominees. Proceeds derived from the sales of YBM stock through the Dean Witter accounts totaled approximately $1.9 million.

**<u>Salaries and other compensation</u>**

46. In addition to the millions of dollars of stock profits the defendants took from YBM, the following defendants further benefitted from the scheme to defraud described herein, by taking salary, bonuses and other compensation totaling the approximate amounts

listed:

| | **Defendant** | **Amount** |
|---|---|---|
| (a) | FISHERMAN | $ 1.3 million |
| (b) | BOGATIN | $ 1 million |
| (c) | TSOURA | $ 1.2 million |

**COUNT ONE**
**(RICO Conspiracy)**

**THE GRAND JURY CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

**THE ENTERPRISE**

2. The Enterprise, also referenced herein as the "Mogilevich Enterprise," was an enterprise as defined in Title 18, United States Code, Section 1961(4), namely, a group of individuals and corporations associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce, and which consisted of the following individuals and legal entities, namely:

(a) **Individuals:** Defendants SEMION MOGILEVICH, IGOR FISHERMAN, JACOB BOGATIN, ANATOLY TSOURA, and other individuals known to the grand jury; and

(b) **Legal Entities:** YBM MAGNEX INTERNATIONAL, INC., its predecessor company, PRATECS, and its subsidiary and related companies, ARIGON, UNITED TRADE, MAGNEX RT, ARBAT, YBM TECHNOLOGIES, YBM MAGNEX, TDL, ORIGON, and BEM.

3. The Mogilevich Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Mogilevich Enterprise existed for the purposes of: (a) defrauding investors in the United States, Canada, and elsewhere, through fraudulent schemes and material misrepresentations and omissions, in order to obtain money and property; (b) receiving, holding

and investing money received from these fraudulent schemes; (c) disguising and concealing the defendants' interest in, and control over the money and investments; and (d) spending and using various amounts of money in ways that promoted the scheme and benefitted the individual members and associates of the Mogilevich Enterprise.

4. Defendants SEMION MOGILEVICH, IGOR FISHERMAN, and JACOB BOGATIN were leaders of the Mogilevich Enterprise who directed other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs. Under the direction of the leaders of the Mogilevich Enterprise, defendant ANATOLY TSOURA, and others known to the grand jury, participated in unlawful activities in furtherance of the conduct of the Enterprise's affairs.

**THE RICO CONSPIRACY**

5. From in or about 1993, continuously thereafter up to and including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

being persons employed by and associated with the Mogilevich Enterprise described above in paragraphs 2 through 4 of Count One, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, did unlawfully, willfully, and knowingly

conspire and agree together and with other persons known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Mogilevich Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5).

6. The pattern of racketeering activity consisted of multiple acts indictable as felony crimes under the following laws of the United States:

(a) Title 18, United States Code, Section 1343 (Wire Fraud);

(b) Title 18, United States Code, Section 1341 (Mail Fraud);

(c) Title 15, United States Code, Sections 78j(b) & 78ff(a) and 17 C.F.R. Section 240.10b-5 (Securities Fraud);

(d) Title 18, United States Code, Section 1956(h) (Money Laundering Conspiracy), and

(e) Title 18, United States Code, Section 1956(a)(2) (Money Laundering).

7. It was a further part of the conspiracy that each defendant agreed that a coconspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

**MANNER AND MEANS**

8. Among the manner and means by which the defendants, and others, conducted and participated in the affairs of the Mogilevich Enterprise, and accomplished and attempted to accomplish the objectives of the conspiracy, were the following:

**The Scheme To Defraud**

9. The defendants devised and intended to devise the scheme as set forth in Paragraphs 1 through 46 of the Introduction to this Superseding Indictment.

**Wire Transmissions**

10. The defendants and others known and unknown to the grand jury, for the purpose of executing the scheme to defraud, caused the interstate and foreign transmission of writings, signs, signals and sounds, to and from the Eastern District of Pennsylvania, as follows:

(a) The defendants caused correspondence and documents to be transmitted via facsimile, to and from various places in the United States, from and to various places in foreign countries, including the United Kingdom, Canada, Hungary and Russia, among others. The documents included, but were not limited to, materially false and fictitious audit confirmations, press releases and statements of YBM's financial condition and business operation.

(b) The defendants communicated between and among themselves and others, by telephone and cellular phone, including calls made to and from various places in the United States, and foreign countries, including Canada and Hungary; and

(c) The defendants caused funds to be distributed between and among themselves and other individuals and entities, via wire transfers to and from bank accounts and brokerage accounts maintained in the United States, Canada, the United Kingdom, Hungary and elsewhere. These funds were used by the defendants for the following, among other things: (i) the

payment of expenses associated with the operation of the scheme; (ii) the purchase of large blocks of PRATECS/YBM stock, by the defendants and others, to insure a controlling interest in YBM and to profit from the sale of YBM stock; and (iii) the creation of the false and fraudulent appearance of commercial activity on YBM's books and records.

**Mailings**

11. The defendants, and others known and unknown to the grand jury, for the purpose of executing the scheme to defraud caused, and attempted to cause, certain matters and things to be sent and delivered, to and from the Eastern District of Pennsylvania, by the United States Postal Service and by private and commercial interstate carriers. These items included, but were not limited to, materially false and fictitious statements of YBM's financial condition and business operations, audit confirmations, correspondence and filings with the ASC, ASE, OSC, TSE, SEC and NASDAQ.

**Securities Transactions**
(**Fraud in Connection with the Purchase and Sale of YBM Securities**)

12. The defendants, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, in connection with the purchase and sale of YBM securities:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and

(c) engaged in acts, practices and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of shares of PRATECS/YBM by the investing public.

13. The defendants caused YBM's financial condition and business operations to be materially misrepresented in YBM's annual reports, prospectuses, press releases and public filings, to present a false appearance to investors and securities regulators that YBM was a profitable and investment-worthy business which generated high revenues from the worldwide sale and distribution of its magnets and other products. The defendants also failed to disclose the true extent of MOGILEVICH's ownership and control of YBM.

**Financial Transactions**

14. The defendants and others known and unknown to the grand jury caused monetary instruments and funds to be transported, transmitted, and transferred from places in the United States to and through places outside of the United States, and to places in the United States from and through places outside the United States, with the intent to:

(a) promote the scheme to defraud through the payment of salaries, consulting fees, commissions, mortgage, rent, advertising fees, and other expenses necessary to support YBM's continued operation of the scheme; and

(b) conceal and disguise the nature, location, source, ownership and control of the proceeds generated by the scheme to defraud through the use of foreign bank accounts, and accounts held in the names of nominees, closely-related parties and shell companies.

15. Portions of the proceeds generated by the three offerings of PRATECS/YBM stock, as more particularly described in the Introduction to this Superseding Indictment, were utilized to further promote the scheme to defraud.

16. Portions of the proceeds from the sale of artificially inflated YBM stock by the defendants and their nominees were misrepresented on the books and records of YBM as revenue from its commercial operations. Similarly, proceeds that were transferred to individual defendants and closely-related entities were concealed on the books and records of YBM as vendor payments or the repayment of loans.

**OVERT ACTS**

17. In furtherance of the conspiracy and in order to carry out the objectives of the conspiracy, on or about the dates listed below, the defendants and others known and unknown to the grand jury, committed and caused to be committed overt acts, which also constitute racketeering acts, including but not limited to the following, in the Eastern District of Pennsylvania, and elsewhere:

**Wire Transmissions**

| Overt Act | Date | Description |
|---|---|---|
| 1 | 1/11/93 | Facsimile of correspondence from BOGATIN's residence, Richboro, PA (ph# 215-953-1080) to FISHERMAN in Budapest, Hungary, (ph# 011-36-1-183-1450) requesting $100,000 to start up company and commence operations. |

| Overt Act | Date | Description |
|---|---|---|
| 2 | 2/24/93 | Two wire transfers from ARIGON'S account at Royal |

| | | |
|---|---|---|
| | | Bank of Scotland, London, England (a/c BLAARI-USDC) to two accounts at CoreStates Bank, Philadelphia, Pennsylvania; one for $70,000 to the YBM TECHNOLOGIES' account (a/c 0197-5336), and the second for $30,000 to BOGATIN's account (a/c 0404-8829). |
| 3 | 12/29/93 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), providing update on the status of formation of public company. |
| 4 | 1/4/94 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), requesting transfer of money for costs related to preparation for public company. |
| 5 | 1/12/94 | Wire transfer of $50,000 from ARIGON'S account at Royal Bank of Scotland, London, England, (a/c BLAARI-USDC) to YBM TECHNOLOGIES account at CoreStates Bank, Philadelphia, PA (a/c 0197-5336). |
| 6 | 3/17/94 | Wire transfer of $50,000 from ARIGON'S account at Royal Bank of Scotland, London, England, (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829), for purchase of stock. |
| 7 | 3/21/94 | Wire transfer of $50,000 from BOGATIN's account at CoreStates Bank, Philadelphia, PA, (a/c 0404-8829) to account of Cook Snowden at Royal Bank of Canada, Calgary, Canada (a/c 1321579). |
| 8 | 7/20/94 | Facsimile of correspondence from BOGATIN, in Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), regarding Pratecs stock prices and requesting $200,000 to $250,000 to redeem 1 million shares, and an additional $50,000 to purchase shares. |

| Overt Act | Date | Description |
|---|---|---|

| | | |
|---|---|---|
| 9 | 7/22/94 | Wire transfer of $200,000 from ARIGON'S account at Royal Bank Of Scotland, London, England (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829). |
| 10 | 7/25/94 | Wire transfer of $150,000 from BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829) to an Anix Investment Club account at Canadian Imperial Bank of Commerce, Toronto, Canada (a/c 49-0068-4). |
| 11 | 3/29/95 | Facsimile of correspondence from an unindicted coconspirator in London, England (ph# 44-0171-242-0726) to Parente, Media, PA (ph# 610-891-0463), providing the auditor with information regarding other purported beneficial owners of ARIGON stock. |
| 12 | 4/17/95 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN, Budapest, Hungary (ph# 011-36-1-342-0758) advising them of expenses incurred. |
| 13 | 7/15/95 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-342-0758), requesting money for expenses. |
| 14 | 7/19/95 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing a false statement denying a relationship between British investigation and ARIGON. |
| 15 | 10/15/96 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's "penetration" of North American market and reporting YBM's magnet sales. |
| 16 | 12/10/96 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's "million dollar contract with Mitsubishi of Japan." |
| 17 | 1/26/97 | Fascimile of false audit confirmation to FE & CE Co., Inc., Buffalo, New York (ph # 716-847-0814) from MAGNEX RT, Budapest, Hungary (ph # 36-1-276-4521) re $5.6 million in sales. |

| **Overt Act** | **Date** | **Description** |
|---|---|---|

| | | |
|---|---|---|
| 18 | 1/26/97 | Facsimile of false audit confirmation to BIG Enterprises, Inc., Buffalo, New York (ph # 716-847-0814) from MAGNEX RT, Budapest, Hungary (ph # 36-1-276-4521) re $2.3 million in sales. |
| 19 | 2/25/97 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's continued "penetration" of North American market and reporting magnet sales figures. |
| 20 | 5/14/97 | Facsimile from FISHERMAN and TSOURA, Budapest, Hungary (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-579-3444) containing April 1997 financial information for UNITED TRADE. |
| 21 | 5/28/97 | Facsimile from TSOURA, Budapest, Hungary, (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-589-3444) containing responses to questions about the April 1997 financial information for UNITED TRADE. |
| 22 | 7/2/97 | Facsimile of false “sales” audit confirmation from Kofa, Ltd. (ph# 095-938-2039) in Russia, to Deloitte in EDPA (ph# 215-448-2236), re $1.37 million in sales. |
| 23 | 7/3/97 | Facsimile of false “sales” audit confirmation from Amadeus Holding Ltd. in Canada (ph # 403-483-4064) to Deloitte in EDPA (ph# 215-448-2236), re $2.8 million in sales. |
| 24 | 7/3/97 | Facsimile of false “sales” audit confirmation from BIG Enterprises, Inc., in Moscow, Russia (ph# 7-502-221-4546) to Deloitte in EDPA (ph# 215-448-2236) re $2.3 million in sales. |
| 25 | 7/31/97 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re the sale of CatchDisk computer security system for $4.5 million, a 200% profit. |
| 26 | 8/29/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph# 215-579-3444), containing responses to questions about the July 1997 financial information for UNITED TRADE. |
| **Overt <u>Act</u>** | **<u>Date</u>** | **<u>Description</u>** |

| | | |
|---|---|---|
| 27 | 11/5/97 | Facsimile from TSOURA, Budapest, Hungary, (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-579-3444) containing information about the January to September 1997 financial information for UNITED TRADE. |
| 28 | 1/30/98 | Facsimile of false "sales" audit confirmation from Amadeus Holding Ltd., Canada (ph # 403-483-4064) to Deloitte in EDPA (ph# 215-448-2236), re $3.1 million in sales. |
| 29 | 2/24/98 | Facsimile of false "sales" audit confirmation re $3 million, from Origon Co., in Nevis to Deloitte in EDPA (ph# 215-448-2236). |
| 30 | 3/9/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for 1997. |
| 31 | 3/9/98 11:52 a.m | Telephone conversation from BOGATIN, in Newtown, PA (ph# 215-738-3800) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 36-20-339-688) discussing MOGILEVICH's continued help, his instructions re ongoing audit problems and the need for documentation. |
| 32 | 3/12/98 10:05 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and a stock broker in Toronto, Canada (ph# 416-943-6101) discussing sale of 1.5 million shares of YBM stock, purportedly by an "ill" shareholder. |
| 33 | 3/19/98 2:27 p.m. | Telephone conversation from BOGATIN, in Newtown, PA (ph# 215-579-5695) to FISHERMAN, in Budapest, Hungary (ph# 36-20-339-688) discussing the transfer of proceeds totaling approximately $17 million from the sale of stock. |

| **Overt <u>Act</u>** | **<u>Date</u>** | **<u>Description</u>** |
|---|---|---|
| 34 | 3/27/98 3:22 p.m. | Telephone conversation from BOGATIN in Newtown, PA |

| | | |
|---|---|---|
| | | (ph# 215-579-5695) to FISHERMAN, in Budapest, Hungary (ph# 36-20-339-688) discussing Russia and Ukraine licensing agreements and the use of a company named "Australian Finance Structure" to facilitate the transfer of money. |
| 35 | 4/27/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for the first quarter of 1998. |
| 36 | 5/1/98 11:59 a.m. | Telephone conversation from BOGATIN in Newtown, PA (ph# 215-579-5695) to FISHERMAN, Budapest, Hungary (ph# 36-20-339-688) in which BOGATIN advises the Australian company is an obvious “sham." |
| 37 | 5/12/98 4:50pm | Telephone conversation from BOGATIN in Newtown, PA (ph# 215-579-5695) to a stockbroker in Toronto, Canada (ph# 514-848-1991) providing false assurances regarding YBM's ongoing audit and promoting YBM's financial expectations |
| 38 | 5/13/98 9:18am | Facsimile correspondence from Budapest, Hungary (ph# 36-1-277- 8121) to YBM in Newtown, PA, (ph# 215-579-4418) providing authorization to transfer $28 million from a YBM bank account at the Royal Bank of Canada, Toronto, Canada, to an account in Budapest, Hungary. |
| 39 | 6/8/98 | Facsimile of YBM press release from EDPA to a wire service in Canada falsely stating that MOGILEVICH's involvement in YBM was only that of a "passive shareholder." |
| 40 | 6/11/98 | Wire transfer of $200,000 from UNITED TRADE’S account at Mellon Bank, Philadelphia, PA (a/c 8-449-779) to FISHERMAN’S account at Summit Bank, Cherry Hill, NJ (a/c 642012962). |
| 41 | 8/21/98 | Facsimile of false Snoras Bank statement for United Trade account and bogus wire transfer instructions totaling approximately $32.2 million from Budapest, Hungary (ph# 36-1-277-8121) to YBM in Newtown, PA (PH# 215-579-4418). |

**Mailings**

| **Overt Act** | **Date** | **Description** |
|---|---|---|

| | | |
|---|---|---|
| 42 | 3/5/95 | False "account payable" audit confirmation in the amount of $49,000 for 1994 audit year, mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 from FNJ Trade Management in Los Angeles, CA. |
| 43 | 3/5/95 | False "account receivable" audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Comspan in Los Angeles, CA**.** |
| 44 | 4/7/95 | False audit confirmations mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063: one from FNJ Trade Management in Los Angles, CA, pertaining to an "account receivable" in the amount of $699,985 for 1992 audit year; and one purportedly from Andrew Gaspar in Los Angeles, CA, pertaining to a "commission." |
| 45 | 8/13/96 | Envelope mailed from EDPA to Andrew Labadie, The NASDAQ Stock Market, 1735 K Street NW, Washington, D.C. 20006-1500, containing NASDAQ Listing Agreement, Application for Listing on NASDAQ, and copy of the Form 40-F. |
| 46 | 8/14/96 | SEC filing (Form 40-F-Registration Statement) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549, from office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. |
| 47 | 11/27/96 | SEC filing (Form 6-K-Report of Foreign Issuer) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549, from the office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. |

| **Overt Act** | **Date** | **Description** |
|---|---|---|
| 48 | 12/19/97 | SEC filing (Form 6K-Report of Foreign Issuer) sent via Federal Express from office of Wolf, Block, Schorr & |

Solis-Cohen, 111 South 15th Street., Philadelphia, PA to United States Securities and Exchange Commission, Washington, DC 20549.

**Financial Transactions**
**(Promotion of the Scheme )**

| **Overt Act** | **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|---|
| 49 | 11/2/95 | Proceeds totaling approx. $755,555 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2006-8360 CoreStates Bank Philadelphia, PA |
| 50 | 5/22/96 | Proceeds totaling approx. $2,072,291 from the sale of shares of YBM stock. | CBN Trust Co. a/c 24070843 Snoras Bank Lithuania | Technology Distribution Ltd. (TDL) a/c 0001-036613-500 Central-Euro. Int'l Bank Budapest, Hungary |

| **Overt Act** | **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|---|
| 51 | 6/12/96 | Six wire transfers of proceeds totaling approx. $3.2 million from the sale of shares of YBM. | Technology Dist. Ltd. (TDL)<br>a/c 0001-036613-500<br>Central-European Int'l Bank<br>Budapest, Hungary | Nominee Accounts:<br>• IBS Trad'g Co. a/c 530-250918 ($528,884)<br>• N.Y. Cotton Corp. a/c 530-295377 ($512,604)<br>• United Norland Investment Corp. a/c 530-043114 ($372,500)<br>• M. Finance Co. a/c 530-296020 ($618,410)<br>• Independent Group, Inc. a/c 530-296047 ($580,080)<br>• Whitley Int'l Corp. a/c 530-296489 ($587,522)<br>Chase Manhattan Bank *(formerly Chemical Bank)*<br>Buffalo, New York |
| 52 | 10/28/96 | Proceeds totaling approx. $150,000 in connection with the Arbat divestiture. | Unindicted Coconspirator<br>a/c 501-01791-3101-4012<br>Magyar Kulkereskedelmi Bank (MKB)<br>Budapest, Hungary | YBM Magnex Inc.<br>a/c 14108-82581<br>CoreStates Bank<br>Philadelphia, PA |
| 53 | 11/28/97 | Proceeds totaling approx. $500,000 from the 1997 Offering. | YBM Magnex International<br>a/c 110-596-4<br>Royal Bank of Canada<br>Toronto, Canada | YBM Magnex Inc.<br>a/c 2-953-495<br>Mellon Bank<br>Philadelphia, PA |
| 54 | 1/12/98 | Proceeds totaling approx. $1,200,000 from the 1997 Offering. | YBM Magnex International<br>a/c 110-596-4<br>Royal Bank of Canada<br>Toronto, Canada | YBM Magnex Inc.<br>a/c 2-953-495<br>Mellon Bank<br>Philadelphia, PA |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 55 | 5/26/98 | Proceeds totaling approx. $10 million from the sale of shares of YBM. | United Trade Ltd.<br>a/c 503-20008-4100-4014<br>MKB Bank<br>Budapest, Hungary | United Trade Ltd.<br>a/c 8-449-779<br>Mellon Bank<br>Philadelphia, PA |
| 56 | 6/30/98 | Approx. $1.8 million for the Russian Licensing Agreement | United Trade Ltd.<br>a/c 402-557-3<br>Royal Bank of Canada<br>Toronto, Canada | Australian Finance Structure Pty. Ltd.<br>a/c 0738081<br>Latvia |

**Financial Transactions**
**(Concealment of Proceeds)**

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 57 | 11/2/95 | Approx. $976,047 | YBM Magnex International<br>a/c 401-060-9<br>Royal Bank of Canada<br>Toronto, Canada | Pantra Trad'g Ltd.<br>a/c 2344502<br>Barclays Bank<br>Cyprus |
| 58 | 5/10/96 | Proceeds totaling approx. $65,179 from the sale of shares of YBM. | Unindicted Coconspirator<br>a/c 52-304-F & a/c 42-304-E<br>Griffiths McBurney Partners<br>Toronto, Canada | Poseidon Investment Club<br>a/c 645-101-745-02<br>Dean Witter Reynolds<br>Jenkintown, PA |

| **Overt Act** | **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|---|
| 59 | 5/23/96 | Five wire transfers of proceeds, each in the approx. amount of $860,076, from the sale of shares of YBM. | Unindicted Coconspirator<br>Griffiths McBurney Partners<br>Toronto, Canada | Nominee Accounts:<br>• N.Y. Cotton Corp. a/c 530-295377<br>• United Norland Investment Corp. a/c 530-043114<br>• M. Finance Co. a/c 530-296020<br>• Independent Group, Inc. a/c 530-296047<br>• Whitley Int'l Corp. a/c 530-296489<br>Chase Manhattan Bank *(formerly Chemical Bank)*<br>Buffalo, New York |
| 60 | 8/1/96 | Approx. $100,500 | Unindicted Coconspirator<br>a/c 501-00152-3101-4014<br>MKB Bank<br>Budapest, Hungary | Olga Zhunzhurova, wife of Igor Fisherman |
| 61 | 8/14/96 | Approx. $250,000 | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 53-360F-0/53-360E-2<br>Griffiths McBurney Partners<br>Toronto, Canada | Jefferson Gersch, Inc.<br>a/c 2664-845<br>Mellon PSFS<br>Newtown, PA |
| 62 | 9/5/96 | Three wire transfers of proceeds, totaling approx. $700,000, from the sale of shares of YBM. | Unindicted Coconspirator<br>a/c 52-304-F/410-00104-14<br>Griffiths McBurney Partners<br>Toronto, Canada | Nominee Accounts:<br>• N.Y. Cotton Corp. a/c 530-295377 ($250,000)<br>• United Norland Investment Corp. a/c 530-043114 ($250,000)<br>• M. Finance Co. a/c 530-296020 ($200,000)<br>Chase Manhattan Bank *(formerly Chemical Bank)*<br>Buffalo, New York |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 63 | 10/7/96 | Five wire transfers of proceeds, totaling approx. $2.3 million, from the sale of shares of YBM. | Unindicted Coconspirator<br>a/c 52-304-F/410-00104-14<br>Griffiths McBurney Partners<br>Toronto, Canada | Nominee Accounts:<br>• N.Y. Cotton Corp.<br>a/c 530-295377<br>($500,000)<br>• United Norland Investment Corp.<br>a/c 530-043114<br>($500,000)<br>• Independent Group, Inc.<br>a/c 530-296047<br>($500,000)<br>• Whitley Int'l Corp.<br>a/c 530-296489<br>($300,000)<br>• M. Finance Co.<br>a/c 530-296020<br>($500,000)<br>Chase Manhattan Bank<br>*(formerly Chemical Bank)*<br>Buffalo, New York |
| 64 | 12/11/96 | Proceeds totaling approx. $301,797. | Poseidon Investment Club<br>a/c 45-101-745-021<br>Dean Witter Reynolds<br>Jenkintown, PA | YBM Magnex, Inc.<br>a/c 1410882581<br>CoreStates Bank<br>Philadelphia, PA |
| 65 | 12/19/96 | Proceeds totaling approx. $100,000 from the sale of shares of YBM. | Jacob Bogatin<br>a/c 310200-639200<br>Barclays Bank<br>Cayman Islands | Jacob Bogatin<br>a/c 0404-8829<br>CoreStates Bank<br>Philadelphia, PA |
| 66 | 2/4/97 | Proceeds totaling approx. $7.3 million from the sale of shares of YBM. | Arion Club accounts<br>a/c 025285A (CDN) &<br>a/c 025285B (USD)<br>First Marathon Securities<br>Toronto, Canada | Unindicted Coconspirator<br>a/c 501-00152-3102-4013<br>MKB Bank<br>Budapest, Hungary |
| 67 | 2/10/97 | Proceeds totaling approx. $350,000 from the sale of shares of YBM. | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 410-00272-10<br>Griffiths McBurney Partners<br>Toronto, Canada | Jefferson Gersch, Inc.<br>a/c 2664-845<br>Mellon PSFS<br>Newtown, PA |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 68 | 4/8/97 | Proceeds totaling approx. $670,000 from the sale of shares of YBM. | Nominee Accounts:<br>• Galina Polouchina a/c 7AM 184173 ($410,000)<br>• Victor Soutchkov a/c 7AM 184371 ($260,000) | Unindicted Coconspirator a/c 501-00152-3101-4014 MKB Bank Budapest, Hungary |
| 69 | 9/11/97 | Proceeds totaling approx. $620,934 from the sale of shares of YBM. | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA | Nominee account: Nadeja Polichtchuk a/c 503-20854-3100-4016 MKB Bank Budapest, Hungary |
| 70 | 2/9/98 | Proceeds totaling approx. $1.9 million from the sale of shares of YBM. | Nominee account: Sandorne Bodonyi a/c 410-00259-25 Griffiths McBurney Partners Toronto, Canada | Nominee account: Sandorne Bodonyi/Andrew Gaspar a/c 23616-06087 Bank of America North Hollywood, CA |
| 71 | 9/7/98 | Proceeds totaling approx. $459,700 from the sale of shares of YBM. | Nominee account: Irina Gruber a/c Z-11-055492 Fidelity Investments New York, N.Y. | Nominee account: Irina Gruber a/c 503-20831-3100-4015 MKB Bank Budapest, Hungary |

All in violation of Title 18, United States Code, Section 1962(d).

**COUNTS TWO THROUGH TWENTY-THREE**
**(Wire Fraud)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

and others known and unknown to the grand jury, having devised a scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations and promises, as described in the Introduction to this Superseding Indictment, and for the purpose of executing the scheme and artifice to defraud, and attempting to do so, caused to be transmitted in interstate commerce, and aided and abetted the transmission, to and from the Eastern District of Pennsylvania, by means of wire communications, certain writings, signs, signals, pictures and sounds, as set forth below, in violation of Title 18, United States Code, Section 1343, each transmission constituting a separate count of the Superseding Indictment to and from the Eastern District of Pennsylvania:

| Count | Date | Description | Defendants |
|---|---|---|---|
| 2 | 7/20/94 | Facsimile of correspondence from BOGATIN, in Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN, in Budapest, Hungary (ph# 011-36-1-277-8844) regarding Pratecs stock prices and requesting $200,000 to $250,000 to redeem 1 million shares, and an additional $50,000 to purchase shares. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 3 | 7/22/94 | Wire transfer of $200,000 from ARIGON'S account at Royal Bank of Scotland, London, England (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829) | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 4 | 7/25/94 | Wire transfer of $150,000 from BOGATIN's account at CoreStates Bank, Phila., PA (a/c 0404-8829) to an Anix Investment Club account at Canadian Imperial Bank of Commerce, Toronto, Canada (a/c 49-0068-4) . | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 5 | 3/29/95 | Facsimile of correspondence from an unindicted coconspirator in London, England (ph# 44 0171-242-0726) to Parente, in Media, PA (ph# 610-891-0463), providing the auditor with information regarding other purported beneficial owners of ARIGON stock. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 6 | 5/14/97 | Facsimile from FISHERMAN and TSOURA, Budapest, Hungary (ph# 36-1-277-8121) to YBM Magnex, Newtown, PA (ph# 215-579-3444) containing April 1997 financial information for UNITED TRADE. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 7 | 5/28/97 | Facsimile from TSOURA, Budapest, Hungary, (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-579-3444) containing responses to questions about the April 1997 financial information for UNITED TRADE. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |

| | | | |
|---|---|---|---|
| 8 | 7/2/97 | Facsimile of false “sales” audit confirmation from Kofa, Ltd., in Russia (ph# 095-938-2039) to Deloitte, in EDPA, (ph# 215-448-2236) re $1.37 million in sales. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 9 | 7/3/97 | Facsimile of false “sales” audit confirmation from: Amadeus Holding Ltd., in Ontario, Canada (ph# 403-483-4064) to Deloitte, in EDPA (ph# 215-448-2236) re $2.8 million in sales. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 10 | 8/29/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph# 215-579-3444), containing responses to questions about the July 1997 financial information for UNITED TRADE. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 11 | 11/5/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph# 215-579-3444), containing information about the January to September 1997 financial information for UNITED TRADE. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 12 | 1/30/98 | Facsimile of false “sales” audit confirmation re $3.1 million, from Amadeus Holding Ltd., in Ontario, Canada (ph# 403-483-4064) to Deloitte, in EDPA (ph# 215-448-2236). | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 13 | 2/24/98 | Facsimile of false “sales” audit confirmation re $3 million, from Origon Co., in Nevis to Deloitte, in EDPA (ph# 215-448-2236). | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 14 | 3/9/98 | Facsimile of YBM press release, from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for 1997. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |

| | | | |
|---|---|---|---|
| 15 | 3/9/98<br>11:52 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-738-3800) and MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing MOGILEVICH's continued help, his instructions re ongoing audit problems and the need for documentation. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 16 | 3/12/98<br>10:05 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and a stock broker in Toronto, Canada (ph# 416-943-6101), discussing sale of 1.5 million shares of YBM stock, purportedly by an "ill" shareholder. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 17 | 3/19/98<br>2:27 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing the transfer of proceeds totaling approximately $17 million from the sale of stock. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 18 | 3/27/98<br>3:22 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing Russia and Ukraine licensing agreements and the use of a company named "Australian Finance Structure" to facilitate the transfer of money. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 19 | 4/27/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for the first quarter of 1998. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 20 | 5/1/98<br>11:59 am | Telephone conversation between BOGATIN in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688) in which BOGATIN advises the Australian company is an obvious “sham." | MOGILEVICH<br>FISHERMAN<br>BOGATIN |

| | | | |
|---|---|---|---|
| 21 | 5/12/98<br>4:50 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and stock broker in Toronto, Canada (ph# 514-848-1991) in which BOGATIN provides false assurances regarding YBM's ongoing audit and promoting YBM's financial expectations. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 22 | 5/13/98<br>9:18 a.m. | Facsimile correspondence from Budapest, Hungary (ph# 36-1-277-8121), to YBM in Newtown, PA, providing authorization to transfer $28 million from a YBM bank account at the Royal Bank of Canada, Toronto, Canada to Budapest. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 23 | 6/11/98 | Wire transfer of $200,000 from UNITED TRADE'S account at Mellon Bank, Philadelphia, PA (a/c 8-449-779); to FISHERMAN'S account at Summit Bank, Cherry Hill, NJ (a/c 642012962). | MOGILEVICH<br>FISHERMAN<br>BOGATIN |

All in violation of Title 18, United States Code, Section**s** 1343 and 2.

**COUNTS TWENTY-FOUR THROUGH TWENTY-NINE**
**(Mail Fraud)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. On or about the dates set forth below in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

and others known and unknown to the grand jury, having devised a scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations and promises, as described in the Introduction to this Superseding Indictment, and for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly caused to be sent and delivered by mail according to the directions thereon, and aided and abetted the delivery, by the United States Postal Service and by private and commercial interstate carrier, the documents described below, in violation of Title 18, United States Code, Section 1341, each delivery constituting a separate count of the Superseding Indictment:

| Count | Date | Description | Defendants |
| --- | --- | --- | --- |
| 24 | 3/5/95 | False "account payable" audit confirmation in the amount of $49,000 for 1994 audit year, mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063; from FNJ Trade Management in Los Angeles, CA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 25 | 3/5/95 | False "account receivable" audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Comspan in Los Angeles, CA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 26 | 4/7/95 | False audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 from FNJ Trade Management in Los Angeles, CA, pertaining to an "account receivable" in the amount of $699,985 for 1992 audit year. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 27 | 4/7/95 | False audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Andrew Gaspar in Los Angeles, CA, pertaining to a "commission." | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 28 | 8/13/96 | Envelope mailed to Andrew Labadie, The NASDAQ Stock Market, 1735 K Street NW, Washington, D.C. 20006-1500, containing NASDAQ Listing Agreement, Application for Listing on NASDAQ, and copy of the Form 40-F sent to United States Securities and Exchange Commission from EDPA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 29 | 8/14/96 | SEC filing (Form 40-F) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549; from Office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |

All in violation of Title 18, United States Code, Sections 1341 and 2.

**COUNT THIRTY**
**(Securities Fraud)**

**THE GRAND JURY FURTHER CHARGES:**

1. The allegations contained in Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. From on or about July 27, 1994, up to and including on or about May 13, 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, used and employed manipulative and deceptive devices and contrivances, by

(a) employing devices, schemes, and artifices to defraud;

(b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of Pratecs/YBM securities by the investing public.

3. The defendants violated those provisions by committing the acts set forth in the scheme as discussed in the Introduction to this Superseding Indictment, including, among other things, making materially false and misleading statements about YBM's core business, its financial condition, and the ownership and control of the company.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5 and Title 18, United States Code, Section 2.

**COUNT THIRTY-ONE**
**(Filing False Registration Statement with the Securities and Exchange Commission)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. On or about August 14, 1996, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 40-F, a Registration Statement of a foreign issuer, which contained statements of material fact that were false and misleading and that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that, among other things: YBM materially misrepresented the nature of its business operations and financial condition, as set forth in paragraph 36 (a) through (e) and (h) through (l) in the Introduction to this Superseding Indictment; and YBM failed to disclose the true extent of MOGILEVICH's ownership and control of YBM, as set forth in paragraph 37 (a) and (b).

In violation of Title 15, United States Code, Sections 78l(g), 78ff(a) and 17 C.F.R., Section 240.12b-20, and Title 18, United States Code, Section 2.

**COUNT THIRTY-TWO**
**(Filing False Report with the Securities and Exchange Commission)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. On or about November 27, 1996, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 6-K (A Report of Foreign Issuer), which contained statements of material fact that were false and misleading and that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that YBM reported, among other things, that its net sales for the nine-month period ending September 30, 1996, were approximately $64 million, which were generated primarily from its core business, the sale of magnets, when the defendants well knew that YBM's net sales were materially misrepresented as to the nature, the amount, and the geographic location of the sales

In violation of Title 15, United States Code, Sections 78m(a), 78ff(a) and 17 C.F.R., Sections 240.12b-20, 240.13a-1, 240.13a-3, 240.13a-16, and Title 18, United States Code, Section 2.

**COUNT THIRTY-THREE**
**(Filing False Report with the Securities and Exchange Commission)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. On or about December 19, 1997, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 6-K (A Report of Foreign Issuer), which contained statements of material fact that were false and misleading and that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that YBM reported, among other things, that its net sales for the nine-month period ending September 30, 1997 to be over $93 million when the defendants well knew that YBM's net sales for the period were materially less than reported.

In violation of Title 15, United States Code, Sections 78m(a), 78ff(a) and 17 C.F.R., Sections 240.12b-20, 240.13a-1, 240.13a-3, 240.13a-16, and Title 18, United States Code, Section 2.

**COUNT THIRTY-FOUR**
**(Falsification of Books and Records)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are hereby incorporated by reference herein.

2. From in or about the Fall of 1995 through in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

and others known and unknown to the grand jury, unlawfully, willfully, and knowingly, directly and indirectly, falsified and caused to be falsified books, records, and accounts which, in reasonable detail, would accurately and fairly reflect the transactions and disposition of the assets of YBM, by, among other things, providing incomplete, inconsistent, contradictory and bogus documentation to identify and support YBM's purported customer and vendor base; creating false financial records, bank statements, invoices, customer lists, shipping documentation and audit confirms; and, destroying wire transfer and other documents.

In violation of Title 15, United States Code, Sections 78m(b)(5), 78ff(a), 17 C.F.R., Section 240.13b2-1, and Title 18, United States Code, Section 2.

**COUNT THIRTY-FIVE**
**(Money Laundering Conspiracy)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2. From in or about May 1994, through in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**

did unlawfully and knowingly conspire and agree together and with other persons known and unknown to the grand jury, to knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from places in the United States to and through places outside the United States, and to places in the United States from and through places outside the United States:

(a) with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud (Title 18, United States Code, Section 1341); wire fraud (Title 18, United States Code, Section 1343); and securities fraud (Title 15, United States Code, Section 78j(b), 17 C.F.R., Section 240.10b-5), in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2; and

(b) knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is, mail fraud (Title 18, United States Code, Section 1341); wire fraud (Title 18, United States Code, Section 1343); and securities fraud (Title 15, United States Code, Section 78j(b), 17 C.F.R., Section 250.10b-5), in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

**MANNER AND MEANS**

3. Among the manner and means by which the defendants MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused and attempted to cause the objectives of the conspiracy to be accomplished, were the following:

**Promotion of Specified Unlawful Activity**

4. The defendants transferred illegal proceeds generated by the scheme to defraud with the intent to promote the continuation of the scheme and the carrying on of specified unlawful activities, that is, mail fraud, wire fraud and securities fraud.

**A. Proceeds from Offerings of YBM Stock**

5. The illegal proceeds generated by the sale of fraudulently inflated stock in connection with the Special Warrants Offering and the 1997 Offering, as described in the Introduction to this Superseding Indictment, were used in part to pay overhead, payroll, vendors and other expenses necessary for the promotion and continued operation of the Network of YBM

companies.

6. The illegal proceeds from these offerings of YBM stock were deposited into accounts in Canada and later transferred to bank accounts in the Eastern District of Pennsylvania as follows, where funds were then disbursed to pay operating expenses of YBM:

| Date | Description | Transferred from | Transferred to |
|---|---|---|---|
| 11/2/95 | Proceeds totaling approx. $755,555 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc a/c 2006-8360 CoreStates Bank Philadelphia, PA |
| 11/2/95 | Proceeds totaling approx. $134,347 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Tech. Inc. a/c 0197-5336 CoreStates Bank Philadelphia, PA |
| 11/28/97 - 3/31/98 | Proceeds totaling approx. $2,700,000 from the 1997 Offering. | YBM Magnex International a/c 110-596-4 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA |

**B. Proceeds Used to Fund Purchase of Arbat**

7. The illegal proceeds generated by the sale of fraudulently inflated YBM stock, as described in the Introduction to this Superseding Indictment, were funneled to a nominee account and used to fund the purchase of Arbat, which was falsely reported by the defendants to be a profitable, arms-length sale in order to promote and continue the scheme to defraud.

8. The illegal proceeds were deposited and transferred to and among the bank accounts in the United States, Hungary and elsewhere, including the following:

| Date | Description | Transferred from | Transferred to |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 10/28/96 | Proceeds totaling approx. $150,000 in connection with the purchase of Arbat. | Unindicted Coconspirator<br>a/c 501-01791-3101-4012<br>MKB Bank<br>Budapest, Hungary | YBM Magnex Inc.<br>a/c 14108-82581<br>CoreStates Bank<br>Philadelphia, PA |

**C. Proceeds From Sale of YBM Stock**

9. To create and promote the false impression that YBM did substantial, highly profitable international business in the industrial magnet market, millions of dollars of illegal proceeds generated by the sale of fraudulently inflated YBM stock were falsely entered on the books and records of UNITED TRADE as customer receipts from magnet sales, and as payments to vendors related to business operations and the production of magnets. The illegal stock proceeds were transferred from nominee brokerage accounts in Canada, through a myriad of nominee bank accounts overseas and in the United States held in the names of purported customers and vendors of United Trade, including the following, among others:

| **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 5/22/96 | Proceeds totaling approx. $2,072,291. | CBN Trust Co.<br>a/c 24070843<br>Snoras Bank<br>Lithuania | Technology Dist. Ltd. (TDL)<br>a/c 0001-036613-500<br>Central-Euro. Int'l Bank<br>Budapest, Hungary |
| 5/31/96 | Proceeds totaling approx. $1,221,255. | TDL<br>a/c 0001-036613-500<br>Central-Euro. Int'l Bank<br>Budapest, Hungary | CBN Trust Co.<br>a/c 24070843<br>Snoras Bank<br>Lithuania |

| **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 6/12/96 | Proceeds totaling approx. $3.2 million. | TDL<br>a/c 0001-036613-500<br>Central-Euro. Int'l Bank<br>Budapest, Hungary | Nominee Accounts:<br>• IBS Trading Co.<br>• N.Y. Cotton Corp.<br>• United Nordland Invest.<br>• M. Finance Co. *(FIN & CE Co.)*<br>• Independent Group, Inc.<br>• Whitley Int'l Corp.<br>Chase Manhattan Bank<br>*(formerly Chemical Bank)*<br>Buffalo, New York |
| 10/15/96 | Proceeds totaling approx. $1,499,965. | CBN Trust Co.<br>a/c 24070843<br>Snoras Bank<br>Lithuania | United Trade Ltd.<br>a/c 503-20008-4100-4014<br>MKB Bank<br>Budapest, Hungary |

10. To disguise the fact that approximately $32 million in customer receipts had been falsely reported on the books and records of UNITED TRADE for 1997, the defendants orchestrated a sell-off of the fraudulently inflated YBM stock in or about March 1998, in order to generate sufficient funds to transfer to the corporate accounts of UNITED TRADE in Canada. Approximately $21.2 million in YBM stock was sold from four brokerage accounts in Canada, which were held in names of nominees and close associates of MOGILEVICH and FISHERMAN. The proceeds were then transferred to foreign bank accounts in Eastern Europe and moved to the UNITED TRADE account in Canada to create the false appearance that these funds had previously existed in the bank account of UNITED TRADE as had been represented on the books and records of UNITED TRADE. Thereafter, the funds were transferred as follows, to and from UNITED TRADE accounts in Canada, Hungary and the United States, on the approximate dates indicated:

| Date | Description | Transferred from | Transferred to |
|---|---|---|---|
| 5/13/98 | Proceeds totaling approx. $28.5 million. | United Trade Ltd.<br>a/c 402-557-3<br>Royal Bank of Canada<br>Toronto, Canada | United Trade Ltd.<br>a/c 503-20008-4100-4014<br>MKB Bank<br>Budapest, Hungary |
| 5/26/98 | Proceeds totaling approx. $10 million. | United Trade Ltd.<br>a/c 503-20008-4100-4014<br>MKB Bank<br>Budapest, Hungary | United Trade Ltd.<br>a/c 8-449-779<br>Mellon Bank<br>Philadelphia, PA |

**Concealing and Disguising Proceeds**
**From Specified Unlawful Activity**

11. Millions of shares of fraudulently inflated YBM stock held in nominee brokerage accounts in Canada were sold, and the illegal proceeds were deposited and transferred to and among various nominee bank accounts controlled by the defendants, knowing the transfers were designed to conceal the true nature, source, ownership and control of proceeds of specified unlawful activities, that is, mail fraud, wire fraud and securities fraud.

**A. Stock Sales from Arion Investment Club Account**

12. Shares of fraudulently inflated YBM stock held in the "Arion Investment Club" account were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred to an overseas bank account held in the name of a nominee for defendant MOGILEVICH and others, as follows:

| Date(s) | Description | Sold & Transferred from | Transferred to |
|---|---|---|---|
| 6/24/96 - 2/4/97 | Proceeds totaling approx. $12.14 million from the sale of over 2.1 million shares of YBM. | Arion Club Account<br>First Marathon Securities<br>Toronto, Canada | Unindicted Coconspirator<br>a/c 501-00152-3101-4014 &<br>a/c 501-00152-3102-4013<br>MKB Bank<br>Budapest, Hungary |

13. The funds were then disbursed from the Hungarian bank account in the name of the unindicted coconspirator to the accounts of closely-related entities, individuals and nominees on the behalf of the defendants in order to conceal the nature, source, ownership and control of the proceeds.

**B. Stock Sales From Anix Investment Club Account**

14. Shares of fraudulently inflated YBM stock held in an "Anix Investment Club" account were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred to a nominee bank account in Budapest, Hungary, and disbursed to bank accounts and individuals closely associated with defendant MOGILEVICH, as follows:

| **Date(s)** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 4/7/98 | Proceeds totaling approx. $1.3 million. | Anix Investment Club<br>Montrose Capital Securities<br>*(Bear Stearns Security Corp.)*<br>New York, New York | Anix Investment Club Ltd.<br>a/c 503-20046-4100-4014<br>MKB Bank<br>Budapest, Hungary |
| 5/98 - 6/98 | Disbursements totaling approx. $862,300 (from the $1.3 million). | Anix Investment Club Ltd.<br>a/c 503-20046-4100-4014<br>MKB Bank<br>Budapest, Hungary | Various nominees and closely-related parties/entities. |

**C. Stock Sales From Griffiths McBurney Accounts**

15. Shares of fraudulently inflated YBM stock held in the brokerage accounts of unindicted coconspirators were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred through a myriad of nominee accounts, including accounts in the names of purported customers and vendors of UNITED TRADE, which served as pass-through accounts in order to conceal the nature, source, ownership and control of the stock proceeds:

| Date(s) | Description | Sold & Transferred from | Transferred to |
|---|---|---|---|
| 10/7/96 - 10/9/96 | Proceeds totaling approx. $2.5 million. | Unindicted Coconspirator account at Griffiths McBurney & Partners Toronto, Canada | Nominee Accounts:<br>• United Nordland Invest.<br>• N.Y. Cotton Corp.<br>• M. Finance Co.<br>• Independent Group, Inc.<br>• Whitley Int'l Corp.<br>Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |
| 2/9/98 | Proceeds totaling approx. $1.9 million. | Nominee account: Sandorne Bodonyi a/c 410-00259-25 Griffiths McBurney Partners | Nominee account: Sandorne Bodonyi/Andrew Gaspar |

16. Proceeds from the sale of shares of fraudulently inflated YBM stock were transferred from a brokerage account and bank accounts held in the name of an unindicted coconspirator, to Poseidon Investment Club accounts ("PIC") which were controlled by BOGATIN, and ultimately diverted for his personal benefit to bank accounts in the United States and overseas, including the following:

| Date(s) | Description | Transferred from | Transferred to |
|---|---|---|---|
| 5/10/96 - 10/9/96 | Proceeds totaling approx. $187,085. | Unindicted Coconspirator account at Griffiths McBurney Partners Toronto, Canada | Poseidon Investment Club a/c 645-101-745-021 Dean Witter Reynolds Jenkintown, PA |
| 8/12/96 | Proceeds totaling approx. $320,000. | Poseidon Investment Club (V. Alexandroff) a/c 53360E-2/53360F-0 Griffiths McBurney Partners Toronto, Canada | Plakychev a/c 137-120-816 Bank Austria Vienna, Austria |

| **Date(s)** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 8/14/96 | Proceeds totaling approx. $250,000. | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 53-360F-0/53-360E-2<br>Griffiths McBurney Partners<br>Toronto, Canada | Jefferson Gersch, Inc.<br>a/c 2664-845<br>Mellon PSFS<br>Newtown, PA |
| 12/11/96 | Proceeds totaling approx. $301,797. | Poseidon Investment Club<br>a/c 45-101-745-021<br>Dean Witter Reynolds<br>Jenkintown, PA | YBM Magnex, Inc.<br>a/c 1410882581<br>CoreStates Bank<br>Philadelphia, PA |
| 12/27/96 | Proceeds totaling approx. $295,000. | YBM Magnex International<br>a/c 401-060-9<br>Royal Bank of Canada<br>Toronto, Canada | Kasiopey<br>a/c 137-141-304100200<br>Bank Austria<br>Vienna, Austria |
| 2/10/97 | Proceeds totaling approx. $396,246. | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 410-00272-10<br>Griffiths McBurney Partners<br>Toronto, Canada | Jacob Bogatin<br>a/c P.O. 281-060<br>Swiss Bank Corp.<br>Zurich, Switzerland |
| 2/10/97 | Proceeds totaling approx. $350,000. | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 53360E-2/53360F-0<br>Griffiths McBurney Partners<br>Toronto, Canada | Jefferson Gersch, Inc.<br>a/c 2664-845<br>Mellon PSFS<br>Newtown, PA |
| 2/13/97 | Proceeds totaling approx. $119,879. | Unindicted Coconspirator<br>a/c 501-00152-3102-4013<br>MKB Bank<br>Budapest, Hungary | Poseidon Investment Club<br>(V. Alexandroff)<br>a/c 410-00272-10<br>Griffiths McBurney Partners<br>Toronto, Canada |

17. Proceeds from the sale of shares of fraudulently inflated YBM stock were also transferred from a brokerage account held in the name of an unindicted coconspirator, through a series of nominee accounts in the names of purported customers and vendors of United Trade, and ultimately diverted to BOGATIN'S personal benefit to an off-shore bank account, including the following:

| **Date(s)** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 9/16/96 | Proceeds totaling approx. $100,000. | M. Finance Company<br>a/c 32070288<br>Snoras Bank<br>Lithuania | Jacob Bogatin<br>[redacted]<br>Barclays Bank<br>Cayman Islands |
| 12/19/96 | Proceeds totaling approx. $100,000. | Jacob Bogatin<br>[redacted]<br>Barclays Bank<br>Cayman Islands | Jacob Bogatin<br>a/c 0404-8829<br>CoreStates Bank<br>Philadelphia, PA |

All in violation of Title 18, United States Code, Section 1956(h).

**COUNTS THIRTY-SIX THROUGH THIRTY-NINE**
**(Money Laundering)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and paragraphs 2 through 17 of Count 35 are incorporated by reference herein.

2. On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**

knowingly transported, transmitted and transferred, and attempted to transport, transmit and transfer, monetary instruments and funds, in the approximate amounts below, from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud, mail fraud and securities fraud, each transfer constituting a separate count of the Superseding Indictment, Title 18, United States Code, Section 1956(a)(2)(A) and Section 2, as set forth below:

| Count | Date | Description | Defendants |
|---|---|---|---|
| 36 | 11/2/95 | Special Warrants Offering: transfer of $682,986 from Royal Bank of Canada (a/c 401060-9) in Toronto, Canada; to YBM MAGNEX payroll account at CoreStates Bank (a/c 2006-8360) in Philadelphia, PA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 37 | 10/28/96 | Purchase of ARBAT: wire transfer of $150,000 from account of an unindicted coconspirator at MKB Bank (a/c 501-01791-3101-4012), Budapest, Hungary to account of YBM MAGNEX (a/c 14108-82581) at CoreStates Bank, Philadelphia, PA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 38 | 1/12/98 | 1997 Offering: wire transfer of $1,200,000 from account of YBM MAGNEX INTERNATIONAL, at Royal Bank of Canada, Toronto, Canada to account of YBM MAGNEX, at Mellon Bank, Philadelphia, PA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 39 | 5/26/98 | Wire transfer of $10 million from account of UNITED TRADE, MKB Bank (503-20008-4100-4014), Budapest, Hungary to account of UNITED TRADE at Mellon Bank (a/c 8-449-779), Philadelphia, PA. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and Section 2.

**COUNTS FORTY THROUGH FORTY-FIVE**
**(Money Laundering)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and paragraph 2 through 17 of Count 35 are incorporated herein.

2. On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**

knowingly transported, transmitted and transferred, and attempted to transport, transmit and transfer, a monetary instrument and funds, in the approximate amounts below, from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer represented proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is, mail fraud, wire fraud and securities fraud, each transfer constituting a separate count of the Superseding Indictment, Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2, as set forth below:

| Count | Date | Description | Defendants |
| --- | --- | --- | --- |
| 40 | 5/10/96 | Wire transfer of $65,179 from brokerage account of an unindicted coconspirator at Griffiths McBurney, Toronto, Canada to PIC account (a/c 645101745021) in Jenkintown, PA. | MOGILEVICH BOGATIN |
| 41 | 8/14/96 | Wire transfer of $250,000 from brokerage account of V. Alexandroff (a/c 53-360F-0/53-360E 2) at Griffiths McBurney, in Toronto, Canada, to the account of Jefferson Gersch, Inc. (a/c 2664-845) at Mellon PSFS, Newtown, PA. | MOGILEVICH BOGATIN |
| 42 | 10/7/96 | Wire transfer of YBM stock proceeds totaling $500,000, from the brokerage account of an unindicted coconspirator at Griffiths McBurney (a/c 52304-F/a/c 410-00104-14), in Toronto, Canada to M. Finance account (a/c 530-296020) at the Chase Manhattan Bank (formerly Chemical Bank), Buffalo, New York, pursuant to instructions from EDPA. | MOGILEVICH FISHERMAN BOGATIN |
| 43 | 10/9/96 | Wire transfer of YBM stock proceeds totaling $300,000 from the brokerage account of an unindicted coconspirator, at Griffiths McBurney, in Toronto, Canada to Whitley International account (a/c 530-296489) at the Chase Manhattan Bank (formerly Chemical Bank), Buffalo, New York pursuant to instructions from EDPA. | MOGILEVICH FISHERMAN BOGATIN |
| 44 | 12/19/96 | Wire transfer of $100,000 from the account of defendant BOGATIN at Barclays Bank (a/c [redacted], Cayman Islands to the account of defendant BOGATIN (a/c 0404-8829) at CoreStates Bank, Philadelphia, PA, for the benefit of defendant BOGATIN. | BOGATIN |

| | | | |
|---|---|---|---|
| 45 | 2/10/97 | Wire transfer of $350,000 from brokerage account of "Poseidon" in c/o V. Alexandroff (a/c 410-00272-10), at Griffiths McBurney, Toronto, Canada to account of Jefferson Gersch, Inc. (a/c 2664-845) at Mellon PSFS, Philadelphia, PA. | BOGATIN |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

**NOTICE OF FORFEITURE**
**(Racketeering Forfeiture - 18 U.S.C. § 1963)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and Count One are incorporated by reference here.

2. From in or about 1993, continuously thereafter, up to and including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

violated Title 18, United States Code, Section 1962(d) as alleged in Count One. Upon conviction on Count One, each defendant shall forfeit to the United States any interest the defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962; and any interest in, security of, claims against, and property and contractual rights affording a source of influence over, the Enterprise, which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Section 1962; and any property constituting and derived from proceeds, which the defendant obtained, directly or indirectly, from racketeering activity in violation of Section 1962, including but not limited to, at least the approximate sum of $32.7 million in proceeds derived from the violation of Title 18, United States Code, Section 1962(d) as alleged in Count One, and all interests and proceeds traceable thereto.

3. The above-named defendants, and each of them, shall be jointly and severally liable

for the forfeiture obligations as alleged above.

**Substitute Assets**

4. In the event any of the above-described forfeitable property, as a result of any act or omission of the defendant: cannot be located upon the exercise of due diligence; has been transferred to, sold to, or deposited with a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; and has been commingled with other property which can not be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Sections 1962(d) and 1963.

**NOTICE OF FORFEITURE**
**(Money Laundering Forfeiture - 18 U.S.C. § 982)**

**THE GRAND JURY FURTHER CHARGES:**

1. Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and Counts Thirty-Five through Forty-Five are incorporated by reference here.

2. From in or about May 1994, and continuously thereafter, up to and including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN**
**a/k/a "Yakov"**

violated Title 18, United States Code, Section 1956(a)(2) as alleged in Counts Thirty-Five through Forty-Five

3. Upon conviction of violating Title 18, United States Code, Section 1956, as alleged in Counts Thirty-Five through Forty-Five, each defendant shall forfeit to the United States the entirety of the defendant's interest in all property, real and personal, involved in each violation, and any property traceable to such property.

4. The property subject to forfeiture includes, but is not limited to, United States currency and its equivalent, in at least the approximate amounts listed below, and all proceeds traceable to such sums, which the defendants obtained directly and indirectly as the result of the violations and which were involved in the violations described in Counts Thirty-Five through Forty-Five:

| | **Defendant** | **Amount** |
|---|---|---|
| (a) | SEMION MOGILEVICH | $18.4 million |
| (b) | IGOR FISHERMAN | $ 3 million |
| (c) | JACOB BOGATIN | $ 10 million |

**Substitute Assets**

5. In the event any of the above-described forfeitable property, as a result of any act or omission of the defendant: cannot be located upon the exercise of due diligence; has been transferred to, sold to, or deposited with a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which can not be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(2) and Title 21, United States Code, Section 853(p), to seek forfeiture of the assets set forth in these forfeiture allegations as well as any other assets and property of such defendant or defendants up to the total forfeiture.

6. All defendants shall be jointly and severally liable up to the amount of total forfeitures.

All pursuant to Title 18, United States Code, Sections 1956 and 982.

A TRUE BILL.

____________________________
FOREPERSON

____________________________
PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania

BETHUNE
BENES

EXHIBIT
F

**Bethany Benes**
**Attorney at Law**
(703) 260-9325 Direct
bbenes@bethunebenes.com

February 10, 2021

**VIA MAIL AND EMAIL**
Valeria V. Gunkova
2 Pidgeon Hill Drive, Suite 100
Sterling, Virginia 20165
vgunkova@gmail.com

***Re: BNG Group, LLC***

Dear Ms. Gunkova:

This firm and undersigned counsel represent Harry Kamin with regard to his ownership interest in BNG Group, LLC (hereinafter referred to as "**BNG**" and/or the "**Company**"). Please direct all future communications to me on behalf of Mr. Kamin.

First, it has come to Mr. Kamin's attention that the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165 has been marketed and listed for sale by the Company. As a Manager and 50% Class A member of the Company, Mr. Kamin hereby demands that all such efforts cease and that no further action be taken without his prior knowledge and written consent. Please immediately confirm that you will comply with this demand and provide written documentation that such action has been taken.

Second, last week, Mr. Kamin requested access to the Company's bank account at TD Bank. It is my understanding that you refused Mr. Kamin's access. As a Manager and 50% Class A Member of the Company, Mr. Kamin has a right to access the account. Please immediately (i) take action with TD Bank to allow Mr. Kamin access to the Company account(s), (ii) add Mr. Kamin as an authorized signatory to the Company account(s); and (iii) supply the Company's online banking login and password information.

Finally, pursuant to Va. Code § 13.1-1028, Mr. Kamin hereby requests that you provide the following documents and information to Mr. Kamin within five (5) days of the date of this letter:

1. All governing documents of the Company for the last three years (2018, 2019, and 2020) to present, including but not limited to the Company's Articles of Organization, Operating Agreement, Amendments, meeting minutes, Notices, and voting records;

2. A current list of the full names and last known addresses for any person serving as an Officer, Director, Manager, President, Secretary, Treasurer, or Board Member for the Company, and all documents and communications related to the election of such persons serving;

3. A current list of the full names and last known addresses of each member of the Company, in alphabetical order;

4. A current list of the full names and last known addresses for each employee, independent contractor, or consultant hired by BNG and for which BNG has compensated, including the total amount paid to each such person or entity;

5. All financial records of the Company, including but not limited to a full accounting of the Companies' assets and expenses, profit and loss statements, balance sheets, accounts receivable ledgers, accounts payable ledgers, loan documents, capital contributions, and distributions;

6. All documents related to bank accounts held, whether individually or jointly, in the name of BNG, including but not limited to bank statements, ATM receipts, withdrawal receipts, deposit slips, checks, and wire transfers;

7. All tax records for the Company for the last three years (2018, 2019, and 2020), including but not limited to K-1s, 1099s, and tax returns;

8. All documents and communications related to the business of the Company, including an identification of the Company's business for the last three years to present;

9. All documents and communications related to any improvement made or anticipated to be made to the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165;

10. All documents and communications purportedly signed by Harry Kamin related to BNG;

11. All contracts entered into or anticipated to be entered into on behalf of BNG or relating to BNG;

12. All documents and communications related to the listing and marketing of the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165;

13. The website to access, as well as login and password information, for the email address known as harry@bnggroupllc.com;