# EXHIBIT F

**VIRGINIA:**

**IN THE CIRCUIT COURT OF LOUDOUN COUNTY**

**HARRY KAMIN,**
**Individually and Derivatively on behalf of**
**BNG GROUP LLC**
**Plaintiffs,**

**v.** **Case No:CL-21-1557**

**VALERIA GUNKOVA,**

**and**

**JACOB BOGATIN,**

**and**

**SKIN LOGIC LLC d/b/a ARIA MEDISPA**
***Serve:* Valeria Gunkova**
**2 Pidgeon Hill Drive, Suite 100**
**Sterling, Virginia 20165**

**and**

**VNJ MANAGEMENT LLC**
***Serve:* Valeria Gunkova**
**2 Pidgeon Hill Drive, Suite 110**
**Sterling, Virginia 20165**

**and**

**STERLING INVESTMENT LLC**
***Serve:* Valeria Gunkova**
**2 Pidgeon Hill Drive, Suite 120**
**Sterling, Virginia 20165**

***Collectively,* Defendants.**

**THIRD AMENDED COMPLAINT**

Plaintiff Harry Kamin, both individually and derivatively on behalf of Plaintiff BNG Group, LLC, by counsel, hereby files the following Third Amended Complaint against Defendants Valeria Gunkova, Jacob Bogatin, Skin Logic LLC d/b/a ARIA MediSpa, VNJ



EXHIBIT 1

Management LLC, and Sterling Investment LLC, and for his and its causes of action, states as follows:

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction pursuant to Virginia Code § 17.1-513.

2. This Court has general personal jurisdiction over each Defendant pursuant to Va. Code § 8.01-328.1(A). Specifically, Defendant Valeria Gunkova has transacted business in this Commonwealth, has caused tortious injury to Mr. Kamin and BNG by her acts or omissions in the Commonwealth, has an interest in and possesses real property in the Commonwealth, and has utilized a computer and/or computer network located in the Commonwealth. Defendant Jacob Bogatin has transacted business in this Commonwealth, has caused tortious injury to Mr. Kamin by his acts or omissions in the Commonwealth, and has utilized a computer and/or computer network located in the Commonwealth. Defendants Skin Logic LLC, VNJ Management LLC, and Sterling Investment LLC are each limited liability companies registered to do business in Virginia and have each utilized a computer and/or computer network located in the Commonwealth.

3. Venue of this Court is proper pursuant to Va. Code § 8.01-262 as the matters set forth herein relate to the Defendants' activities in Loudoun County.

**THE PARTIES**

4. Plaintiff BNG Group LLC ("**BNG**" and/or the "**Company**") is a limited liability company registered to do business in Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 120, Sterling, Virginia 20165.

5. Plaintiff Harry Kamin ("**Mr. Kamin**") is a resident of the state of Florida. Mr. Kamin is a 50% Class A Member and co-Manager of Plaintiff BNG. Mr. Kamin fairly and

adequately represents the interests of the Company in enforcing the rights of the Companies and in seeking to remedy Ms. Gunkova's improper conduct as set forth below.

6. Defendant Valeria Gunkova ("**Ms. Gunkova**") is a resident of the Commonwealth of Virginia residing at 20701 Riptide Square, Sterling, Virginia 20165. Ms. Gunkova is the other 50% Class A Member of BNG and co-Manager of BNG. Ms. Gunkova cannot fairly and adequately represent the interests of the Company because it is Ms. Gunkova who has engaged in improper and fraudulent conduct in violation of the Company's Operating Agreement (as defined herein) and Virginia law. Ms. Gunkova is the sole owner of Defendants Skin Logic LLC and VNJ Management LLC. Upon information and belief, Ms. Gunkova is a member of Defendant Sterling Investment LLC. Together with Jacob Bogatin, Ms. Gunkova operates Defendants Skin Logic LLC, VNJ Management LLC, and Sterling Investment LLC.

7. Defendant Jacob Bogatin ("**Mr. Bogatin**") is a resident of the Commonwealth of Virginia residing with Ms. Gunkova at 20701 Riptide Square, Sterling, Virginia 20165. Together with Ms. Gunkova, Mr. Bogatin operates Defendants Skin Logic LLC, VNJ Management LLC, and Sterling Investment LLC.

8. Defendant Skin Logic LLC d/b/a Aria MediSpa ("**ARIA**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165.

9. Defendant VNJ Management LLC ("**VNJ**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 110, Sterling, Virginia 20165.

10. Defendant Sterling Investment LLC ("**Sterling Investment**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 120, Sterling, Virginia 20165.

## STATEMENT OF FACTS

11. Upon information and belief, Ms. Gunkova, with the assistance of Mr. Bogatin (whom Ms. Gunkova holds out to be her husband even though Mr. Bogatin is legally married to Galina Bogatin), formed ARIA in or around 2010 to operate a wellness spa in Loudoun County.

12. On or about February 25, 2013, ARIA entered into Deed of Lease with then owner of the Building CSG Countryside LLC to lease office space in the commercial building located at 2 Pidgeon Hill Drive, Sterling, Virginia 20165 (the "**Building**") Building. Pursuant to the Deed of Lease, ARIA agreed to pay 18% interest per year until paid on any rent not paid within 6 days of its due date and all attorney's fees incurred in enforcing the terms of the Deed of Lease.

13. On or about February 10, 2015, ARIA entered into a First Amendment to Lease Agreement with Liber LLC, the predecessor in interest of the Building to CSG Countryside LLC. Pursuant to the First Amendment to Lease Agreement, the terms previously agreed to by ARIA with regards to interest and attorney's fees remained in full force and effect.

14. On or about March 17, 2017, ARIA entered into a Second Amended to Office Lease Agreement with Judicial Drive Property Holding LLC (the "**Lease**") to lease Suites 100, 110, 120, 170, 180, 240, and 260 in the Building. Pursuant to the Second Amended to Office Lease Agreement, the terms previously agreed to by ARIA with regards to interest and attorney's fees remained in full force and effect.

15. Since in or around February of 2013, ARIA has operated its business in the Building. In each of the 2015 and 2017 lease amendments, ARIA obtained additional space within the building and the amount owed by ARIA for rent and expenses increased.

16. While only a mere tenant of the Building and not an owner, Ms. Gunkova and ARIA made improvements to the suites leased by ARIA in the building from 2013 to 2019, including but not limited to construction performed by PRC Construction Inc.

17. Sometime in 2019, Ms. Gunkova was advised by then-owner of the Building, Judicial Drive Property Holding LLC (the "**Prior Owner**"), that it wanted to sell the Building. Realizing that all of the improvements made to the ARIA leased suites belonged to the Prior Owner as built-in fixtures of the Building and were therefore subject to transfer upon the sale of the Building (and that ARIA would potentially lose the use of those improvements and its leased suites), Ms. Gunkova, on behalf of ARIA and with the assistance of Mr. Bogatin, attempted to purchase the Building.

18. Mr. Bogatin and Ms. Gunkova contacted Matthew Harris ("**Mr. Harris**") of REIL Capital LLC to assist in obtaining financing for ARIA to complete the purchase. However, as a result of Ms. Gunkova's low credit score and debt, and ARIA's insufficient business assets and income, Ms. Gunkova and ARIA were denied financing for the purchase of the Building.

19. Not wanting to give up on the opportunity to purchase the Building, Ms. Gunkova and Mr. Bogatin conspired to create a new company to purchase the Building. However, as set forth in the Grand Jury Superseding Indictment attached hereto as **Exhibit A,** Mr. Bogatin had been indicted by a grand jury on no less than forty-five (45) felony charges including (i) RICO conspiracy, (ii) wire fraud, (iii) mail fraud, (iv) securities fraud, (v) filing false reports with the SEC, (vi) falsification of books and records, (vii) money laundering conspiracy, (viii) and money laundering.[1] Knowing that Ms. Gunkova and ARIA's financial condition was insufficient to obtain a loan, and that Mr. Bogatin's criminal charges would impede financing, Ms. Gunkova

[1] The criminal case remains pending against Mr. Bogatin as of the filing of this Complaint.

and Mr. Bogatin together decided that they would lure in a new partner to join the new company to provide the financial backing and clout to purchase the Building.

20. Upon information and belief, Ms. Gunkova and Mr. Bogatin created BNG on or about September 15, 2019 as a limited liability company in the Commonwealth of Virginia, with Ms. Gunkova being the sole member of BNG. Upon information and belief, Mr. Bogatin was not included as a member out of fear that his known association with the new company and his pending criminal charges would destroy any chances of obtaining financing for the new company.

21. Mr. Bogatin and Ms. Gunkova discussed potential victim investors and ultimately agreed upon Mr. Kamin, whom Mr. Bogatin had known through one of Mr. Kamin's other businesses. Mr. Bogatin knew that Mr. Kamin was a successful businessman and as a result, that Mr. Kamin would be able to provide the legitimacy that financial institutions indicated they would need to provide any loan for the purchase of the Building.

22. In or about February 2020, Defendant Mr. Bogatin appeared at Mr. Kamin's home in Florida to further his and Ms. Gunkova's plan. Mr. Bogatin indicated that Ms. Gunkova was interested in buying the Building, that she had formed BNG, which rented office space located at Suite 120 of the Building, and that Ms. Gunkova and BNG needed Mr. Kamin's financial assistance in doing so. Mr. Bogatin, on behalf of Ms. Gunkova, represented that Mr. Kamin would be made a 50% Class A Member and Manager of BNG if he provided a payment for the purchase of his membership interest. Mr. Bogatin, on behalf of Ms. Gunkova, also represented that as Manager, Mr. Kamin would have full access to all Company bank accounts and that no decisions with regards to the Company would be made without Mr. Kamin's approval. Mr. Kamin, not knowing about Mr. Bogatin's criminal activity, indicated that he would consider Ms. Gunkova's proposal and Mr. Bogatin's representations.

23. To further Ms. Gunkova and Mr. Bogatin's plan, Mr. Bogatin returned to Mr. Kamin's home on a second day. During the visit, Mr. Bogatin, in furtherance of his plan with Ms. Gunkova, spent several hours trying to convince Mr. Kamin to go into business with Ms. Gunkova. Mr. Bogatin, on behalf of Ms. Gunkova, repeated Ms. Gunkova's prior representations that Mr. Kamin would be made a 50% Class A Member and Manager of BNG, have full access to the Company's bank accounts, and decision-making power for the Company. Mr. Kamin agreed that he would visit to tour the Building and meet Ms. Gunkova in further consideration of Mr. Bogatin and Ms. Gunkova's proposal.

24. On or about March 6, 2020, BNG submitted an offer to purchase the Building. A copy of the document believed by Mr. Kamin to be the Contract of Sale dated March 6, 2020 (produced by Ms. Gunkova as GUNKOVA_000098 through 000115) is attached hereto as **Exhibit B.** Mr. Bogatin and Ms. Gunkova contacted Mr. Harris, who had since left REIL Capital and joined Stryker Services LLC of Boynton Beach, Florida (the "**Broker**"), to serve as BNG's broker in the purchase. Mr. Bogatin and Ms. Gunkova handled all communications with the Broker.

25. In or around early March 2020, Mr. Kamin travelled to Virginia for approximately one week per the parties' prior discussions. Mr. Bogatin picked up Mr. Kamin from the airport and introduced him to Ms. Gunkova. During his visit, Mr. Kamin explored the Building and attempted to speak with Ms. Gunkova about the business. Mr. Kamin was informed that he was to direct all communications to Mr. Bogatin on behalf of Ms. Gunkova.

26. During Mr. Kamin's visit, Ms. Gunkova and Mr. Kamin agreed to add Mr. Kamin as a 50% Class A Member and Manager of BNG in exchange for Mr. Kamin's buy-in contribution of $150,000. Ms. Gunkova further agreed that Mr. Kamin would have full access to the Company's bank accounts and that no decisions or actions could be taken for the Company

without Mr. Kamin's approval. As a result of Ms. Gunkova's promises, Mr. Kamin agreed and issued and endorsed two initial checks, each in the amount of $25,000.00 on March 8, 2020 for the purchase of his membership interest in BNG. Copies of Mr. Kamin's March 8, 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit C.**

27. Mr. Bogatin also represented to Mr. Kamin that additional monies were needed by BNG or the purchase of the Building. Accordingly, Mr. Kamin agreed to loan funds to BNG in furtherance of the purchase. Mr. Kamin issued and endorsed two additional checks, each in the amount of $65,000.00 on March 10, 2020 to cover the remaining $100,000 of his buy-in contribution and a $30,000.00 loan by Mr. Kamin to BNG. Copies of Mr. Kamin's March 10, 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit D.**

28. In April 2020, Mr. Bogatin again represented to Mr. Kamin that additional monies were needed, and again, Mr. Kamin agreed to loan money to BNG in furtherance of the purchase of the Building. On April 15, 2020, Mr. Kamin loaned an additional $270,000.00 to BNG. Copies of Mr. Kamin's April 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit E.**

29. On or about May 14, 2020, Mr. Kamin again travelled to Virginia. During Mr. Kamin's second visit, Mr. Bogatin, on behalf of Ms. Gunkova, provided Mr. Kamin with a document believed by Mr. Kamin to be the Operating Agreement of BNG (the "**Operating Agreement**").[2] Nevertheless, the Operating Agreement was presented to and signed by Mr.

---

[2] The document recalled by Mr. Kamin looked similar to a document now known to be fabricated by Ms. Gunkova and Mr. Bogatin titled "Limited Liability Company Operating Agreement of BNG Group, LLC", a copy of which is attached hereto as **Exhibit F.** As set forth below, Mr. Kamin originally believed the document attached as Exhibit B to be the true and accurate Operating Agreement signed by Mr. Kamin and Ms. Gunkova because the document was provided to him and represented to be such document by Mr. Bogatin and Ms. Gunkova in November 2020. Only after this litigation was filed did Mr. Kamin learn through a forensic analysis of the document by an expert handwriting and document examiner that Exhibit B was an altered document that lifted Mr. Kamin and Ms. Gunkova's signatures from another document signed by Mr. Kamin and Ms. Gunkova on October 30, 2020.

Kamin which memorialized the terms agreed to by Mr. Kamin and Ms. Gunkova, including (i) Mr. Kamin and Ms. Gunkova each are a 50% Class A Member and Manager of the Company with an initial buy-in contribution of $150,000.00 each; (ii) Ms. Gunkova is prohibited from taking unilateral action for the Company without the approval of Mr. Kamin; and (iii) Mr. Kamin has full access and control of the Company's finances and bank accounts. Mr. Kamin signed the Operating Agreement while at the Building but was not given the original signed Operating Agreement or a copy thereof at that time. Mr. Bogatin represented to Mr. Kamin that Ms. Gunkova also signed the Operating Agreement.

30. BNG eventually obtained financing for the Building loan through Atlantic Union Bank. Ms. Gunkova and Mr. Bogatin compiled all necessary documentation, including documentation from Mr. Kamin, and coordinated with Atlantic Union Bank to obtain the loan.

31. Throughout May, June, July, August, September, and October of 2020, Mr. Bogatin continued to represent to Mr. Kamin that additional monies were needed for the purchase. Mr. Kamin continued to provide monies to BNG as a loan to the Company based on Mr. Bogatin's representations. Mr. Kamin ultimately loaned more than two million dollars to BNG to accomplish the purchase of the Building.

32. On October 30, 2020, BNG, through Mr. Kamin and Ms. Gunkova, closed on the purchase of the Building. BNG purchased the Building for $9,500,000, including the down payment provided by Mr. Kamin and included in the loan to the Company. Notably, the loan documents submitted and signed by Mr. Kamin and Ms. Gunkova list Mr. Kamin as both a 50% Member and Manager of BNG. Copies of the relevant closing documents, which corroborate Mr. Kamin's 50% membership interest in BNG and his status as BNG Manager, are attached collectively as **Exhibit G.**

33. After becoming a Member in March 2020, Mr. Kamin requested information about the Company on a weekly basis. Ms. Gunkova and Mr. Bogatin failed to fulfill Mr. Kamin's requests and refused to provide Mr. Kamin with information about the Company's business and records.

34. Eventually, on or around January 2, 2021, Mr. Bogatin and Ms. Gunkova shipped a box to Mr. Kamin containing three binders of documents. The box contained the Operating Agreement attached hereto as Exhibit B represented by Mr. Bogatin and Ms. Gunkova to Mr. Kamin to be the Operating Agreement signed by Mr. Kamin on May 14, 2020. Mr. Kamin confirmed that the terms included in the Operating Agreement believed by Mr. Kamin to be a true and accurate copy signed by him and delivered to him by Mr. Bogatin and Ms. Gunkova were consistent with the terms agreed upon by Mr. Kamin and Ms. Gunkova, including:

a) the "Company shall be managed by a Board of Managers". Section 5.1.3. The Board of Managers consisting of two (2) Class A Members (for which Mr. Kamin and Ms. Gunkova are the only Class A Members) shall be elected and be responsible for performing the major functions of the company. *Id.; see also* Section 5.1.3.3. Any action taken on behalf of the Company must be approved by both Class A Members, specifically,

> The Board of Managers shall have full, exclusive and complete discretion, power, and authority…to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:…sell, convey, assign, mortgage or lease any real estate and any personal property…Sell, dispose, trade or exchange Company assets…Enter into agreements and contracts…Execute or modify leases with respect to any part or all of the assets of the Company" *see* p. 15, Section 5.1.4 and 5.1.4.2;

b) "the Board of Managers shall not undertake any of the following without the approval of at least fifty-one percent (51%) of the Interests of the Members",