including but not limited to any sale, lease or other disposition of the Company assets. Section 5.1.5;

c) "Except as otherwise provided in this Agreement, wherever the Law or this Agreement requires unanimous consent by the Board of Managers to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of all Managers." Section 5.2.6;

d) the "Board of Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business." Section 8.2.1; and

e) each Member has a right to inspect the books and records of the Company at any time. Section 8.2.2.

35. Unbeknownst to Mr. Kamin at the time of his agreement to join the Company, Ms. Gunkova never intended to fulfill the promises she made or that she and Mr. Bogatin represented to Mr. Kamin regarding his membership interest, his authority on behalf of the Company, and his access to financial accounts and company information. Ms. Gunkova and Mr. Bogatin simply made the representations to Mr. Kamin to induce Mr. Kamin into providing the finances Ms. Gunkova needed to purchase the Building and also to obtain Mr. Kamin's personal and financial information.

36. Immediately after the purchase settlement of the Building, Mr. Bogatin contacted Mr. Kamin on November 3, 2020 regarding a potential purchase of a residential house and land lot in Palm Beach County, Florida (the "**Florida Deal**").

37. Again, without knowledge of the true intents and actions of Ms. Gunkova and Mr. Bogatin, Mr. Kamin agreed to consider the Florida Deal.

38. On or around November 10, 2020, Mr. Bogatin and Ms. Gunkova traveled to the Palm Beach area and invited Mr. Kamin to stay with them for a few days. Mr. Bogatin picked Mr. Kamin up on November 11, 2020, and brought him to the vacation rental leased by Mr. Bogatin and Ms. Gunkova. Over the course of four days, Mr. Bogatin and Ms. Gunkova persuaded Mr. Kamin to proceed with the Florida Deal, including a representation to Mr. Kamin that Mr. Bogatin had a client who had agreed to subsequently purchase the Florida Deal property from them for a substantial profit. Mr. Kamin, still not fully informed as to Mr. Bogatin and Ms. Gunkova's true actions, agreed on the condition that Mr. Bogatin would obtain financing.

39. On or about November 15, 2020, Mr. Bogatin and Ms. Gunkova took Mr. Kamin to the office of real estate agent Jim Wrona, where Mr. Kamin and Ms. Gunkova signed a Residential Contract for Sale and Purchase (the "**Florida Contract**").

40. On November 17, 2020, Mr. Kamin submitted a payment in the amount of $100,000.00 on behalf of BNG as the initial deposit for the Florida Deal.

41. On November 20, 2020, Mr. Bogatin arrived at Mr. Kamin's residence, crying that he had financial problems and could not pay the additional deposits necessary for the Florida Deal. Mr. Bogatin represented to Mr. Kamin that if Mr. Kamin did not provide the additional $300,000.00 required under the Florida Deal's Residential Purchase Contract, BNG would be in breach of the Florida Contract and that Mr. Kamin would lose his initial $100,000.00 deposit. Accordingly, Mr. Kamin submitted a second deposit in the amount of $300,000.00 on behalf of BNG. Mr. Bogatin agreed to and did sign a Promissory Note with Mr. Kamin, agreeing to repay Mr. Kamin for the amounts loaned by Mr. Kamin for the Florida Deal.

42. On November 23, 2020, Mr. Bogatin again contacted Mr. Kamin with further complaints that Mr. Bogatin would not provide the remaining deposits needed for the Florida Deal. Mr. Kamin provided two additional deposits in the amount of $40,000.00 and $60,000.00

out of fear that his prior deposits would be lost forever if Mr. Kamin did not continue paying. In total, Mr. Kamin paid $500,000.00 in furtherance of the Florida Deal based on the misrepresentations of Mr. Bogatin that Mr. Bogatin would obtain successful financing for the deal when Mr. Bogatin had no intent or ability to do so.

43. Mr. Bogatin notified Mr. Kamin that Mr. Bogatin was not able to obtain financing as he had promised. Mr. Kamin became concerned and suspicious of the representations previously made by Mr. Bogatin and Mr. Kamin. The Florida Deal did not close, and Mr. Kamin hired an attorney to recover his deposits. Ultimately, Mr. Kamin was refunded $442,500.00 of his $500,000.00. To date, Mr. Kamin has not received the remaining $57,500.00 he paid for the Florida Deal as a result of Mr. Bogatin and Ms. Gunkova's fraudulent representations and inducement of Mr. Kamin into the Florida Deal.

44. Also beginning in December 2020, Mr. Kamin discovered that Ms. Gunkova was further violating the terms of the parties' BNG agreement, including but not limited to:

a) Ms. Gunkova unilaterally hired employees for BNG without the knowledge or consent of Mr. Kamin;

b) Ms. Gunkova unilaterally entered into lease contracts with third-party tenants of the Building without the knowledge or consent of Mr. Kamin;

c) Unbeknownst to Mr. Kamin, Ms. Gunkova signed an agreement with a real estate broker to begin listing the Building for marketing and sale in or around January 2021. Ms. Gunkova did not confer with Mr. Kamin prior to taking actions to list the Building for sale, nor did she obtain his consent to take such action;

d) Ms. Gunkova has directed BNG funds to activities outside of the Company, including for personal use by Ms. Gunkova and for use in Ms. Gunkova's other businesses, including ARIA, VNJ, and Sterling Investment;

e) Ms. Gunkova has unilaterally made purported amendments to the Company's governance documents without Mr. Kamin's knowledge and/or approval;

f) Ms. Gunkova directed distributions to made from BNG to herself, but failed to cause a similar proportionate distribution to be made to Mr. Kamin as BNG's 50% member.

45. On or about December 20, 2020, Mr. Kamin also learned of Mr. Bogatin's indictment of the no less than forty-five (45) felony charges previously mentioned above.

46. After repeatedly being shut out of Company business and after learning of Mr. Bogatin's pending felony fraud charges, Mr. Kamin became increasingly concerned with his investment in BNG. Mr. Kamin requested Mr. Bogatin and Ms. Gunkova provide him information related to BNG's bank accounts in February 2021. Ms. Gunkova and Mr. Bogatin refused. Mr. Kamin attempted to receive the information directly from the financial institutions but was told repeatedly by such institutions that the accounts only authorized Ms. Gunkova to request and receive such information.

47. Mr. Kamin requested he be added as an authorized signatory to BNG's operating account at TD Bank. Ms. Gunkova again refused. Ms. Gunkova instead offered to open a *new* account and add Mr. Kamin as an authorized holder on the account.

48. On February 9, 2021, Mr. Kamin, by counsel, sent Ms. Gunkova a letter objecting to the sale of the Building and demanding certain information about the business of BNG. A copy of the letter is attached hereto as **Exhibit H** and incorporated by reference as if fully set forth herein.

49. To date, all of Mr. Kamin's requests have been rejected by Ms. Gunkova. Notwithstanding this Court's June 7, 2021, Order compelling Ms. Gunkova to provide Mr.

Kamin full and complete financial records of the Company, Ms. Gunkova has failed to do so and continues to refuse Mr. Kamin's full access to all of the Company's bank accounts.

50. Since receiving the February 9, 2021 letter, Ms. Gunkova has insisted that Mr. Kamin is not a 50% Class A Member and/or Manager of BNG. Contrary to the Company's Operating Agreement provided to Mr. Kamin by Ms. Gunkova and Mr. Bogatin, and documents submitted by Ms. Gunkova and Mr. Kamin to the banks on October 30, 2020, Ms. Gunkova now asserts that Mr. Kamin is only a 20% Class A Member and is not entitled to any Company information or management.

51. Ms. Gunkova also directed the Company's taxes for the year 2020 to be filed indicating that Mr. Kamin holds only a 20% membership interest in the Company. During the course of discovery, Mr. Kamin learned that an amended return was filed on June 2, 2021, indicating that Mr. Kamin does indeed hold 50% membership interest in the Company. Notwithstanding, Ms. Gunkova continues to assert in this litigation that Mr. Kamin is not a 50% Class A Member and/or Manager while continuing to file tax records and financial documents indicating that Mr. Kamin *is* at 50% Class A Member, thereby increasing Mr. Kamin's tax liabilities and reducing those of Ms. Gunkova if in fact Mr. Kamin is only a 20% owner.

52. Mr. Kamin filed his initial Complaint in this action on March 8, 2021. Since filing his Complaint, Mr. Kamin has discovered, and continues to discover, that without Mr. Kamin's knowledge or consent, Ms. Gunkova and Mr. Bogatin worked together beginning in 2019 and continuing to date to defraud Mr. Kamin, as well as others.

53. Ms. Gunkova used BNG funds (including the monies loaned by Mr. Kamin to BNG) to pay personal expenses of Ms. Gunkova and Mr. Bogatin, including the $43,700.00 cash purchase of Ms. Gunkova's personal Honda van on June 22, 2020, just nine days after one of Mr. Kamin's $100,000.00 loans to BNG.

54. Mr. Bogatin and Ms. Gunkova worked together to create numerous email addresses as early as March 2020 purporting to belong to Mr. Kamin, including harry@ariamedispa.com ; harry@bnggroupllc.com; and grishak301@gmail.com. Mr. Bogatin and Ms. Gunkova utilized the email addresses to exchange thousands of pages worth of emails to the SBA, financial institutions, and the Broker with a signature block affixed to the emails to give the appearance that Mr. Kamin was the sender. Ms. Gunkova knew that Mr. Bogatin created and used the email addresses to portray emails as coming from Mr. Kamin and never notified the Broker, Atlantic Union Bank, or any others involved in the process that the emails were not in fact coming from Mr. Kamin but were instead coming from Mr. Bogatin.[3]

55. Ms. Gunkova and Mr. Bogatin worked together to forge Mr. Kamin's signature on documents and/or electronically sign documents on Mr. Kamin's behalf. Mr. Bogatin and Ms. Gunkova have repeatedly utilized the notary services of notary public Kirk David Hilliard ("**Notary Hilliard**") of Capitol Mobile Notary, Virginia Registration No. 7839539 and have apparently used his services to perpetuate their fraud and conspiracy that documents are in fact signed and notarized as they appear, while providing Notary Hilliard with thousands of dollars in return. To date, it is believed that Ms. Gunkova and Mr. Bogatin together have committed no less than fifty (50) forgeries of Mr. Kamin's signature, including but not limited to:

a) Unbeknownst to Mr. Kamin, Ms. Gunkova has held Mr. Kamin out to be a "Director" and owner of ARIA, for which if Mr. Kamin has no involvement, including forging numerous versions of ARIA's Operating Agreement to

[3] Mr. Kamin did not learn of the fraudulent communications using these email addresses until the emails were compelled by this Court to be produced by Ms. Gunkova in this litigation after she originally refused to produce them. Mr. Kamin was not (and still has not been) provided with the account login and/or password information, although he has requested such information. Accordingly, Mr. Kamin did not and still does not have access to the account(s) and is unable to determine what, if any, emails are being sent by the account purportedly on his behalf, or received by the account purportedly on his behalf.

represent Mr. Kamin's alleged ownership, one version of the many forgeries of which is attached hereto as **Exhibit I**;

b) Unbeknownst to Mr. Kamin, Ms. Gunkova and Mr. Bogatin created and registered Defendant Sterling Investment allegedly on behalf of Mr. Kamin. Ms. Gunkova and Mr. Bogatin fabricated a "Certificate of Organization" purportedly issued on behalf of the Virginia State Corporation Commission reflecting Mr. Kamin as "Director" of that entity, a copy of which is attached hereto as **Exhibit J;**

c) Mr. Kamin learned that at some point after the purchase of the Building, Ms. Gunkova and/or Mr. Bogatin sent a letter to tenants of the Building and signed the letter as: "Harry D Kamin Director and CEO BNG Group LLC harry@bnggroupllc.com". Mr. Kamin had no involvement or knowledge of the letter and did not authorize anyone send out the letter on his behalf. A copy of the letter is attached hereto as **Exhibit K;**

d) Ms. Gunkova and/or Mr. Bogatin fabricated an Operating Agreement of BNG purportedly signed by Mr. Kamin on February 20, 2020. Mr. Kamin has no knowledge of signing the putative Operating Agreement and a review of the document indicates it has been altered to be give the appearance that it was signed by Mr. Kamin. A copy of the February 20, 2020 forged Operating Agreement is attached hereto as **Exhibit L;**

e) Ms. Gunkova and Mr. Bogatin fabricated a document titled "First Amendment to the Operating Agreement of BNG Group LLC" dated March 14, 2020, a copy of which is attached hereto as **Exhibit M**, and forged or caused to be forged Mr.

Kamin's signature and initials, as well as the signature and initials of Dr. Bruce Freedman, to the document;

f) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Power of Representation" dated March 14, 2020 and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit N**. Additionally, Ms. Gunkova forged the notary block and signature of notary public Fatima El-Hage by lifting the block and signature from the Contract of Sale document signed by Ms. Gunkova and notarized by Ms. El-Hage (*see* Exhibit D) and pasting it to the Power of Representation document to appear as if Ms. El-Hage had notarized the Power of Representation document when in fact she confirmed she has never met Mr. Kamin nor seen this document prior to this litigation;

g) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Membership Interest Transfer Agreement" dated May 16, 2020, a copy of which is attached hereto as **Exhibit O**, and forged Mr. Kamin's signature to the document, which was allegedly notarized by Notary Hilliard;

h) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Amendment No. 1 to Contract of Sale" dated August 17, 2020, and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit P**;

i) Ms. Gunkova and Mr. Bogatin fabricated a Term Sheet dated August 28, 2020, by forging Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit Q**;

j) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Amendment No. 2 to Contract of Sale" dated September 27, 2020, and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit R**;

k) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Amendment No. 3 to Contract of Sale" dated September 29, 2020, and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit S;**

l) Ms. Gunkova and Mr. Bogatin fabricated a document titled "October 29, 2020 Members Meeting" dated October 29, 2020, and forged Mr. Kamin's signature to the document, a copy of which is attached hereto as **Exhibit T**;

m) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Amended and Restated Operating Agreement of BNG Group LLC" dated October 29, 2020, a copy of which is attached hereto as **Exhibit U**, and forged Mr. Kamin's signature to the document, which was allegedly notarized by Notary Hilliard;

n) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Second Amendment to Operating Agreement of BNG Group LLC" dated October 29, 2020, a copy of which is attached hereto as **Exhibit V**, and forged Mr. Kamin's signature to the document, which was allegedly notarized by Notary Hilliard;

o) Ms. Gunkova and Mr. Bogatin fraudulently "e-signed" documents on behalf of Mr. Kamin without his knowledge or consent through the use of their fraudulent email addresses harry@ariamedispa.com and grishak301@gmail.com , including the signing of a "Consulting, Success Fee and Non-Circumvention/Non-Disclosure Agreement" with Broker Stryker Services LLC on November 9, 2020, a copy of which is attached hereto as **Exhibit W,** and which purports to make Mr. Kamin personally liable for fees allegedly owed by BNG to the Broker related to the purchase of the Building (interestingly, there is no similar agreement making Ms. Gunkova personally liable);

p) Ms. Gunkova and Mr. Bogatin fabricated a document titled "Guaranty Note" dated February 1, 2021, a copy of which is attached hereto as **Exhibit X,** and forged Mr. Kamin's signature to the document, which was allegedly notarized by Notary Hilliard in Virginia;

56. Mr. Kamin also learned through third-party discovery in this litigation that the forgeries of documents were not limited to internal governance documents of BNG. Mr. Kamin has learned that Mr. Bogatin and Ms. Gunkova armed with Mr. Kamin's personal identifiers and financial records as a result of the loan process for the purchase of the Building, continued their scheme throughout 2020, 2021, 2022, and 2023 by purporting to be Mr. Kamin to various entities and individuals including but not limited to the Small Business Administration, TD Bank, EagleBank, Atlantic Union Bank, Ascentium Capital, US Business Funding, Financial Partners Group, and Bank Five Nine. Mr. Bogatin and Ms. Gunkova, individually and on behalf of ARIA, used Mr. Kamin's identity and financial records to apply for financial loan and falsified documents necessary to obtain such loans – all without Mr. Kamin's knowledge or consent. To date, the total amounts received by Ms. Gunkova, ARIA, and Mr. Bogatin as a result of Ms. Gunkova and Mr. Bogatin's conspiracy and submissions of false information to the Small Business Administration and numerous financial institutions is believed to be more than $2.5 million.

57. Ms. Gunkova and Mr. Bogatin used funds converted from BNG as well as monies received from their fraudulent loan scheme to pay hundreds of thousands of dollars in legal fees to Ms. Gunkova's personal attorneys in this case, including Ms. Gunkova's current counsel who has been serving in this case since August 2021.

58. Ms. Gunkova and ARIA each received funds obtained as a result of the fraudulent loan scheme, and have transferred those funds to Ms. Gunkova, Mr. Bogatin, ARIA, VNJ, and Sterling Investment.

59. Ms. Gunkova engaged and continues to engage in self-dealing to benefit her *other* company, ARIA, including converting BNG's assets, including large sums of money, to ARIA without Mr. Kamin's knowledge and over his express objection to any such transfer. In addition, Ms. Gunkova, with the assistance of Mr. Bogatin, fabricated a document purported to be a "Third Amendment to Office Lease Agreement" between BNG and ARIA, which included a backdated effective date of January 1, 2018, and reduced ARIA's monthly rent by $10,000 to the detriment of BNG. Ms. Gunkova has used and co-mingled BNG funds to pay ARIA expenses, including payroll expenses of ARIA.

60. Ms. Gunkova, with the assistance of Mr. Bogatin, filed improper and false tax records, including co-mingling assets and liabilities of BNG with other entities, including those of ARIA. Ms. Gunkova has intentionally failed to properly amend BNG's 2020 tax returns as recommended by accountant and BNG tax preparer, Alan Bassman.

61. Ms. Gunkova, with the assistance of Mr. Bogatin, fabricated numerous contracts alleged by Ms. Gunkova in this litigation to have been entered into by ARIA and BNG, including (i) an alleged "Short Term Loan Exchange Agreement" dated September 18, 2019, (ii) an alleged "Contract for Services" dated September 20, 2019, (iii) an alleged "Asset Contribution Agreement" dated September 21, 2019, and (iv) an alleged "Loan Agreement" dated October 30, 2019 . If the alleged contracts are in fact authentic and enforceable agreements (and not just additional act of fraud by Ms. Gunkova and Mr. Bogatin), Ms. Gunkova has breached her fiduciary duties to BNG by failing to enforce the alleged agreements in favor of BNG and against ARIA.

62. ARIA also failed to pay timely and full rent payments to BNG under its Lease with BNG. While purporting to be the sole Manager of BNG, Ms. Gunkova has failed to enforce the lease agreements of BNG and ARIA, including failing to collect full and timely rent from ARIA, to ultimately benefit herself and ARIA.

63. Finally, since the filing of this Complaint in March 2021, Ms. Gunkova has continued to transfer and dissipate assets in violation of Virginia's fraudulent conveyance statute, codified at Va. Code § 55.1-400, *et seq.,* including making improper transfers to ARIA and Mr. Bogatin.

**COUNT I: SPECIFIC PERFORMANCE**
**(on behalf of Mr. Kamin against Defendant Gunkova only)**

64. The allegations contained in Paragraphs 1 through 63 above are incorporated by reference as if fully set forth herein.

65. Pursuant to Section 9.3 of the Operating Agreement, Mr. Kamin and Ms. Gunkova agreed:

> that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions in this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

66. Ms. Gunkova has certain obligations pursuant to the Operating Agreement, including to provide information to Mr. Kamin at his request.

67. Ms. Gunkova has breached her obligations pursuant to the Operating Agreement.