the Title Objections. In the event that Seller advises Buyer of its inability or election not to cure one or more Title Objections after electing to cure the Title Objections, Buyer may, at its option either (a) elect to waive such Title Objections, or (b) terminate this Contract by written notice to Seller within five (5) Business Days after receipt of Seller's notice of inability or election not to cure such objections, in which event the Deposit shall be returned to the Buyer and the parties shall have no further liability hereunder. For purposes of this Contract, "Business Day" shall mean any day except Saturday, Sunday, or any other day on which commercial banks located in Virginia are authorized or required by law to be closed for business. In the event that the Buyer fails to terminate this Contract as set forth in this section, Buyer shall be deemed to have waived any and all Title Objections and shall then accept title to the Real Property as set forth in the title report.

7.4 Buyer acknowledges that Seller has pledged the Real Property as collateral under a certain Indemnity Deed of Trust ("IDOT") made in favor of United Bank, under which the Real Property is pledged to secure certain loans made to principals or related entities of the Seller. Seller agrees to use its best efforts prior to Closing hereunder to effect the full release of the IDOT and any other documents evidencing any encumbrance or lien granted to United Bank. Seller and Buyer agree and consent that Closing under this Contract is expressly contingent upon Seller's ability to effect and obtain the full release of such liens and encumbrances. Should Seller fail to obtain such releases on or before the Closing Cutoff Date, then this Contract shall automatically terminate, in which event the Deposit shall be returned to the Buyer and the parties shall have no further liability hereunder.

7.5 Buyer shall have a sixty (60) days period from the Effective Date (the "Financing Period") to obtain financing sufficient to fund payment of the sum of Six Million and no/100 Dollars ($6,000,000.00) of the Purchase Price. Buyer will immediately make application for, and will diligently pursue approval of, a commercial loan to be secured by Buyer's interest in the Property after Closing. In the event that Buyer is unable to close on such financing on or before the termination of the Financing Period, this Contract will automatically terminate, whereupon the Deposit shall be returned to Buyer by Escrow Agent and neither party shall have any further rights, liabilities or obligations hereunder, except for those obligations that expressly survive termination.

## ARTICLE VIII. ADJUSTMENTS, TAXES AND CLOSING COSTS

8.1 At Closing, all customary adjustments shall be made, including utility expenses and deposits, payroll taxes, personal property taxes, license fees, and other income and expense items, pertaining to the Property. Without limiting the generality of the foregoing, it is specifically agreed that:

(1) all operating receipts and expenses, utilities expenses, taxes, water and sewer rents, or similar charges or fees, condo fees, and inventories of supplies, if any, are to be adjusted as of 11:59:59 p.m. of the day preceding the date of Closing ("Adjustment Time"). Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the taxing authority in the jurisdiction in which the Real Property is situated;

(2) each party hereto shall be responsible for payment of their own respective attorney's fees.

(3) all service contracts shall be terminated as of Closing, and, as result (x) the same shall not be assigned to and assumed by Buyer at Closing, and (y) no adjustments shall be made between the parties related thereto provided that Seller shall fully pay all amounts due under such Service Contracts;

(4) any other costs or charges of closing this transaction not specifically mentioned in this Contract shall be paid and adjusted in accordance with local custom in the area in which the Real Property is located; and

(5) except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Article VIII and elsewhere in this Contract is that Seller shall bear all expenses of ownership and operation of the Real Property and shall receive all income therefrom accruing through 11:59:59 p.m. of the day preceding the date of Closing and Buyer shall bear all such expenses and receive all such income accruing on the date of Closing and thereafter.

8.2 The costs of examination of title, the costs of title insurance covering Buyer's interest in the Real Property as the owner, and the tax or lien certificates, conveyancing, escrow and settlement fees, notary fees and recording charges shall be at the Buyer's sole expense.

8.3 Seller and Buyer shall each pay one-half (1/2) of all other state, county and local transfer and recordation taxes on the Deed. Seller and Buyer shall equally share the cost of recording any Deed of Trust loans. Seller shall be responsible for obtaining and recording releases promptly for any existing monetary liens (except to the extent caused by Buyer or Buyer's Agents) on the Real Property.

8.4 All real property taxes and all other public or governmental charges or assessments, general or special, against the Real Property which are or may be payable on an annual basis (including benefit charges, assessments, liens or encumbrances for sewer, water, drainage or other public improvements completed or commenced on or prior to the date hereof, or subsequent thereto) shall be pro-rated as of the date immediately preceding the Closing based upon the most recent assessment therefor as of the date of Closing. If any such assessment has not been received by the date of Closing, then such adjustment shall be based on the prior year's assessment, and when the current year's is received, the parties shall readjust their payments accordingly. The provisions of this paragraph shall survive Closing for a period of three (3) months.

8.5 Any utility company charges (electricity, gas, water, and sewer) accrued and payable by Seller based upon the last bill(s) therefor shall be adjusted as of the date immediately preceding the Closing. If any such bill(s) has not been received by the date of Closing, then such adjustment shall be based on the last such bill received, and when the bill is received, the parties shall readjust their payments accordingly. With respect to any adjustment relating to utilities, such as water, gas or electricity, if it is practical for Seller to obtain a reading of the meter of the

utility consumption as of Closing, Seller shall do so, and in such case Seller shall pay directly to the utility provider the amount determined to be due as of Closing, instead of adjusting same with Buyer. The provisions of this paragraph shall survive Closing for a period of three (3) months.

## ARTICLE IX. GENERAL PROVISIONS

9.1 This Contract constitutes the sole, final and entire agreement and understanding of the parties hereto and supersedes all prior written or oral agreements. The parties shall not be bound by any terms, conditions, statements or representations, oral or written, not contained herein. This Contract may not be changed orally, but only by an agreement in writing signed and delivered by both parties.

9.2 No exercise or waiver, in whole or in part, of any right or remedy provided for in this Contract shall operate as a waiver of any other right or remedy, except as otherwise herein provided. No delay on the part of any party in the exercise of any right or remedy shall operate as a waiver thereof. Time is of the essence with respect to all the terms, conditions and provisions of this Contract.

9.3 The parties acknowledge and agree that they have not used the services of any agent, broker or consultant in this transaction. In the event any other agent or broker claims commission due from this transaction, the party through whom such claim is made shall indemnify and hold harmless the other from any costs, damages, and liabilities, including reasonable attorney's fees and costs incurred.

9.4 Seller shall assume all risk of loss due to fire or other casualty up to and including the date of Closing. If, at any time prior thereto, any portion of the Real Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Buyer. In the event that (a) the total cost to repair or restore such destruction or damage, as determined by Seller's insurance claim adjuster, exceeds $500,000.00, and/or (b) the estimated time to restore or repair such destruction or damage, as determined by Seller's insurance claim adjuster, exceeds one hundred eighty (180) days from the casualty date, Buyer shall have the right to terminate this Contract by written notice delivered to Seller within twenty (20) days following the date upon which Buyer receives Seller's written notice of the destruction or damage. If (i) such destruction or damage can be repaired or restored for $500,000.00 or less, and can be repaired in one hundred eighty (180) days or less from the casualty date, or (ii) the cost of such repair or restoration shall exceed $500,000.00, and/or the time to complete the repair and restoration of the Real Property shall exceed one hundred eighty (180) days from the casualty date, but Buyer does not elect to so terminate this Contract within said twenty (20) day period, then, in either such case, this Contract shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds, if any, will be assigned to Buyer. Seller shall have no obligation or liability whatsoever for payment to Buyer of any amount related to deductibles under any such policies of insurance.

Seller ________ Buyer ________

occurred before the first (1st) anniversary of the Effective Date, then anything herein to the contrary notwithstanding, this Contract shall automatically be rendered null and void.

9.9 This Contract shall be governed by the laws of the Commonwealth of Virginia.

9.10 If any provision of this Contract or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Contract or the application of such provision to such person or circumstances, other than those as to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

9.11 Should either party hereto institute any action in court to enforce any provision hereof for damages by reason of any alleged breach of any provision of this Contract or for any other judicial remedy, the prevailing party shall be entitled to receive from the losing party all reasonable attorneys' fees and all court costs in connection with said proceeding and any costs incurred in the enforcement of such party's rights hereunder.

9.12 This Contract may be executed in counterparts, and all counterparts so executed shall constitute one purchase and sale agreement binding upon all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

9.13 Seller and Buyer shall cooperate with each other as reasonably necessary to effect the provisions of this Contract, shall use reasonable and good faith efforts to satisfy conditions to Closing and, at and after Closing, shall each execute and deliver such additional instruments or other documents as the other may reasonably request to accomplish the purposes and intent of this Contract; provided, however, that nothing in this Section shall be deemed to enlarge the obligations of the parties hereunder or to require either Seller or Buyer to incur any material expense or liability not otherwise required of it hereunder.

9.14 Each party acknowledges that it and its legal counsel have participated substantially in the drafting of this Contract and agree that, accordingly, in the interpretation and construction of this Contract, no ambiguity, real or apparent, in any provision hereof shall be construed against either party by reason of the role of such party or its counsel in the drafting of such provision.

9.15 Indemnification.

(1) Seller shall defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any

Seller:

Buyer:

litigation or proceeding - collectively, "Losses") to the extent arising prior to or resulting from the sale and purchase of the Real Property.

(2) Buyer shall defend, indemnify and hold harmless Seller, its affiliates and their respective stockholders, directors, officers and employees from and against all Losses to the extent arising from or relating to claims arising after the sale and purchase of the Real Property.

(3) The party making a claim under this Section 9.16 is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this this Section 9.16 is referred to as the "Indemnifying Party."

(i) If any Indemnified Party receives notice of the assertion or notice of the commencement of any Action made or brought by any person who is not a party to this Contract or an affiliate of a party to this Contract or a representative of the foregoing (a "Third Party Claim") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Contract, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Losses that have been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel. The Indemnifying Party shall cooperate with the Indemnified Party in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim.

(iv) All indemnification payments made under this Contract shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

SIGNATURES ON FOLLOWING PAGE

Seller: ______ Buyer: ______

9.5 Any and all notices, requests or other communications required or permitted hereunder shall be deemed to have been duly given only if in writing and if transmitted by (i) hand delivery (with receipt), or (ii) reputable overnight delivery service, with request for next business day delivery, addressed as follows:

| | |
|---|---|
| TO SELLER: | Judicial Drive Property Holding, LLC<br>14 Pidgeon Hill Drive, Ste. 270<br>Sterling, Virginia 20165<br>571-643-8256 |
| WITH A COPY TO: | Kevin M. O'Donnell<br>300 N. Washington Street, Suite 204<br>Alexandria, Virginia 22314<br>703-548-2100<br>kmo@henrylaw.com |
| TO BUYER: | **BNG GROUP, LLC**<br>2 Pidgeon hill Dr Suite 120<br>Sterling VA 20165<br>jacob@ariamedispa.com |
| WITH A COPY TO: | Andrei J. Kublan, Esquire<br>Kublan Khan PLC<br>6521 Arlington Boulevard, Suite 201<br>Falls Church VA 22042<br>703-854-1081<br>andrei@kublankhan.com |

Any notice shall be deemed to have been given and received on the date of delivery indicated on the return receipt or signed receipt.

9.6 This Contract and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, legal representatives, successors and permitted assigns.

9.7 This Contract may be not be assigned by Buyer except with the consent of Seller, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, should either Buyer or Seller desire to structure the transactions contemplated by this Contract as a tax-deferred exchange pursuant to Section 1031 of the Internal Revenue Code, then the other party shall cooperate in all reasonable respects (but at no expense to the cooperating party) in order to effect such exchange including, without limitation, by consenting to an assignment of this Contract to an exchange intermediary. In no event shall either party be required to consent to a delay of the Closing in order to allow the other party to effect such exchange.

9.8 Seller and Buyer agree that this Contract shall not be recorded. Solely for purposes of compliance with the Rule Against Perpetuities, in the event that Closing hereunder shall not have

Seller: ______ Buyer: ______

IN WITNESS WHEREOF, the parties have executed this Contract of Sale under seal on the day and year first above written.

WITNESS:

______________________________

BUYER: BNG GROUP, LLC
By: Valeria Gunkova, its

Valeria V Gunkova (SEAL)
By:
Name: VALERIA GUNKOVA
Title: president

STATE/COMMONWEALTH OF VA
CITY/COUNTY OF Fairfax to wit:

I HEREBY CERTIFY that on this the 6th day of March, ~~2019,~~ 2020 before me, the Subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared Valeria, V. the Gunkova of **SKIN LOGIC, LLC,** personally well known to me (or proven satisfactorily) to be the person who executed the foregoing instrument, and acknowledged that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[Seal]

FATIMA EL-HAGE
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JAN. 31, 2021
COMMISSION # 243437

Fatima El-Hage
Notary Public
Name: Fatima El-Hage

Notary Registration Number: 243437
My Commission Expires: Jan 31, 2021

Seller ______ Buyer ______

WITNESS:

SELLER: JUDICIAL DRIVE PROPERTY HOLDING, LLC

______________________________

______________________________(SEAL)
By:
Name:
Title:

STATE/COMMONWEALTH OF __________

CITY/COUNTY OF ____________ to wit:

I HEREBY CERTIFY that on this the ___ day of ___________, 2019, before me, the Subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared ____________, the ____________ of **JUDICIAL DRIVE PROPERTY HOLDING, LLC,** personally well known to me (or proven satisfactorily) to be the person who executed the foregoing instrument, and acknowledged that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[Seal]

______________________________
Notary Public

Name:______________________

Notary Registration Number: ________________

My Commission Expires: ________________

Escrow Agent hereby joins in the foregoing Contract of Sale solely for the purpose of acknowledging and consenting to the provisions of Section 2.1 thereof regarding the Deposit.

ESCROW AGENT:

STEWART TITLE AND ESCROW, INC.

__________________________________

By:
Name:
Title:

HARRY D KAMIN
320 S SURF RD APT 504
HOLLYWOOD FL 33019

164
63-1482/670
933

MAR 08, 2020
Date

Pay to the Order of BNG GROUP LLC $ 25,000.00

Twenty-five thousand + 00/100 Dollars

Photo Safe Deposit® Details on back

TD Bank
America's Most Convenient Bank®

For c/o Sterling Investment LLC

Harry D Kamin

[redacted] 0164

Account: [redacted]
Amount: 25,000.00
PostDate: 20200309
Tran_ID: 512010551
CheckNum: 164
DIN: 512010556
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 512010556
ECEItemSeqNum: 522138008433

[redacted]
DDA_DEBIT FELICIMD 25000.00
Leesburg 0221 94004 5221 0010 0036

DEPOSIT ONLY TO THE CREDIT OF WITHIN NAMED PAYEE BANK N.A.

Account: [redacted]
Amount: 25,000.00
PostDate: 20200309
Tran_ID: 512010551
CheckNum: 164
DIN: 512010556
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 512010556
ECEItemSeqNum: 522138008433

EXHIBIT
C




Account: [redacted]
Amount: 25,000.00
PostDate: 20200309
Tran_ID: 512010551
CheckNum: 165
DIN: 512010561
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 512010561
ECEItemSeqNum: 522138008434




Account: [redacted]
Amount: 25,000.00
PostDate: 20200309
Tran_ID: 512010551
CheckNum: 165
DIN: 512010561
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 512010561
ECEItemSeqNum: 522138008434

HARRY D KAMIN
320 S SURF RD APT 504
HOLLYWOOD FL 33019

167

63-1482/670
933

MAR. 10, 2020
Date

Pay to the Order of BNG GROUP LLC $65,000.00

Sixty-five thousand + 00/100 —— Dollars

Photo Safe Deposit® Details on back

TD Bank
America's Most Convenient Bank®

For c/o Sterling Investment LLC    Harry D Kamin MP

[redacted] 0167

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 167
DIN: 557575551
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575551
ECEItemSeqNum: 522138009005

[redacted]
DDA_DEBIT FELICIMD 65000.00
Leesburg 0221 94004 5221 0010 0073

TD BANK
DEPOSIT ONLY
GROUP LLC
4377488519

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 167
DIN: 557575551
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575551
ECEItemSeqNum: 522138009005

EXHIBIT
D

HARRY D KAMIN
320 S SURF RD APT 504
HOLLYWOOD FL 33019

167
63-1482/670
933

MAR. 10, 2020
Date

Pay to the Order of BNG GROUP LLC $65000.00

Sixty-five thousand + 00/100 Dollars

Photo Safe Deposit® Details on back

TD Bank
America's Most Convenient Bank®

For c/o Sterling Investment LLC Harry D Kamin MP

[redacted] 0167

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 167
DIN: 557575551
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575551
ECEItemSeqNum: 522138009005

[redacted]
DDA_DEBIT FELICIMD 65000.00
Leesburg 0221 94004 5221 0010 0073

TD BANK
FO[redacted] DEPOSIT ONLY
[redacted]G GROUP LLC
AC[redacted]# 4377488519

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 167
DIN: 557575551
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575551
ECEItemSeqNum: 522138009005

**HARRY D KAMIN**
320 S SURF RD APT 504
HOLLYWOOD FL 33019

168
63-1482/670
933

MAR. 10, 2020
Date

Pay to the Order of BHG GROUP LLC $65,000.00

Sixty-five thousand + 00/100 Dollars

Photo Safe Deposit® Details on back

**TD Bank**
America's Most Convenient Bank®

For c/o Sterling Investment llc Harry D Kamin MP

[redacted] 0168

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 168
DIN: 557575546
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575546
ECEItemSeqNum: 522138009004

FO[redacted] TD BANK
[redacted] DEPOSIT ONLY
B[redacted] GROUP LLC
ACC[redacted] 4377488519

DDA_DEBIT FELICIMD 65000.00
Leesburg 0221 94004 5221 0010 0073

Account: [redacted]
Amount: 65,000.00
PostDate: 20200316
Tran_ID: 557575541
CheckNum: 168
DIN: 557575546
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 557575546
ECEItemSeqNum: 522138009004

HARRY D KAMIN
320 S SURF RD APT 504
HOLLYWOOD FL 33019

175
63-1482/670
933

Apr 15, 2020
Date

Pay to the Order of BNG Group LLC $ 135,000.00

One hundred & thirty-five thousand + 00/100 Dollars

Photo Safe Deposit® Details on back

TD Bank
America's Most Convenient Bank®

For c/o Sterling Investment  Harry D Kamin

[redacted] 0175

Account: [redacted]
Amount: 135,000.00
PostDate: 20200519
Tran_ID: 733863101
CheckNum: 175
DIN: 733863106
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 733863106
ECEItemSeqNum: 522135015771

[redacted]
DDA_DEBIT MCANTAD 0.00
Leesburg 0221 94004 5221 0002 0050

TD BANK
[redacted]R DEPOSIT ONLY
[redacted]NG GROUP LLC
AC[redacted]T# 4377488519

Account: [redacted]
Amount: 135,000.00
PostDate: 20200519
Tran_ID: 733863101
CheckNum: 175
DIN: 733863106
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 733863106
ECEItemSeqNum: 522135015771

EXHIBIT
E

TD 03058


176
HARRY D KAMIN
320 S SURF RD APT 504
HOLLYWOOD FL 33019
63-1482/670
933
Apr 15, 2020
Date
Pay to the Order of, BNG GROUP LLC
$ 135,000.00
One hundred & thirty-five thousand & 00/100 Dollars
Photo Safe Deposit® Details on back
TD Bank
America's Most Convenient Bank®
For c/o Sterling Investment llc
Harry D Kamin MP
[redacted]
0176
TD Bank, N.A.

Account: [redacted]
Amount: 135,000.00
PostDate: 20200519
Tran_ID: 733863101
CheckNum: 176
DIN: 733863111
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 733863111
ECEItemSeqNum: 522135015772


[redacted]
DDA_DEBIT MCANTAD 0.00
Leesburg 0221 94004 5221 0002 0050
TD BANK
DEPOSIT ONLY
[redacted] GROUP LLC
#4377488519

Account: [redacted]
Amount: 135,000.00
PostDate: 20200519
Tran_ID: 733863101
CheckNum: 176
DIN: 733863111
ReturnReasonCode:
ReturnReasonDescription:
Orig_DIN: 733863111
ECEItemSeqNum: 522135015772

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

**BNG GROUP, LLC**

A Virginia Limited Liability Company

THE MEMBERSHIP INTERESTS IN **BNG GROUP, LLC** **HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS. THE MEMBERSHIP INTERESTS ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER UNDER THIS AGREEMENT.**

EXHIBIT

F

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**BNG GROUP, LLC**

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is made as of this 20 day of March 2020 by, between and among individuals undersigned individuals whose names are set forth on the signature pages hereto and whose names and addresses appear on Exhibit "A" attached hereto. For purposes of this Agreement, the foregoing parties are further referred to each as a "Member" and collectively as the "Members."

## BACKGROUND

**The Members formed BNG GROUP, LLC**
(the "Company") as a Virginia limited liability company under the Virginia Limited Liability Company Act by filing a Certificate of Organization with the Department of State of the Commonwealth of Virginia on 17 day of September 2019. The Members intend this Agreement to set forth the rights and obligations of each of the Members regarding the Company and each other and to provide for the management and operation of the Company.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the legal sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## Section 1.
## Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) The deficit shall be decreased by the amounts which the Member is obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii) The deficit shall be increased by the items described in Regulation Section 1.704-(b)(2)(ii)-(d)(4), (5), and (6).

Adjusted Capital Balance means, as of any day, a Member's total Capital Contributions less all amounts actually distributed to the Member pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

Affiliate means, with respect to any Member, any Person: (i) in which the Member owns or controls more than thirty-three and one-third percent (33 1/3%) of the voting interests; or (ii) in which more than thirty-three and one-third percent (33 1/3%) of the voting interests are owned or controlled by a Person who has a relationship with the Member described in clause (i) above.

Agreement means this Agreement, as amended from time to time.

Capital Account means the account to be maintained by the Company for each Member in accordance with the following provisions:

(i) A Member's Capital Account shall be credited with the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to the Member), the Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii) A Member's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or which are secured by property contributed by the Member to the Company), the Member's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Member pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

Capital Contribution means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed by the Company or to which the assets are subject.

Capital Proceeds means the gross receipts received by the Company from a Capital Transaction.

Capital Transaction means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, finances, refinances, condemnations, recoveries of damage awards and insurance proceeds.

Cash Flow means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements and replacements as determined by the Board of Managers. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

Class means a group of Members that comprises the Class A

The Members, subject to the terms of Section 5.1.6 below, may provide for the creation of additional Classes of Members having such relative rights, powers and duties as the Members, in their discretion, may determine, including but not limited to, rights, powers and duties senior to any existing Class of Members.

Code means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

Company means the limited liability company formed in accordance with this Agreement.

Interest means a Person's interest as a Member in the Company including, without limitation, the Member's share of the Profits and Losses of, and the right to receive distributions from, the Company, and to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Law.

Involuntary Withdrawal means, with respect to any Member, the occurrence of any of the following events:

(i) The Member makes an assignment for the benefit of creditors;

(ii) The Member files a voluntary petition of bankruptcy;

(iii) The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v) The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) The Member's death, Permanent Disability (as hereinafter defined) or adjudication by a court of competent jurisdiction that the Member is incompetent to manage the Member's person or property;

(ix) A Member's ceasing to be eligible to own an interest in a Virginia limited liability company;

(x) A Member's ceasing to meet the ownership standards set forth at Section 3.3;

(xi) A Member's loss of his or her Virginia medical license;

(xii) A material breach by a Member of a Member's obligation hereunder which is not cured within thirty (30) days of Member's receipt of notice thereof; or

Law means the Virginia Limited Liability Company Law of 1994, 15 Virginia Consolidated Statutes, Chapter 89, and its provisions pertaining to limited liability companies, as amended from time to time.

Manager or Board of Managers means the Person or Persons designated as such in Section V as the same may be changed from time to time.

Member means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

Minimum Gain has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under Code Section 704(b).

Negative Capital Account means a Capital Account with a balance of less than zero.

Nonrecourse Deductions has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

Nonrecourse Liability means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

Percentage means, as to a Member, the percentage Interest set forth after the Member's name on Exhibit "A" or Exhibit "B", as applicable, as amended from time to time.

Permanent Disability means a Member's inability to engage in the practice of medicine for twelve (12) consecutive months on account of disability or other illness.

Person means and includes any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

Positive Capital Account means a Capital Account with a balance greater than zero.

Profit and Loss mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) In lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

Regulation(s) mean the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

Transfer means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer of the Interest held by any Member as permitted under this Agreement; and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer a Member's Interest as permitted under this Agreement.

Unit(s) means units of ownership Interests of Members in the Company as reflected on Exhibits "A" and "B" attached hereto.

Voluntary Withdrawal means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

**Section II.**
**Formation and Name: Office; Purpose; Term**

2.1 Organization. The Company has been organized as a Virginia limited liability company pursuant to the Law and the provisions of this Agreement and has caused the Certificate of Organization in the form attached as Exhibit "C" to be executed and filed with the Virginia Department of State on 20 day of February 2020.

**2.2 Name of the Company. The name of the Company is "[BNG GROUP, LLC]"** The Company may do business under any other name or names which the Board of Managers selects from time to time.

2.3 Purposes. The Company is organized to (i) management services and other related products and services; (ii) to make, enter into, and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes; and (iii) to engage in such other lawful businesses and activities as the Managers may determine are reasonably related to the foregoing purposes.

2.4 Term. The existence of the Company commenced on the date the Certificate was filed with the Department of State of the Commonwealth of Virginia pursuant to Section 8914 of the Law. The Company shall dissolve on the first to occur of the following events: (a) the decision by the Members to dissolve the Company; or (b) the date the Company may be otherwise dissolved by operation of law or judicial decree.

2.5 Registered Office; Principal Office. The initial registered office of the Company in the Commonwealth of Virginia shall be located at 2 Pidgeon Hill Dr Suite 120, Sterling, VA

20165, or such other location as the Board of Managers may designate from time to time in the manner provided by law.

**Section III.**
**Members; Member Rights and Requirements;**
**Capital; Capital Accounts; Unit Certificates**

3.1 Members. The name, present mailing address, number of Units and Percentage of each initial Member are set forth on Exhibits "A" and "B" attached hereto.

3.2 Voting Rights. Each Member shall have voting rights on all matters required to be voted upon by the Members as stated in Section 5.3.3.

3.3 Left empty

3.4 Initial Capital Contributions. The Company seeks Tree Hundred Thousand Dollars ($300,000) of initial capital contributions from its Class A Member. The capital shall be contributed to the Company by the Members within time frames to be established by the Board of Managers, in exchange for which the Members will receive their Interests as set forth on Exhibits "A" and "B" hereto. The capital contributions may, as permitted by the Board of Managers, be made in the form of contributed property.

3.5 Contribution; Combined Disclosure Memorandum and Subscription Agreements. Prior to or simultaneously with the execution of this Agreement, the Members shall execute the Combined Disclosure Memorandum and Subscription Agreement attached hereto as Exhibits "D" and "E".

3.6 Additional Capital Contributions. If, pursuant to Section V of this Agreement, the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions, then each Member shall contribute his or her share of additional Capital Contributions; provided, however, that the Board of Managers may only request additional Capital Contributions four times in any twelve (12) month period. If the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions on more than (4) occasion in any twelve (12) month period, then the Members shall determine by a majority vote pursuant to Section 5.3.2 whether to require additional Capital Contributions from the Members. A Member's share of the additional Capital Contributions shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contributions so approved by the Board of Managers. Within sixty (60) days after the Board of Managers has determined the amount of additional Capital Contributions required, each Member shall pay the Member's share, in readily available funds, to the Company.

3.6.1 Personal Liability. Except as set forth above, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company, excepting those liabilities specified herein or accepted in writing outside of this Agreement by any respective Member.

3.6.2 Failure to Contribute Additional Capital. If a Member fails to pay when due all or any portion of any Capital Contribution, such Member shall be deemed to have forfeited a proportionate Percentage Interest in the Company and the non-defaulting Members of such Member's Class shall, on a pro rata basis, pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution"). The Interest of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Interest is equal to a fraction (expressed as a percentage), the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Members, and the defaulting Member's Interest shall be decreased accordingly. The Board of Managers shall amend Exhibit "A" or "B", as applicable, accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.7 No Interest on Capital Contributions. Members shall not be paid interest on their Capital Contributions.

3.8 Return of Capital Contributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.

3.9 Capital Accounts. A separate Capital Account shall be maintained for each Member.

3.10 Loans. Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Board of Managers and the Members agree.

3.11 Units and Unit Certificates. The Units into which the aggregate Interest in the Company has been divided shall be represented by certificates ("Unit Certificates"). Initially, each Class A Member shall obtain one Unit for each Fifty Thousand Dollars ($50,000) of capital contributed by the Class A Member. Unit Certificates designating the number of Units owned shall be issued to the Class A Members.

3.11.1 Formality of Certificates. The Unit Certificates shall be in such form as is approved by the Board of Managers, and shall state that the Company is organized under the laws of the Commonwealth of Virginia, the name of the person to whom issued, and the number of Units that the Unit Certificate represents. The Unit register or transfer books and unissued Unit Certificates shall be kept by the Board of Managers.

3.11.2 Registration of Certificates. The Unit Certificates of the Company shall be numbered and registered in the Unit register or transfer books of the Company as they are issued. They shall be signed by the President or a Vice President of the Company.

3.12 Guaranty of the Company's Debts and Obligations. The debt incurred by the Company at the commencement of its operation shall, as required by any lender to the Company, be guaranteed personally by each Member on a pro rata basis. No Member may refuse to execute the documents reasonably required by a lender to effect such guaranty. In the event the

Company incurs debt subsequent to the commencement of the operation and a guaranty is required by the lender, the Company must obtain the agreement of a majority of the Interests of each ClassAefore a Member will be required to execute additional guarantees.

**Section IV.**
**Profit, Loss and Distributions**

4.1 Distributions of Cash Flow and Allocations of Profit or Loss Other Than From Capital Transactions.

4.1.1 Profit or Loss Other Than from a Capital Transaction. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Members in proportion to their Percentages.

4.1.2 Cash Available for Distribution. The Board of Managers shall determine whether all or a portion of the Cash Flow, if any, for each taxable year of the Company shall be distributed to the Members. Any distribution of Cash Flow to the Members shall be in proportion to the Members' Percentages and at such times as the Board of Managers may determine. To the extent practicable, all distributions made to Members shall be made in a manner to allow the income tax attributable to the income passed through and taxed to Members for a taxable year to be paid when due.

4.2 Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.

4.2.1 Profit. After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1 If one or more Members has a Negative Capital Account, to those Members, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been increased to zero.

4.2.1.2 Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Members in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 4.2.3.4.1 and 4.2.3.4.3.

4.2.1.3 Any Profit in excess of the foregoing allocations shall be allocated to the Members in proportion to their Percentages.

4.2.2 Loss. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1 If one or more Members has a Positive Capital Account, to those Members, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2 Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Members in proportion to their Percentages.

4.2.3 Capital Proceeds. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Member); then

4.2.3.3 To the establishment of any reserves which the Board of Managers deems necessary for liabilities or obligations of the Company; then

4.2.3.4 The balance shall be distributed as follows:

4.2.3.4.1 To the Members in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2 If any Member has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Members in proportion to their Positive Capital Accounts; then

4.2.3.4.3 The balance, to the Members in proportion to their Percentages.

4.3 Regulatory Allocations.

4.3.1 Qualified Income Offset. No Member shall be allocated Losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a *pro rata* portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.

This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the qualified income offset provisions of the Regulations promulgated under Section 704(b) of the Code.

4.3.2 Minimum Gain Charge Back. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a *pro rata* portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a minimum gain charge back under Regulation Section 1.704-2(f).

4.3.3 Contributed Property and Adjusted Book Value. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Board of Managers shall determine the applicable method of applying Code Section 704(c) and the Regulations thereunder.

4.3.4 Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5 Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Percentages.

4.3.6 Member Loan Nonrecourse Deductions. Any Member loan nonrecourse deduction for any taxable year or other period shall be specially allocated to the Member who bears the risk of loss with respect to the loan to which the Member loan nonrecourse deduction is attributable in accordance with Regulation Section 1.704-2(i).

4.3.7 Guaranteed Payments. To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.4 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8 Unrealized Receivables. If a Member's Interest is reduced (provided the reduction does not result in a complete termination of the Member's Interest), the Member's share of the Company's unrealized receivables and substantially appreciated inventory (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specially allocated among the Members in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Board of Managers.

4.3.9 Withholding. All amounts required to be withheld pursuant to Code Section 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

4.4 Liquidation and Dissolution.

4.4.1 Distribution Upon Liquidation. If the Company is liquidated, the assets of the Company shall be distributed to the Members in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2 Negative Capital Account. No Member shall be obligated to restore a Negative Capital Account.

4.5 General.

4.5.1 Timing and Amount of Distributions. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Board of Managers.

4.5.2 Fair Market Value. If any assets of the Company are distributed in kind to the Members, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common

with all other Members so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Board of Managers. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Members prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3 Profit and Loss. All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each was a Member during the taxable year; provided, however, the Company's taxable year shall be segregated into two (2) or more segments in order to account for Profit, Loss or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4 Amendment. The Board of Managers is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to a Member without the Member's prior written consent.

## Section V.
## Management: Rights, Powers and Duties

5.1 Management.

5.1.1 Officers. The Board of Managers shall, by a majority vote, elect the officers of the Company. The officers of the Company shall be a President, a Secretary and a Treasurer. In addition, the Board of Managers may elect one or more Vice Presidents. The President, Treasurer, Vice President and Secretary shall be Members of the Company and shall serve for a term of two (2) years. The officers may be compensated by the Company in such amount as determined by the Board of Managers from time to time. The officers shall be elected and removed in accordance with the following:

5.1.1.1 Upon the death, disability, resignation, removal or retirement of an officer, or at the end of the term as set forth in Section 5.1.1 hereof, the successor officer shall be elected by a majority vote of the Board of Managers. An officer may be removed with or without cause by a majority vote of Board of Managers of Company; provided that the Members simultaneously replace the removed officer with another qualified individual in accordance with the provisions of this Section 5.1.1.

5.1.1.2 The President shall be responsible for conducting all meetings of the Members and for performing the functions set forth in this Section 5.1.1.2. The responsibility for the day-to-day management and operation of the Company's shall be delegated

to the President by the Board of Managers. Furthermore, the President may authorize an expenditure of up to Ten Thousand Dollars ($10,000) without the approval of the Board of Managers. Notwithstanding the foregoing, in the event the Board of Managers hires a Person to act as the chief executive officer (the "CEO") of the Company's then the Board of Managers, in its discretion, may delegate to the CEO some or all of the duties, authority and responsibility previously delegated to the President.

5.1.1.3 The Treasurer shall have custody of all funds and securities of the Company which may come into his or her hands. When necessary or proper (unless otherwise ordered by the Board of Managers) he or she shall (a) endorse for collection on behalf of the Company checks, notes and other obligations, (b) deposit the same to the credit of the Company in such banks or depositories as the Board of Managers may designate and (c) sign all receipts and vouchers for payments made by the Company. The Treasurer shall, at all reasonable times, exhibit his or her books and accounts to the Board of Managers of the Company upon the request of any Manager, and he or she shall also, if so directed by the Board of Managers, annually prepare and submit to the Annual Meeting of Members a full statement of the assets and liabilities of the Company and of its transactions during the preceding year, and shall have such other powers and shall perform such other duties as may be assigned to him or her from time to time by the Board of Managers. The Treasurer shall give such bond for the faithful performance of his or her duties as may be required by the Board of Managers. Notwithstanding the foregoing, in the event the Board of Managers hires a Person to act as the CEO of the Company's, then the Board of Managers, in its discretion, may delegate to the CEO some or all of the duties, authority and responsibility previously delegated to the Treasurer, including without limitation the day-to-day functions related to the finances of the Company and authority to sign checks on the Company's account, provided that the CEO shall inform the Treasurer on a regular basis of all financial matters and transactions of the Company which are carried out within the scope of the Board's delegation.

5.1.1.4 The Secretary shall keep the minutes of all meetings of the Members and of the Board of Managers in proper books to be kept for such purpose and shall attend to the giving of all notices by the Company, including notices of meetings of Members and of the Board of Managers. The Secretary shall have charge of the Unit Certificate register, transfer books and such other books and papers as the Board of Managers may direct. The Secretary shall in general perform all the duties incident to the office of Secretary and have such other powers and perform such other duties as may be assigned to him or her by the Board of Managers.

5.1.1.5 The Vice President, if any, shall serve as President in the President's absence and shall perform such other functions as the Board of Managers from time to time directs.

5.1.2 <u>Director</u>. The Board of Managers may, by a majority vote, select a director ("Director") who shall be responsible for performing the functions set forth in Section 5.1.2.3 hereof. The Director, if any, shall serve as Director for a term of two (2) years or for such other period of time specified in a contract between the Director and the Company as

authorized by the Board of Managers (the "I Director Agreement). The Director shall be a Member of the Company.

5.1.2.1 Upon the death, disability, resignation or retirement of the Director, or at the end of the term as set forth in Section 5.1.2 hereof, the successor Director shall be selected by a majority vote of the Board of Managers. A Director may serve consecutive terms provided that he or she is selected in accordance with this Section 5.1.2.1.

5.1.2.2 Except as otherwise provided in this Agreement, the duties, authority and responsibility of the Director shall be set forth in the Director Agreement. The Director shall be compensated by the Company in an amount determined by the Board of Managers and set forth in the Director Agreement. The Director may from time to time temporarily delegate his or her duties hereunder to a Physician of the Director's choice who meets the qualifications set forth in Section 5.1.2.2 hereof.

5.1.2.3 The Director may be removed with or without cause by a majority vote of the Board of Managers.

5.1.3 Board of Managers. The Company shall be managed by a Board of Managers consisting of four (2) voting Board members (each a "Manager" and collectively the "Managers") with two (2) Managers elected from the Class A Member.

5.1.3.1 Each Manager shall have one (1) vote on matters coming before the Board of Managers on which a vote is required.

5.1.3.2 Each Manager shall hold office until the next annual meeting of Members and until such Manager's successor shall have been elected and qualified, or until such Manager's earlier death, resignation or removal.

5.1.3.3 The two (2) Class A Members receiving the largest number of votes from among all Class A Members shall serve on the Board of Managers.

5.1.4 General Powers. The Board of Managers shall have full, exclusive and complete discretion, power and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:

5.1.4.1 Acquire by purchase, lease or otherwise, any real or personal property, tangible or intangible;

5.1.4.2 Construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property;