5.1.4.3 Sell, dispose, trade or exchange Company assets in the ordinary course of the Company's business;

5.1.4.4 Enter into agreements and contracts and to give receipts, releases and discharges;

5.1.4.5 Purchase liability and other insurance to protect the Company's properties and business;

5.1.4.6 Borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments authorizing the confession of judgment against the Company;

5.1.4.7 Execute or modify leases with respect to any part or all of the assets of the Company;

5.1.4.8 Prepay, in whole or in part, refinance, amend, modify or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

5.1.4.9 Execute any and all other instruments and documents which may be necessary or, in the opinion of the Board of Managers, desirable to carry out the intent and purpose of this Agreement;

5.1.4.10 Make any and all expenditures which the Board of Managers, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization, financing and operation of the Company;

5.1.4.11 Prepare annual budgets;

5.1.4.12 Enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company;

5.1.4.13 Invest and reinvest Company reserves in short-term instruments or money market funds; and

5.1.4.14 Designate those Persons authorized to sign checks on behalf of the Company and impose whatever restrictions on that authority as the Board of Managers deems appropriate.

5.1.5 Transactions Requiring Approval of the Class A Members. Notwithstanding anything to the contrary in this Agreement, the Board of Managers shall not undertake any of the following without the approval of at least fifty-one percent (51%) of the Interests of the Members:

5.1.5.1 Any change in the legal form of the Company, or the dissolution or liquidation of the Company, or any declaration of bankruptcy by the Company, or any merger, consolidation or other business combination involving the Company or any other fundamental change of the Company;

5.1.5.2 Any sale, lease, license, assignment, transfer or other disposition of all or a substantial portion of the assets of the Company or of any significant assets of the Company or any other sale, lease, license, transfer or disposition outside of the ordinary course of business;

5.1.5.3 Any modification, amendment, waiver or change in the Certificate of Organization or this Agreement;

5.1.5.4 The entering into or termination of any agreement (other than a termination of an agreement which occurs on its own terms) with any Member or Members, or a practice entity with which any Member is affiliated, or any material amendment, modification, supplement or extension thereof or any waiver or release of material rights thereunder;

5.1.5.5 The admission or creation of any new Class or any new Member to a Class, or the authorization, designation or reclassification of any Interest or of any other equity interest in the Company or the conversion or exchange of debt or other obligations into any Interest or any other equity interest in the Company; it being understood that the admission of a new Member to a Class or a new Class of Members will result in a pro rata dilution of each Member's and each Class's Interest, respectively; and

5.1.5.6 Any other matter determined by the Managers to be added to this Section 5.1.5.

5.1.6 Extraordinary Transactions. Notwithstanding anything to the contrary in this Agreement, the Board of Managers shall not undertake any of the following without the unanimous approval of the Members:

5.1.6.1 Any act in violation of Section 8942 of the Law; or

5.1.6.2 Any act which would impose personal liability on any Member in excess of the obligations to make additional Capital Contributions set forth in Section 3.6.

5.1.7 Limitation on Authority of Members.

5.1.7.1 No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.7.2 This Section 5.1 supersedes any authority granted to the Members pursuant to Section 8941 of the Law. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.8 Resignation of Manager. In the event a Manager resigns from the Board of Managers, replacement of such Manager to complete the term of the resigning Manager shall be determined in the same manner as set forth in Section 5.1.3 hereof.

5.1.9 Removal of Manager. The Class Member(s) may, at any time and from time to time and for any reason, by the affirmative vote of those Class Members holding at least fifty-one percent (51%) of the Class Interests, remove a Manager for that respective Class and elect or appoint a new Manager in the same manner as set forth in Section 5.1.3 hereof.

5.2 Meetings of the Board of Managers and Voting by Managers.

5.2.1 Regular Meetings of the Board of Managers. Regular meetings of the Board of Managers shall be held on such days and at such time on those days as determined by a majority of the Managers.

5.2.2 Special Meetings of the Board of Managers. A special meeting of the Board of Managers may be called at any time by the President, the Secretary or by two (2) or more of the Managers. Meetings of the Board of Managers shall be held at the Company's principal place of business or at such time and place as designated by the Board of Managers. Not less than five (5) nor more than fifteen (15) days before each meeting, those who call the meeting shall give written notice of the meeting to all Managers of the Company. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Manager who is entitled to notice waives notice if before or after the meeting the Manager signs a waiver of the notice which is filed with the records of Board of Managers' meetings, or is present at the meeting in person or by proxy.

5.2.3 Quorum for Meetings of the Board of Managers. A quorum shall be deemed present if there is a majority of Managers then in office present at the meeting.

5.2.4 Voting. Managers may vote either in person, by means of conference telephone or similar communications equipment by means of which all persons participating in such meeting can hear each other or by written proxy signed by the Manager or by his or her duly authorized attorney-in-fact; provided, however, that a Manager may give his or her proxy only to another Manager of the Company. Except as otherwise provided in this Agreement, the

affirmative vote of a majority of all of the Managers shall be required to approve any matter coming before the Board of Managers.

5.2.5 Written Consent. In lieu of holding a meeting, the Board of Managers may vote or otherwise take action by a written instrument indicating the unanimous consent of the Managers.

5.2.6 Unanimous Consent. Except as otherwise provided in this Agreement, wherever the Law or this Agreement requires unanimous consent by the Board of Managers to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of all Managers.

5.3 Meetings of Members and Voting by Members.

5.3.1 Regular Meetings of the Members. Regular meetings of the Members shall take place annually or more frequently as determined by the Board of Managers. Meetings of Members shall be held at the Company's principal place of business or at any other place in the Commonwealth of Virginia designated by the Board of Managers. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding at least fifty-one percent (51%) of the Interests then held by the Members constitutes a quorum. Members may vote either in person or by written proxy signed by the Member or by his or her duly authorized attorney-in-fact.

5.3.2 Special Meetings of the Members. A special meeting of the Members may be called at any time by the Board of Managers or by those Members holding at least thirty percent (30%) of the Interests then held by the Members. Meetings of Members shall be held at the Company's principal place of business or at such time and place as designated by the Board of Managers. Not less than five (5) nor more than forty-five (45) days before each meeting, the Board of Managers or Secretary shall give written notice of the meeting to each Member of the Company. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.

5.3.3 Voting. At a properly called meeting of the Members, each Member shall have the number of votes equal to the number of Units owned by such Member on any matter being considered by the Company requiring a vote by the Members. Unless otherwise specifically required by this Agreement or by applicable law, all decisions to be made and actions to be taken by the Members shall be determined by the affirmative vote of the Members holding a majority of the Units present in person or by proxy at a meeting of the Members.

5.3.4 Written Consent. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the unanimous consent of the Members. Wherever the Law requires unanimous consent of the Members to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of Members holding one hundred percent (100%) of the Interests then held by Members. Any votes or

actions to be taken by such written instrument shall be disclosed and communicated in advance to all Members and all such decisions shall be communicated as soon as possible after such votes or actions.

5.4 Personal Services.

5.4.1 Performance of Services. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless expressly provided in this Agreement or approved by the Board of Managers, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.4.2 Compensation for Services. Unless approved by Members holding fifty-one percent (51%) of the Interests then held by all Members or as otherwise provided herein, the Managers shall not be entitled to compensation for their services as Managers. However, upon substantiation of the amount and purpose thereof and the granting of the approval of the Board of Managers, the Managers shall be entitled to reimbursement for out-of-pocket expenses reasonably incurred in connection with the activities of the Company.

5.5 Duties of Parties.

5.5.1 Devotion of Time. Each Manager shall devote such time to the business and affairs of the Company as he or she, in his or her sole discretion, deems necessary to carry out the Manager's duties set forth in this Agreement.

5.5.2 Other Activities. Except as otherwise expressly provided in Sections 5.5.3 and 5.5.4, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity, except for any business or activity in competition with the Company, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity. The organization of the Company shall be without prejudice to the respective rights of the Members (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or any other Member's Affiliates.

5.5.3 Dealings with Members and Affiliates. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms and with full written disclosure of the nature and extent of any such direct or indirect relationships to the Board of Managers. Each Member, upon request by the Board of Managers, shall complete and execute a Conflict of Interest Questionnaire in the form adopted by the Board of Managers and shall submit written updates when necessary to keep such information current.

5.5.4 Covenant. So long as a Member is a Member of the Company, and for a period of one (1) year after such Member ceases to be a Member of the Company, such Member

agrees that he or she shall not directly or indirectly own, invest in or obtain an ownership interest in any company within a ten (10) mile radius of the Company's, except to the extent that such Member has invested in any such facility as of the date of such Member's subscription or acquisition of Interest, has disclosed such investment to the Board of Managers and has received the approval of the Board of Managers for such investment. Those existing investment interests identified on Exhibit "F" attached hereto are deemed to be pre-approved and the identified Member's continued investment therein shall not be deemed a violation of this Section 5.5.4.

5.6 Liability and Indemnification.

5.6.1 Liability. The Managers shall not be liable, responsible or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Managers within the scope of the authority conferred on the Managers by this Agreement, except for fraud, gross negligence, willful misconduct or a breach of this Agreement.

5.6.2 Indemnification. The Company shall indemnify the Managers for any act performed by the Managers within the scope of the authority conferred on the Managers by this Agreement, except for fraud, gross negligence, willful misconduct or a breach of this Agreement.

5.6.3 Directors and Officers Insurance. The Company may, in the discretion of the Board of Managers, secure and maintain in force a policy of directors and officers insurance from a carrier licensed to do business in the Commonwealth of Virginia in such amounts as the Board of Managers deems appropriate from time to time.

5.7 Power of Attorney.

5.7.1 Grant of Power. Each Member constitutes and appoints the President as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge and file:

5.7.1.1 All documents (including amendments to certificates of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change or modification in accordance with this Agreement;

5.7.1.2 Any and all other certificates or other instruments required to be filed by the Company under the laws of the Commonwealth of Virginia or of any other state or jurisdiction, including, without limitation, any certificate or other instrument necessary in order for the Company to continue to qualify as a limited liability company under the laws of the Commonwealth of Virginia;

5.7.1.3 One (1) or more fictitious or trade name certificates; and

5.7.1.4 All duly authorized documents which may be required to dissolve and terminate the Company and to cancel its certificate of organization.

5.7.2 Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

5.8 Other Officers. The Board of Managers may elect other persons to serve as officers of the Company. If so elected, each officer shall have the duties and authority of officers of corporations, as those duties and authority are set forth in the Business Corporation Law of the Commonwealth of Virginia. Any officer may be removed with or without cause by the vote of a majority of the Board of Managers.

## Section VI.
## Transfer of Interests and Withdrawals of Members

6.1 Transfers.

6.1.1 Conditions of Transfer. Except as otherwise expressly set forth herein, no Member may Transfer all or any portion of or any interest or rights in the Member's Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1 The Transfer is approved by the vote of a majority of the Board of Managers;

6.1.1.2 The Transfer will not require registration of Interests under any federal or state securities laws;

6.1.1.3 The transferee delivers to the Company a written instrument agreeing to be bound by the terms of this Agreement;

6.1.1.4 The Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.5 The Transfer will not result in the Company's being subject to the Investment Company Act of 1940, as amended;

6.1.1.6 The transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the Transferred Interest;

6.1.1.7 The transferee meets the ownership standards as set forth in Section 3.3;

6.1.1.8 The transferor complies with the provisions set forth in Sections 6.2 and 6.3 as applicable; and

6.1.1.9 Except in the case of a Transfer pursuant to an Involuntary Withdrawal, no Transfers may be made hereunder within twelve (12) months of any Member's purchase of that Member's Interest.

6.1.2 Transfer Upon Approval. If the conditions of Transfer are satisfied, then a Member may Transfer all or any portion of his or her Interest as to which the approval of the Board of Managers was obtained.

6.1.3 Reasonableness. Each Member hereby acknowledges the reasonableness of the prohibitions contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Interests in violation of the prohibitions contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom an Interest is attempted to be transferred in violation of this Section 6.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company or have any other rights in or with respect to the Interest.

6.2 Class A Transfers.

6.2.1 Notice of Transfer. If the Class A Member (a "Transferor") desires to Transfer, or is required as a consequence of an Involuntary Withdrawal to Transfer, all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire or requirement (the "Transfer Notice") and the Company shall notify the Class A Members. The Transfer Notice shall describe the Transferor Interest, the proposed transferee and the proposed purchase price and/or other terms of the proposed Transfer.

6.2.2 Purchase Option. Except where the Transfer is as a result of an Involuntary Withdrawal of the Class A Member, upon receipt of a Transfer Notice, the remaining Class A Members shall have an option (a "Purchase Option") to purchase, subject to Section 6.8 below, all of the Transferor Interest for a purchase price equal to the greater of (i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest. The Transfer shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the tenth (10th) day following the day the Transfer Notice is given to the Class A Members (the "Transfer Period"). At any time during the

Transfer Period, the remaining Class A Members may elect to exercise the Purchase Option by giving written notice of the election to the Transferor.

6.2.3 Free Transfer Period. If the Class A Members fail to exercise the Purchase Option with respect to the entire Transferor Interest, the Transferor shall be permitted to offer and sell the Transferor Interest to any Physician who meets the qualifications to become a Member of the Company, and such transaction shall be in the manner described in the Transfer Notice, for a period of thirty (30) days following the end of the ten (10) day period referred to in Section 6.2.2 above (the "Free Transfer Period"); provided, however, that the price for the Transferor Interest shall be no less than the greater of (i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest. If the Transferor does not so Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section 6.2.3 shall cease and terminate until the Transferor has again complied with the provisions of Sections 6.1 and 6.2 hereof.

6.2.4 Involuntary Withdrawal Transfer. If the Transfer is a result of an Involuntary Withdrawal of a Class the Member, the Class A Members shall purchase, on a pro rata basis, the entire Transferor Interest for a purchase price, subject to Section 6.8 below, equal to the greater of (i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest, and such purchase shall be on the terms and conditions set forth in Section 6.4 below.

6.3 ClassA Transfers.

6.3.1 Notice of Transfer. If a Class A Member (a "Transferor") desires to Transfer, or is required, at any time, pursuant to an Involuntary Withdrawal to Transfer, all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire or requirement (the "Transfer Notice") and the Company shall notify the Class A Member. The Transfer Notice shall describe the Transferor Interest, the proposed transferee and the other terms of the proposed Transfer.

6.3.2 Class A Purchase Option. Except where the Transfer is as a result of an Involuntary Transfer of a Class A Member, upon receipt of a Transfer Notice pursuant to Section 6.3.1 above, the ClassA Members shall have a Purchase Option to purchase, subject to Section 6.8 below, all of the Transferor Interest for a purchase price equal to the lower of (i) the purchase price set forth in the bona fide offer from the proposed third-party transferee, or (ii) the fair market value of the Transferor Interest. Any Transfer pursuant to this Section 6.3.2 shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is given to the ClassA Members (the "Transfer Period"). At any time during the Transfer Period, the ClassA Members may elect to exercise the Purchase Option by giving written notice of the election to the Transferor, which shall be exercised by the ClassA Members pro rata in accordance with their respective ClassA Interests.

6.3.3 Class A Purchase Option. If the ClassA Members fail to exercise the Purchase Option set forth in Section 6.3.2 with respect to the entire Transferor Interest, the Class A Member shall then have a Purchase Option to purchase, subject to Section 6.8 below, the Transferor Interest for a purchase price equal to the lower of (i) the purchase price set forth in the bona fide offer from the proposed third-party transferee, or (ii) the fair market value of the Transferor Interest. Any Transfer pursuant to this Section 6.3.3 shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the thirtieth (30th) day following the end of the thirty (30) day period referred to in Section 6.3.2 above (the "Transfer Period"). At any time during the Transfer Period, the Class A Member may elect to exercise the Purchase Option by giving written notice of the election to the Transferor.

6.3.4 Free Transfer Period. If the ClassA and Class A Members fail to exercise the Purchase Options set forth in Sections 6.3.2 and 6.3.3 with respect to the entire Transferor Interest, the Transferor shall be permitted for a period of thirty (30) days following the end of the thirty (30) day period referred to in Section 6.3.3 above (the "Free Transfer Period") to offer and sell the remaining Transferor Interest to any Physician who meets the qualifications to become a Member of the Company. Any such transaction shall be in the manner described in the Transfer Notice; provided, however, that the price for the Transferor Interest shall be no less than the greater of (i) the fair market value of the Transferor Interest, or (ii) if applicable, the purchase price set forth in the bona fide offer from the proposed third-party transferee. If the Transferor does not so Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section 6.3.4 shall cease and terminate until the Transferor has again complied with the provisions of Sections 6.3.1, 6.3.2 and 6.3.3.

6.3.4 Involuntary Withdrawal Transfer. If the Transfer is a result of an Involuntary Withdrawal of a ClassA Member, including without limitation the death or Permanent Disability of a ClassA Member, the ClassA Members shall purchase, on a pro rata basis, the entire Transferor Interest for a purchase price, subject to Section 6.8 below, equal to the greater of (i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest, and such purchase shall be on the terms and conditions set forth in Section 6.4 below.

6.4 Terms of Transfer. Any Transfer of a Transferor Interest made to a Member shall be completed within sixty (60) days after the end of the expiration of any applicable Purchase Option or, in the case of Transfers as a result of an Involuntary Withdrawal, within thirty (30) days after the event or determination giving rise to the Involuntary Withdrawal. The purchase price for any Transferor Interest sold to a Member shall be paid by the delivery to the Transferor of a promissory note in customary form, in the principal amount of the purchase price (or the applicable portion thereof), providing for payment of the principal amount in equal monthly installments over a period of not more than five (5) years, with interest at a rate equal to the Applicable Federal Rate, as determined on the date of Transfer under Section 1274(d) of the Code. Any Transfer of the Transferor Interest made after the last day of any applicable Free Transfer Period or without strict compliance with the terms, provisions and conditions of this

Section and other terms, provisions and conditions of this Agreement, shall be null, void and of no force or effect.

6.5 Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company; except that a Member may (1) elect to voluntarily forfeit his or her Interest in the Company without payment or other consideration for such Interest; or (2) seek to Transfer his or her Interest to the remaining Members or the Company pursuant to the Transfer requirements set forth in Sections 6.1, 6.2 and/or 6.3 as applicable.

6.6 Involuntary Withdrawal. No Member shall be liable, responsible or accountable, in damages or otherwise, to any Member who is deemed to have given a Transfer Notice as a result of such Member's Involuntary Withdrawal event. In addition, the Company shall indemnify the Members against any suits, claims, actions, losses, liabilities or expenses (including without limitation reasonable attorneys' fees) related to or arising out of a Member's mandatory Transfer of his or her Interest due to the Involuntary Withdrawal of a Member.

6.7 Fair Market Value of a Transferor Interest. The fair market value of the Company and of a Transferor Interest shall be determined in accordance with the procedure set forth in Exhibit "G" hereof.

6.8 Early Transfer Purchase Price. Notwithstanding any provision contained herein to the contrary, in the event of any Transfer during the initial twelve (12) months after any Member's purchase of that Member's Interest, the purchase price for the Transferor Interest shall be equal to the Transferring Member's Capital Contribution plus interest calculated at the rate of five percent (5%) per annum from the date of the acquisition of the Interest.

**Section VII.**
**Dissolution, Liquidation and**
**Termination of the Company**

7.1 Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

7.1.1 Sale of Assets. Upon the sale of all or substantially all of the Company's assets, including the Company's and the collection by the Company of the proceeds of such transaction; or

7.1.2 Judicial Order. Upon the entry of an order of judicial dissolution under Section 8972 of the Law.

7.2 Procedure for Winding Up and Dissolution. If the Company is dissolved, the Board of Managers shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members and the Board of Managers who are creditors, in satisfaction of the liabilities of the Company, and then to the Members in accordance with Section 4.4.

7.3 Filing of Certificate of Dissolution. If the Company is dissolved, the Board of Managers shall file a Certificate of Dissolution with the Department of State of the Commonwealth of Virginia at the time set forth in the Law. If there is no Manager, then the Certificate of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Certificate of Dissolution shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, or a Person who last was a Member, the Certificate of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section VIII.
## Books, Records, Accounting and Tax Elections

8.1 Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Board of Managers shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2 Books and Records.

8.2.1 Retention. The Board of Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the certificate of organization and this Agreement and all amendments to the certificate of organization and this Agreement; a current list of the names and last known business, residence or mailing addresses of all Members; and the Company's federal, state and local tax returns.

8.2.2 Inspection. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative for any proper purpose, upon fifteen (15) days written notice setting forth the purpose of such inspection, at any and all reasonable times during normal business hours. Any Member seeking information regarding Transfers of Members' Interests shall be deemed a proper purpose.

8.2.3 Reimbursement of Costs and Expenses. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3 Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Board of Managers, subject to the requirements and limitations of the Code.

8.4 Reports. Within seventy-five (75) days after the end of each taxable year of the Company, the Board of Managers shall cause to be sent to each Person who was a Member at

any time during the accounting year then ended: (i) an annual compilation report prepared by the Company's independent certified public accountants in accordance with standards issued by the American Institute of Certified Public Accountants; (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Board of Managers or any Affiliate in respect of the taxable year and a report of any Transfers of a Member's Interest during the year; and (iii) that tax information concerning the Company which is necessary for preparing the Member's income tax returns for that year. In addition, within one hundred twenty (120) days after the end of each taxable year, the Board of Managers shall cause to be sent to each Person who was a Member at any time during the accounting year then ended an annual review prepared by the Company's independent certified public accountants in accordance with standards issued by the American Institute of Certified Public Accountants.

8.5 Tax Matters Partner. The President shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6231, *et seq.* The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. Each Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute with the Internal Revenue Service without the approval of the Class A Members.

8.6 Tax Elections. The Board of Managers shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Board of Managers' sole and absolute discretion.

8.7 Title to Company Property.

8.7.1 Real and Personal Property. Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2 Title. The Board of Managers may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Board of Managers may cause title to be acquired and held in its name or in the names of trustees, nominees or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## Section IX.
## General Provisions

9.1 Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Board of Managers deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation or holding of the property of the Company.

9.2 Notifications. Any notice, demand, consent, election, offer, approval, request or other communication (collectively a notice) required or permitted under this Agreement must be in writing and either delivered personally or sent by Federal Express or other comparable commercial overnight courier. Any notice to be given hereunder by the Company shall be given by the Board of Managers. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3 Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4 Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter contained herein. It supersedes all prior written and oral statements, including any prior representation, statement, condition or warranty, with respect to the Company. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Class A Members.

9.5 Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law of the Commonwealth of Virginia, without reference to the principles governing the conflict of laws applicable in that or any other jurisdiction.

9.6 Section Titles. The headings herein are inserted as a matter of convenience only and do not define, limit or describe the scope of this Agreement or the intent of the provisions hereof.

9.7 Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.

9.8 Jurisdiction and Venue. Any suit involving any Dispute or matter arising under this Agreement may only be brought in the United States District Court for the Middle District of Virginia or any Virginia State Court having jurisdiction over the subject matter of the Dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9 Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

9.10 Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11 Counterparts. This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

[SIGNATURE PAGES FOLLOW]

SIGNATURE PAGE TO OPERATING AGREEMENT OF
**[BNG GROUP, LLC]**

The undersigned, each desiring to become a Member of the Company pursuant to the Limited Liability Company Operating Agreement dated 20 March, 2020 (the "Operating Agreement"), the terms and conditions of which the undersigned has reviewed and is familiar with, does hereby execute this Signature Page to be attached to the Operating Agreement. The Signature Page shall constitute legal and sufficient evidence of execution and certification by the undersigned of such document.

The undersigned further agree to contribute to the Company the amount of the Capital Contribution as set forth in the Operating Agreement and Exhibit's A' and B" of the Operating Agreement.

Executed this 20 day of March 2020

By:

Valeria V Gunkova.
President and member

By: ____________ (SEAL)
HARRY KAMIN, Manager

By: ____________ (SEAL)
VALERIA GUNKOVA, Manager

**Limited Liability Company**
**Operating Agreement**

**EXHIBIT "A"**
**LIST OF CLASS A MEMBERS, CAPITAL AND PERCENTAGE INTERESTS**

| Name and Address | Initial Capital Cash Contribution | Percentage | Units | Class |
|---|---|---|---|---|
| VALERIA V GUNKOVA | $150,000 | 50 % | 50 | A |
| HARRY D KAMIN | $150,000 | 50% | 50 | A |

**EXHIBIT "B"**

**PROCEDURE FOR DETERMINING THE FAIR MARKET VALUE OF A MEMBER'S INTEREST IN THE COMPANY**

At such time as the fair market value of a Transferor Interest is needed in connection with a Transfer, the Company, at its expense, shall retain the services of a valuation firm that will analyze the financial statements of the Company and will render an opinion as to the fair market value of the Company, in general, and the Transferor Interest, in particular. If the Transferor does not accept the fair market value as stated in the opinion, the Transferor, at his or her expense, may retain the services of a valuation firm that will analyze the financial statements of the Company and will render an opinion as to the fair market value of the Company, in general, and the Transferor Interest, in particular and deliver the opinion to the Company.

If there is more than a ten percent (10%) variation in the values expressed in the opinions, the Company and the Transferor shall identify a mutually-agreeable valuation firm whose opinion of fair market value will be binding on the parties. The cost of the opinion shall be paid equally by the Company and the Transferor.

If there is less than a ten percent (10%) variation in the values expressed in the opinions, the values will be averaged to determine the fair market value of the Company and the Transferor Interest.

# A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB Approval No. 2502-0265

| B. Type of Loan | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|
| 1.☐ FHA 2.☐ FmHA 3.☒ Conv. Unins. 4.☐ VA 5.☐ Conv. Ins. ☐ Other | 2000097 | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

**D. Name & Address of Borrower:** BNG GROUP LLC, a Virginia limited liability company, 2 Pidgeon Hill Drive, Suite 120, Sterling, VA 20165

**E. Name & Address of Seller:** JUDICIAL DRIVE PROPERTY HOLDING, LLC, a Virginia limited liability company, 5521 LEESBURG PIKE, FALLS CHURCH, VA 22041

**F. Name & Address of Lender:** Atlantic Union Bank, 2325 Dulles Corner Boulevard, Suite 500, Herndon, VA 20171

**G. Property Location:** 2 Pidgeon Hill Drive Sterling, Virginia 20165

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-000, 029 39 4077 000

**H. Settlement Agent:** Stewart Title and Escrow, Inc., 10505 Judicial Drive, Suite 300, Fairfax, VA 22030, (703) 352-2900

**Place of Settlement:** 10505 Judicial Drive, Suite 300, Fairfax, VA 22030

**I. Settlement Date:** 10/30/2020 **Proration Date:** 10/30/2020 **Disbursement Date:** 10/30/2020

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | $9,500,000.00 | 401. Contract sales price | $9,500,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $315,135.18 | 403. | |
| 104. | | 404. | |
| 105 | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107 County taxes 10/30/2020 to 1/1/2021 | $11,198.27 | 407. County taxes 10/30/2020 to 1/1/2021 | $11,198.27 |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112 | | 412. | |
| **120. Gross Amount Due from Borrower** | $9,826,333.45 | **420. Gross Amount Due to Seller** | $9,511,198.27 |
| **200. Amounts Paid by or in Behalf of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | $250,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $7,360,000.00 | 502. Settlement charges to seller (line 1400) | $38,473.33 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. ADDITIONAL DEPOSIT from Stewart Title And | $250,000.00 | 504. Payoff of first mortgage loan | |
| 205. DUE DILIGENCE DEPOSIT from Atlantic Unio | $11,600.00 | 505. Payoff of second mortgage loan | |
| 206. HVAC ROOFTOP ADJ. PER CONTRACT | $600,000.00 | 506. HVAC ROOFTOP ADJ. PER CONTRACT | $600,000.00 |
| 207. | | 507. 2ND HALF TAX to LOUDOUN COUNTY, ACC | $32,528.32 |
| 208. AGREEMENT FOR MAINTENANCE ITEMS | $5,000.00 | 508. AGREEMENT FOR MAINTENANCE ITEMS | $5,000.00 |
| 209. TENANT SECURITY DEPOSITS | $51,601.05 | 509. TENANT SECURITY DEPOSITS | $51,601.05 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. PRE PAID RENT 10/30/2020 to 11/1/2020 | $5,887.26 | 513. PRE PAID RENT 10/30/2020 to 11/1/2020 | $5,887.26 |
| 214. NOVEMBER PREPAID RENT(CANTY,NV DE | $17,367.91 | 514. NOVEMBER PREPAID RENT(CANTY,NV DE | $17,367.91 |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218 | | 518. | |
| 219. | | 519. | |
| **220. Total Paid by/for Borrower** | $8,551,456.22 | **520. Total Reduction Amount Due Seller** | $750,857.87 |
| **300. Cash at Settlement from/to Borrower** | | **600. Cash at Settlement to/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $9,826,333.45 | 601. Gross amount due to seller (line 420) | $9,511,198.27 |
| 302. Less amounts paid by/for borrower (line 220) | ($8,551,456.22) | 602. Less reductions in amount due seller (line 520 | ($750,857.87) |
| **303. Cash ☒ From ☐ To Borrower** | $1,274,877.23 | **603. Cash ☒ To ☐ From Seller** | $8,760,340.40 |

EXHIBIT
G

**SUBSTITUTE FORM 1099 SELLER STATEMENT -** The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**SELLER INSTRUCTION -** If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required to provide the Settlement Agent with your correct taxpayer identification number.
If you do not provide the Settlement Agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

YOUNG NAM CHUN
MANAGER

| L. Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission | | | |
| Division of commission (line 700) as follows: | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan origination fee to Atlantic Union Bank (0.500000%) | | $36,800.00 | |
| 802. Loan discount | | | |
| 803. Appraisal fee to Atlantic Union Bank | | $7,000.00 | |
| 804. Credit report | | | |
| 805. Lender's inspection fee | | | |
| 806. Mortgage insurance application fee | | | |
| 807. Assumption fee | | | |
| 808. APPRAISAL REVIEW FEE to Atlantic Union Bank | | $850.00 | |
| 809. FLOOD CERT. FEE to Atlantic Union Bank | | $25.00 | |
| 810. DOCUMENTATION FEE to Atlantic Union Bank | | $300.00 | |
| 811. REQUIRED RESERVE ACCOUNT to Atlantic Union Bank | | $200,000.00 | |
| 812. | | | |
| 813. LENDER COUNSEL FEE to KeEGAN & DEVOL, PLC | | $4,250.00 | |
| **900. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Interest from | | | |
| 902. Mortgage insurance premium for | | | |
| 903. Hazard insurance premium for to STATE FARM | POCB $2,406.50 | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | | |
| 1005. Annual assessments | | | |
| 1006. | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to Stewart Title And Escrow, Inc - VA | | $900.00 | |
| 1102. Abstract or title search | | | |
| 1103. Title examination to Stewart Title And Escrow, Inc - VA | | $250.00 | |
| 1104. Title insurance binder to Stewart Title And Escrow, Inc - VA | | $250.00 | |
| 1105. Document preparation DEED FEE to J. Charles Curran, Attorney at Law | | | $125.00 |
| 1106. Notary fees | | | |
| 1107. Attorney's fees to | | | |
| Includes above item numbers: | | | |
| 1108. Title Insurance to Stewart Title And Escrow, Inc - VA | | $9,700.00 | |
| Includes above item numbers: | | | |
| 1109. Lender's coverage $7,360,000.00 $7,360.00 SIMULTANEOUS ISSUE | | | |
| 1110. Owner's coverage $9,500,000.00 $2,340.00 SPECIAL RATE | | | |
| 1111. RECORDING FEE REIMBURSEMENT to Stewart Title And Escrow, Inc - VA | | | $47.50 |
| 1112. RECORD OPTION RELEASE to Stewart Title E-Record | | | $47.50 |
| 1113. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees: Deed $49.50; Mortgage $62.50 | | $112.00 | |
| 1202. City/county tax/stamps: Deed $7,916.67 Mortgage $6,133.34 | | $10,091.68 | $3,958.33 |
| 1203. State tax/stamps: Deed $23,750.00 Mortgage $18,400.00 | | $30,275.00 | $11,875.00 |
| 1204. GRANTOR TAX to Stewart Title E-Record | | $4,750.00 | $4,750.00 |
| 1205. WMATA FEE to Stewart Title E-Record | | $7,125.00 | $7,125.00 |
| 1206. CONGESTION RELIEF FEE to Stewart Title E-Record | | $2,375.00 | $2,375.00 |
| 1207. ASSIGN/RENTS/LEASES to Stewart Title E-Record | | $41.50 | |
| 1208. FINANCING STATEMENT-LOCAL to Stewart Title E-Record | | $20.00 | |
| 1209. FINANCING STATEMENT-VA SCC to Stewart Title OPERATING ACCOUNT | | $20.00 | |
| 1210. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey | | | |
| 1302. Pest inspection | | | |
| 1303. PROFESSIONAL LEGAL SERVICES to J. CHARLES CURRAN, ATTY AT LAW | | | $2,000.00 |
| 1304. PROFESSIONAL LEGAL SERVICES to KUBLAN KHAN PLC | POCB $5,000.00 | | |
| 1305. PLUMBING INVOICE to PORFIRIO HUMBERTO RAMOS BONILLA | POCB $47,400.00 | | |
| 1306. ESCROW-COUNTRYSIDE CENTER ASSOC. FINAL RECONCILIATION to Stewart Title And ESCR | | | $6,170.00 |
| 1307. | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | **$315,135.18** | **$38,473.33** |

Items marked "POC" were paid outside the closing by: Borrower (POCB), Lender (POCL), Mortgage Broker (POCM), Other (POCO), Real Estate Agent (POCR), or Seller (POCS).

**CERTIFICATION:**
I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement. The Settlement Agent does not warrant or represent the accuracy of information provided by any party, including information concerning POC items and information supplied by the lender, if any, in this transaction appearing on this HUD-1 Settlement Statement and the parties hold harmless the Settlement Agent as to any inaccuracies in such matters. The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

BNG GROUP LLC, A VIRGINIA LIMITED LIABILITY COMPANY

Harry Z. Kamin

HARRY KAMIN
MANAGER

Valeria Gunkova

VALERIA GUNKOVA
MANAGER

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

________________________

YOUNG NAM CHUN
MANAGER

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Title and Escrow, Inc

6/2/20
Date

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

**CERTIFICATION:**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction, I further certify that I have received a copy of HUD-1 Settlement Statement. The Settlement Agent does not warrant or represent the accuracy of information provided by any party, including information concerning POC items and information supplied by the lender, if any, in this transaction appearing on this HUD-1 Settlement Statement and the parties hold harmless the Settlement Agent as to any inaccuracies in such matters. The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same.

BNG GROUP LLC, A VIRGINIA LIMITED LIABILITY COMPANY

HARRY KAMIN
MANAGER

VALERIA GUNKOVA
MANAGER

JUDICIAL DRIVE PROPERTY HOLDING, LLC, A VIRGINIA LIMITED LIABILITY COMPANY

YOUNG NAM CHUN
MANAGER

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Stewart Title and Escrow, Inc.

10\30\20
Date

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010.

**This Deed was prepared by:**
J. Charles Curran
Virginia State Bar # 21455
Consideration: $9,500,000.00
Assessed Value: $5,398,890.00
Grantee's Address:
2 Pidgeon Hill Drive
Sterling, Virginia 20165

**Return Requested to:**
Stewart Title and Escrow, Inc.
10505 Judicial Drive
Fairfax, Virginia 22030
Title Insurance Underwriter:
Stewart Title Guaranty Company
File: 20-B202
Tax ID No: 117394275000

**DEED**

**THIS DEED** is made this 30 day of October, 2020, by and between **JUDICIAL DRIVE PROPERTY HOLDING, LLC**, a Virginia Limited Liability Company, party of the first part, GRANTOR, and **BNG GROUP LLC**, A Virginia Limited Liability Company, party of the second part, GRANTEE;

**WITNESSETH**, that the said party of the first part, **JUDICIAL DRIVE PROPERTY HOLDING, LLC**, for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey unto the said party of the second part, **BNG GROUP LLC**, in Fee Simple and with Special General Warranty of Title, all of that certain lot or parcel of land, with improvements thereon, situate, lying and being in **LOUDOUN COUNTY, VIRGINIA** and more particularly described as follows:

**Parcel J-3,** containing 3.4435 acres of land, more or less, Professional Office/Commercial Park, Countryside, as more particularly shown on a Plat entitled "Boundary Line Adjustment Parcels C-3, F-2, J-2, K-2, and O-1 Professional Office/Commercial Park, Countryside" and attached to Deed of Boundary Line Adjustment and Deeds of Trust Modification recorded in Instrument Number 20041020-0112922, among the land records of Loudoun County, Virginia.

(NOTE: PURSUANT TO OWNER'S TERMINATION AGREEMENT OF COUNTRYSIDE CENTRE OFFICE CONDOMINIUM DATED JANUARY 31, 2018 AND RECORDED FEBRUARY 16, 2018 AS INSTRUMENT NUMBER 20180216- 0009064.)

**AND BEING** that property acquired by Deed dated May 10, 2016 and recorded May 11, 2016 as Instrument Number 20160511-0027890 **AND** further that property acquired by Deed dated December 1, 2017 and recorded December 1, 2017 as Instrument Number 20171201-0074923, among the aforesaid land records.



Gunkova_054829

This conveyance is made subject to restrictions, rights of way, easements, if any, and/or agreements contained in the deeds forming the chain of title to the property.

**WITNESS** the following signatures and seals.

**Judicial Drive Property Holding, LLC**

By:__________________________(SEAL)
Name: Young Nam Chun
Its: Manager

Commonwealth of Virginia:
City/County of Fairfax, To-wit:

I, the undersigned, a Notary Public for the State and County aforesaid, do certify that a person known to me, or satisfactorily proven to be, Yong Nam Chun, the Manager of Judicial Drive Property Holding, LLC, whose name is signed to the foregoing and hereunto annexed Deed, bearing the date of the 30 day of October, 2020, has this day acknowledged the same before me in my County aforesaid.

GIVEN under my hand this 30 day of October, 2020.

________________________
Notary Public

My commission expires: __________________

Registration Number: ____________________

John Charles Curran
Notary Public
Reg #243314
Commonwealth of Virginia
My Commission Expires July 31, 2024



Gunkova_054830

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement") made this 30th day of October, 2020, by and between **BNG GROUP LLC**, a Virginia limited liability company ("Borrower"); **ATLANTIC UNION BANK** ("Lender"); and **HARRY KAMIN** and **VALERIA GUNKOVA** ("Guarantor").

**WITNESSETH**

THAT, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1 Specific Definitions. The following terms have the following definitions (each definition is equally applicable to the singular and plural forms of the terms used, as the context requires):

"***Accounts***" means any and all deposit accounts, operating accounts, savings accounts and other accounts of Borrower with Lender.

"***Appraisal***" shall mean and refer to a report of value, and/or any updated report of value, in a form and substance acceptable to Lender in its sole and absolute discretion in connection with the Property and executed by a licensed professional appraiser, which: (i) establishes the present "as-is market value of the Property; and (ii) conforms in every particular with the appraisal standards established by the Lender and pursuant to 12 C.F.R. 564, as may be amended from time to time, and any and all other applicable memorandum, rule, regulation, act or order of the FDIC relating to appraisal practices, standards and procedures.

***"Bank Secrecy Act"*** means, collectively, the Bank Secrecy Act as set forth in 31 U.S.C. 5311, *et seq.,* and the regulations promulgated thereunder.

***"Closing"*** means the execution and delivery of this Agreement and the other Loan Documents. The date of Closing is the date reflected on this Agreement, even if this Agreement is executed and delivered on some other date.

***"Collateral"*** means all of the now owned and hereafter acquired assets, properties and property rights of Borrower with respect to which Borrower has at any time granted a security interest or lien to Lender or has at any time otherwise assigned or pledged to Lender as security for any of the Obligations, including, but not limited to the Property and the Accounts.

***"Debt Service Coverage Ratio"*** or "***DSCR***" shall mean and refer to the ratio of Borrower's Net Cash Flow to Borrower's Debt Service. For the purpose of defining DSCR, "***Net Cash Flow***" shall mean and refer to Borrower's net rental income derived from the Property, including

management fees of 4% of gross rents if not already included in actual expenses and replacement reserves of $0.15 per square foot of rentable space within the Property plus, to the extent deducted in determining net income, depreciation, amortization and all other non-cash charges, any non-customary expenses and interest expense and "***Debt Service***" shall mean and refer to all annual principal and interest payments due on Borrower's current maturities of long term debt secured by the Property.

"***Event of Default***" or "***Events of Default***" shall have the meanings ascribed in Article V below.

"***G.A.A.P.***" means, with respect to any date of determination, generally accepted accounting principles as used by the Financial Accounting Standards Board and/or the American Institute of Certified Public Accountants consistently applied and maintained throughout the periods indicated.

"***Liquid Assets***" shall mean unencumbered cash and marketable securities.

"***Loan***" means the **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** purchase money loan being provided by Lender to Borrower pursuant to the terms of this Agreement and the Loan Documents, as the same may be amended, modified, extended, renewed, supplemented, restated or replaced from time to time.

"***Loan Documents***" means this Agreement; the Promissory Note of even date herewith from Borrower to Lender in the amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** (the "*Note*"); the Deed of Trust, Assignment of Rents and Security Agreement of even date herewith from Borrower to the trustees therein named for the benefit of Lender (the "***Deed of Trust***"); the Assignment of Rents and Leases of even date herewith from Borrower to Lender; the Guaranty and Indemnification Agreement of even date herewith from Guarantor in favor of Lender; and all other documents evidencing, securing, guaranteeing and/or otherwise documenting the terms and conditions of the Loan, together with all extensions, renewals, amendments and modifications thereof and substitutions therefor.

"***Loan-To-Value Ratio***" or "***LTV***" shall mean and refer to the ratio between the principal amount of the Loan advanced and outstanding at any time during the term of the Loan to the value of the Property as shown on an Appraisal.

"***Maturity Date***" means such date that is five (5) years from the date of Closing.

"***Obligations***" means collectively the obligations of Borrower to pay to Lender: (i) any and all sums due to Lender under or pursuant to the Loan or otherwise under the terms of this Agreement or any accompanying Loan Documents; (ii) any and all sums advanced by Lender to preserve or protect the Collateral or to preserve, protect, or perfect Lender's security interests and liens in the Collateral; (iii) the expenses of retaking, holding, preparing for sale, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by Lender of Lender's rights upon the occurrence of an Event of Default by Borrower, together with Lender's attorneys'



Gunkova_054832

fees, expenses of collection, and court costs; and (iv) any other indebtedness or liability of Borrower to Lender, whether direct or indirect (by way of endorsement, guaranty, pledge or otherwise), liquidated or unliquidated, joint or several, absolute or contingent, contemplated or uncontemplated, or otherwise arising from any loan, note, letter of credit, guaranty, overdraft, or any other duty owed by Borrower to Lender, now existing or hereafter arising.

***"Other Obligor"*** means Guarantor and/or any person or entity other than Borrower that is now or hereafter liable, directly, contingently or otherwise, upon or in connection with any of the Obligations or that has granted any lien or security interest to or for the benefit of Lender to secure any of the Obligations, including, but not limited to, any guarantor, surety, endorser, or co-maker of any of the Obligations.

***"Property"*** means that certain real property and improvements thereon located at 2 Pidgeon Hill Drive, Sterling, VA 20165.

***"Reserve Account"*** means the account being set up and held by Lender relative to the certain deferred repairs on the HVAC system within the Property, all as more particularly described in Section 8.7 hereof.

Section 1.2 Accounting Terms. The accounting terms used in this Agreement have the meanings customarily given them in accordance with G.A.A.P., unless this Agreement expressly provides a different meaning.

## ARTICLE II
## BASIC TERMS OF LOAN

Section 2.1. Loan. Lender shall advance to Borrower as the Loan, the principal sum of $7,360,000.00. Borrower shall use the proceeds of the Loan only for the purchase of the Property and costs associated therewith. If not sooner paid, all amounts owed under the Loan are due and payable in full on the Maturity Date.

Section 2.2. Evidence of Loan; Terms of Repayment; Statement of Account. The interest rates on the Loan and the method of calculating interest upon the Loan, the term of the Loan, the method and times of repayment, and other conditions pertaining to the repayment of the Loan shall be evidenced by the Note or as otherwise set forth in appropriate writings between the parties as determined by Lender. The Loan shall be deemed to be conclusively evidenced by Lender's record of advances of proceeds of the Loan and Lender's record of receipt of repayments and other bookkeeping entries reflecting the payment of principal and interest, and interest shall be deemed to accrue at the interest rate(s) reflected in the Note. Lender may at any time or from time to time render a statement or statements of account to Borrower for the Obligations or any portion thereof. Each such statement shall be deemed to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary in writing within thirty (30) days from the date of any such statement which Borrower deems to be incorrect.

Section 2.3. Security Interest. As security for the payment and performance of all of the Obligations, whether or not any instrument or agreement relating to any Obligation specifically

refers to this Agreement or the security interest created hereunder, Borrower hereby assigns, pledges and grants to Lender a continuing security interest in the Collateral. Lender's security interest shall continually exist until all Obligations have been paid in full. Upon the occurrence of any Event of Default, Lender is authorized to charge the sum then due to Lender against any and all monies held by or on deposit with Lender in the Accounts, and to offset any amounts against the Accounts and to enforce such other remedies as may be available at law or in equity, without necessity of election. It is the intent of this Agreement that Lender shall have "control" (as that term is defined in Article 9 of the Uniform Commercial Code currently in effect in the Commonwealth of Virginia) over the Accounts and the funds contained therein as a result of the execution of this Agreement, and that Lender shall have a perfected security interest in the Accounts and the funds contained therein.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants that:

Section 3.1. Accuracy. All information, financial statements and data submitted to Lender by Borrower or any Other Obligor are true, accurate and complete in all material respects.

Section 3.2. Authority. Borrower is duly organized and existing in good standing in the state of its organization, is qualified to do business and in good standing in all jurisdictions where it conducts its business, and has all requisite power, authority, licenses and permits to own its property and carry on its business, and Borrower shall deliver to Lender a written opinion of counsel to such effect if requested by Lender. None of the terms and conditions herein, or of any other agreement executed by Borrower, are in violation of the charter or by-laws, or other organizational documents of Borrower, any contractual obligation Borrower may have with any third party, or any order or decree by which Borrower is bound, and the execution and delivery of this Agreement have been duly authorized by appropriate corporate, company or partnership action.

Section 3.3. Litigation. No litigation or other proceeding before any court or administrative agency is pending, or to the knowledge of Borrower, is threatened against Borrower, the outcome of which could materially impair Borrower's financial condition or its ability to carry on its business. Borrower is not the subject of any pending bankruptcy proceeding nor subject to the continuing jurisdiction of a bankruptcy court as the result of an approved plan of reorganization.

Section 3.4. Addresses. The principal place of business of Borrower and the books and records relating to Borrower's business are located at the address(es) set forth in this Agreement.

Section 3.5. Hazardous Substances. Borrower has never received any notification, citation, complaint or notice of investigation relating to the making, storing, handling, generating or transporting of any materials or substances which under applicable laws require special handling in collection, storage, treatment or disposal ("Hazardous Substances"), and Borrower does not



Gunkova_054834

own, make, store, handle, dispose of or transport any Hazardous Substances in violation of any applicable laws.

Section 3.6. Taxes. There are no unpaid Federal, State, city, county, or other taxes owed by Borrower, there are no Federal, State, city, county or other tax liens presently filed against Borrower, and there are no outstanding personal property taxes of any kind.

Section 3.7. USA PATRIOT Act. Neither Borrower nor any affiliate of Borrower or any Guarantor is identified in any list of known or suspected terrorists published by any United States government agency, including, without limitation, (i) the annex to Executive Order 13224 issued on September 23, 2001 by the President of the United States and (ii) the Specially Designated Nationals List published by the United States Office of Foreign Assets Control.

Section 3.8. OFAC. Neither Borrower nor any of its members, shareholders, officers or directors (i) is a "Sanctioned Person" (as defined below), (ii) has any of its assets in "Sanctioned Countries" (as defined below), or (iii) derives any of its operating income from investments in, or transactions with, Sanctioned Persons or Sanctioned Countries. No part of the proceeds of the Loan hereunder will be used directly or indirectly to fund any operations in, finance any investments or activities in or make any payments to a Sanctioned Person or a Sanctioned Country or for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended and in effect from time to time. Sanctioned Country shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treasury.gov/resource-center/sanctions/Pages/default.aspx, or as otherwise published from time to time. Sanctioned Person shall mean (i) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

## ARTICLE IV
## COVENANTS

Borrower covenants that:

Section 4.1. Costs. Borrower shall pay all costs and expenses incident to the making of the Loan including, but not limited to, all attorneys' fees.

Section 4.2 Further Documents. Borrower shall execute and deliver to Lender from time to time any instruments or documents, including, but not limited to, estoppel certificates, subordination agreements, financing statements, amendments, continuation statements, deeds of trust, loss payable endorsements for insurance policies, and assignments of insurance policies and proceeds, and shall do all things necessary or convenient to carry into effect the provisions of this

Agreement. Borrower designates Lender or any of its officers as attorney-in-fact to sign Borrower's name on any such instruments or documents, and to file the same as may be appropriate.

Section 4.3 Taxes. Borrower shall pay and discharge, when due, all taxes, levies, liens, and other charges on any of its assets and shall pay promptly, when due, all other taxes, including withholding taxes.

Section 4.4 Laws. Borrower shall comply at all times with all laws, ordinances, rules and regulations of any Federal, State, municipal or other public authorities having jurisdiction over Borrower, the Collateral or any of Borrower's other assets, including, but not limited to, all laws relating to Hazardous Substances.

Section 4.5 Name and Location. Borrower shall immediately advise Lender in writing of the opening of any new place of business or the closing of any of its existing places of business, and of any change in Borrower's name or the location of the places where the Collateral, or books and records pertaining to the Collateral, are kept.

Section 4.6 Books and Records. Borrower shall maintain such records with respect to the Collateral and the condition (financial and otherwise) and operation of Borrower's business as Lender may request from time to time, and shall furnish Lender such information with respect to the Collateral and the condition (financial and otherwise) and operation of Borrower's business, including, but not limited to, balance sheets, operating statements, and other financial information, as Lender may request from time to time. Borrower shall furnish Lender or cause to be furnished to Lender such financial information with respect to any Other Obligor, including, but not limited to, balance sheets, operating statements, personal financial statements and other financial information, as Lender may request from time to time.

Section 4.7 Inspection. Lender or any of its representatives may from time to time inspect, check, make copies of or extracts from the books, records and files of Borrower, and inspect any of the Collateral wherever located. Borrower shall make same available at any time for such purposes.

Section 4.8 Misrepresentation. Borrower shall not make or furnish Lender any representation, warranty, or certificate in connection with or pursuant to this Agreement which is materially false.

Section 4.9 Insurance. Borrower has and shall maintain insurance on the Collateral at all times and against hazards, with companies, in amounts and in form acceptable to Lender, all as more particularly set forth in the Deed of Trust. Borrower shall submit to Lender original insurance policies and receipts evidencing payment of the premiums due on same.

Section 4.10 Further Covenants. Without the prior written consent of Lender, Borrower shall not: (i) pledge or grant any security interest in any Collateral to anyone except Lender, nor permit any financing statement (except Lender's financing statement) to be on file in any public office with respect thereto; (ii) permit or suffer any lien, levy or other encumbrance to attach to

any of the Collateral, except for liens and encumbrances in favor of Lender; (iii) make any agreement, compromise, settlement, bulk sale, lease or transfer of assets other than in the normal course of business; (iv) create, incur or assume any liability for borrowed money, except borrowings from Lender; or (v) enter into any merger or consolidation, or sell or lease substantially all of its assets.

## ARTICLE V
## EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default hereunder:

Section 5.1 Failure To Pay. A failure by Borrower or any Other Obligor to pay any of the Obligations when the same are due and payable.

Section 5.2 Failure To Perform. A failure by Borrower to perform or observe any of the covenants and agreements of this Agreement and such failure (which, in the Lender's sole, absolute and subjective discretion, is capable of being cured) is not cured within thirty (30) calendar days following the giving of notice thereof by Lender to Borrower; provided however, if such failure, Lender believes in its sole, absolute and subjective discretion, cannot be cured within such 30-day period, such 30-day period may be extended if: (i) Borrower is diligently pursuing cure of the applicable default, (ii) Lender, in its sole, absolute and subjective discretion, believes that the applicable default can be cured by Borrower to the complete satisfaction of the Lender, and (iii) the occurrence of the applicable default has not impaired the security of the Loan. The contrary notwithstanding, no notice or cure period shall be provided if the Event of Default is based upon a willful or material misrepresentation at any time by Borrower to Lender or otherwise by Borrower in connection with the Loan or the advance (or readvance) of proceeds of the Loan.

Section 5.3 Failure To Perform Under the Loan Documents. A failure by Borrower or any Other Obligor to perform or observe any of the terms, covenants, conditions, and provisions of any of the Loan Documents or any default under any terms, covenants, conditions and provisions of any of the Loan Documents, and the expiration of any applicable cure period.

Section 5.4 Representations and Warranties. Any warranty, representation, or statement made to Lender by or on behalf of Borrower or any Other Obligor proving to have been incorrect in any material respect when made or furnished.

Section 5.5 Financial Condition. A determination by Lender in good faith, but in its sole discretion, that the financial condition of Borrower or any Other Obligor is unsatisfactory; insolvency of Borrower or any Other Obligor; suspension of business, or commission of an act amounting to business failure by Borrower or any Other Obligor; or a determination by Lender in good faith, but in its sole discretion, that the ability of Borrower or any Other Obligor to pay any of the Obligations is impaired for any reason.

Section 5.6 Assignments. Any assignment made by Borrower or any Other Obligor for the benefit of creditors.



Gunkova_054837

Section 5.7 Judgments; Awards. The entry of any judgment, order, award or decree against Borrower, any Guarantor or Other Obligor and a determination by Lender, in good faith but in its sole discretion, that the same, when aggregated with all other judgments, orders, awards and decrees outstanding against Borrower, any Guarantor or Other Obligor, could have a material adverse effect on the prospect for Lender to fully and punctually realize the full benefits conferred on Lender by this Agreement.

Section 5.8 Involuntary Bankruptcy. The filing of a petition by one or more creditors of the Borrower seeking: (a) the entry of a decree or order for relief by a court having jurisdiction against or with respect to Borrower in an involuntary case under the federal bankruptcy laws or any state insolvency or similar laws ordering the liquidation of Borrower; or (b) a reorganization of Borrower or Borrower's business and affairs or the appointment of a receiver, liquidator, assignee, custodian, trustee, or similar official for Borrower or any of Borrower's property, including but not limited to the Property, and such petition is not unconditionally dismissed within sixty (60) days from the date of filing.

Section 5.9 Voluntary Bankruptcy. The commencement by Borrower of a voluntary case under the federal bankruptcy laws or any state insolvency or similar laws or the consent by Borrower to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or similar official for Borrower or any of Borrower's property, including but not limited to the Property, or the making by Borrower of an assignment for the benefit of creditors, or the failure by Borrower generally to pay Borrower's debts as they become due.

Section 5.10 Extraordinary Acts. A change of ownership or the sale, dissolution, merger, consolidation, liquidation or reorganization of Borrower.

Section 5.11 Attachments. The levy upon or attachment of any property of Borrower or any Other Obligor, or the recordation of any Federal, State or local tax lien against Borrower or any Other Obligor.

Section 5.12 Reserved.

Section 5.13 Cross-Default. The occurrence of any event which is, or would be with the passage of time or the giving of notice or both, a default under any indebtedness of Borrower or any Other Obligor to Lender or to any person other than Lender.

Section 5.14 Loss or Damage. Any material loss, theft or substantial damage to any of the Collateral not insured for the benefit of Lender pursuant to the terms of the Loan Documents.

Section 5.15 Financial Information. The failure of Borrower or any Other Obligor to furnish Lender such financial information as Lender may require from time to time.

Section 5.16 Other Default. The failure of Borrower to provide information related to the Bank Secrecy Act including, but not limited to, all information with regards to Beneficial Ownership of the Borrower.

## ARTICLE VI
## REMEDIES

Section 6.1 Specific Rights and Remedies. In addition to all other rights and remedies provided by law and the Loan Documents, Lender, during the existence of an Event of Default, may: (i) accelerate and call due and payable any and all of the Obligations, including all principal, accrued interest and other sums due as of the date of default; (ii) impose the default rate of interest provided in the Note, with or without acceleration; (iii) file suit against Borrower or against any Other Obligor; and/or (iv) seek specific performance or injunctive relief to enforce performance of the Obligations, whether or not a remedy at law exists or is adequate.

Section 6.2 Costs of Collection. After the occurrence of an Event of Default, Lender shall be entitled to recover from Borrower its reasonable attorneys' fees actually incurred, plus court costs and other expenses which may be incurred by Lender in the enforcement or attempted enforcement of its rights hereunder, whether against any third party, Borrower, or any Other Obligor. Expenses recoverable from Borrower shall (to the extent not prohibited by law) include costs of collection including salaries, out-of-pocket travel expenses and the hiring of agents, consultants, accountants, or otherwise. All sums of money thus expended shall be repayable by Borrower to Lender on demand.

Section 6.3 Offset. During the existence of an Event of Default, Lender is authorized to charge the sum then due to Lender against any and all monies held by or on deposit with Lender on account of Borrower, and to offset any amounts against any Accounts which Borrower, may have with Lender and to enforce such other remedies as may be available at law or in equity, without necessity of election.

Section 6.4 Alternative Remedies. Lender may exercise its rights and remedies hereunder either alternatively or concurrently with its rights under any and all other agreements between Lender and Borrower and shall have the full right to realize upon all available Collateral, collecting on the same or instituting proceedings in connection therewith, until Lender receives payment in full of all amounts owing to Lender under any of its agreements with Borrower, including principal, interest, costs and expenses, and costs of enforcement or attempted enforcement of this or any other agreement among or between Lender and Borrower or any Other Obligors. Lender shall be under no obligation to pursue Lender's rights against any Other Obligor or any of the collateral of any Other Obligor securing any of the Obligations before pursuing Lender's rights against Borrower, or the Collateral.

## ARTICLE VII
## GENERAL PROVISIONS

Section 7.1 Loan Costs. All fees incurred in connection with the Loan and the Loan Documents including, without limitation, the Lender's reasonable counsel fees, title insurance premiums, insurance premiums, recordation costs, costs of surveys, costs of transfer taxes and documentary stamps, photocopying expenses, appraisals, the fees of architects, professional engineers and inspectors, travel expenses for the Lender's agents, employees, counsel, inspectors,



Gunkova_054839

architects, and engineers, and all other expenses shall be paid by the Borrower, whether incurred prior to or after Closing, such that the Loan shall be cost free to the Lender.

Section 7.2 Incorporation. The terms and conditions of the Loan Documents are incorporated by reference and made a part hereof as if fully set forth herein. In the event of any inconsistencies between this Agreement and any other Loan Document, such inconsistencies shall be construed, interpreted, and resolved so as to benefit the Lender, independent of whether this Agreement or another Loan Document controls, and the Lender's election of which interpretation or construction is for the Lender's benefit shall govern.

Section 7.3 Notices. Any notice required or permitted by or in connection with this Agreement shall be in writing and shall be made by hand delivery, by Federal Express, or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the respective parties at the appropriate address set forth below or to such other address as may be hereafter specified by written notice by the respective parties. Notice shall be considered given as of the date of hand delivery, one (1) business day after delivery to Federal Express or similar overnight delivery service, or three (3) business days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was given as provided herein. If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

| | |
|---|---|
| If to BORROWER: | BNG GROUP LLC<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |
| If to the LENDER: | ATLANTIC UNION BANK<br>5803 Rolling Road<br>Springfield, VA 22152<br>Attn: Anthony Wininger |
| With a copy to: | Vincent J. Keegan, Esquire<br>Keegan & DeVol, PLC<br>8280 Greensboro Drive, Suite 710<br>McLean, VA 22102 |
| If to the GUARANTOR: | HARRY KAMIN<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |
| and to: | VALERIA GUNKOVA<br>2 Pidgeon Hill Drive, Suite 100<br>Sterling, VA 20165 |



Gunkova_054840

Section 7.4 Waivers. The Lender may at any time or from time to time waive all or any rights under this Agreement or any other Loan Document, but any waiver or indulgence by the Lender at any time and from time to time shall not constitute, unless specially so expressed by the Lender in writing (except to the extent an express waiver need not be in writing under the provisions of another section of this Agreement), a future waiver of performance or exact performance by the Borrower.

Section 7.5 No Third Party Beneficiary Rights. No person not a party to this Agreement shall have any benefit hereunder nor have third party beneficiary rights as a result of this Agreement or any other Loan Documents, nor shall any party be entitled to rely on any actions or inactions of the Lender or the Lender's agents, all of which are done for the sole benefit and protection of the Lender. The Lender shall not be deemed a partner or joint venture with the Borrower.

Section 7.6 Continuing Obligation Of Borrower. The terms, conditions, and covenants set forth herein and in the Loan Documents shall survive Closing and shall constitute a continuing obligation of the Borrower during the course of the Loan.

Section 7.7 Binding Obligation. This Agreement shall be binding upon the parties and their successors, personal representatives, and assigns.

Section 7.8 Final Agreement. This Agreement and the Loan Documents contain the final and entire agreement and understanding of the parties, and any terms and conditions not set forth in this Agreement or the Loan Documents are not a part of this Agreement and the understanding of the parties hereto.

Section 7.9 Amendment. This Agreement may be amended or altered only in writing signed by the party to be bound by the change or alteration.

Section 7.10 Time. Time is of the essence of the Borrower's obligations under this Agreement.

Section 7.11 Choice Of Law. The laws of the Commonwealth of Virginia (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this Agreement and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this Agreement and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this Agreement or which occurred or were to occur as a direct or indirect result of this Agreement having been executed.

Section 7.12 Consent To Jurisdiction/Agreement As To Venue. The Borrower irrevocably consents to the non-exclusive jurisdiction of the courts of the Commonwealth of Virginia and the United States District Courts for the Eastern District of Virginia (Alexandria Division), if a basis for federal jurisdiction exists. The Borrower agrees that venue shall be proper in any circuit court of the Commonwealth of Virginia selected by the Lender or in the United States District Court for the Eastern District of Virginia (Alexandria Division) if a basis for federal

jurisdiction exists and waives any right to object to the maintenance of a suit in any of the aforementioned state or federal courts within the Commonwealth of Virginia on the basis of improper venue or of inconvenience of forum.

Section 7.13 Number, Gender, And Captions. As used herein, the singular includes the plural and the plural the singular. The use of any gender applies to all genders. The captions contained herein are for purposes of convenience only and are not a part of this Agreement.

Section 7.14 No Assignment. The Borrower shall have no rights of assignment or substitution with respect to the Loan or any of the Loan Documents.

Section 7.15 Participations/Release Of Information. This Agreement, the Loan, and any other loan or documentation connected with or contemplated by this transaction may be placed, assigned, serviced or participated out (either in whole or in part) by the Lender, its successors and assigns. The Borrower and the Guarantor hereby grant the Lender their unlimited and unconditional consent to the disclosure and dissemination of financial records, including without limitation loan application and account information, statements of deposit and share accounts, negotiable instruments, individual, corporate and partnership financial statements, credit references and histories, property appraisals, surveys, pro forma assumptions, profit and loss statements, resumes, accounting reports, balance sheets, and other financial information provided to the Lender by or on behalf of the Borrower or the Guarantor, to prospective participants in or purchasers of the Loan, the Lender's auditors and the Lender's governmental regulators as the Lender, in its sole discretion, from time to time deems necessary or proper. The Borrower and the Guarantor further release, acquit and forever discharge the Lender and its agents from all liability, claims, actions, or causes of action for disclosure of confidential financial records under any applicable federal or state statute or common law.

Section 7.16 Invalidity Of Any Part. If any provision or part of any provision of this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

Section 7.17 Waiver Of Trial By Jury. The Borrower agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by or against either party hereto or any successor or assign of any party on or with respect to this Agreement or any of the other Loan Documents or which in any way relates, directly or indirectly, to the Loan or any event, transaction, or occurrence arising out of or in any way connected with the Loan, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. THE BORROWER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. The Borrower acknowledges and agrees that this provision is a specific and material aspect of the agreement between the parties and that the Lender would not enter into the transaction with the Borrower if this provision were not part of their agreement.

Section 7.18 Joint and Several Obligation. In the event there is more than one Borrower



Gunkova_054842

hereunder, all obligations and liabilities under this Agreement shall be joint and several obligations and liabilities of each Borrower. In addition, all covenants and agreements of the Borrower hereunder shall be applicable to each Borrower individually and all Borrowers collectively. The occurrence of any event or occurrence set forth herein as a default to any one Borrower shall constitute a default under this Agreement as to all Borrowers.

Section 7.19 Appraisals. In the event Lender has reason to believe the value of the Property has diminished, Lender shall have the right to require updated Appraisals of the Property, which Appraisals shall be prepared by an appraiser or appraisers designated by the Lender and shall be in all respects acceptable to the Lender. Each of such Appraisals, when reviewed by the Lender, must indicate a value in the Property that results in an LTV of not more than eighty percent (80%). The basis of the appraisal calculations shown on such Appraisals and all other aspects thereof must be satisfactory to the Lender in all respects. The Borrower shall reimburse the Lender upon demand for all costs and expenses incurred by the Lender with respect to the preparation and review of all future Appraisals required pursuant to the terms hereof. In the event that, upon the receipt of any such updated Appraisal, the value of the Property, as determined by the Lender based upon its review of such Appraisal, is less than that required pursuant to the terms hereof, the Borrower shall pay to the Lender within ten (10) days of written demand by the Lender, a principal curtailment on the Loan in an amount equal to the difference between the sum of the then current outstanding principal balance of the Loan and eighty percent (80%) of the actual appraised value of the Property, as determined by the Lender.

## ARTICLE VIII
## ADDITIONAL COVENANTS

In addition to the other terms and conditions herein, Borrower represents, warrants and covenants that:

Section 8.1 Banking Relationship. Borrower shall establish and maintain its operating and depository accounts with the Lender for the term of the Loan.

Section 8.2 Debt Service Coverage Ratio. The Debt Service Coverage Ratio at all times during the term of the Loan shall be greater than or equal to 1.2:1, measured annually in arrears.

Section 8.3 Financial Statements. Within ninety (90) days from the end of each year, Borrower and each Guarantor shall each provide Lender with their annual financial statements for the immediately preceding year, in form and detail satisfactory to Lender.

Section 8.4 Tax Returns. As soon as available, but in any event within thirty (30) days of filing each year during the term of the Loan, Borrower and each Guarantor shall provide Lender with copies of their respective federal and state income tax returns, including all schedules and attachments thereto.

Section 8.5 Other Information. The Borrower shall provide Lender with such additional information, reports or statements as the Lender may from time-to-time reasonably request.



Gunkova_054843

Section 8.6 Liquidity Maintenance Requirement. At all times during the term of the Loan, Guarantor shall maintain at least $500,000.00 in aggregate Liquid Assets, as determined by the Lender in its commercially reasonable discretion.

Section 8.7 Reserve Account. At Closing, Borrower shall deposit $200,000.00 with Lender in order to establish the Reserve Account. Thereafter, contemporaneously with its monthly payments to Lender under the Note, Borrower shall deposit an additional $12,083.34 into the Reserve Account. Such funds shall be held by Lender for the purpose of reimbursing Borrower as it completes the deferred repairs and maintenance of the HVAC system in the Property. Funds shall be released from the Reserve Account to reimburse Borrower for work on the HVAC system as it is completed by licensed contractors and after such work has inspected and verified as to completeness and value by a third-party inspector approved by Lender, the cost of which shall be borne by Borrower. Borrower shall provide Lender with copies of all invoices and lien waivers relative to the work.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Borrower and Guarantor have executed this Agreement under seal as of the day and year first above written.

**WITNESS OR ATTEST:**

**BORROWER:**
BNG GROUP LLC

By: ______________________ (SEAL)
HARRY KAMIN, Manager

By: ______________________ (SEAL)
VALERIA GUNKOVA, Manager

**GUARANTOR:**

______________________ (SEAL)
HARRY KAMIN

______________________ (SEAL)
VALERIA GUNKOVA



Gunkova_054844

**CCEPTED AS OF THE DATE HEREOF:**

**LENDER:**
ATLANTIC UNION BANK

By: ______________________________(SEAL)
Its:



Gunkova_054845

# PROMISSORY NOTE

**IMPORTANT NOTICE - THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

$7,360,000.00

Fairfax County, Virginia October 30, 2020

FOR VALUE RECEIVED, **BNG GROUP LLC**, a Virginia limited liability company, having an address of 2 Pidgeon Hill Drive, Suite 100, Sterling, VA 20165 (the "Borrower") hereby unconditionally promises to pay to **ATLANTIC UNION BANK** or order (the "Lender") at its office at 5803 Rolling Road, Springfield, VA 22152, the sum of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)**, together with interest from the date of this Note as set forth herein.

1. **REPAYMENT/CALCULATION OF INTEREST**. Principal and interest shall be payable as follows: Commencing November 30, 2020 and continuing on same day of each and every calendar month thereafter until October 30, 2025 (the "Maturity Date"), this Note shall be payable in monthly installments of principal and interest of $35,812.42, which amount includes interest at the fixed rate THREE AND 19/100TH PERCENT (3.19%) per annum and is sufficient to amortize the then outstanding principal balance over a period of twenty-five (25) years, with all outstanding principal and interest due and payable in full on the Maturity Date. Interest hereon shall be calculated based upon the actual number of days elapsed in a three hundred sixty (360) day year. All payments under this Note shall be made in lawful currency of the United States in immediately available funds. All payments shall be applied first to late charges and attorneys' fees, next to interest and then to principal. Payments shall be due on the last day of any month not containing thirty (30) days.

**MATURITY DATE/BALLOON PAYMENT.** Notwithstanding the 25-year term upon which the amount of the monthly payments are computed, the entire unpaid principal balance of this Note, with all accrued and unpaid interest and other charges, if not sooner paid, shall be due and payable in full on the Maturity Date. **THE BORROWER ACKNOWLEDGES AND AGREES THAT THIS NOTE PROVIDES FOR A BALLOON PAYMENT OF THE ENTIRE UNPAID PRINCIPAL BALANCE OF THIS NOTE, WITH INTEREST, ON THE MATURITY DATE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. THE BORROWER WILL BE REQUIRED TO MAKE PAYMENT OUT OF OTHER FUNDS OR ASSETS THAT BORROWER OWNS OR FIND A BANK, WHICH MAY BE THE LENDER, WILLING TO LEND THE MONEY NECESSARY TO REFINANCE THE ENTIRE UNPAID INDEBTEDNESS EVIDENCED BY THIS NOTE.**

2. **PREPAYMENT.** This Note may not be prepaid in whole or in part, whether by voluntary prepayment, refinancing or acceleration, prior to such date that is three (3) years from the date hereof unless such prepayment is accompanied by a prepayment premium equal to the



Gunkova_054846

applicable percentage of the principal amount prepaid as follows: (i) 3% if the prepayment occurs during the first year after the date hereof; (ii) 2% if the prepayment occurs during the second year after the date hereof; and (iii) 1% if the prepayment occurs during the third year after the date hereof. No partial prepayment shall reduce the amount of the periodic payments of principal and/or interest that would otherwise be due hereunder. For purposes hereof, "acceleration" shall mean the acceleration of the principal balance hereof by Lender following the occurrence of an Event of Default under this Note or any other document or documents given in evidence, guaranty or security hereof.

3. **LATE PAYMENT CHARGE**. If Borrower fails to make any payment within ten (10) days after its due date, Borrower will pay a late charge of five percent (5%) of the payment due.

4. **EVENTS OF DEFAULT**. Borrower will be in default hereunder upon the occurrence of any of the following events (each being an "Event of Default"):

(a) failure by Borrower to pay when due any sum required to be paid hereunder; or

(b) failure by Borrower to observe or perform any covenant or agreement Borrower has made in this Note, the Deed of Trust, Assignment of Rents and Security Agreement given to secure the indebtedness evidenced hereby, the Loan and Security Agreement of even date herewith between Borrower and Lender, or in any other agreement Borrower has made with Lender in connection with the loan evidenced hereby and such failure continues after the expiration of any applicable grace period.

Upon the occurrence of an Event of Default, Borrower agrees that the applicable rate of interest set forth in this Note shall be increased by five (5) percentage points above the rate of interest otherwise payable hereunder until such time as the Event of Default is cured to Lender's reasonable satisfaction. Such default interest shall be in addition to all other rights and remedies provided herein or by law for the benefit of Lender upon a default. Notwithstanding anything contained herein to the contrary, Lender shall never be entitled to receive, collect, or apply, as interest on the obligation, any amount in excess of the maximum rate of interest permitted to be charged by applicable law, and, in the event Lender ever receives, collects, or applies as interest any such excess, such amount that would be excessive interest shall be applied to the reduction of the principal debt; and, if the principal debt is paid in full, any remaining excess shall forthwith be paid to Borrower. Upon the occurrence of an Event of Default hereunder, the principal sum hereof together with all arrearages of interest thereon shall, at the option of the Lender, become and be due and payable immediately.

5. **WAIVERS**. Borrower hereof waives presentment, demand, notice of dishonor and protest hereof, and consent that the time of payment may be extended from time to time without notice thereof, and hereby respectively waive the benefit of any homestead exemption and all other state exemptions as to the property securing this debt.



Gunkova_054847

**6. COST OF COLLECTION.** Borrower agrees that if, after this Note becomes due by demand, acceleration or otherwise, it is referred to an attorney (including in-house counsel) retained by or employed by Lender for collection, to pay Lender's reasonable attorneys' fees and all costs and expenses of collection.

**7. LENDER AS ATTORNEY IN FACT.** Borrower hereby appoints any employee of Lender as its attorney-in-fact for the purpose of signing Borrower's name to and filing such financing statements, continuation statements and/or lien forms as Lender deems necessary or advisable to perfect or continue the perfection of Lender's security interest in any collateral which may now or in the future secure this Note. The foregoing special power of attorney is deemed coupled with an interest and shall remain in full force and effect until this Note is paid and satisfied in full.

**8. CHOICE OF LAW; CONSENT TO VENUE/JURISDICTION.** This Note and its construction shall be governed by the internal laws of the Commonwealth of Virginia without regard to conflict of law provisions. The Borrower irrevocably consents to the non-exclusive jurisdiction of the courts of the Commonwealth of Virginia and the United States District Courts for the Eastern District of Virginia (Alexandria Division), if a basis for federal jurisdiction exists. The Borrower agrees that venue shall be proper in any circuit court of the Commonwealth of Virginia selected by the Lender or in the United States District Court for the Eastern District of Virginia (Alexandria Division) if a basis for federal jurisdiction exists and waives any right to object to the maintenance of a suit in any of the aforementioned state or federal courts within the Commonwealth of Virginia on the basis of improper venue or of inconvenience of forum.

**9. WAIVER OF TRIAL BY JURY.** BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY BORROWER AGAINST LENDER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS NOTE OR ANY RELATED AGREEMENTS OR INSTRUMENTS AND THE ENFORCEMENT THEREOF.

**10. NOTICES.** Any notice required or permitted by or in connection with this Note shall be in writing and shall be made by hand delivery, by FedEx, or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the respective parties at the appropriate address set forth above or to such other address as may be hereafter specified by written notice by the respective parties. Notice shall be considered given as of the date of hand delivery, one (1) business day after delivery to Federal Express or similar overnight delivery service, or three (3) business days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was given as provided herein. If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

**11. NO WAIVER.** No failure on the part of Lender to exercise any of its rights hereunder shall be deemed a waiver of such rights or of any default.



Gunkova_054848

12. **COMMERCIAL LOAN.** Borrower represents and warrants to Lender that no portion of the proceeds of the loan evidenced by this Note is being used for personal, family or household purposes.

13. **SEVERABILITY.** In the event any provision of this Note shall be held to be invalid, illegal or unenforceable, this Note shall be construed as if such provision had never been contained herein and the remainder of this Note shall remain in full force and effect.

14. **TIME IS OF THE ESSENCE.** Time is of the essence as to all dates set forth herein.

15. **CONFESSION OF JUDGMENT.** Upon the occurrence of an Event of Default, Borrower hereby authorizes, appoints and empowers any of Douglas D. Callaway and/or Michael E. Walsh and/or Lynn Harrison and/or Frank Merritt and/or Inga Green as its attorney-in-fact to appear in the Clerk's Office for the Circuit Court of the City of Richmond, Virginia on behalf of Borrower and therein to confess or enter judgment against the undersigned, in favor of Lender for any sums due hereunder with interest thereon at the default rate of interest otherwise payable under the terms of the Note, from the date the same shall become due and payable until the date paid, together with attorney's fees equal to fifteen percent (15%) of the unpaid balance owed under this Note and court costs, without stay of execution or right of appeal and expressly waiving the benefit of all exemption laws and all irregularity or error in entering said judgment or the execution thereon. No single exercise of the foregoing power to confess judgment shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable or void, but the power shall continue undiminished, and it may be exercised from time to time as often as Lender shall elect, until such time as Lender shall have received payment in full of all indebtedness of Borrower to Lender. Notice under this confession of judgment provision, pursuant to § 8.01-438 of the Code of Virginia, 1950, as amended, shall be served on Borrower at Borrower's address above.

In the event that (a) Lender obtains judgment by confession under this Note and (b) all of the obligations of Borrower under the Note are satisfied and paid in full other than the obligation to pay attorneys' fees, the Lender will require the Borrower make payment only of attorneys' fees actually incurred (such fees to be reasonable), and any funds received in excess of the actual amount of attorneys' fees shall be returned to Borrower.

SIGNATURE APPEARS ON FOLLOWING PAGE



Gunkova_054849

Witness the due execution and sealing hereof.

**BORROWER:**
BNG GROUP LLC

By: ______________________(SEAL)
HARRY KAMIN, Manager

By: ______________________(SEAL)
VALERIA GUNKOVA, Manager

**COMMONWEALTH OF VIRGINIA :**
**: to wit:**
**CITY/COUNTY OF** Fairfax **:**

I HEREBY CERTIFY that on this 30 day of October, 2020, before me, the undersigned Notary Public of the jurisdiction aforesaid personally appeared HARRY KAMIN and VALERIA GUNKOVA, and acknowledged themselves to be Managers of BNG GROUP LLC, and that they, being authorized so to do, executed the foregoing instrument for the purposes therein contained.

WITNESS MY Hand and Notarial Seal.

______________________ (SEAL)
Notary Public

My Commission expires: 6/30/24 Registration #: 120278

MARK FITZGERALD
NOTARY PUBLIC
REG # 120278
MY COMMISSION EXPIRES 6/30/2024
COMMONWEALTH OF VIRGINIA

Prepared by:
Vincent J. Keegan, Esquire
Keegan & DeVol, PLC
8280 Greensboro Drive, Suite 710
McLean, VA 22102

PIN: 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-000

# DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT** ("Deed of Trust") is made as of October 30th, 2020, by and between **BNG GROUP LLC**, a Virginia limited liability company ("Grantor") and **UNION SERVICE CORPORATION**, a Virginia corporation, Trustee, having an address of 5803 Rolling Road, Springfield, VA 22152 (hereinafter, "Trustees", whether one or more) for the benefit of **ATLANTIC UNION BANK**, having offices at 5803 Rolling Road, Springfield, VA 22152 ("Beneficiary").

## RECITALS

A. Pursuant to that certain Loan and Security Agreement of even date herewith by and between Grantor and Beneficiary (the "Loan Agreement", such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor), the Beneficiary has agreed to make a purchase money loan to the Grantor (the "Loan"), in the principal amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** as evidenced by a Promissory Note of even date herewith from the Grantor, payable to the order of the Beneficiary in the principal amount of **SEVEN MILLION THREE HUNDRED SIXTY THOUSAND AND 00/100 DOLLARS ($7,360,000.00)** (the "Note", such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor). The Loan is guaranteed by **HARRY KAMIN** and **VALERIA GUNKOVA** (individually and collectively, the "Guarantor") pursuant to the terms of a Guaranty and Indemnification Agreement of even date herewith from the Guarantor in favor of the Beneficiary (the "Guaranty"). The Loan is further secured by an Assignment of Rents and Leases of even date herewith from the Grantor in favor of the Beneficiary (the "Assignment of Rents"). In addition to the Note and the Loan Agreement, the Loan is evidenced by additional documents evidencing, securing, guaranteeing and/or otherwise documenting the terms and conditions of the Loan (together with this Deed of Trust, the Note, the Guaranty, the Assignment of Rents and the Loan



Gunkova_054851

Agreement, collectively, "Loan Documents", such term to include all extensions, renewals, amendments and modifications thereof and substitutions therefor).

B. The Grantor has agreed to secure the Loan, in part, by the execution of this Deed of Trust.

C. As used in this Deed of Trust: (a) the term "Indebtedness" means all sums now or hereafter outstanding under the Note and the other Loan Documents, including (i) all principal sums outstanding from time to time under the Loan, all interest thereon at the rate or rates provided in the Note, and all fees or charges, (ii) all sums which may hereafter be advanced to or for the account of the Grantor under the Loan Documents, (iii) all sums which may be advanced by the Trustees or the Beneficiary pursuant to or under authorizations contained in this Deed of Trust or other Loan Documents, even if and to the extent such sums may exceed the face amount of the Note and the principal sum stated above, (iv) all sums which may be payable by the Grantor on account of any warranty or indemnity given by the Grantor under this Deed of Trust or any other Loan Document, and (v) all fees and costs (including without limitation all attorneys' fees and expenses) incurred by the Trustees or the Beneficiary in connection with the administration or collection of the Loan, including all such fees and costs incurred in the enforcement of this Deed of Trust or any of the other Loan Documents or otherwise as a result of an Event of Default; (b) the term "Obligations" means all duties of payment and performance owed by the Grantor to the Trustees or the Beneficiary under the Loan Documents, including but not limited to (i) the duty of the Grantor to pay all sums now or hereafter outstanding on account of the Indebtedness, when and as the same become due; and (ii) the strict observance and performance of all of the covenants and agreements of the Grantor under the Loan Documents and the satisfaction of all requirements and conditions contained in the Loan Documents; and (c) the term "Person" means any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, court, or government or political subdivision or agency thereof.

## GRANT

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the full and absolute payment and performance of each of the Obligations, the Grantor grants, pledges, assigns, transfers and conveys to the Trustees all those certain lot(s) or parcel(s) of ground situated and lying in Loudoun County, Virginia, and more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Land").

**TOGETHER WITH** all buildings, structures, or improvements, and replacements thereof, now or hereafter existing on or to be erected upon the Land ("Improvements"). The Land and Improvements are collectively referred to as the "Real Property."

**AND TOGETHER** with all plant equipment, apparatus, machinery, fittings, appliances, furniture, furnishings, fixtures and other chattels and personal property and replacements thereof (exclusive of any inventory held for sale or resale by the Grantor) owned by the Grantor and now

or at any time hereafter affixed or attached to, incorporated in, placed upon, or in any way used in connection with the current or future utilization, enjoyment, occupation, or operation of the Real Property including by way of example and not by way of limitation, all lighting, heating, ventilating, air conditioning, incinerating, sprinkling, laundry, lifting and plumbing fixtures and equipment, water and power systems, loading and unloading equipment, burglar alarms and security systems, fire prevention and fire extinguishing systems and equipment, engines, boilers, ranges, refrigerators, stoves, furnaces, oil burners or units, communication systems and equipment, dynamos, transformers, motors, tanks, electrical equipment, elevators, escalators, cabinets, partitions, ducts, compressors, switchboards, storm and screen windows and doors, pictures, sculptures, awnings and shades, signs and shrubbery; as well as all building and construction materials and supplies of every kind, nature and description owned by the Grantor and located on, at, or about the Real Property, whether or not yet incorporated into any building, structure, or improvement, or located elsewhere and not as yet delivered to the Real Property, which was intended to be used for the purpose of erecting, renovating, restoring, or repairing any building, structure, or improvement on the Real Property, including by way of example and not by way of limitation, all steel, iron, concrete, sheet rock and plaster board, screws, paint, plaster, plastics, insulation, fiberglass, wood and wood products, glass, bricks, mortar, masonry, pipes, wiring, linoleum and tile and other floor and wall coverings, roofing and roofing materials, framing and molding (collectively, "Personalty") all of which the Grantor declares to be fixtures and permanent additions to the Real Property.

**AND TOGETHER WITH** all plans and specifications, surveys and surveyor's reports, engineer's and architect's reports, diagrams and drawings, all licenses, permits and approvals and applications therefor from governmental authorities, service contracts, books, records, reports, accounting records, invoices, change orders, correspondence, diagrams, drawings, schematics, sales and promotional literature and forms, advertising materials and the like, wherever located and whenever created, compiled, or made with respect to the construction of the Improvements upon the Land and/or any leasing of space in the Improvements.

**AND TOGETHER WITH** all easements, rights, privileges, and appurtenances thereunto belonging or in any way appurtenant, and all of the right, title, interest, estate, or claim of the Grantor in or to the streets, ways, alleys, and waters adjoining or adjacent to the Real Property, whether now existing or hereafter acquired.

**AND TOGETHER WITH** all mineral rights, and mining rights, as well as all minerals, sand, gravel, soil and the like (including oil and gas) which have not been extracted from the Land.

**AND TOGETHER WITH** all documents, instruments, general intangibles, chattel paper, contract rights, inventory and accounts now owned or hereafter acquired by the Grantor and relating to or arising out of the herein described Real Property or any contract of sale for the herein described Real Property or portions thereof, as such items of property may from time to time exist, together with all modifications, accessions and substitutions therefor and proceeds therefrom.

**AND TOGETHER WITH** all the rights, title, interest and privileges which the Grantor as seller has or may have in the contracts of sale now existing or hereafter made and affecting the Real



Gunkova_054853

Property, as such contracts may have been, or may from time to time be, modified, extended and renewed, with all deposits, proceeds, income and profits due and becoming due therefrom.

**AND TOGETHER WITH** all rights, benefits, profits, rents, and monies payable under, by reason of, or with respect to any restrictive covenants, easements, agreements applicable to the Real Property or adjoining lands, or contracts of sale with respect thereto, and all proceeds and products thereof, with the right to: (a) collect any sums of money at any time payable to the Grantor in consequence of such rights and benefits, including the release, modification, or amendment thereof, for application to the Obligations; and (b) utilize any collection or enforcement rights or remedies to collect the same which may be available to the Grantor under law.

**AND ALSO TOGETHER WITH**: (a) all of the proceeds of the voluntary or involuntary conversion of the aforementioned property or any part of the aforementioned property into cash or liquidated claims, whether by way of condemnation, insured casualty, judgment or otherwise, as well as a security interest which is hereby granted to the Beneficiary in the same; (b) all rents, profits, and benefits, including any deposits of tenants to secure payment of the same and performance of the terms and conditions of any oral or written lease, with respect to the leasing of all or any portion of the Real Property (each, a "Lease"), with the right to collect such rents, profits, and benefits at any time for application to the Obligations and to utilize any collection or enforcement rights or remedies which may be available to the Grantor under law or any written Lease, but without any duty or obligation to perform on behalf of the Grantor any of the Grantor's duties or obligations to any lessee; and (c) all revenues and profits, accounts receivable and contract rights, including any deposits of purchasers to secure payment of the contract price and performance of the terms and conditions of any contract of sale for the Real Property, with the right to collect the same at any time for application to the Obligations and to utilize any collection or enforcement rights or remedies which may be available to the Grantor under law or any contract of sale, but without any duty or obligation to perform on behalf of the Grantor any of the Grantor's duties or obligations to any purchaser of the Real Property.

**AND TOGETHER WITH**: (a) an irrevocable license to enter on and upon the Real Property at any time and from time to time for the purpose of making such audit tests, inspections, and examinations, including subsurface exploration and testing, as the Beneficiary, in its discretion, deems necessary, convenient, or proper to determine whether the ownership, use, and operation of the Real Property and the conduct of the activities engaged in thereon are in compliance with the Environmental Requirements, as that term is defined below; (b) the right at any time and from time to time to inspect and copy all of the Grantor's records relating to environmental matters and to enter all buildings or facilities of the Grantor for such purpose; and (c) all of the Grantor's records with respect to environmental matters, whether or not located at the Real Property or elsewhere, whether or not in the possession of the Grantor or some third party (including any federal, state, or local agency or instrumentality), and whether written, photographic, or computerized.

All of the aforementioned Real Property, Personalty, and other rights and benefits and all other property described in the above stated granting clauses of this Deed of Trust are referred to collectively as the "Secured Property." To the extent that any items of Secured Property are not



Gunkova_054854

or have not yet become fixtures and permanent additions to and a part of the Real Property, and are instead personal property, the Grantor grants, re-grants, conveys, re-conveys and confirms to the Beneficiary a continuing security interest under the Virginia Uniform Commercial Code, as amended, in all of such items of personal property and the proceeds and products thereof, as well as in all substitutions, renewals, replacements, additions, modifications and accretions thereof and in all of such items hereafter acquired and constituting after acquired property, for so long as such items are or remain personal property and not fixtures and permanent additions to the Real Property. It is acknowledged and agreed that this Deed of Trust shall constitute a "Fixture Filing" as to the Personalty, as the same is permitted under § 8.9A-502(c) of the Code of Virginia of 1950, as amended.

**TO HAVE AND TO HOLD** the Secured Property to the Trustees and the Trustees' successors and assigns in fee simple forever.

**IN TRUST**, for the benefit and security of the Beneficiary to secure the full, complete, timely and absolute payment, performance, completion, and satisfaction of each of the Obligations, whether such Obligations are existing or hereafter arising, as contemplated by and in accordance with the terms and conditions of the Loan Agreement; provided, however, that the Beneficiary and the Trustees shall release the Secured Property from this Deed of Trust hereof, and if all of the Obligations are duly paid, performed, completed and satisfied, then the Beneficiary shall execute and deliver to the Grantor a full written release which shall reconvey the Secured Property to the Grantor and terminate this Deed of Trust at the sole cost and expense of the Grantor; and further provided that until such a full written release is executed and delivered, this Deed of Trust shall not be deemed released or terminated in whole or in part, even if the amount secured by this Deed of Trust is Zero Dollars ($0.00) from time to time.

## ARTICLE 1
## COVENANTS AND AGREEMENTS OF THE GRANTOR

The Grantor covenants and agrees as follows:

**Section 1.1. Repayment**. The Grantor shall pay punctually all Indebtedness secured by this Deed of Trust, together with interest thereon and any penalty, fee, charge, deposit, escrow or assessment, at the times and in the manner and amounts set forth in this Deed of Trust, the Note, and each of the other Loan Documents.

**Section 1.2. Performance**. The Grantor shall perform fully all duties, obligations, and requirements and comply exactly in all respects with the terms, covenants, conditions, representations and warranties of this Deed of Trust, the Note, the Loan Agreement and each of the other Loan Documents.

**Section 1.3. Taxes And Expenses**. The Grantor shall pay and discharge, when and as the same come due, all taxes of every kind and nature, real and personal; all general and special assessments and levies; all water, sewer and other utility charges, rents, and assessments; and any and all other public charges, dues, levies, impositions, or assessments of a like or different



Gunkova_054855

nature, imposed upon or assessed against the Secured Property or the rents, issues, income or profits thereof, and which are or may become liens against the same, as well as any ground rent to which the Real Property may be subject, and the Grantor shall not permit to exist any lien or security interest for taxes, assessments, levies, fees, ground rents and public charges other than: (a) liens for taxes, assessments, levies, fees, rents, ground rents, and public charges not yet delinquent; and (b) liens and security interests which the Beneficiary has specifically and in writing consented to the existence of and with respect to which the Grantor has paid currently all sums secured thereby. The Grantor shall, upon the request of the Trustees or the Beneficiary, deliver to the Trustees or the Beneficiary receipts evidencing the payment of all such taxes, assessments, levies, fees, rents, ground rents, and public charges imposed upon or assessed against the Secured Property, or the revenues, rents, issues, income, or profits thereof, as well as the payment of all superior liens and security interests with respect to which the Beneficiary may have consented. Notwithstanding the above, the Grantor may contest, at its expense, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any taxes or other charges enumerated above in this Section 1.3; provided that (i) such proceedings shall suspend the collection thereof, (ii) neither the Secured Property nor any part thereof or interest therein would be in any danger of being sold, forfeited or lost, (iii) neither the Grantor, the Trustees nor the Beneficiary would be in any danger of any civil or criminal liability for failure to pay same and the Secured Property or any part thereof would not be subject to the imposition of any lien as a result of such failure, and (iv) if the applicable tax or other charge would, if such amount remains unpaid, result in a lien against the Secured Property or any part thereof, the Grantor shall have deposited the amount of said taxes or charges together with interest, penalties, attorneys' fees and court costs with the Beneficiary who shall have the sole and absolute discretion to pay such contested amounts in the event that, in the sole, absolute and subjective discretion of the Beneficiary, the Secured Property or any part thereof is in danger of forfeiture or the Trustees and/or Beneficiary are in danger of being held civilly or criminally liable with respect thereto or the Beneficiary concludes, in its sole, absolute and subjective discretion, that the Secured Property or any part thereof is impaired thereby.

**Section 1.4.** **Insurance**. The Grantor shall maintain the following insurance coverages with insurance companies rated at least "A" by A.M. Best Company:

**1.4.1.** **Casualty Insurance.** The Grantor shall obtain and at all times maintain "special perils" casualty insurance insuring the Secured Property against all risks which are customarily insured under "special perils" insurance, in amounts equal to the greater of (i) the full replacement value of the Secured Property, or (ii) an amount sufficient to prevent co-insurance liability. The coverage provided by such policy or policies shall include coverage for any and all loss or damage caused by fire, collapse, vandalism, malicious mischief, water damage, damage from rain, snow, sleet or ice, use of defective materials or methods in the construction of such capital project, and such other risks as the Beneficiary may reasonably require. The Grantor shall give the Beneficiary immediate notice of any loss covered by such casualty insurance, and the Trustees or the Beneficiary shall have the right to join the Grantor in adjusting any loss covered by an insurance policy.



Gunkova_054856

**1.4.2. Flood Insurance**. If at any time all or any portion of the Real Property is determined to be located in an area designated as having special flood or mudslide hazards by the Secretary of Housing and Urban Development or the Director of the Federal Emergency Management Agency, pursuant to the National Flood Insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1973, as amended, the Grantor shall obtain and thereafter shall maintain flood hazard insurance in the full insurable value of the Improvements to be constructed on the Real Property or the full amount of coverage available, if less than the full insurable value of the Improvements, naming the Beneficiary as first Beneficiary, under a standard deed of trust clause, and as the sole loss payee. The policy or policies of such flood insurance shall be delivered to and retained by the Beneficiary, and the Grantor shall provide the Beneficiary with receipts evidencing the payment of all premiums due on such policies. All insurance policies shall bear an endorsement prohibiting cancellation, material modification or termination, unless thirty (30) calendar days' prior written notice thereof is provided to the Beneficiary.

**1.4.3. Liability Insurance**. The Grantor shall obtain and maintain public liability and property damage insurance in such amounts, with such insurance companies, and upon policy forms acceptable to and approved by the Beneficiary, but, in any event, in an amount of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate as to liability for personal injury. The Grantor shall supply the Beneficiary with a copy of the aforesaid liability insurance policy and receipts evidencing the payment of premiums due thereon or, alternatively, a certificate from the insurance company certifying to the existence of such a policy summarizing the terms of the policy, and indicating the payment of premiums due thereon. The Beneficiary shall be named as an additional insured under the aforementioned liability insurance policy.

**1.4.4. Workers Compensation Insurance**. Grantor shall maintain, at all times, workmen's compensation insurance to the fullest extent required by the laws of the Commonwealth of Virginia, which insurance shall cover all employees of the Grantor for which such coverage is required. During the construction, repair, restoration or replacement of improvements on the Secured Property, the general contractor will maintain workmen's compensation insurance to the fullest extent required by the laws of the Commonwealth of Virginia, which insurance shall cover all employees of the general contractor for which such coverage is required.

**1.4.5. Business Interruption Insurance.** The Grantor shall obtain and at all times maintain business interruption insurance, including without limitation coverage for loss of rental income, in amounts satisfactory to the Beneficiary.

**1.4.6. Other Insurance**. The Grantor shall carry such other insurance relating to the Secured Property as may be reasonably required by the Beneficiary.

1.4.7. **General Requirements Applicable to Casualty, Business Interruption and Flood Insurance.** No policy of casualty, business interruption or flood insurance shall be subject to an aggregate loss deductible which exceeds any amount designated by the Beneficiary as the permitted deductible with respect thereto. Duplicate originals or certified

true copies of all policies of casualty insurance, business interruption insurance and, if applicable, flood insurance, shall be delivered to and retained by the Beneficiary. The Grantor shall provide the Beneficiary with receipts evidencing the payment of all premiums due on such policies. The Beneficiary shall be named under each such policy as first mortgagee, under a standard mortgage clause, and as sole loss payee. All casualty, business interruption and flood insurance shall be written on forms which are satisfactory to the Beneficiary, and which bear an endorsement prohibiting cancellation, material modification or termination, unless thirty (30) calendar days prior written notice thereof is provided to the Beneficiary. Promptly after any insured loss, the Grantor shall give the Beneficiary notice of the same and the Beneficiary shall have the right to join the Grantor in adjusting any claims resulting from such loss. The proceeds arising from any insured loss shall be payable to the Beneficiary, to be applied in accordance with this Deed of Trust. The Grantor shall not take out separate casualty, business interruption or flood insurance concurrent in form or contributing in the event of loss with that required to be maintained pursuant to the foregoing paragraphs of this section unless the Beneficiary is included thereon as first mortgagee and sole loss payee, as required above, with losses payable as provided above. The Grantor shall give the Beneficiary prior notice of its obtaining any such separate casualty, business interruption or flood insurance and shall promptly deliver duplicate originals or certified copies of such policy or policies to the Beneficiary.

**Section 1.5. __Escrow__.** After the occurrence of an Event of Default, the Beneficiary, at any time or from time to time, upon notice to the Grantor, may require the deposit by the Grantor with the Beneficiary, at the time of each payment of an installment of interest, of principal, or of principal and interest under the Note, of an additional amount sufficient to discharge the obligations of the Grantor for: (a) the payment of taxes, assessments, levies, fees, rents, and other public charges imposed upon or assessed against the Secured Property or the revenues, rents, issues, income, or profits thereof, as provided in Section 1.3; or (b) the payment of the premiums for fire, casualty and other hazard insurance, and flood insurance, as provided by Section 1.4, for the purpose of providing a fund to assure the payment of the aforesaid expenses when and as they come due. The determination of the amount so payable and of the fraction or part thereof to be deposited with the Beneficiary, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by the Beneficiary in its sole, absolute and subjective discretion. Such amounts shall be applied to the payment of the obligations in respect to which such amounts were deposited or, at the option of the Beneficiary, to the payment of such obligations in such order of priority as the Beneficiary shall determine, on or before the date they become delinquent. If the Beneficiary determines prior to the due date of any of the aforementioned obligations that the amount then on deposit shall be insufficient for the payment of such obligations in full, the Grantor, within ten (10) calendar days after demand, shall deposit the amount of the deficiency with the Beneficiary. The contrary notwithstanding, the Beneficiary shall retain the right under the provisions of this Deed of Trust to pay any such amount and to add the amount so paid, together with interest at the highest default rate provided in the Note, to the Obligations.

**Section 1.6. __Advancements__.** If the Grantor fails to perform any of the covenants contained in this Deed of Trust or to protect or preserve the Secured Property or the status and priority of the lien and security interest of this Deed of Trust, the Trustees or the Beneficiary, after

five (5) business days advance notice, may make advances to perform the same on behalf of the Grantor or to protect or preserve the Secured Property or the status and priority of the lien and security interest of this Deed of Trust, and all sums so advanced shall immediately upon advancement become a lien and security interest upon the Secured Property and shall be secured by this Deed of Trust. The Grantor shall repay on demand all sums so advanced on the Grantor's behalf, plus any reasonable expenses or costs incurred by the Trustees or the Beneficiary, including reasonable attorney's fees, with interest thereon at the default rate provided in the Note. The provisions of this Section shall not be construed to prevent the institution of foreclosure or other rights and remedies of the Trustees upon the occurrence of an Event of Default by the Grantor. The contrary notwithstanding, the authorization contained in this Section shall impose no duty or obligation on the Trustees or the Beneficiary to perform any action or make any advancement on behalf of the Grantor and is for the sole benefit and protection of the Beneficiary.

**Section 1.7. Condition And Use Of Improvements**. The Grantor shall not abandon the Secured Property at any time, nor commit any waste on the Secured Property, nor make any change in the use of the Secured Property which will in any way increase any ordinary fire or other hazard insurance risk arising out of the operation of, or the construction of Improvements on, the Secured Property. The Grantor shall maintain and keep the Secured Property in good operating order and condition at all times and shall promptly make, from time to time, all repairs, renewals, replacements, additions, and improvements in connection therewith which are needed or desirable. The Grantor shall comply fully and strictly with all statutes, ordinances, rules, regulations, or laws affecting the Secured Property or the use thereof. The Improvements shall not be removed, demolished or substantially altered without the prior written consent of the Beneficiary. The Grantor shall permit the Trustees or the Beneficiary, or their agents or employees, at all reasonable times to enter and inspect the Secured Property.

**Section 1.8. Title To Secured Property: Liens**. The Grantor as of the date hereof has, and at all times during the term of this Deed of Trust shall maintain, good and marketable title to the Secured Property free and clear of any and all liens, charges, restrictions, encumbrances, security interests and adverse claims whatsoever, excepting any liens, charges, restrictions, encumbrances or security interests which: (a) are set forth in any title insurance policy issued in favor of, and approved by, the Beneficiary with respect to the Real Property; (b) are expressly permitted by the provisions of this Deed of Trust; or (c) are otherwise expressly consented to in writing by the Beneficiary.

**Section 1.9. Transfer Or Encumbrance**. Title to all or any portion of the Secured Property shall not be acquired by any Person, individual, partnership, association, or corporation, other than the Grantor, by voluntary or involuntary conveyance, transfer, grant or assignment, by operation of law, or in any other manner, or become encumbered or charged with a lien or security interest of any kind or variety, excepting mortgages or deeds of trust disclosed in writing to and approved in writing by the Beneficiary, whether voluntary or involuntary, including any mechanic's or materialman's lien or judgment lien, senior, junior, or of equal priority to the lien and security interest of this Deed of Trust, without the prior written consent of the Trustees or the Beneficiary. The direct or indirect transfer or pledge of any ownership interest in the Grantor without the prior written consent of the Trustees or the Beneficiary shall constitute a prohibited

transfer hereunder. The contrary notwithstanding, if the ownership of the Secured Property becomes vested in a Person, individual, partnership, association, or corporation other than the Grantor, the Trustees or the Beneficiary may, without notice to the Grantor, deal with such successor or successors in interest with reference to this Deed of Trust and the Indebtedness secured by it in the same manner as with the Grantor, and any extension of the time of the Indebtedness or any other modifications of the terms of the Indebtedness at the instance of the then owner of the Secured Property shall not relieve the Grantor of the Grantor's liability on the Note hereby secured or from the performance of any of the covenants and agreements contained herein or any of the covenants, terms, conditions, provisions, representations, or warranties contained in the Loan Documents, whether the extension or modification be made with or without the consent of the Grantor.

**NOTICE: THE SECURED INDEBTEDNESS IS SUBJECT TO ACCELERATION OR CALL IN FULL IN THE EVENT OF THE SALE, CONVEYANCE, TRANSFER OR OTHER ASSIGNMENT OF THE SECURED PROPERTY OR ANY PART THEREOF IN VIOLATION OF THIS DEED OF TRUST.**

**Section 1.10. Condemnation.** The Grantor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Secured Property or any portion thereof, shall notify the Trustees and the Beneficiary of the pendency of such proceedings. The Trustees or the Beneficiary may participate in any such proceedings and the Grantor from time to time shall deliver to the Trustees or the Beneficiary all instruments requested by them to permit such participation. In the event of such condemnation proceedings, the award or compensation payable is hereby assigned and shall be paid to the Beneficiary for application to and reduction of the Indebtedness, at the non-default rate of interest provided in the Note, regardless of the rate of interest payable on the award by the condemning authority. The Trustees or the Beneficiary shall be under no obligation to question the amount of any such award or compensation and may accept the same in the amount in which the same shall be paid. In any such condemnation proceedings, the Trustees or the Beneficiary may be represented by counsel selected by them at the Grantor's sole expense.

**Section 1.11. Future Advances.** Pursuant to the terms of the Loan Documents, the Beneficiary may make future advances to the Grantor and may advance or readvance funds to the Grantor and all such future advances and readvances shall be fully secured by the lien and security interest of this Deed of Trust.

**Section 1.12. Estoppel Certificate.** The Grantor, upon written notice from the Beneficiary or the Trustees, shall deliver to the Beneficiary or the Trustees, within ten (10) calendar days of the giving of notice, a written statement, duly acknowledged, setting forth the amount of principal, interest, penalty, and other charges or assessments due the Beneficiary as of the notice date and whether any offsets or defenses exist against any of the same.

**Section 1.13. Zoning, Etc.; Restrictive Covenants.** The Grantor, in its use and operation of the Secured Property, shall comply fully with all applicable laws, rules and regulations of any federal, state, and local governmental authorities having jurisdiction over the Secured

Property, including but not limited to, all zoning, land use, and environmental laws, rules and regulations. The Grantor shall comply fully with all restrictions, covenants, easements, setbacks and other limitations on the use of the Secured Property contained in documents of public record.

**Section 1.14.** **Preservation Of Lien**. The Grantor shall take all steps and do all things necessary, convenient, or proper to establish, protect, preserve, and maintain the priority and status of the lien and security interest in the Secured Property established or intended to be established by this Deed of Trust, except and only to the extent the Beneficiary may have consented specifically and in writing to a senior lien or security interest.

**Section 1.15.** **Security Agreement**. This Deed of Trust also shall constitute a security agreement from the Grantor to the Beneficiary under the Virginia Uniform Commercial Code. In furtherance thereof, Grantor hereby grants and pledges to Beneficiary a continuing security interest in and to the following (collectively, the "Collateral"): (i) All building materials, appliances, leasehold improvements and equipment delivered to, installed in, affixed to, placed upon, or attached to the Real Property, including, but not limited to, the following: all buildings, machinery, engines, furnaces, boilers, stokers, pumps, heaters, incinerators, power equipment, laundry equipment, tanks, dynamos, motors, generators, switchboards, conduits, electrical equipment, heating, cooling, ventilating, air conditioning, lighting, incinerating and plumbing apparatus, compressors, elevators, escalators, shades, brackets, electric signs, bulbs, gas and electric equipment, fire prevention and extinguishing apparatus, plumbing fixtures, vacuum cleaning systems, floor cleaning, waxing, and polishing apparatus, call systems, fuel conveyors, other apparatus, mirrors, linoleum and other floor coverings, refrigerating and cooling apparatus and equipment, screens, screen doors, awnings, blinds, refrigerators, stoves, ranges and ovens, garbage disposals, dishwashers, washers and dryers, mantels, plants and trees, and any and all such property which is at any time hereafter installed in, affixed to, or placed upon the Real Property, and all replacements thereof, additions thereto, and substitutions therefor; (ii) All rents, issues, income, revenues, profits, accounts, and benefits from, under, and in connection with the Real Property; (iii) All awards heretofore or hereafter made by any public or quasi-public authority to the present or subsequent owners of the Real Property and the improvements now or hereafter existing thereon by virtue of (a) an exercise of the right of eminent domain by such authority, or right of access to a public way, (b) any change of grade of any street affecting the Real Property or (c) any other injury to or decrease in the value of the Real Property; (iv) all unearned hazard insurance premiums and insurance proceeds payable in connection with the Real Property and the improvements now or hereafter existing thereon; and (v) All documents, instruments, general intangibles, chattel paper, contract rights, inventory and accounts now owned or hereafter acquired by the Grantor and relating to or arising out of the Real Property or any contract of sale for the Real Property or any portions thereof, as such items of property may from time to time exist, together with all modifications accessions and substitutions therefor and proceeds therefrom.

Grantor also hereby grants and pledges to Beneficiary a continuing security interest in: (i) all proceeds (including insurance proceeds) and products of the above-described Collateral; (ii) any of Grantor's assets in which Beneficiary has been or is hereafter granted a security interest under any other security agreements, notes or other obligations or liabilities between Grantor and Beneficiary; (iii) any accounts, property, securities, Investment Property or monies of Grantor may



Gunkova_054861

at any time be maintained at, assigned to, delivered to, or come into possession of, Beneficiary, as well as all proceeds and products thereof; and (iv) all of the books and records pertaining to any of the above-described items of Collateral. Grantor further authorizes Beneficiary to file with the local and central filing offices such financing and continuation statements as may be required in the Beneficiary's sole opinion to perfect or continue as perfected the security interest created by this Deed of Trust.

**Section 1.16. Validity of Obligations, Etc.** The Grantor represents and warrants that (i) it has the power to enter into the Loan, to grant the Secured Property and the liens, assignments and security interests provided herein, and to execute and deliver the Note, this Deed of Trust and the other Loan Documents, (ii) it has taken all action necessary or appropriate to authorize the actions described in the preceding clause (i), and (iii) the Note, this Deed of Trust and the other Loan Documents constitute the valid and binding obligations of the Grantor, enforceable against the Grantor in accordance with their respective terms.

**Section 1.17. Status; Changes in Ownership.** The Grantor shall maintain in good standing and in full force and effect the Grantor's status as a validly constituted limited liability company under the laws of the state of its organization, and all rights and privileges incident thereto. There shall be no direct or indirect transfer or pledge of any ownership interest in the Grantor without the prior written consent of the Beneficiary.

**Section 1.18. Financial and Other Statements.** The Grantor shall provide the Beneficiary with the financial information required under the terms of the Loan Agreement.

**Section 1.19. Environmental Requirements**. The Grantor represents and warrants to the Trustees and the Beneficiary that, except for such de minimis amounts thereof as may be necessary in connection with the operation of the Improvements, no materials or substances previously have been or are now located in, on or near the Secured Property which, under federal, state, or local law, statute, ordinance or regulation, or court or administrative order or decree, or private agreement (collectively, "Environmental Requirements"), require special handling in collection, storage, treatment, or disposal. The Grantor shall not place or permit to be placed any such materials or substances in, on or near the Secured Property, and all Leases affecting the Secured Property shall contain a covenant to that effect. If at any time it is determined that there are materials or substances located in, on or near the Secured Property which, under any Environmental Requirement, require special handling in collection, storage, treatment, or disposal, the Grantor shall, within thirty (30) calendar days after written notice thereof, commence or cause to be commenced and diligently pursued to completion within thirty (30) calendar days thereafter, at the Grantor's sole expense, such actions as may be necessary to comply with all Environmental Requirements. If the Grantor fails to take such action, the Beneficiary may make advances or payments toward performance or satisfaction of the same but shall be under no obligation so to do; and all sums so advanced or paid, including all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, including without limitation reasonable attorney's fees, and fines or other penalty payments, shall be at once repayable by the Grantor and shall bear interest at the default rate provided in the Promissory Note, from the date the same shall become due and payable until the date paid, and all sums so advanced or paid, with

interest as aforesaid, shall become a part of the Indebtedness secured hereby. The Grantor shall indemnify and hold harmless the Trustees and the Beneficiary from all loss, liability, damage, cost and expense, including without limitation reasonable attorney's fees, for failure of the Secured Property to comply in all respects with all Environmental Requirements. The provisions of this section shall survive payoff, release, or foreclosure of this Deed of Trust. The Grantor, promptly upon the written request of the Beneficiary from time to time, shall provide the Beneficiary from time to time with an environmental site assessment or report, all in scope, form, and content satisfactory to the Beneficiary. The Beneficiary, or its designated agent, upon providing the Grantor with an advance written notice, may interview any or all of the Grantor's agents and employees regarding environmental matters, including any consultants or experts retained by the Grantor, all of whom are directed to discuss environmental issues fully and openly with the Beneficiary or its designated agent and to provide such information as may be requested. All of the costs and expenses incurred by the Beneficiary with respect to the audits, tests, inspections, and examinations which the Beneficiary may conduct, including the fees of the engineers, laboratories, and contractors, shall be paid by the Grantor. The Grantor shall remain liable hereunder regardless of any other provisions hereof which may limit Grantor's liability.

**Section 1.20. Assignment Of Leases And Rents**. The Grantor assigns to the Beneficiary all Leases and rents of the Real Property, independent of whether a receiver is appointed or not; provided, however, that nothing herein shall obligate the Beneficiary to perform any of the Grantor's duties or obligations under any Lease or shall entitle any Lease to continue in full force and effect after a foreclosure sale unless the Beneficiary has subordinated the lien of this Deed of Trust such that the foreclosure sale is subject to a Lease. The Grantor shall perform all of its obligations under all Leases of all or any portion of the Real Property in the manner and within the time specified in those Leases, and shall take all steps which may be required to preserve and maintain the liability of any lessee under any such Lease and the enforceability thereof. The Grantor shall notify the Beneficiary promptly of any defense or claim of non-liability, whether in whole or in part, by any such lessee, of which claim or defense the Grantor has knowledge. If the Grantor executes a separate assignment of Leases and rents for the benefit of the Beneficiary, the terms and conditions contained therein shall be incorporated by reference in this Deed of Trust and such terms and conditions control in the event of any inconsistency with the items and conditions contained herein regarding the assignment of Leases and rents.

**Section 1.21. Inspection**. The Trustees and the Beneficiary and their respective authorized representatives may enter onto the Secured Property or any part thereof at all reasonable times for the purposes of inspecting the same and to enforce any remedies upon the occurrence of an Event of Default hereunder. Neither the Trustees nor the Beneficiary, nor any of them, shall have any duty to make any such inspection nor shall any of them incur any liability or obligation for not making any such inspection.