BETHUNE BENES

**Bethany Benes**
**Attorney at Law**
(703) 260-9325 Direct
bbenes@bethunebenes.com

February 10, 2021

**VIA MAIL AND EMAIL**
Valeria V. Gunkova
2 Pidgeon Hill Drive, Suite 100
Sterling, Virginia 20165
vgunkova@gmail.com

***Re: BNG Group, LLC***

Dear Ms. Gunkova:

This firm and undersigned counsel represent Harry Kamin with regard to his ownership interest in BNG Group, LLC (hereinafter referred to as "**BNG**" and/or the "**Company**"). Please direct all future communications to me on behalf of Mr. Kamin.

First, it has come to Mr. Kamin's attention that the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165 has been marketed and listed for sale by the Company. As a Manager and 50% Class A member of the Company, Mr. Kamin hereby demands that all such efforts cease and that no further action be taken without his prior knowledge and written consent. Please immediately confirm that you will comply with this demand and provide written documentation that such action has been taken.

Second, last week, Mr. Kamin requested access to the Company's bank account at TD Bank. It is my understanding that you refused Mr. Kamin's access. As a Manager and 50% Class A Member of the Company, Mr. Kamin has a right to access the account. Please immediately (i) take action with TD Bank to allow Mr. Kamin access to the Company account(s), (ii) add Mr. Kamin as an authorized signatory to the Company account(s); and (iii) supply the Company's online banking login and password information.

Finally, pursuant to Va. Code § 13.1-1028, Mr. Kamin hereby requests that you provide the following documents and information to Mr. Kamin within five (5) days of the date of this letter:



EXHIBIT
H

1. All governing documents of the Company for the last three years (2018, 2019, and 2020) to present, including but not limited to the Company's Articles of Organization, Operating Agreement, Amendments, meeting minutes, Notices, and voting records;

2. A current list of the full names and last known addresses for any person serving as an Officer, Director, Manager, President, Secretary, Treasurer, or Board Member for the Company, and all documents and communications related to the election of such persons serving;

3. A current list of the full names and last known addresses of each member of the Company, in alphabetical order;

4. A current list of the full names and last known addresses for each employee, independent contractor, or consultant hired by BNG and for which BNG has compensated, including the total amount paid to each such person or entity;

5. All financial records of the Company, including but not limited to a full accounting of the Companies' assets and expenses, profit and loss statements, balance sheets, accounts receivable ledgers, accounts payable ledgers, loan documents, capital contributions, and distributions;

6. All documents related to bank accounts held, whether individually or jointly, in the name of BNG, including but not limited to bank statements, ATM receipts, withdrawal receipts, deposit slips, checks, and wire transfers;

7. All tax records for the Company for the last three years (2018, 2019, and 2020), including but not limited to K-1s, 1099s, and tax returns;

8. All documents and communications related to the business of the Company, including an identification of the Company's business for the last three years to present;

9. All documents and communications related to any improvement made or anticipated to be made to the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165;

10. All documents and communications purportedly signed by Harry Kamin related to BNG;

11. All contracts entered into or anticipated to be entered into on behalf of BNG or relating to BNG;

12. All documents and communications related to the listing and marketing of the Company's building located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165;

13. The website to access, as well as login and password information, for the email address known as harry@bnggroupllc.com;

14. All communications and documents received by or sent by the email address known as harry@bnggroupllc.com; and
15. A current list of all email addresses created by you or any Company agent for Harry Kamin;

Please note that if this information is not supplied as requested in this letter, Mr. Kamin will be forced to take legal action to protect his interests, including but not limited to injunctive relief pursuant to Va. Code § 8.01-622, dissociation pursuant to Va. Code § 13.1-1040.1, and/or dissolution pursuant to Va. Code § 13.1-1046. Should legal action be required, Mr. Kamin will seek costs and attorney's fees. Mr. Kamin reserves all rights.

If you should have any questions or want to discuss this matter further, please do not hesitate to contact me. I look forward to receiving the information requested above and working with you in this matter.

Sincerely,

Bethany Benes

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

# OF

# Skin Logic LLC

A Virginia Limited Liability Company

THE MEMBERSHIP INTERESTS IN SKIN LOGIC, LLC HAYE NOT BEEN **REGISTERED** UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE **WITE ALL** APPLICABLE SECURITIES LAWS. THE MEMBERSHIP INTERESTS ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER UNDER THIS AGREEMENT.

EXHIBIT

I

EAGLEBANK 0743

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
OF
**Skin Logic LLC**

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is made as of this 10 day of April 2010 by, between and among individuals undersigned individuals whose names are set forth on the signature pages hereto and whose names and addresses appear on Exhibit "A" attached hereto. For purposes of this Agreement, the foregoing parties are further referred to each as a "Member" and collectively as the "Members."

## BACKGROUND

**The Members formed SKIN LOGIC, LLC**
(the "Company") as a Virginia limited liability company under the Virginia Limited Liability Company Act by filing a Certificate of Organization with the Department of State of the Commonwealth of Virginia on 07 day of April 2010. The Members intend this Agreement to set forth the rights and obligations of each of the Members regarding the Company and each other and to provide for the management and operation of the Company.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the legal sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## Section I.
## Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) The deficit shall be decreased by the amounts which the Member is obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii) The deficit shall be increased by the items described in Regulation Section I.704-(b)(2)(ii)-(d)(4), (5), and (6).

Adjusted Capital Balance means, as of any day, a Member's total Capital Contributions less all amounts actually distributed to the Member pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

Affiliate means, with respect to any Member, any Person: (i) in which the Member owns or controls more than thirty-three and one-third percent (33 1/3%) of the voting interests; or (ii) in which more than thirty-three and one-third percent (33 1/3%) of the voting interests are owned or controlled by a Person who has a relationship with the Member described in clause (i) above.

Agreement means this Agreement, as amended from time to time.

Capital Account means the account to be maintained by the Company for each Member in accordance with the following provisions:

(i) A Member's Capital Account shall be credited with the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to the Member), the Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii) A Member's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or which are secured by property contributed by the Member to the Company), the Member's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Member pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

Capital Contribution means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed by the Company or to which the assets are subject.

Capital Proceeds means the gross receipts received by the Company from a Capital Transaction.

Capital Transaction means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, finances, refinances, condemnations, recoveries of damage awards and insurance proceeds.

Cash Flow means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements and replacements as determined by the Board of Managers. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

Class means a group of Members that comprises the Class A

The Members, subject to the terms of Section 5.1.6 below, may provide for the creation of additional Classes of Members having such relative rights, powers and duties as the Members, in their discretion, may determine, including but not limited to, rights, powers and duties senior to any existing Class of Members.

Code means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

Company means the limited liability company formed in accordance with this Agreement.

Interest means a Person's interest as a Member in the Company including, without limitation, the Member's share of the Profits and Losses of, and the right to receive distributions from, the Company, and to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Law.

Involuntary Withdrawal means, with respect to any Member, the occurrence of any of the following events:

(i) The Member makes an assignment for the benefit ofcreditors;

(ii) The Member files a voluntary petition of bankruptcy;

(iii) The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v) The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(Yii) Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief undei any statute, law or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) The Member's death, Permanent Disability (as hereinafter defined) or adjudication by a court of competent jurisdiction that the Member is incompetent to manage the Member's person or property;

(ix) A Member's ceasing to be eligible to own an interest in a Virginia limited liability company;

(x) A Member's ceasing to meet the ownership standards set forth at Section 3.3;

(xi) A Member's loss of his or her Virginia medical license;

(xii) A material breach by a Member of a Member's obligation hereunder which is not cured within thirty (30) days of Member's receipt of notice thereof; or

Law means the Virginia Limited Liability Company Law of 1994, 15 Virginia Consolidated Statutes, Chapter 89, and its provisions pertaining to limited liability companies, as amended from time to time.

Manager or Board of Managers means the Person or Persons designated as such in Section V as the same may be changed from time to time.

Member means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

Minimum Gain has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under Code Section 704(b).

Negative Capital Account means a Capital Account with a balance of less than zero.

Nonrecourse Deductions has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section I.704-2(c).

Nonrecourse Liability means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

Percentage means, as to a Member, the percentage Interest set forth after the Member's name on Exhibit "A" or Exhibit "B", as applicable, as amended from time to time.

Permanent Disability means a Member's inability to engage in the practice of medicine for twelve (12) consecutive months on account of disability or other illness.

Person means and includes any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

Positive Capital Account means a Capital Account with a balance greater than zero.

Profit and Loss mean, for each taxable year of the Company (or other period for which Profit **or Loss** must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) In lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

RegulationJs) mean the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

Transfer means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer of the Interest held by any Member as permitted under this Agreement; and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer a Member's Interest as permitted under this Agreement.

Uni_(s_)t means units of ownership Interests of Members in the Company as reflected on Exhibits "A" and "B" attached hereto.

Voluntary Withdrawal means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

**Section II.**
**Formation and Name: Office, Purpose; Term**

2.1 Organization. The Company has been organized as a Virginia limited liability company pursuant to the Law and the provisions of this Agreement and has caused the Certificate of Organization in the form attached as Exhibit "C" to be executed and filed with the Virginia Department of State on 7 day of April, 2010

**2.2 Name of the Company. The name of the Company is "[SKIN LOGIC LLC]"** The Company may do business under any other name or names which the Board of Managers selects from time to time.

2.3 Purposes. The Company is organized to (i) management services and other related products and services; (ii) to make, enter into, and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes; and (iii) to engage in such other lawful businesses and activities as the Managers may determine are reasonably related to the foregoing purposes.

2.4 Term. The existence of the Company commenced on the date the Certificate was filed with the Department of State of the Commonwealth of Virginia pursuant to Section 8914 of the Law. The Company shall dissolve on the first to occur of the following events: (a) the decision by the Members to dissolve the Company; or (b) the date the Company may be otherwise dissolved by operation of law or judicial decree.

2.5 Registered Office; Principal Office. The initial registered office of the Company in the Commonwealth of Virginia shall be located at 2 Pidgeon Hill Dr Suite 120, Sterling VA

20165, or such other location as the Board of Managers may designate from time to time in the manner provided by law.

**Section III.**
**Members; Member Rights and Requirements;**
**Capltal; Capital Accounts; Unit Certificates**

3.1 Members. The name, present mailing address, number of Units and Percentage of each initial Member are set forth on Exhibits "A" and "B" attached hereto.

3.2 Votine Rights, Each Member shall have voting rights on all matters required to be voted upon by the Members as stated in Section 5.3.3.

3.3 Left empty

3.4 Initial Capital Contributions. The Company seeks 100,000 Thousand Dollars ($100,000) of initial capital contributions from its Class A Member. The capital shall be contributed to the Company by the Members within time frames to be established by the Board of Managers, in exchange for which the Members will receive their Interests as set forth on Exhibits "A" and "B" hereto. The capital contributions may, as permitted by the Board of Managers, be made in the form of contributed property.

3.5 Contribution; Combined Disclosure Memorandum and Subscription Agreements. Prior to or simultaneously with the execution of this Agreement, the Members shall execute the Combined Disclosure Memorandum and Subscription Agreement attached hereto as Exhibits "D" and "E".

3.6 Additional Capital Contributions. If, pursuant to Section V of this Agreement, the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions, then each Member shall contribute his or her share of additional Capital Contributions; provided, however, that the Board of Managers may only request additional Capital Contributions four times in any twelve (12) month period. If the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions on more than (4) occasion in any twelve (12) month period, then the Members shall determine by a majority vote pursuant to Section 5.3.2 whether to require additional Capital Contributions from the Members. A Member's share of the additional Capital Contributions shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contributions so approved by the Board of Managers. Within sixty (60) days after the Board of Managers has determined the amount of additional Capital Contributions required, each Member shall pay the Member's share, in readily available funds, to the Company.

3.6.1 Personal Liability. Except as set forth above, no Member shall be required to contribute any additional capital to the Company, and no Member shall haxe any personal liability for any obligation of the Company, excepting those liabilities specified herein or accepted in writing outside of this Agreement by any respective Member.

3.6.2 Failure to Contribute Additional Capital. If a Member fails to pay when due all or any portion of any Capital Contribution, such Member shall be deemed to have forfeited a proportionate Percentage Interest in the Company and the non-defaulting Members of such Member's Class shall, on a pro rata basis, pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution"). The Interest of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Interest is equal to a fraction (expressed as a percentage), the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Members, and the defaulting Member's Interest shall be decreased accordingly. The Board of Managers shall amend Exhibit "A" or "B", as applicable, accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.7 No Interest on Capital Contributions. Members shall not be paid interest on their Capital Contributions.

3.8 Return of Capital Contributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.

3.9 Capital Accounts. A separate Capital Account shall be maintained for each Member.

3.10 Loans. Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Board of Managers and the Members agree.

3.11 Units and Unit Certificates. The Units into which the aggregate Interest in the Company has been divided shall be represented by certificates ("Unit Certificates"). Initially, each Class A Member shall obtain one Unit for each Fifty Thousand Dollars ($50,000) of capital contributed by the Class A Member. Unit Certificates designating the number of Units owned shall be issued to the Class A Members.

3.11.1 Formality of Certificates. The Unit Certificates shall be in such form as is approved by the Board of Managers, and shall state that the Company is organized under the laws of the Commonwealth of Virginia, the name of the person to whom issued, and the number of Units that the Unit Certificate represents. The Unit register or transfer books and unissued Unit Certificates shall be kept by the Board of Managers.

3.11.2 Registration of Certificates. The Unit Certificates of the Company shall be numbered and registered in the Unit register or transfer books of the Company as they are issued. They shall be signed by the President or a Vice President of the Company.

3.12 Guaranty of the Company's Debts and Obligations. The debt incurred by the Company at the commencement of its operation shall, as required by any lender to the Company, be guaranteed personally by each Member on a pro rata basis. No Member may refuse to execute the documents reasonably required by a lender to effect such guaranty. In the event the

Company incurs debt subsequent to the commencement of the operation and a guaranty is required by the lender, the Company must obtain the agreement of a majority of the Interests of each ClassAefore a Member will be required to execute additional guarantees.

**Section IV.**
**Profit, Loss and Distributions**

4.1 Distributions of Cash Flow and Allocations of Profit or Loss Other Than From Capital Transactions.

4.1.1 Profit or Loss Other Than from a Capital Transaction. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Members in proportion to their Percentages.

4.1.2 Cash Available for Distribution. The Board of Managers shall determine whether all or a portion of the Cash Flow, if any, for each taxable year of the Company shall be distributed to the Members. Any distribution of Cash Flow to the Members shall be in proportion to the Members' Percentages and at such times as the Board of Managers may determine. To the extent practicable, all distributions made to Members shall be made in a manner to allow the income tax attributable to the income passed through and taxed to Members for a taxable year to be paid when due.

4.2 Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.

4.2.1 Profit. After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1 If one or more Members has a Negative Capital Account, to those Members, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been increased to zero.

4.2.1.2 Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Members in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 4.2.3.4.1 and 4.2.3.4.3.

4.2.1.3 Any Profit in excess of the foregoing allocations shall be allocated to the Members in proportion to their Percentages.

4.2.2 Loss. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:



EAGLEBANK 0752

4.2.2.1 If one or more Members has a Positive Capital Account, to those Members, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2 Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Members in proponion to their Percentages.

4.2.3 Capital Proceeds. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Member); then

4.2.3.3 To the establishment of any reserves which the Board of Managers deems necessary for liabilities or obligations of the Company; then

4.2.3.4 The balance shall be distributed as follows:

4.2.3.4.1 To the Members in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2 If any Member has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Members in proportion to their Positive Capital Accounts; then

4.2.3.4.3 The balance, to the Members in proportion to their Percentages.

4.3 Regulatory Allocations.

4.3.1 Qualified Income Offset. No Member shall be allocated Losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives (I) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a *pro rata* portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.

This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the qualified income offset provisions of the Regulations promulgated under Section 704(b) of the Code.

4.3.2 Minimum Gain Charee Back. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a *pro rata* portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a minimum gain charge back under Regulation Section I.704-2(f).

4.3.3 Contributed Property and Adjusted Book Value. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Board of Managers shall determine the applicable method of applying Code Section 704(c) and the Regulations thereunder.

4.3.4 Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5 Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Percentages.

4.3.6 Member Loan Nonrecourse Deductions. Any Member loan nonrecourse deduction for any taxable year or other period shall be specially allocated to the Member who bears the risk of loss with respect to the loan to which the Member loan nonrecourse deduction is attributable in accordance with Regulation Section I.704-2(i).

4.3.7 Guaranteed Payments. To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.4 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8 Unrealized Receivables. If a Member's Interest is reduced (provided the reduction does not result in a complete termination of the Member's Interest), the Member's share of the Company's unrealized receivables and substantially appreciated inventory (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specially allocated among the Members in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Board of Managers.

4.3.9 Withholding. All amounts required to be withheld pursuant to Code Section 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

4.4 Liquidation and Dissolution.

4.4.1 Distribution Upon Liquidation. If the Company is liquidated, the assets of the Company shall be distributed to the Members in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2 Negative Capital Account. No Member shall be obligated to restore a Negative Capital Account.

4.5 General.

4.5.1 Timing and Amount of Distributions. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Board of Managers.

4.5.2 Fair Market Value. If any assets of the Company are distributed in kind to the Members, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common

with all other Members so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Board of Managers. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Members prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3 Profit and Loss. All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each was a Member during the taxable year; provided, however, the Company's taxable year shall be segregated into two (2) or more segments 3n order to account for Profit, Loss or proceeds attributable to a Capital Transaction or to any otherextraordinary nonrecurring items of the Company.

4.5.4 Amendment. The Board of Managers is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to a Member without the Member's prior written consent.

**Section V.**
**Management: Rights, Powers and Duties**

5.1 Management.

5.1.1 Officers. The Board of Managers shall, by a majority vote, elect the officers of the Company. The officers of the Company shall be a President, a Secretary and a Treasurer. In addition, the Board of Managers may elect one or more Vice Presidents. The President, Treasurer, Vice President and Secretary shall be Members of the Company and shall serve for a term of two (2) years. The officers may be compensated by the Company in such amount as determined by the Board of Managers from time to time. The officers shall be elected and removed in accordance with the following:

5.1.1.1 Upon the death, disability, resignation, removal or retirement of an officer, or at the end of the term as set forth in Section 5.1.1 hereof, the successor officer shall be elected by a majority vote of the Board of Managers. An officer may be removed with or without cause by a majority vote of Board of Managers of Company; provided that the Members simultaneously replace the removed officer with another qualified individual in accordance with the provisions of this Section 5.1.1.

5.1.1.2 The President shall be responsible for conducting all meetings of the Members and for performing the functions set forth in this Section 5.1.1.2. The responsibility for the day-to-day management and operation of the Company's shall bedelegated

to the President by the Board of Managers. Furthermore, the President may authorize an expenditure of up to Ten Thousand Dollars ($10,000) without the approval of the Board of Managers. Notwithstanding the foregoing, in the event the Board of Managers hires a Person to act as the chief executive officer (the "CEO") of the Company's then the Board of Managers, in its discretion, may delegate to the CEO some or all of the duties, authority and responsibility previously delegated to the President.

5.1.1.3 The Treasurer shall have custody of all funds and securities of the Company which may come into his or her hands. When necessary or proper (unless otherwise ordered by the Board of Managers) he or she shall (a) endorse for collection on behalf of the Company checks, notes and other obligations, (b) deposit the same to the credit of the Company in such banks or depositories as the Board of Managers may designate and (c) sign all receipts and vouchers for payments made by the Company. The Treasurer shall, at all reasonable times, exhibit his or her books and accounts to the Board of Managers of the Company upon the request of any Manager, and he or she shall also, if so directed by the Board of Managers, annually prepare and submit to the Annual Meeting of Members a full statement of the assets and liabilities of the Company and of its transactions during the preceding year, and shall have such other powers and shall perform such other duties as may be assigned to him or her from time to time by the Board of Managers. The Treasurer shall give such bond for the faithful performance of his or her duties as may be required by the Board of Managers. Notwithstanding the foregoing, in the event the Board of Managers hires a Person to act as the CEO of the Company's, then the Board of Managers, in its discretion, may delegate to the CEO some or all of the duties, authority and responsibility previously delegated to the Treasurer, including without limitation the day-to-day functions related to the finances of the Company and authority to sign checks on the Company's account, provided that the CEO shall inform the Treasurer on a regular basis of all financial matters and transactions of the Company which are carried out within the scope of the Board's delegation.

5.1.1.4 The Secretary shall keep the minutes of all meetings of the Members and of the Board of Managers in proper books to be kept for such purpose and shall attend to the giving of all notices by the Company, including notices of meetings of Members and of the Board of Managers. The Secretary shall have charge of the Unit Certificate register, transfer books and such other books and papers as the Board of Managers may direct. The Secretary shall in general perform all the duties incident to the office of Secretary and have such other powers and perform such other duties as may be assigned to him or her by the Board of Managers.

5.1.1.5 The Vice President, if any, shall serve as President in the President's absence and shall perform such other functions as the Board of Managers fromtime to time directs.

5.1.2 <u>Director</u>. The Board of Managers may, by a majority vote, select a director ("Director") who shall be responsible for performing the functions set forth in Section 5.1.2.3 hereof. The Director, if any, shall serve as Director for a term of two (2) years or for such other period of time specified in a contract between the Director and the Company as

authorized by the Board of Managers (the "I Director Agreement). The Director shall be a Member of the Company.

5.1.2.1 Upon the death, disability, resignation or retirement of the Director, or at the end of the term as set forth in Section 5.1.2 hereof, the successor Director shall be selected by a majority vote of the Board of Managers. A Director may serve consecutive terms provided that he or she is selected in accordance with this Section 5.1.2.1.

5.1.2.2 Except as otherwise provided in this Agreement, the duties, authority and responsibility of the Director shall be set forth in the Director Agreement. The Director shall be compensated by the Company in an amount determined by the Board of Managers and set forth in the Director Agreement. The Director may from time to time temporarily delegate his or her duties hereunder to a Physician of the Director's choice who meets the qualifications set forth in Section 5.1.2.2 hereof.

5.1.2.3 The Director may be removed with or without cause by a majority vote of the Board of Managers.

5.1.3 <u>Board of Managers.</u> The Company shall be managed by a Board of Managers consisting of four (2) voting Board members (each a "Manager" and collectively the "Managers") with two (2) Managers elected from the Class A Member.

5.1.3.1 Each Manager shall have one (1) vote on matters coming before the Board of Managers on which a vote is required.

5.1.3.2 Each Manager shall hold office until the next annual meeting of Members and until such Manager's successor shall have been elected and qualified, or until such Manager's earlier death, resignation or removal.

5.1.3.3 The two (2) Class A Members receiving the largest number of votes from among all Class A Members shall serve on the Board of Managers.

5.1.4 <u>General Powers</u>. The Board of Managers shall have full, exclusive and complete discretion, power and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:

5.1.4.1 Acquire by purchase, lease or otherwise, any real or personal property, tangible or intangible;

5.1.4.2 Construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property;

5.1.4.3 Sell, dispose, trade or exchange Company assets in the ordinary course of the Company's business;

5.1.4.4 Enter into agreements and contracts and to give receipts, releases and discharges;

5.1.4.5 Purchase liability and other insurance to protect the Company's properties and business;

5.1.4.6 Borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments authorizing the confession of judgment against the Company;

5.1.4.7 Execute or modify leases with respect to any part or all of the assets of the Company;

5.1.4.8 Prepay, in whole or in part, refinance, amend, modify or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

5.1.4.9 Execute any and all other instruments and documents which may be necessary or, in the opinion of the Board of Managers, desirable to carry out the intent and purpose of this Agreement;

5.1.4.10 Make any and all expenditures which the Board of Managers, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization, financing and operation of the Company;

5.1.4.11 Prepare annual budgets;

5.1.4.12 Enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company;

5.1.4.13 Invest and reinvest Company reserves in short-term instruments or money market funds; and

5.1.4.14 Designate those Persons authorized to sign checks on behalf of the Company and impose whatever restrictions on that authority as the Board of Managers deems appropriate.

5.1.5 Transactions Requiring Approval of the Class A Members. Notwithstanding anything to the contrary in this Agreement, the Board of Managers shall not undertake any of the following without the approval of at least fifty-one percent (51%) of the Interests of the Members:

5.1.5.1 Any change in the legal form of the Company, or the dissolution or liquidation of the Company, or any declaration of bankruptcy by the Company, or any merger, consolidation or other business combination involving the Company or any other fundamental change of the Company;

5.1.5.2 Any sale, lease, license, assignment, transfer or other disposition of all or a substantial portion of the assets of the Company or of any significant assets of the Company or any other sale, lease, license, transfer or disposition outside of the ordinary course of business;

5.1.5.3 Any modification, amendment, waiver or change in the Certificate of Organization or this Agreement;

5.1.5.4 The entering into or termination of any agreement (other than a termination of an agreement which occurs on its own terms) with any Member or Members, or a practice entity with which any Member is affiliated, or any material amendment, modification, supplement or extension thereof or any waiver or release of material rights thereunder;

5.1.5.5 The admission or creation of any new Class or any new Member to a Class, or the authorization, designation or reclassification of any Interest or of any other equity interest in the Company or the conversion or exchange of debt or other obligations into any Interest or any other equity interest in the Company; it being undefstood that the admission of a new Member to a Class or a new Class of Members will result in a pro rata dilution of each Member's and each Class's Interest, respectively; and

5.1.5.6 Any other matter determined by the Managers to be added to this Section 5.1.5.

5.1.6 Extraordinary Transactions. Notwithstanding anything to the contrary in this Agreement, the Board of Managers shall not undertake any of the following without the unanimous approval of the Members:

5.1.6.1 Any act in violation of Section 8942 of the Law; or

5.1.6.2 Any act which would impose personal liability on any Member in excess of the obligations to make additional Capital Contributions set forth in Section 3.6.

5.1.7 Limitation on Authority of Members.

5.1.7.1 No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.7.2 This Section 5.1 supersedes any authority granted to the Members pursuant to Section 8941 of the Law. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.8 Resignation of Manager. In the event a Manager resigns from the Board of Managers, replacement of such Manager to complete the term of the resigning Manager shall be determined in the same manner as set forth in Section 5.1.3 hereof.

5.1.9 Removal of Manager. The Class Member(s) may, at any time and from time to time and for any reason, by the affirmative vote of those Class Members holding at least fifty-one percent (51%) of the Class Interests, remove a Manager for that respective Class and elect or appoint a new Manager in the same manner as set forth in Section 5.1.3 hereof.

5.2 Meetings of the Board of Managers and Voting by Managers.

5.2.1 Regular Meetings of the Board of Managers. Regular meetings of the Board of Managers shall be held on such days and at such time on those days as determined bya majority of the Managers.

5.2.2 Special Meetings of the Board of Managers. A special meeting of the Board of Managers may be called at any time by the President, the Secretary or by two (2) or more of the Managers. Meetings of the Board of Managers shall be held at the Company's principal place of business or at such time and place as designated by the Board of Managers. Not less than five (5) nor more than fifteen (15) days before each meeting, those who call the meeting shall give written notice of the meeting to all Managers of the Company. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Manager who is entitled to notice waives notice if before or after the meeting the Manager signs a waiver of the notice which is filed with the records of Board of Managers' meetings, or is present at the meeting in person or by proxy.

5.2.3 Quorum for Meetings of the Board of Managers. A quorum shall be deemed present if there is a majority of Managers then in office present at the meeting.

5.2.4 Voting. Managers may vote either in person, by means of conference telephone or similar communications equipment by means of which all persons participating in such meeting can hear each other or by written proxy signed by the Manager or by his or her duly authorized attorney-in-fact; provided, however, that a Manager may give his or her proxy only to another Manager of the Company. Except as otherwise provided in this Agreement, the

affirmative vote of a majority of all of the Managers shall be required to approve any matter coming before the Board of Managers.

5.2.5 Written Consent. In lieu of holding a meeting, the Board of Managers may vote or otherwise take action by a written instrument indicating the unanimous consent of the Managers.

5.2.6 Unanimous Consent. Except as otherwise provided in this Agreement, wherever the Law or this Agreement requires unanimous consent by the Board of Managers to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of all Managers.

5.3 Meetings of Members and Voting by Members.

5.3.1 Regular Meetings of the Members. Regular meetings of the Members shall take place annually or more frequently as determined by the Board of Managers. Meetings of Members shall be held at the Company's principal place of business or at any other place in the Commonwealth of Virginia designated by the Board of Managers. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding at least fifty-one percent (51%) of the Interests then held by the Members constitutes a quorum. Members may vote either in person or by written proxy signed by the Member or by his or her duly authorized attorney-in-fact.

5.3.2 Special Meetings of the Members. A special meeting of the Members may be called at any time by the Board of Managers or by those Members holding at least thirty percent (30%) of the Interests then held by the Members. Meetings of Members shall be held at the Company's principal place of business or at such time and place as designated by the Board of Managers. Not less than five (5) nor more than forty-five (45) days before each meeting, the Board of Managers or Secretary shall give written notice of the meeting to each Member of the Company. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy.

5.3.3 Voting. At a properly called meeting of the Members, each Member shall have the number of votes equal to the number of Units owned by such Member on any matter being considered by the Company requiring a vote by the Members. Unless otherwise specifically required by this Agreement or by applicable law, all decisions to be made and actions to be taken by the Members shall be determined by the affirmative vote of the Members holding a majority of the Units present in person or by proxy at a meeting of the Members.

5.3.4 Written Consent. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the unanimous consent of the Members. Wherever the Law requires unanimous consent of the Members to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of Members holding one hundred percent (100%) of the Interests then held by Members. Any votes or

actions to be taken by such written instrument shall be disclosed and communicated in advance to all Members and all such decisions shall be communicated as soon as possible after such votes or actions.

5.4 Personal Services.

5.4.1 Performance of Services. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless expressly provided in this Agreement or approved by the Board of Managers, no Member shall perform services for the Company or be entitled to compensation for services pefformed for the Company.

5.4.2 Compensation for Services. Unless approved by Members holding fifty-one percent (51%) of the Interests then held by all Members or as otherwise provided herein, the Managers shall not be entitled to compensation for their services as Managers. However, upon substantiation of the amount and purpose thereof and the granting of the approval of the Board of Managers, the Managers shall be entitled to reimbursement for out-of-pocket expenses reasonably incurred in connection with the activities of the Company.

5.5 Duties of Parties.

5.5.1 Devotion of Time. Each Manager shall devote such time to the business and affairs of the Company as he or she, in his or her sole discretion, deems necessary to carry out the Manager's duties set forth in this Agreement.

5.5.2 Other Activities. Except as otherwise expressly provided in Sections 5.5.3 and 5.5.4, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity, except for any business or activity in competition with the Company, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity. The organization of the Company shall be without prejudice to the respective rights of the Members (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or any other Member's Affiliates.

5.5.3 Dealings with Members and Affiliates. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms and with full written disclosure of the nature and extent of any such direct or indirect relationships to the Board of Managers. Each Member, upon request by the Board of Managers, shall complete and execute a Conflict of Interest Questionnaire in the form adopted by the Board of Managers and shall submit written updates when necessary to keep such information current.

5.5.4 Covenant. So long as a Member is a Member of the Company, and for a period of one (I) year aher such Member ceases to be a Member of the Company, such Member

agrees that he or she shall not directly or indirectly own, invest in or obtain an ownership interest in any company within a ten (10) mile radius of the Company's, except to the extent that such Member has invested in any such facility as of the date of such Member's subscription or acquisition of Interest, has disclosed such investment to the Board of Managers and has received the approval of the Board of Managers for such investment. Those existing investment interests identified on Exhibit "F" attached hereto are deemed to be pre-approved and the identified Member's continued investment therein shall not be deemed a violation of this Section 5.5.4.

5.6 Liability and Indemnification.

5.6.1 Liabityli. The Managers shall not be liable, responsible or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Managers within the scope of the authority conferred on the Managers by this Agreement, except for fraud, gross negligence, willful misconduct or a breach of this Agreement.

5.6.2 Indemnification. The Company shall indemnify the Managers for any act performed by the Managers within the scope of the authority conferred on the Managers by this Agreement, except for fraud, gross negligence, willful misconduct or a breach of this Agreement.

5.6.3 Directors and Officers Insurance. The Company may, in the discretion of the Board of Managers, secure and maintain in force a policy of directors and officers insurance from a carrier licensed to do business in the Commonwealth of Virginia in such amounts as the Board of Managers deems appropriate from time to time.

5.7 Power of Attorney.

5.7.1 Grant of Power. Each Member constitutes and appoints the President as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge and file:

5.7.1.1 All documents (including amendments to certificates of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change or modification in accordance with this Agreement;

5,7.1.2 Any and all other certificates or other instruments required to be filed by the Company under the laws of the Commonwealth of Virginia or of any other state or jurisdiction, including, without limitation, any certificate or other instrument necessary in order for the Company to continue to qualify as a limited liability company under the laws of the Commonwealth of Virginia;

5.7.1.3 One (1) or more fictitious or trade name certificates; and

5.7.1.4 All duly authorized documents which may be required to dissolve and terminate the Company and to cancel its certificate of organization.

5.7.2 Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

5.8 Other Officers. The Board of Managers may elect other persons to serve as officers of the Company. If so elected, each officer shall have the duties and authority of officers of corporations, as those duties and authority are set forth in the Business Corporation Law of the Commonwealth of Virginia. Any officer may be removed with or without cause by the vote of a majority of the Board of Managers.

## Section VI.
## Transfer of Interests and Withdrawals of Members

6.1 Transfers.

6.1.1 Conditions of Transfer. Except as otherwise expressly set forth herein, no Member may Transfer all or any portion of or any interest or rights in the Member's Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1 The Transfer is approved by the vote of a majority of the Board of Managers;

6.1.1.2 The Transfer will not require registration of Interests under any federal or state securities laws;

6.1.1.3 The transferee delivers to the Company a written instrument agreeing to be bound by the terms of this Agreement;

6.1.1.4 The Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.5 The Transfer will not result in the Company's being subject to the Investment Company Act of 1940, as amended;

6.1.1.6 The transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the Transferred Interest;

6.1.1.7 The transferee meets the ownership standards as set forth in Section 3.3;

6.1.1.8 The transferor complies with the provisions set forth in Sections 6.2 and 6.3 as applicable; and

6.1.1.9 Except in the case of a Transfer pursuant to an Involuntary Withdrawal, no Transfers may be made hereunder within twelve (12) months of any Member's purchase of that Member's Interest.

6.1.2 Transfer Upon Approval. If the conditions of Transfer are satisfied, then a Member may Transfer all or any portion of his or her Interest as to which the approval of the Board of Managers was obtained.

6.1.3 Reasonableness. Each Member hereby acknowledges the reasonableness of the prohibitions contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Interests in violation of the prohibitions contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom an Interest is attempted to be transferred in violation of this Section 6.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company or have any other rights in or with respect to the Interest.

6.2 Class A Transfers.

6.2.1 Notice of Transfer. If the Class A Member (a "Transferor") desires to Transfer, or is required as a consequence of an Involuntary Withdrawal to Transfer, all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire or requirement (the "Transfer Notice") and the Company shall notify the Class A Members. The Transfer Notice shall describe the Transferor Interest, the proposed transferee and the proposed purchase price and/or other terms of the proposed Transfer.

6.2.2 Purchase Option. Except where the Transfer is as a result of an Involuntary Withdrawal of the Class A Member, upon receipt of a Transfer Notice, the remaining Class A Members shall have an option (a "Purchase Option") to purchase, subject to Section 6.8 below, all of the Transferor Interest for a purchase price equal to the greater of(i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest. The Transfer shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the tenth (10th) day following the day the Transfer Notice is given to the Class A Members (the "Transfer Period"). At any time during the

Transfer Period, the remaining Class A Members may elect to exercise the Purchase Option by giving written notice of the election to the Transferor.

6.2.3 Free Transfer Period. If the Class A Members fail to exercise the Purchase Option with respect to the entire Transferor Interest, the Transferor shall be permitted to offer and sell the Transferor Interest to any Physician who meets the qualifications to become a Member of the Company, and such transaction shall be in the manner described in the Transfer Notice, for a period of thirty (30) days following the end of the ten (10) day period referred to in Section 6.2.2 above (the "Free Transfer Period"); provided, however, that the price for the Transferor Interest shall be no less than the greater of(i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest. If the Transferor does not so Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section 6.2.3 shall cease and terminate until the Transferor has again complied with the provisions of Sections 6.1 and 6.2 hereof.

6.2.4 Involuntary Withdrawal Transfer. If the Transfer is a result of an Involuntary Withdrawal of a Class the Member, the Class A Members shall purchase, on a pro rata basis, the entire Transferor Interest for a purchase price, subject to Section 6.8 below, equal to the greater of(i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest, and such purchase shall be on the terms and conditions set forth in Section 6.4 below.

6.3 ClassA Transfers.

6.3.1 Notice of Transfer. If a Class A Member (a "Transferor") desires to Transfer, or is required, at any time, pursuant to an Involuntary Withdrawal to Transfer, all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire or requirement (the "Transfer Notice") and the Company shall notify the Class A Member. The Transfer Notice shall describe the Transferor Interest, the proposed transferee and the other terms of the proposed Transfer.

6.3.2 Class A Purchase Option. Except where the Transfer is as a result of an Involuntary Transfer of a Class A Member, upon receipt of a Transfer Notice pursuant to Section 6.3.1 above, the ClassA Members shall have a Purchase Option to purchase, subject to Section 6.8 below, all of the Transferor Interest for a purchase price equal to the loser of (i) the purchase price set forth in the bona fide offer from the proposed third-party transferee, or (ii) the fair market value of the Transferor Interest. Any Transfer pursuant to this Section 6.3.2 shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is gîven to the ClassA Members (the "Transfer Period"). At any time during the Transfer Period, the ClassA Members may elect to exercise the Purchase Option by giving written notice of the election to the Transferor, which shall be exercised by the ClassA Members pro rata in accordance with their respective ClassA Interests.

6.3.3 Class A Purchase Option. If the ClassA Members fail to exercise the Purchase Option set forth in Section 6.3.2 with respect to the entire Transferor Interest, the Class A Member shall then have a Purchase Option to purchase, subject to Section 6.8 below, the Transferor Interest for a purchase price equal to tire lowef of (i) the purchase price set forth in the bona fide offer from the proposed third-party transferee, or (ii) the fair market value of the Transferor Interest. Any Transfer pursuant to this Section 6.3.3 shall be on the terms and conditions set forth in Section 6.4 below. The Purchase Option shall be and remain irrevocable for a period ending at 11:59 p.m., local time, at the Company's principal office on the thirtieth (30th) day following the end of the thirty (30) day period referred to in Section 6.3.2 above (the "Transfer Period"). At any time during the Transfer Period, the Class A Member may elect to exercise the Purchase Option by giving written notice of the election to the Transferor.

6.3.4 Free Transfer Period. If the ClassA and Class A Members fail to exercise the Purchase Options set forth in Sections 6.3.2 and 6.3.3 with respect to the entire Transferor Interest, the Transferor shall be permitted for a period of thirty (30) days following the end ofthe thirty (30) day period referred to in Section 6.3.3 above (the "Free Transfer Period") to offer and sell the remaining Transferor Interest to any Physician who meets the qualifications to become a Member of the Company. Any such transaction shall be in the manner described in the Transfer Notice; provided, however, that the price for the Transferor Interest shall be no less than the greater of(i) the fair market value of the Transferor Interest, or (ii) if applicable, the purchase price set forth in the bona fide offer from the proposed third-party transferee. If the Transferor does not so Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section 6.3.4 shall cease and terminate until the Transferor has again complied with the provisions of Sections 6.3.1, 6.3.2 and 6.3.3.

6.3.4 Involuntary Withdrawal Transfer. If the Transfer is a result of an Involuntary Withdrawal of a ClassA Member, including without limitation the death or Permanent Disability of a ClassA Member, the ClassA Members shall purchase, on a pro rata basis, the entire Transferor Interest for a purchase price, subject to Section 6.8 below, equal to the greater of(i) the Transferor's Capital Account balance on the date of the Transfer, or (ii) the fair market value of the Transferor Interest, and such purchase shall be on the terms and conditions set forth in Section 6.4 below.

6.4 Terms of Transfer. Any Transfer of a Transferor Interest made to a Member shall be completed within sixty (60) days after the end of the expiration of any applicable Purchase Option or, in the case of Transfers as a result of an Involuntary Withdrawal, within thirty (30) days after the event or determination giving rise to the Involuntary Withdrawal. The purchase price for any Transferor Interest sold to a Member shall be paid by the delivery to the Transferor of a promissory note in customary form, in the principal amount of the purchase price (or the applicable portion thereof), providing for payment of the principal amount in equal monthly installments over a period of not more than five (5) years, with interest at a rate equal to the Applicable Federal Rate, as determined on the date of Transfer under Section 1274(d) of the Code. Any Transfer of the Transferor Interest made after the last day of any applicable Free Transfer Period or without strict compliance with the terms, provisions and conditions of this

Section and other terms, provisions and conditions of this Agreement, shall be null, void and of no force or effect.

6.5 Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company; exceot that a Member may (1) elect to voluntarily forfeit his or her Interest in the Company without payment or other consideration for such Interest; or (2) seek to Transfer his or her Interest to the remaining Members or the Company pursuant to the Transfer requirements set forth in Sections 6.1, 6.2 and/or 6.3 asapplicable.

6.6 Involuntary Withdrawal. No Member shall be liable, responsible or accountable, in damages or otherwise, to any Member who is deemed to have given a Transfer Notice as a result of such Member's Involuntary Withdrawal event. In addition, the Company shall indemnify the Members against any suits, claims, actions, losses, liabilities or expenses (including without limitation reasonable attorneys' fees) related to or arising out of a Member's mandatory Transfer of his or her Interest due to the Involuntary Withdrawal of a Member.

6.7 Fair Market Value of a Transferor Interest. The fair market value of the Company and of a Transferor Interest shall be determined in accordance with the procedure set forth in Exhibit "G" hereof.

6.8 Early Transfer Purchase Price. Notwithstanding any provision contained herein to the contrary, in the event of any Transfer during the initial twelve (12) months after any Member's purchase of that Member's Interest, the purchase price for the Transferor Interest shall be equal to the Transferring Member's Capital Contribution plus interest calculated at the rate of five percent (5%) per annum from the date of the acquisition of the Interest.

## Section VII.
## Dissolution, Liquidation and Termination of the Company

7.1 Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

7.1.1 Sale of Assets. Upon the sale of all or substantially all of the Company's assets, including the Company's and the collection by the Company of the proceeds of such transaction; or

7.1.2 Judicial Order. Upon the entry of an order of judicial dissolution under Section 8972 of the Law.

7.2 Procedure for Winding Up and Dissolution. If the Company is dissolved, the Board of Managers shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members and the Board of Managers who are creditors, in satisfaction of the liabilities of the Company, and then to the Members in accordance with Section 4.4.

7.3 Filing of Certificate of Dissolution. If the Company is dissolved, the Board of Managers shall file a Certificate of Dissolution with the Department of State of the Commonwealth of Virginia at the time set forth in the Law. If there is no Manager, then the Certificate of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Certificate of Dissolution shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, or a Person who last was a Member, the Certificate of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

**Section VIII.**
**Books, Records, Accounting and Tax Elections**

8.1 Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Board of Managers shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2 Books and Records.

8.2.1 Retention. The Board of Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the certificate of organization and this Agreement and all amendments to the certificate of organization and this Agreement; a current list of the names and last known business, residence or mailing addresses of all Members; and the Company's federal, state and local tax returns.

8.2.2 Inspection. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative for any proper purpose, upon fifteen (15) days written notice setting forth the purpose of such inspection, at any and all reasonable times during normal business hours. Any Member seeking information regarding Transfers of Members' Interests shall be deemed a proper purpose.

8.2.3 Reimbursement of Costs and Expenses. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3 Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Board of Managers, subject to the requirements and limitations of the Code.

8.4 Reports. Within seventy-five (75) days after the end of each taxable year of the Company, the Board of Managers shall cause to be sent to each Person who was a Member at

any time during the accounting year then ended: (i) an annual compilation report prepared by the Company's independent certified public accountants in accordance with standards issued by the American Institute of Certified Public Accountants; (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Board of Managers or any Affiliate in respect of the taxable year and a report of any Transfers of a Member's Interest during the year; and (iii) that tax information concerning the Company which is necessary for preparing the Member's income tax returns for that year. In addition, within one hundred twenty (120) days after the end of each taxable year, the Board of Managers shall cause to be sent to each Person who was a Member at any time during the accounting year then ended an annual review prepared by the Company's independent certified public accountants in accordance with standards issued by the American Institute of Certified Public Accountants.

8.5 Tax Matters Partner. The President shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6231, *et seq.* The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. Each Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute with the Internal Revenue Service without the approval of the Class A Members.

8.6 Tax Elections. The Board of Managers shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Board of Managers' sole and absolute discretion.

8.7 Title to Company Property.

8.7.1 Real and Personal Property. Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2 Title. The Board of Managers may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Board of Managers may cause title to be acquired and held in its name or in the names of trustees, nominees or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## Section IX.
## General Provisions

9.1 Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Board of Managers deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation or holding of the property of the Company.

9.2 Notifications. Any notice, demand, consent, election, offer, approval, request or other communication (collectively a notice) required or permitted under this Agreement must be in writing and either delivered personally or sent by Federal Express or other comparable commercial overnight courier. Any notice to be given hereunder by the Company shall be given by the Board of Managers. A notice must be addressed to a Member at the Member's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3 Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach, or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4 Complete Agreement. This Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter contained herein. It supersedes all prior written and oral statements, including any prior representation, statement, condition or warranty, with respect to the Company. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Class A Members.

9.5 Applicable Law. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law of the Commonwealth of Virginia, without reference to the principles governing the conflict of laws applicable in that or any other jurisdiction.

9.6 Section Titles. The headings herein are inserted as a matter of convenience only and do not define, limit or describe the scope of this Agreement or the intent of the provisions hereof.

9.7 Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns.

9.8 Jurisdiction and Venue. Any suit involving any Dispute or matter arising under this Agreement may only be brought in the United States District Court for the Middle District of Virginia or any Virginia State Court having jurisdiction over the subject matter of the Dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9 Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

9.10 Separability of Provisions. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11 Counterparts. This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

(SIGNATURE PAGES FOLLOW]

SIGNATURE PAGE TO OPERATING AGREEMENT OF
**(SKIN LOGIC, LLC}**

The undersigned, each desiring to become a Member of the Company pursuant to the Limited Liability Company Operating Agreement dated 10 April , 2020 (the "Operating Agreement"), the terms and conditions of which the undersigned has reviewed and is familiar with, does hereby execute this Signature Page to be attached to the Operating Agreement. The Signature Page shall constitute legal and sufficient evidence of execution and certification by the undersigned of such document.

The undersigned further agree to contribute to the Company the amount of the Capital Contribution as set forth in the Operating Agreement and Exhibits "A" and "B" of the Operating Agreement.

Executed this 10 day of April 2020

By: [signature]

Valeria V Gunkova, President and member

[signature] 10/4/20
VALERIA V GUNKOVA MEMBER DATE

Harry D Kamin [signature] 4/10/2020
HARRY D KAMIN MEMBER DATE

Operating Agreement

EXHIBIT "A"
LIST OF CLASS A MEMBERS, CAPITAL AND PERCENTAGE INTERESTS

| Name and Address | Initial Capital Cash Contribution | Percentage | Units | Class |
|---|---|---|---|---|
| VALERIA V GUNKOVA | $100,000 | 50% | 50 | A |
| HARRY D KAMIN | $100,000 | 50% | 50 | A |

**Operating Agreement**

**EXHIBIT "B"**

## PROCEDURE FOR DETERMINING TiIE FAIR MARKET VALUE OF A MEMBER'S INTEREST IN TI-iE COMPANY

At such time as the fair market value of a Transferor Interest is needed in connection with a Transfer, the Company, at its expense, shall retain the services of a valuation firm that will analyze the financial statements of the Company and will render an opinion as to the fair market value of the Company, in general, and the Transferor Interest, in particular. If the Transferor does not accept the fair market value as stated in the opinion, the Transferor, at his or her expense, may retain the services of a valuation firm that will analyze the financial statements of the Company and will render an opinion as to the fair market value of the Company, in general, and the Transferor Interest, in particular and deliver the opinion to the Company.

If there is more than a ten percent (10%) variation in the values expressed in the opinions, the Company and the Transferor shall identify a mutually-agreeable valuation firm whose opinion of fair market value will be binding on the parties. The cost of the opinion shall be paid equally by the Company and the Transferor.

If there is less than a ten percent (10%) variation in the values expressed in the opinions, the values will be averaged to determine the fair market value of the Company and the Transferor Interest.

# Commonwealth of Virginia

## STATE CORPORATION COMMISSION

*Richmond, September 18, 2019*

*This is to certify that the certificate of organization of*

Sterling Investment LLC

Harry D Kamin
Director

*was this day issued and admitted to record in this office and that the said limited liability company is authorized to transact its business subject to all Virginia laws applicable to the company and its business. Effective date:* September 15, 2019

*State Corporation Commission*
*Attest:*

Joel H. Peck
*Clerk of the Commission*

CISECOM

EXHIBIT
5

bng | GROUP

BNG Group LLC P.O. Box 6500127
Potomac Falls, VA 20165-0127

Dear Tenants,

I would like to take this opportunity to introduce BNG Group LLC as the new owner of this property. We hope you enjoy leasing space in our beautiful building, and want to share with you important contact & administrative information as well as the positive changes we will introduce shortly.

Young Yoon is the Property Manager. You can reach him at (703) 587-2244 or (540) 351 5201between the hours of 8:00AM - 6:00PM, or by email at young@bnggroupllc.com.

You are also welcome to contact our Executive Consultant, Jacob Gersh at (215) 431-2670 or (540) 351 5200); or by email at jacob@bnggroupllc.com or jacob@ariamedispa.com.

Please also feel free to contact me, Harry D Kamin, Director of the BNG Group LLC, at harry@bnggroupllc.com.

For maintenance issues, repairs, or other requests, please call Young Yoon at (703) 587-2244 between the hours of 8:00AM - 6:00PM. In case of an emergency, please contact Jacob at (215) 431-2670.

As Young discussed with you, the monthly rent will not change and will be due on the 1st of each month (November 1, 2020). You will receive your invoice on the 20th of every month. You should send your rental check by U.S. mail to: BNG Group LLC, P.O.BOX 650127, Potomac Falls, VA 20165- 0127; or transmitted electronically to Lockbox (please let us know if you opt for this method, and we will set you up for electronic payments).

We are planning the following property improvements for our tenants:

1. Security cameras, door security, and motion detectors with controls on your Smartphone.
2. Networking, Wi-Fi, teleconference, 1GB Internet, and server with space up to 1,000GK;
3. Phone and TV Services;
4. Installation of UV Lights;
5. COVID-19 Test and Body Composition Screening;
6. Affordable Corporate Yoga classes and complimentary sauna, steam, and salt room for your employees and clients;
7. We plan to install coffee and vending machines, and open a cafeteria;
8. Security guard;
9. Fence on the front of the building with gate to secure parking space only for our guest and client
10. All parking lots will be monitored by security cameras for your vehicle's protection.

Finally, a few new rules for the health and safety off all our tenants:

1. Please park your cars on the back and both sides of the building; parking in front of the building is reserved for clients and visitors.
2. Please smoke only in the designated smoking area(s).
3. Please wear a mask inside the building and in the parking lots.

If you have any questions or suggestions, please do not hesitate to contact me.

Harry D Kamin
Director and CEO
BNG Group LLC
harry@bnggroupllc.com

EXHIBIT
K