LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

**BNG GROUP, LLC**

A Virginia Limited Liability Company

**THE MEMBERSHIP INTERESTS IN BNG GROUP, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS. THE MEMBERSHIP INTERESTS ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER UNDER THIS AGREEMENT.**

EXHIBIT
L

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**BNG GROUP, LLC**

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is made as of this 20 day of February 2020 by, between and among individuals undersigned individuals whose names are set forth on the signature pages hereto and whose names and addresses appear on Exhibit "A" attached hereto. For purposes of this Agreement, the foregoing parties are further referred to each as a "Member" and collectively as the "Members."

## BACKGROUND

**The Members formed BNG GROUP, LLC**
(the "Company") as a Virginia limited liability company under the Virginia Limited Liability Company Act by filing a Certificate of Organization with the Department of State of the Commonwealth of Virginia on 17 day of September 2019. The Members intend this Agreement to set forth the rights and obligations of each of the Members regarding the Company and each other and to provide for the management and operation of the Company.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the legal sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## Section I.
## Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) The deficit shall be decreased by the amounts which the Member is obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii) The deficit shall be increased by the items described in Regulation Section 1.704-(b)(2)(ii)-(d)(4), (5), and (6).

Adjusted Capital Balance means, as of any day, a Member's total Capital Contributions less all amounts actually distributed to the Member pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

Affiliate means, with respect to any Member, any Person: (i) in which the Member owns or controls more than thirty-three and one-third percent (33 1/3%) of the voting interests; or (ii) in which more than thirty-three and one-third percent (33 1/3%) of the voting interests are owned or controlled by a Person who has a relationship with the Member described in clause (i) above.

Agreement means this Agreement, as amended from time to time.

Capital Account means the account to be maintained by the Company for each Member in accordance with the following provisions:

(i) A Member's Capital Account shall be credited with the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to the Member), the Member's distributive share of Profit and any item in the nature of income or gain specially allocated to such Member pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii) A Member's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or which are secured by property contributed by the Member to the Company), the Member's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Member pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Member shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Members shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

Capital Contribution means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed by the Company or to which the assets are subject.

Capital Proceeds means the gross receipts received by the Company from a Capital Transaction.

Capital Transaction means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, finances, refinances, condemnations, recoveries of damage awards and insurance proceeds.

Cash Flow means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements and replacements as determined by the Board of Managers. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

Class means a group of Members that comprises the Class A

The Members, subject to the terms of Section 5.1.6 below, may provide for the creation of additional Classes of Members having such relative rights, powers and duties as the Members, in their discretion, may determine, including but not limited to, rights, powers and duties senior to any existing Class of Members.

Code means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

Company means the limited liability company formed in accordance with this Agreement.

Interest means a Person's interest as a Member in the Company including, without limitation, the Member's share of the Profits and Losses of, and the right to receive distributions from, the Company, and to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Law.

Involuntary Withdrawal means, with respect to any Member, the occurrence of any of the following events:

(i) The Member makes an assignment for the benefit of creditors;

(ii) The Member files a voluntary petition of bankruptcy;

(iii) The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v) The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) The Member's death, Permanent Disability (as hereinafter defined) or adjudication by a court of competent jurisdiction that the Member is incompetent to manage the Member's person or property;

(ix) A Member's ceasing to be eligible to own an interest in a Virginia limited liability company;

(x) A Member's ceasing to meet the ownership standards set forth at Section 3.3;

(xi) A Member's loss of his or her Virginia medical license;

(xii) A material breach by a Member of a Member's obligation hereunder which is not cured within thirty (30) days of Member's receipt of notice thereof; or

Law means the Virginia Limited Liability Company Law of 1994, 15 Virginia Consolidated Statutes, Chapter 89, and its provisions pertaining to limited liability companies, as amended from time to time.

Manager or Board of Managers means the Person or Persons designated as such in Section V as the same may be changed from time to time.

Member means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

Minimum Gain has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Member in a manner consistent with the Regulations under Code Section 704(b).



KAMIN 253

Negative Capital Account means a Capital Account with a balance of less than zero.

Nonrecourse Deductions has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

Nonrecourse Liability means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

Percentage means, as to a Member, the percentage Interest set forth after the Member's name on Exhibit "A" or Exhibit "B", as applicable, as amended from time to time.

Permanent Disability means a Member's inability to engage in the practice of medicine for twelve (12) consecutive months on account of disability or other illness.

Person means and includes any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

Positive Capital Account means a Capital Account with a balance greater than zero.

Profit and Loss mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) In lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

Regulation(s) mean the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

Transfer means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer of the Interest held by any Member as permitted under this Agreement; and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer a Member's Interest as permitted under this Agreement.

Unit(s) means units of ownership Interests of Members in the Company as reflected on Exhibits "A" and "B" attached hereto.

Voluntary Withdrawal means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

## Section II.
## Formation and Name: Office; Purpose; Term

2.1 Organization. The Company has been organized as a Virginia limited liability company pursuant to the Law and the provisions of this Agreement and has caused the Certificate of Organization in the form attached as Exhibit "C" to be executed and filed with the Virginia Department of State on 20 day of February 2020.

**2.2 Name of the Company. The name of the Company is "[BNG GROUP, LLC]"** The Company may do business under any other name or names which the Board of Managers selects from time to time.

2.3 Purposes. The Company is organized to (i) management services and other related products and services; (ii) to make, enter into, and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes; and (iii) to engage in such other lawful businesses and activities as the Managers may determine are reasonably related to the foregoing purposes.

2.4 Term. The existence of the Company commenced on the date the Certificate was filed with the Department of State of the Commonwealth of Virginia pursuant to Section 8914 of the Law. The Company shall dissolve on the first to occur of the following events: (a) the decision by the Members to dissolve the Company; or (b) the date the Company may be otherwise dissolved by operation of law or judicial decree.

2.5 Registered Office; Principal Office. The initial registered office of the Company in the Commonwealth of Virginia shall be located at 2 Pidgeon Hill Dr Suite 120, Sterling, VA

20165, or such other location as the Board of Managers may designate from time to time in the manner provided by law.

## Section III.
## Members; Member Rights and Requirements; Capital; Capital Accounts; Unit Certificates

3.1 Members. The name, present mailing address, number of Units and Percentage of each initial Member are set forth on Exhibits "A" and "B" attached hereto.

3.2 Voting Rights. Each Member shall have voting rights on all matters required to be voted upon by the Members as stated in Section 5.3.3.

3.3 Left empty

3.4 Initial Capital Contributions. The Company seeks Tree Hundred Thousand Dollars ($300,000) of initial capital contributions from its Class A Member. The capital shall be contributed to the Company by the Members within time frames to be established by the Board of Managers, in exchange for which the Members will receive their Interests as set forth on Exhibits "A" and "B" hereto. The capital contributions may, as permitted by the Board of Managers, be made in the form of contributed property.

3.5 Contribution: Combined Disclosure Memorandum and Subscription Agreements. Prior to or simultaneously with the execution of this Agreement, the Members shall execute the Combined Disclosure Memorandum and Subscription Agreement attached hereto as Exhibits "D" and "E".

3.6 Additional Capital Contributions. If, pursuant to Section V of this Agreement, the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions, then each Member shall contribute his or her share of additional Capital Contributions; provided, however, that the Board of Managers may only request additional Capital Contributions four times in any twelve (12) month period. If the Board of Managers determines, by a majority vote of the Managers, that the Company requires additional Capital Contributions on more than (4) occasion in any twelve (12) month period, then the Members shall determine by a majority vote pursuant to Section 5.3.2 whether to require additional Capital Contributions from the Members. A Member's share of the additional Capital Contributions shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contributions so approved by the Board of Managers. Within sixty (60) days after the Board of Managers has determined the amount of additional Capital Contributions required, each Member shall pay the Member's share, in readily available funds, to the Company.

3.6.1 Personal Liability. Except as set forth above, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company, excepting those liabilities specified herein or accepted in writing outside of this Agreement by any respective Member.

3.6.2 Failure to Contribute Additional Capital. If a Member fails to pay when due all or any portion of any Capital Contribution, such Member shall be deemed to have forfeited a proportionate Percentage Interest in the Company and the non-defaulting Members of such Member's Class shall, on a pro rata basis, pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution"). The Interest of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Interest is equal to a fraction (expressed as a percentage), the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Members, and the defaulting Member's Interest shall be decreased accordingly. The Board of Managers shall amend Exhibit "A" or "B", as applicable, accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.7 No Interest on Capital Contributions. Members shall not be paid interest on their Capital Contributions.

3.8 Return of Capital Contributions. Except as otherwise provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.

3.9 Capital Accounts. A separate Capital Account shall be maintained for each Member.

3.10 Loans. Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Board of Managers and the Members agree.

3.11 Units and Unit Certificates. The Units into which the aggregate Interest in the Company has been divided shall be represented by certificates ("Unit Certificates"). Initially, each Class A Member shall obtain one Unit for each Fifty Thousand Dollars ($50,000) of capital contributed by the Class A Member. Unit Certificates designating the number of Units owned shall be issued to the Class A Members.

3.11.1 Formality of Certificates. The Unit Certificates shall be in such form as is approved by the Board of Managers, and shall state that the Company is organized under the laws of the Commonwealth of Virginia, the name of the person to whom issued, and the number of Units that the Unit Certificate represents. The Unit register or transfer books and unissued Unit Certificates shall be kept by the Board of Managers.

3.11.2 Registration of Certificates. The Unit Certificates of the Company shall be numbered and registered in the Unit register or transfer books of the Company as they are issued. They shall be signed by the President or a Vice President of the Company.

3.12 Guaranty of the Company's Debts and Obligations. The debt incurred by the Company at the commencement of its operation shall, as required by any lender to the Company, be guaranteed personally by each Member on a pro rata basis. No Member may refuse to execute the documents reasonably required by a lender to effect such guaranty. In the event the

Company incurs debt subsequent to the commencement of the operation and a guaranty is required by the lender, the Company must obtain the agreement of a majority of the Interests of each ClassAefore a Member will be required to execute additional guarantees.

**Section IV.**
**Profit, Loss and Distributions**

4.1 Distributions of Cash Flow and Allocations of Profit or Loss Other Than From Capital Transactions.

4.1.1 Profit or Loss Other Than from a Capital Transaction. After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Members in proportion to their Percentages.

4.1.2 Cash Available for Distribution. The Board of Managers shall determine whether all or a portion of the Cash Flow, if any, for each taxable year of the Company shall be distributed to the Members. Any distribution of Cash Flow to the Members shall be in proportion to the Members' Percentages and at such times as the Board of Managers may determine. To the extent practicable, all distributions made to Members shall be made in a manner to allow the income tax attributable to the income passed through and taxed to Members for a taxable year to be paid when due.

4.2 Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.

4.2.1 Profit. After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1 If one or more Members has a Negative Capital Account, to those Members, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been increased to zero.

4.2.1.2 Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Members in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 4.2.3.4.1 and 4.2.3.4.3.

4.2.1.3 Any Profit in excess of the foregoing allocations shall be allocated to the Members in proportion to their Percentages.

4.2.2 Loss. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:



KAMIN 258

4.2.2.1 If one or more Members has a Positive Capital Account, to those Members, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2 Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Members in proportion to their Percentages.

4.2.3 Capital Proceeds. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Member); then

4.2.3.3 To the establishment of any reserves which the Board of Managers deems necessary for liabilities or obligations of the Company; then

4.2.3.4 The balance shall be distributed as follows:

4.2.3.4.1 To the Members in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2 If any Member has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Members in proportion to their Positive Capital Accounts; then

4.2.3.4.3 The balance, to the Members in proportion to their Percentages.

4.3 Regulatory Allocations.

4.3.1 Qualified Income Offset. No Member shall be allocated Losses or deductions if the allocation causes a Member to have an Adjusted Capital Account Deficit. If a Member receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Member to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a *pro rata* portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Member, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.

This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the qualified income offset provisions of the Regulations promulgated under Section 704(b) of the Code.

4.3.2 Minimum Gain Charge Back. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Member, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a *pro rata* portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a minimum gain charge back under Regulation Section 1.704-2(f).

4.3.3 Contributed Property and Adjusted Book Value. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Board of Managers shall determine the applicable method of applying Code Section 704(c) and the Regulations thereunder.

4.3.4 Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5 Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Members in proportion to their Percentages.

4.3.6 Member Loan Nonrecourse Deductions. Any Member loan nonrecourse deduction for any taxable year or other period shall be specially allocated to the Member who bears the risk of loss with respect to the loan to which the Member loan nonrecourse deduction is attributable in accordance with Regulation Section 1.704-2(i).

4.3.7 Guaranteed Payments. To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.4 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8 Unrealized Receivables. If a Member's Interest is reduced (provided the reduction does not result in a complete termination of the Member's Interest), the Member's share of the Company's unrealized receivables and substantially appreciated inventory (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Member, be specially allocated among the Members in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Board of Managers.

4.3.9 Withholding. All amounts required to be withheld pursuant to Code Section 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Members for all purposes under this Agreement.

4.4 Liquidation and Dissolution.

4.4.1 Distribution Upon Liquidation. If the Company is liquidated, the assets of the Company shall be distributed to the Members in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2 Negative Capital Account. No Member shall be obligated to restore a Negative Capital Account.

4.5 General.

4.5.1 Timing and Amount of Distributions. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Board of Managers.

4.5.2 Fair Market Value. If any assets of the Company are distributed in kind to the Members, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets shall receive that interest as a tenant-in-common

with all other Members so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Board of Managers. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Members prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3 Profit and Loss. All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Members as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Member and the successor on the basis of the number of days each was a Member during the taxable year; provided, however, the Company's taxable year shall be segregated into two (2) or more segments in order to account for Profit, Loss or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4 Amendment. The Board of Managers is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to a Member without the Member's prior written consent.

## Section V.
## Management: Rights, Powers and Duties

5.1 Management.

5.1.1 Officers. The Board of Managers shall, by a majority vote, elect the officers of the Company. The officers of the Company shall be a President, a Secretary and a Treasurer. In addition, the Board of Managers may elect one or more Vice Presidents. The President, Treasurer, Vice President and Secretary shall be Members of the Company and shall serve for a term of two (2) years. The officers may be compensated by the Company in such amount as determined by the Board of Managers from time to time. The officers shall be elected and removed in accordance with the following:

5.1.1.1 Upon the death, disability, resignation, removal or retirement of an officer, or at the end of the term as set forth in Section 5.1.1 hereof, the successor officer shall be elected by a majority vote of the Board of Managers. An officer may be removed with or without cause by a majority vote of Board of Managers of Company; provided that the Members simultaneously replace the removed officer with another qualified individual in accordance with the provisions of this Section 5.1.1.

5.1.1.2 The President shall be responsible for conducting all meetings of the Members and for performing the functions set forth in this Section 5.1.1.2. The responsibility for the day-to-day management and operation of the Company's shall be delegated