preference, limitations, and other terms, conditions, relative rights and restrictions of such Members in respect of their economic ownership interests, shall be expressed as Membership Units.

(b) The Company shall have two classes of Membership Units, as follows:

i. Class A Units: these Units shall have full equity rights in the Company, which shall include a right, and/or responsibility for, profits/losses, equity appreciation/depreciation, to vote, to distributions, and dissolution proceeds/liabilities of the Company; each Unit shall have identical voting rights, tax allocations, rights to distributions, rights upon dissolution or liquidation, preferences, limitations and other terms, conditions, relative rights or restrictions as any other Class A Membership Unit; and

ii. Class B Units: these Units shall only have an interest in the real estate owned by the Company. To that end, Class B Units shall the right and/or responsibility for maintaining the property owned by the Company and shall have the right to profits/losses, equity appreciation/depreciation, to vote, to distributions, and dissolution proceeds/liabilities of or in the real estate owned by the Company; each Unit shall have identical voting rights, tax allocations, rights to distributions, rights upon dissolution or liquidation, preferences, limitations and other terms, conditions, relative rights or restrictions as any other Class B Membership Unit.

(c) The number of Membership Units held by the Members as of the Agreement Date are as set forth on **Exhibit A,** and **Exhibit B** attached hereto. The Exhibits shall be updated as necessary to record any changes in the allocation of Units, and any updates shall be deemed to amend and shall be incorporated into, this Agreement as an essential part of this Agreement.

(d) The Company hereby issues **100** Class A Membership Units and **100** Class B Membership Units. Any Units issued but not outstanding shall be held in treasury by the Company

**3.2** **Restrictions on Transfers.** No Member shall sell, transfer, assign, convey, pledge or hypothecate all or any portion of his Membership Units without notice to and the approval of three-quarters (3/4) of the Members holding the outstanding Class A Membership Units entitled to vote.

**3.3** **In General.** The powers of the Company shall be exercised by or under the authority of the Members, and the Members shall be entitled to make all decisions and take all actions for the Company, unless otherwise delegated to a Manager (*see*, Article IV).

**3.4** **Actions Requiring Unanimous Consent.** Notwithstanding any other provision of this Agreement, the approval of all of the Members shall be required in order for any of the following actions to be taken on behalf of the Company:

(a) Amending the Articles of Organization in any manner.

(b) Taking any action which would make it impossible to carry on the ordinary business of the Company.

(c) Confessing a judgment against the Company.

(d) Filing or consenting to filing a petition for or against the Company under any federal or state bankruptcy, insolvency or reorganization act.

**3.5** **Action by Members.** In managing the affairs of the Company and exercising its powers, the Members shall act collectively through meetings and/or written consents as provided in this Article III or through a Manager or Managers to whom authority and duties have been delegated pursuant to Article IV

hereof. Except as stated otherwise herein, a vote by the Members holding a majority of the outstanding Membership Units entitled to vote shall suffice for all general Member actions.

**3.6** **Notice of Meetings.** Written notice stating the place, day and hour of any meeting of the Members and, if a special meeting, the purpose of purposes for which the meeting is called shall be delivered not less than 3 nor more than 45 days before the date of the meeting.

**3.7** **Participation by Telephone or Similar Communications.** Members may participate and hold a meeting by means of conference telephone, video conference or similar communications equipment by means of which all Members participating can hear and be heard, and such participation shall constitute attendance and presence in person at such meeting.

**3.8** **Waiver of Notice.** When any notice of a meeting of the Members is required to be given, a waiver thereof in writing signed by a Member entitled to such notice, whether given before, at, or after the time of the meeting as stated in such notice, shall be equivalent to the proper giving of such notice.

**3.9** **Action by Written Consent.** Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if one or more written consents to such action are signed by the Members who are entitled to vote on the matter set forth in the consents and who constitute the requisite number or percentage of such Members necessary for adoption or approval of such matter on behalf of the Company. Such consent or consents shall be filed with the minutes of the meeting of the Members. Action taken under this Section shall be effective when the requisite Members have signed the consent or consents, unless the consent or consents specify a different effective date.

## ARTICLE IV
## MANAGEMENT OF THE COMPANY

**4.1** **Designation and Election.** The Member hereby agrees that the responsibility for managing the business and affairs of the Company shall be delegated to the "Managers" of the Company pursuant to Section 13.1-1024 of the Act. The Managers shall serve and continue in office throughout the entire term of the Company unless sooner removed (i) by operation of law, (ii) by order or decree of any court of competent jurisdiction, (iii) by voluntary resignation, (iv) upon their death, insanity or bankruptcy or (v) by the Members as stated below.

(a) The Members elected Valeria Gunkova to serve as the Manager of the Company, effective as of September 19, 2019, to serve until a successor or successors shall be duly elected and qualified.

(b) The Members may elect one or more Persons as Managers at any meeting of the Members to serve until their respective successors are duly elected and qualified. In addition, if any Person resigns or otherwise vacated the office of Manager, the Members shall elect a replacement Manager, unless one or more other Persons than serve as Managers and the Members determine not to fill such vacancy. A Person may be removed as a Manager by the Members with or without cause at any time. A Manager may, but shall not be required to, be elected from among the Members. A Manager may be a natural person or an Entity.

**4.2** **Power and Authority of the Managers.** The Managers shall have the complete and exclusive control of the management of the Company's business and affairs, and the Members shall have no right to participate in the management or the conduct of the Company's business and affairs, nor any power or authority to act for or on behalf of the Company in any respect whatsoever, in their capacity as Members. Except as otherwise specifically provided in this Agreement, the Managers shall have the right, power, and authority, on

behalf of the Company and in its name, to execute documents or other instruments and to exercise all of the rights, powers, and authority of the Company under the Act, subject only to any express limitations set forth in this Agreement.

Notwithstanding the above, the approval by the Members holding two-thirds (2/3) of the outstanding Membership Units entitled to vote shall be required before a Manager can take the following actions:

(a) Sale or purchase of real estate;

(b) Borrowing or refinancing on behalf of the Company or pledging its assets in any way;

(c) Lending money or other assets of the Company exceeding $75,000.00 in value in 30 days;

(d) Change of accounting method unless required by law; or

(e) Making any purchase or entering any lease, contract, or material transaction involving $125,000 or more.

4.3 **Rights of Members.** The Members shall not take part in the management of the business or transact any business for the Company in their capacity as Members, nor shall they have power to sign for or to bind the Company; provided, however, that the Members shall have the right to approve those matters specified in this Agreement.

4.4 **Third Party Reliance.** Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managers as set forth in this Agreement. The signature of Managers shall bind the Company and be sufficient for all purposes.

4.5 **No Duty to Consult.** Except as otherwise provided herein, the Managers shall have no duty or obligation to consult with or seek the advice of the Members.

4.6 **Duties of Managers.** The Managers shall devote such time, effort, and skill to the Company's business affairs as he deems necessary and proper for the Company's welfare and success.

4.7 **Fiduciary Relationship.** The Managers shall at all times act in a fiduciary capacity for the Company. The Managers shall not have any hidden or concealed earnings from any activity of the Company. The Managers shall not be liable, responsible or accountable to the Company or to the Members for damages or otherwise for any acts performed, or for any failure to act, taken in good faith; provided, however, that the Managers shall not be relieved of his respective fiduciary obligations to the Members and to the Company for fraud, bad faith or gross negligence.

4.8 **Reimbursement.** All expenses incurred with respect to the organization, operation and management of the Company shall be borne by the Company. The Managers shall be entitled to reimbursement from the Company for all reasonable direct expenses allocable to the organization, operation and management of the Company.

4.9 **Managers and Affiliates Dealing With the Company.** The Managers may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Managers may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transaction.

**4.10** **Single Manager.** If at any time there is only one Person serving as a Manager, such Manager shall be entitled to exercise all powers of the Managers set forth in this Section, and all references in this Section and otherwise in this Operation Agreement to "Managers" shall be deemed to refer to such single Manager.

**4.11** **Limitation of Liability of Managers.** The Members hereby acknowledge and agree that the liability of the Managers to the Company or to any of the other Members shall be eliminated fully to the maximum extent possible pursuant to 13.1-1025 of the Act.

**4.12** **Ratification of Actions of Managers.** All actions undertaken by a Manager on behalf of or in the name of the Company prior to the execution of this Agreement by all Members, including actions taken on behalf of or in the name of the Company prior to issuance of a certificate of organization for the Company by the Virginia State Corporation Commission on September 15, 2020, are hereby expressly ratified and confirmed as the acts of the Company.

**4.13** **Officers of the Company.** The Managers may, by unanimous consent, appoint from time to time any one or more persons to serve as officers of the Company as they deem necessary for the proper conduct of the business of the Company, in such capacities and with such delegated rights and powers as the Managers may approve.

## ARTICLE V
## FUNDING

### Financial Contributions.

(a) No further Contributions are required at this time. The Contributions as previously made by the Members are as reflected on Exhibit A. If at any time additional funds are required by the Company for or in respect of its business or any of its obligations, expenses, costs or liabilities, the Manager may notify each Member of such fact and require that each Member make an additional capital contribution to the Company (pro rata, in proportion to each Member's respective Membership Interest), in the aggregate of the total amount of funds required. Each Member shall be obligated to make its additional capital contributions within ten (10) days after the delivery of the Manager's notice. Such funds shall be deemed to be additional capital contributions of the Members and shall increase the Members' respective capital accounts.

(b) In the event that a Member does not make the required additional Capital Contribution within twenty (20) days of the receipt of the notice from the Managers, the Managers may: (1) pursue any and all legal and equitable remedies against the defaulting Member and the Members hereby waive any requirement that any action or collection be in the form of an accounting or that such action await dissolution of the Company; (2) allow one or more other Members to pay any or all of the defaulting Member's required contribution; or (3) have the Company proceed without payment by the Member of the additional contribution. If the Managers choose option (2) or (3), then the amount unpaid by the defaulting Member shall be treated as a loan to the Member(s) who pay the additional contributions or to the Company, if the amounts are not paid by any Member; the loan shall be repaid, if not sooner, by withholding all distributions otherwise payable to the defaulting Member and applying those amounts to the payment of the loan. The defaulting Member's loan shall bear interest at a rate of one percent per month until paid.

(c) Any Member in default hereunder, shall be considered a Member not in good standing and shall not be entitled to any privileges of Membership, including voting until all amounts owed are repaid.

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS

6.1 **Distributions.** Distributions shall be made at such time or times as determined by the Members; provided, however, that such distributions shall be made to the Members in the same proportion as their respective ownership interests.

6.2 **Allocations.** Profits and Losses of the Company for each Fiscal year shall be determined as of the end of each Fiscal Year. Profits and Losses, if any, for each Fiscal Year shall be allocated among the Members in proportion to their respective Percentage Interests. Unless later changed, the Fiscal Year shall be the Calendar Year.

6.3 **Distribution of the Proceeds of Dissolution.** If the Company dissolves, the net proceeds of dissolution, including any accompanying sale of Company assets, shall be distributed in the following order of priority:

**(a)** First, toward the satisfaction of all outstanding debts and other obligations of the Company, including Members, who are creditors.

**(b)** Then, pro-rata among those Members with a positive capital account balance, after adjustments for the above distributions and tax allocations for the current fiscal year, in proportion to their respective capital accounts.

## ARTICLE VII
## ADMISSION, ASSIGNMENT OR WITHDRAWAL

7.1 **Buy-Out.** A Member's Units may be purchased pursuant to the following:

(a) **Optional Buy-Out**. The Member's Units may be purchased at the discretion of the Company or any Member(s) in accordance with Section 7.5 if a Member dies, is deemed legally incompetent, or requests a buy-out of all or part of their Units.

(b) **Forced Buy-Out**. The Company may force a sale For Cause with a three-quarters approval of the outstanding Membership Units remaining, including the expelled Member. "For Cause" shall be defined as any illegal, grossly immoral or other act that equates to material theft from the Company that if known, would bring the Company's name into disrepute in the community.

7.2 **Assignment Generally.** Membership Units shall not be sold, exchanged, conveyed, transferred, or otherwise assigned, either in whole or in part, except as provided in Section 7.5 hereof or upon the three-quarters (3/4) vote of the Members. Notwithstanding the preceding sentence, no assignee of any Membership Units shall become a Member of the Company except upon the three-quarters (3/4) consent of the remaining Members. Before being recognized, any new Member shall agree in writing to be bound by the terms of this Agreement and the Articles of Organization.

7.3 **Encumbrances.** The Membership Units of a Member shall not be pledged, hypothecated, subjected to a security interest, or otherwise encumbered except upon the unanimous consent of the Members. Notwithstanding the preceding sentence, no Person who acquires any Membership Interest as a result of such an encumbrance shall become a Member except upon the unanimous consent of the Members.

**7.4 Purchase of Certain Membership Units.** If at any time a Withdrawal Event occurs with respect to any Member (the "Withdrawing Member") and three-quarters (3/4) of the remaining Members consent to continue the business of the Company as provided herein, the Company and/or one or more Members shall purchase from the Withdrawing Member, and the Withdrawing Member shall sell to the Company or a Member(s), all or part of the Membership Units owned by the Withdrawing Member for a purchase price equal to the Agreement Purchase Price (defined below). "Withdrawing Member" shall include the Withdrawing Member's personal representative. For purposes hereof, the following terms apply:

(a) A "Withdrawal Event" shall occur with respect to a Member for any of the reasons listed as triggering a Buy-Out in Section 7.2.

(b) For any sale, the Company shall have the first right, at its sole option, to purchase all (or any part) of the offered Units (Right of First Refusal, "ROFR"). The exercise or non-exercise of the Company's right to purchase all the offered Units shall be determined by a vote of Members holding not less than three-quarters (3/4) of the outstanding Membership Units entitled to vote (including the Selling Member). If the Company fails to exercise its option within 20 days of receiving a bona fide offer, then the Members, beginning with the longest-standing Members and proceeding in the order that a person became a Member, shall have the opportunity to purchase all or part of the offered Units.

(c) The payment of the purchase price can be made in whole or over an up to five-year time period payable on a monthly or quarterly basis pursuant to the terms laid out in the attached example promissory note (**Exhibit B**) at the sole discretion of the Purchaser.

(d) To effectuate any buy-out referenced in this Article, the parties agree that the Company may purchase one or more "key man" life insurance policies upon the life of a Member. The Company shall own and shall have the absolute right to name the beneficiary or beneficiaries of said policy. Members agree to cooperate fully with the Company in securing said policy, including, but not limited to submitting themselves to any physical examination which may be required at such reasonable times and places as Company shall specify.

**7.5 Agreement Purchase Price.**

(a) The "Agreement Purchase Price" for any purchase pursuant to Section 7.5 hereof shall be the purchase price for the amount of the Membership Units being purchased from the Withdrawing Member. The Agreement Purchase Price shall be determined as follows:

i. The price to be paid for the ownership shares shall be determined as of the Valuation Date, which shall be the last day of the month in which the Units are placed for sale.

ii. If the sale is required by Section 7.2(b) (Forced Buy-out), then the Units shall be valued using a Book Value Method (the value of the Company is derived from the Company's regularly maintained financial books) or the amount originally paid for the Units by the Withdrawing Member, whichever is higher.

iii. If the sale arises under Section 7.2(a) (Optional Buy-Out), unless agreed otherwise the Units shall be valued using a Fair Market Value Method. The Fair Market Value shall be determined by using the following calculation: Prior 12 Months Net Operating Income (NOI) x multiplier of 2.5 + assets – liabilities (amounts shall be derived from the Company's regularly maintained financial books). In addition, the Company may deduct from the calculation any income attributable to known substantial losses that have occurred in the last six months or are reasonably expected to occur within 90 days of the Buy-Out. Substantial losses shall include any government shutdowns of businesses (e.g.-

pandemic), loss of clients and/or contracts that provide $30,000 or more in annual revenue or any similar type event.

Notwithstanding anything herein except the ROFR limitations found in Section 7.5(b), the Members may agree to make purchases of all or part of another Member's Units by Agreement between the Members who are a party to the purchase or sale of their interest.

**7.6 <u>Sale of the Company</u>.**

(a) **General Requirement**. The Company, or any of its assets, may only be sold with the approval of three-quarters (3/4) of the Members holding the outstanding Membership Units entitled to vote at the time of sale.

(b) **Drag Along Rights**. Members holding three-quarters of the outstanding Units may at their option at any time require the other Members ("Minority Members") to sell all of their Units to a buyer in a single transaction, if the aggregate Fair Market Value of the consideration in such transaction to be received by each Minority Member is greater than or equal to the Deemed Fair Market Value (Section 7.6(a)(iii)) of all of the Units held by each such Minority Member at the time of such transaction. For this reason, any Member or Members holding twenty-five percent (25%) or more of the outstanding Class A Units are authorized to market the Company for sale (with prior notice to the Managers).

(c) **Forced Purchase**. If the Company receives a bona fide offer of purchase from an outside investor and a Minority Member or Members holding at least twenty-five percent (25%) of the outstanding Class A Units desires to sell the Company to the outside investor but the majority of the Members will not, then the Minority Member can require that the Company and/or the majority of Members buy out the Minority Member(s) Units for the price offered per Unit by the potential outside buyer. Any such sale shall take place in accordance with Section 7.5(b) and (c) above.

**7.7** **<u>Employee Options</u>.** The Company may offer employees the option to purchase or earn Units in the Company under terms and conditions determined by the Members, as long as such Agreements comply with the terms of this Article VII and any such employees agree to be bound by the latest Articles of Organization and Operating Agreement.

## ARTICLE VIII
## LIMITED LIABILITY

Except as otherwise provided by law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligation and liabilities of the Company.

## ARTICLE IX
## TERMINATION

**9.1** **<u>Conclusion of Affairs</u>.** In the event of the dissolution of the Company for any reason, the Members shall proceed promptly to wind up the affairs of and liquidate the Company. Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution. The Members shall have reasonable discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market and general financial and economic conditions and consistent with its fiduciary obligations to the Members.

**9.2** **Termination.** Within a reasonable time following the completion of the liquidation of the Company, the Members shall complete a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement. Upon completion of the liquidation of the Company and the distribution of all Company assets, the Company shall terminate, and the Members shall have the authority to execute and file with the State Corporation Commission a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

**10.1** **Applicable Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to principles of conflicts of law.

**10.2** **Other Parties.** The Agreements, covenants and representations contained herein are for the benefit of the parties hereto and are not for the benefit of any third parties including, without limitation, any creditors of the Company. This Operating Agreement constitutes the full and entire understanding and Agreement of the Members and supersedes any and all prior agreements, arrangements and understandings relating to the subject matters hereof.

**10.3** **Effective Date.** This Operating Agreement shall become effective upon its signing.

**10.4** **Venue**. The parties agree to settle all disputes arising in connection with this Agreement through good faith consultation. In the event no agreement can be reached on any dispute arising out of or related to this Agreement or the Company within fifteen (15) days after notification in writing by either Party to the other concerning such dispute, the dispute shall be brought in the courts having jurisdiction over Loudoun County, Virginia. The governing law for all such disputes shall be the laws of the Commonwealth of Virginia without respect to any governing conflicts of law requirements. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

**10.5** **Amendment.** No amendment or modification of this Operating Agreement shall be effective except upon the written consent of the Members holding at least three-fourths (3/4) of the Company's ownership interest.

Signature Page follow

**IN WITNESS WHEREOF**, this Operating Agreement is hereby executed by Members holding more than three-quarters (3/4) of the Class A Units entitled to vote and is effective as this 29th day of October, 2020

Valeria Gunkova, President and Manager Member

Harry D Kamin

Harry D. Kamin, Member

KIRK DAVID HILLIARD
NOTARY PUBLIC
REG. #7839539
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MARCH 31, 2023

Kirk Hilliard

I witnessed the above signatures in Loudoun County Virginia on 10-29-2020

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**BNG GROUP LLC**

**EXHIBIT A**

**LIST OF CLASS "A" MEMBERS, CAPITAL AND PERCENTAGE INTERESTS**

| Name | Contributions | Membership Units | % of Outstanding Units |
|---|---|---|---|
| Valerie Gunkova | $720,000 and services rendered | 80 | 80% |
| Harry D. Kamin | $180,000 | 20 | 20% |

**AMENDED AND RESTATED
OPERATING AGREEMENT
OF
BNG GROUP LLC**

**EXHIBIT B**
**LIST OF CLASS "B" MEMBERS, CAPITAL AND PERCENTAGE INTERESTS**

| Name | Contributions | Membership Units | % of Outstanding Units |
|---|---|---|---|
| Valerie Gunkova | $720,000 and services rendered | 50 | 50% |
| Harry D. Kamin | $180,000 | 50 | 50% |

**EXHIBIT C**

$________________

**PROMISSORY NOTE**

______________, Virginia
________________, 20__

**FOR VALUE RECEIVED**, the undersigned, ________________ (hereinafter referred to as "Maker"), hereby promises to pay to ____________ ("Payee"), at ____________________________, _____, or at such other place as the holder hereof may from time to time designate in writing, the principal sum of _____________ Dollars ($_____), in sixty (60) equal installments beginning on the ____ day of ____________, 20__ and on the same day of each month thereafter until, together with interest from and after the date hereof, with interest, determined at the same time as each installment of principal hereunder is due, equal to the applicable federal rate for the period, as provided for in Section 1274 of Internal Revenue Code of 1986 (as amended) (the "IRC") or, if such rate no longer exists, such other comparable rate provided for in the IRC, for a debt of such period to maturity computed on the unpaid principal balance.

Maker shall have the right to prepay in part or in full, without penalty, this promissory note (together with accrued interest to the date of prepayment on the amount of principal thus prepaid) at any time or times in the inverse order of maturity.

In the event of any failure to pay when due any installment of interest hereunder or any installment of the principal sum hereof, and the continuance of such failure to pay for a period of ten days after written notice (by certified or registered mail or by hand delivery) of such failure, this promissory note shall be considered to be in default and the entire unpaid principal sum hereof, together with accrued interest, shall at the option of the holder hereof become immediately due and payable in full.

Except as set forth herein, Maker waives presentment, demand and presentation for payment, notice of nonpayment and dishonor, protest and notice of protest and expressly agrees that this promissory note or any payment hereunder may be extended from time to time without in any way affecting the liability of Maker.

The validity and construction of this promissory note and all matters pertaining hereto are to be determined in accordance with the laws of the Commonwealth of Virginia.

**IN WITNESS WHEREOF**, Maker, by its appropriate officers thereunto duly authorized, has executed this promissory note and affixed its corporate seal on this ____ day of _________, 20__.

ATTEST:

______________________________,
A Virginia Limited Liability Company

By______________________
, Member

By________________________
, Member

[Corporate Seal]

[WITNESS:

______________________

EXHIBIT
V

# SECOND AMENDMENT TO OPERATING AGREEMENT OF BNG GROUP LLC.

This Second Amendment (the "Amendment") to Operating Agreement of BNG Group LLC, dated as of September 15, 2019, was made by the Company's members on October 29, 2020. Capitalized terms used but not defined herein shall have the meanings outlined in the LLC Agreement.

WHEREAS, Valeria Gunkova, existing Manager Member of BNG Group LLC ("Manager member"), hold Eighty Percent (80) of Class A Units of BNG Group LLC, and Harry D. Kamin existing Member of BNG Group LLC (the "Member") own Twenty percent (20%) of Class A Units of BNG Group LLC;

WHEREAS, BNG Group LLC entered in an agreement with Juditial Property Drive Holding LLC to purchases Property at 2 Pidgeon Hill Dr, Sterling VA 20165 ( "Property");

WHEREAS, BNG Group LLC intends to enter into a Term Loan Agreement with Atlantic Union Bank (" Loan");

WHEREAS, BNG Group LLC desire to issue Class B Units of the Company for distribution of net income of Real Estate Property operation and proceeds arise from net Sale of such Property,

NOW, THEREFORE, in consideration of the mutual covenants and Membership interest, the undersigned agrees to amend the BNG Group LLC Agreement as follows::

1. Capitalized terms not otherwise defined in this Amendment shall have the meaning given such terms in the Operating Agreement;
2. Transfer of Membership Interest
   The Manager Member and Member hereby expressly waive the notice requirement as outlined in Sections:

   a. 6.2.1 and 6.3.1 of the Operating Agreement. Further, the existing members expressly waive the purchase option requirements outlined in Sections 6.2.2 and 6.3.2 of the Operating Agreement.

3. The Manager Member and Member hereby expressly consent to issue fifty percent (50%) of Class B membership interests of the Company to Manager Member and Fifty percent (50%) of Class B membership interests of the Company to Member for the following terms and on the conditions:

   a. As of the Effective Date of this Second Amendment, the BNG Group LLC Operating Agreement shall be amended to add Exhibit C, "List of Class B Members and Percentage Interests," to read as set forth below and as so amended, shall constitute Exhibit C to the Operating Agreement.

   b. The Definition of "Class" in the Operating Agreement shall be modified to state: "Class means a group of Members that comprises Class A and Class B."

   c. Section 3 of the Operating Agreement shall also be modified to add the following section: "3.1.1 Class B members. The Company shall have Class B Members with rights and responsibilities as decided by the Members. For Class B members, the Company name, present mailing address, numbers of Units, and Percentage of each Member's ownership shall be as set forth on Exhibit "C" attached."

Section 4 of the Operating Agreement is modified to add the followingsection:

d. 4.1.3 <u>Cash Available for Distribution</u>. The Members of Class A shall determine whether all or a portion of the Cash Flow, if any, for each taxable year of the Real Estate Property owned by Company shall be distributed to the Class B Members. Any distribution of Cash Flow to the Class B Members Members shall be in proportion to the class B Members' percentages ownership. To the extent practicable, all distributions made to Class B Members shall be made

in a manner for the best interest of members and the Company.

4. The effective date of this Second Amendment shall be the close of business on the Effective Date.

5. This Amendment may be executed in one or more counterparts, all of which shall be considered the same Amendment agreement. It shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (including facsimile, email, or mail ) to the other parties hereto.

6. Except as amended hereby, the LLC Agreement shall remain in full force and effect as previously executed, and each Member hereby ratifies the LLC Agreement as amended hereby.

IN WITNESS WHEREOF, the undersigned Members, who are all of the Company members, intending to be legally bound, have caused this Second Amendment to be duly executed and delivered as of the date first set forth above.

*[Signature page follows.]*

Signature Page to Second Amendment of
Operating Agreement
BNG Group LLC

**IN WITNESS WHEREOF, the undersigned Members, who are all of the Company members, intending to be legally bound, have caused this Amendment to be duly executed and delivered as of the date Second set forth above.**

BNG GROUP, LLC.

By: [signature]
Name: Valeria Gunkova
Title: President

MANAGER MEMBER

By: [signature]
Name: Valeria Gunkova

MEMBER

By: Harry D Kamin
Name: Harry D Kamin
Title: Member

Witness: [signature] (Sign)
Witness Name: FARRUKH KUCHAKOU
Address: 9517 DRAYCOTT CT
BURKE, VA 22015

KIRK DAVID HILLIARD
NOTARY PUBLIC
REG. #7839539
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MARCH 31, 2023

I witnessed the above signatures in Loudoun County Virginia on 10-29-2020

[signature]
Kirk Hilliard

**BNG Group LLC**
**Limited Liability Company**
**Operating Agreement**

**EXHIBIT "C"**
**LIST OF CLASS B MEMBERS, CAPITAL AND PERCENTAGE INTERESTS**

| Name and Address | Percentage | Units | Class |
|---|---|---|---|
| VALERIA V GUNKOVA | 50 % | 50 | B |
| STERLING INVESTMENT LLC | 50% | 50 | B |

**THIS CONSULTING, SUCCESS FEE AND NON-CIRCUMVENTION / NON-DISCLOSURE AGREEMENT ("Agreement")**

is made effective this 30th day of October 2020 by and between the following

parties: Collectively Referred to as the "**Consultant or Consultants**"
**Scott Schultz – CEO / Matthew Harris – Executive Principle**
**Stryker Services, LLC** (its affiliates and/or subsidiaries)
3036 Waterside Circle,
Boynton Beach, FL 33435

Collectively Referred to as the "**Client or Client's**"

**Client Personal Name and Title:** Harry Kamin, Manager
**Business Legal Name including any DBA:** BNG Group, LLC
**Business Address:** 2 Pidgeon Hill Drive, Sterling, Virginia 20165

1. **Agreement**. The Client agrees to retain the Consultant, and the Consultant agrees to work with the Client to present a single or several funding opportunities to the Client that meets the Client's financial requests and funding/investment criteria. Client acknowledges that Consultant is not acting as an attorney, realtor, tax advisor, surveyor, and/or appraiser in this matter and the Client has been advised to seek separate counsel from legal, tax advisors, surveyors, appraiser's, realtors and/or other third parties for advice on these matters. Consultant will not obtain or order products or services from outside sources (e.g. surveys, soil tests, title reports, inspections) without the prior written consent of Client. Client agrees that Client is responsible to pay for all fees & costs of ordered products and or services so approved and obtained by said Parties.

   Consultant agrees to use reasonable efforts to assist in securing the financing; however, Consultant does not guarantee the financing can or will be obtained. Client agrees that Consultant will not be liable to Client for any losses or damages whatsoever in the event funding is not secured.

   Client agrees to provide all documentation necessary in a timely manner to Consultant for all lending partners considering funding to the Client. Client understands that failure to provide said documentation in a timely manner to Consultant prohibits Consultant from providing it's services to Client. As such, Consultant reserves the right to discontinue working with Client if Client fails to provide this documentation.

2. **Non-Circumvention.** Neither Party (including Affiliates of such Party) will attempt, directly or indirectly, to contact the other Parties' Confidential Sources, or transaction Investors on matters of and to the Transaction, or contact or negotiate with a Confidential Source or make use of any Confidential Information of the other Party, except through such other Party or with the express written consent of such other Party as to each such contact. The Parties or their Affiliates shall not contact, deal with, or otherwise become involved in any Transaction with any corporation, partnership, individual, Investors, and trust or lending institutions that have been introduced by the other Party without the permission of the introducing Party. Any violation of this covenant shall be deemed an attempt to circumvent such other Party, and the Party so violating this covenant shall be liable for damages in favor of the circumvented Party.

3. **Pre-Existing Relationship**. Both the Consultant and the Client recognize and acknowledge that the Client may have had or currently has a relationship, business or personal, formal or informal, of whatever nature, with the Lender(s) or Investor(s) that have been referred to the Client by the Consultant. Unless a prior or existing Client relationship is disclosed and documented in writing to Consultant upon or prior to execution of this agreement, the Client agrees that it shall strictly adhere to and abide by all of the terms and conditions of this Agreement.



EXHIBIT
W